McLEOD v. TARRANT.

1. DEEDS—HABENDUM.—Where a deed, in its premises, grants land to A, *habendum* to A and B, their heirs and assigns forever, followed by a general warranty to A and B, their heirs and assigns, the intention to grant the estate to A and B is manifested, and the courts will effectuate such intention.

2. ESTATES BY ENTIRETY—CIRCUIT DECREE.—And A and B being husband and wife, they took as tenants by entireties, and the land vested in fee in the surviving wife on the death of the husband. The Circuit Judge erred in failing so to decide.

Mr. JUSTICE McGOWAN concurred in the result and Mr. CHIEF JUSTICE McIVER dissented.

Before HUDSON, J., Greenville, April, 1892.

This was an action for partition by the heirs at law of A. B. McGilvary, who died in 1863, against the devisees of Nancy McGilvary, who died in 1891. The Circuit decree was as follows:

This cause came to trial before me upon exceptions to the master's report. The facts are as follows: Stephen Holloway, late of the county and State aforesaid, departed this life in 1844, leaving a will by which he devised the land, sought in this action to be partitioned, to his wife, Nancy Holloway, for life; remainder, one-half in fee to said wife, and the other one-half to his daughter, Mary Mariah; in the event that the said Mary Mariah should die, leaving no bodily heirs, then over to testator's surviving child or children; but in the event there should be none such, then over to Stephen H. Wood. Testator left surviving him his widow and the said only child, the latter dying in 1849, unmarried. There being thus no bodily heirs of her, or other surviving children of testator, the said Stephen H. Wood became entitled to the one-half devised to the said Mary Mariah.

In the winter of 1849, the widow, Nancy Holloway, intermarried with one A. B. McGilvary. Subsequently, in 1850, Stephen H. Wood conveyed by deed his interest in the land referred to to the said A. B. McGilvary. The point at issue in this case is

the construction of that deed.   The original deed is in evidence before me.   By the premises thereof the grant is to A. B. Mc-Gilvary, and the consideration is stated to be "one hundred dollars, paid by A. B. McGilvary."   The *habendum* and the warranty clauses of the deed are peculiar, however, and are in these words: "To have and to hold, all and singular the premises before mentioned unto the said A. B. McGilvary and Nancy McGilvary (late Nancy Holloway), their heirs and assigns forever.   And I do hereby bind myself, my heirs, executors and administrators, to warrant and forever defend all and singular the said premises unto the said A. B. McGilvary and Nancy McGilvary (late Nancy Holloway), their heirs and assigns, against me and my heirs and against any person whomsoever lawfully claiming the same or any part thereof."   The said Nancy McGilvary died in June, 1891, leaving a will, wherein she devised all her interest in the land referred to to the defendant.

It is claimed by the defendant that the said deed created an estate by entirety, and that, the wife having survived, the whole estate became vested in her.   In that event, the plaintiffs, as heirs at law of A. B. McGilvary, who became deceased as far back as 1865, would have no interest in this land.   Such were the conclusions of the master, but I cannot concur therein. I agree with the master that there is no repugnancy between the premises and the *habendum* of the deed such as to render void the *habendum*.   The effect of the *habendum*, however, would be to vest the fee in A. B. McGilvary.   In so far only as that clause would give any estate to Nancy McGilvary, is it invalid? See Mart. Conv., 92; 3 Wash. Real Prop., 468; 3 Cruise Real Prop.,432, and cases therein cited.   I, therefore, must reverse the master in his conclusion that there was an estate by entirety, and must sustain the plaintiffs' exceptions upon this point. The fact that it appears, from the evidence taken before the master, that the purchase money for this land was probably procured by A. B. McGilvary from the sale of certain personalty belonging to his wife, cannot, in my opinion, affect the construction I have given to this deed.   This act on the part of the husband would be only a reduction to possession of his

wife's personalty, and I find, as a matter of fact, that it was such. The defendant must also account for the rent and profits of this tract since he has been in possession of the same, subsequent to the death of Nancy McGilvary. * * * The master's report is, therefore, reversed to the extent rendered necessary by this decree; otherwise confirmed. It is ordered, that a writ of partition be issued, &c.

*Messrs. Cothran, Wells, Ansel & Cothran,* for appellants.

*Messrs. Benet, McCullough & Parker,* contra.

May 23, 1893. The opinion of the court was delivered by

MR. JUSTICE POPE. There are only two questions raised by this appeal. *First:* Whether the *habendum* in a deed, whereby an estate in land is provided for a man and his wife and their heirs and assigns, can be so construed to enlarge the *premises* in such deed, wherein the husband alone is granted an estate in such land, as that the estate in such land is vested in both husband and wife. *Second:* If so, and the wife survive the husband, whether she becomes seized of such land as an estate in entirety. The Circuit Judge, by his decree, answered the first question in the negative, thus rendering it unnecessary, in his judgment, to answer the second question.

We are not satisfied with that conclusion for the following reasons: The technical meaning of the *premises* in a deed is that part of the deed that sets forth the number and names of the parties; recitals necessary to explain the transaction, the consideration; and the certainty of the grantor, grantee, and thing granted. 2 Bl. Com., 241. This is the object of the *premises.* In the case at bar, the *premises* provide an estate for life to the husband (*Varn* v. *Varn,* 32 S. C., 77), the reason being that no words of inheritance are coupled with the estate vested in the grantee thereby. However, in the case at bar, in the *habendum* of the deed, the grantor uses words of inheritance whereby the estate for life, set out in the *premises,* is enlarged to an estate in fee in the husband. Why is this allowed? Is it not because the intention of the grantor is thus made clear to vest an estate in fee

rather than a life estate? Thus the cardinal principle governing the construction of deeds is made to appear, viz: that the intention of the grantor, if consistent with law, must govern. This principle is recognized and enforced by this court. *Chancellor* v. *Windham*, 1 Rich., 161; *McCown* v. *King*, 26 S. C., 233; *Mellichamp* v. *Mellichamp*, 28 S. C., 125; *Fuller* v. *Missroon*, 35 S. C., 314.

But, it may be said, granted that the estate in land of the grantee in the *premises* of a deed may be enlarged by the *habendum*, it does not follow that a person named for the first time in the *habendum*, and not so named in the premises, can be admitted to be a grantee under such deed. Why should this be so? If no name at all appears in the *premises* as the grantee, but such name first appears in the *habendum*, the courts effectuate the intention of the grantor by making the grantee named in the *habendum* the true grantee under the deed. 3 Wash. R. P., 319; *Perry* v. *Bellinger*, 44 Maine, 416. All these matters are governed by the ascertainment of the *intention* of the grantor. This court, in the case of *Kibler* v. *Luther*, 18 S. C., 606, held, in effect, that when the concluding parts of a *warranty* in a deed for land imposed a duty, or a condition, for the first time expressed in the whole deed, it was incumbent upon the court to give effect to such stipulations by the grantor. Why? Because thereby the grantor evinced his intention for his conveyance to so operate. "The office of the *habendum* in a deed is properly to determine what estate or interest is granted by the deed." 2 Blackstone, 241. Applying these well established and just principles to the case at bar, and we fail to see why the intention of the grantor that the wife should be a grantee, along with the husband, of the estate in fee he had conveyed by his deed, should not be enforced. How else can the words of this deed in the *habendum*—"To have and to hold all and singular the said premises before mentioned unto the said A. B. McGilvary and Nancy McGilvary (late Nancy Holloway), their heirs and assigns forever. And I do hereby bind myself, my heirs, executors and administrators, to warrant and forever defend all and singular the said premises unto

the said A. B. McGilvary and Nancy McGilvary (late Nancy Holloway), their heirs and assigns,'' &c.—be construed.

The second question has been already decided by our courts. In a deed whereby lands are conveyed to husband and wife and their heirs and assigns forever, the survivor of such husband and wife is seized of such *in entirety. Bomar* v. *Mullins,* 4 Rich. Eq., 80; also, *Georgia, &c., Railway Company* v. *Scott,* by Judge McGowan, 38 S. C., 34. It follows, therefore, that the Circuit Judge, as before remarked, was in error in his decision of the first question, and was also in error in refusing to decide the second question in the affirmative.

It is the judgment of this court, that the judgment of the Circuit Court be reversed, and the complaint be dismissed.

Mr. Justice McGowan, *concurring in result.* It is very manifest that the deed of Stephen H. Wood, of January 3, 1850, was inartificially drawn, but whether we look at the property intended to be conveyed, the relation of the parties, or the terms of the paper itself, construing all of its provisions together, it seems to me there can be no doubt that the grantor meant to convey his interest in the land in question to A. B. McGilvary and his wife Nancy, not for life, but in fee. Indeed, the master found as a fact, that it was the intention of the parties that the conveyance should be made "to A. B. McGilvary and Nancy McGilvary, his wife, their heirs and assigns forever." I do not think that the *habendum* is so wholly inconsistent with or repugnant to the *premises* as to make the *habendum* void, and, therefore, I concur in the conclusion reached by Mr. Justice Pope.

Mr. Chief Justice McIver, *dissenting* [filed June 5, 1893]. As I cannot concur in the conclusion reached by the majority of this court, I propose to state very briefly the reasons for my dissent. The main question in the case is whether Mrs. McGilvary, who is not named in the premises of the deed which we are called upon to construe, as grantee, but whose name first appears in the *habendum* clause of said deed, took any estate whatever in the premises conveyed. It seems to me that it would be very unsafe for courts to infer an intention on the

part of the grantor in this case to convey an estate to Mrs. McGilvary, from the simple fact that her name appears in the *habendum* clause, for that is really the only circumstance which can be relied on to support such an inference, unless, contrary to the well settled rule, we should go outside of the terms of the deed to ascertain its true intent. It seems to me that the authorities show clearly that such an inference is not permissible.

In *Windsmore* v. *Hobart*, Hob. Rep., 313, b and c, the syllabus of the case is as follows: "Lands were demised by indenture to T. H., *habendum* to the said T. H. and three other persons *successively;* held that no one could take *immediately* but T. H., because he was the only party to the deed; and that the others could not take by way of joint remainder on account of the word *successively*, nor in succession on account of the uncertainty who should take first and who should follow." In a note to this case, doubtless the work of Mr. Justice Williams, the editor of the first American edition, I find that, in speaking of the office of a *habendum* in a deed, he uses this language: "Its general office is to limit the certainty of the estate granted. Therefore, no person can take an *immediate* estate by the *habendum* of a deed, where he is not named in the premises; for it is by the premises that the thing is really granted. A stranger to the deed may take by way of remainder, but he cannot take any present estate in possession. Co. Litt., 231 a. If no name whatever be mentioned in the premises, then a person named in the *habendum* may take a present estate; but if the thing granted be only in the *habendum* and not in the premises, the deed will not pass it. Shep. Touch., 75. A use may be declared in the *habendum* to a person to whom no estate is granted in the premises. 13 Co., 54, *Sammes' Case;* 3 East, 115, *Spyve* v. *Topham*."

*Brooks* v. *Brooks*, Cro. Jac., 434. The syllabus is as follows: "If a copyholder surrender his estate generally, without saying to whose use it is made, and the lord regrant it to the surrenderer, *habendum* to him and his wife in tail, the wife shall take, though not named in the premises." The reason given by the court for this decision, in the body of the case, which is very brief, is thus stated: "for the intent of the lord appears

that both should take; and there is no more granted to the husband than the wife, for there are not any words of grant to the husband but *cepit de domino, cui dominus concessit seisuian,* but all the words of grant and limitation are in the *habendum;* and in many manors there are no other forms of grant or limitation." *Note:* The report does not show the terms of the conveyance further than as above stated, and it would seem that the decision really rests upon either of the two apparant exceptions to the general rule mentioned in the note to *Windsmore* v. *Hobart,* above quoted: 1st. That where no person is named in the premises, the persons named in the *habendum* may take, or 2d. That a use may be declared to the wife, who is only named in the *habendum.*

*Greenwood* v. *Tyber,* Cro. Jac., 564, was a case in which the third and principal point, as it is said in the report of the case, was in regard to the indenture made between Long and wife, of the first part, and Fisher, of the second part, whereby the demise was to Fisher and wife and to Joan, their daughter, *ut supradictum est,* the wife and daughter not being parties to the indenture; and the question was whether it was a good lease to the wife and daughter, by way of remainder, the one after the other or not, *"for otherwise as joint tenants it was agreed clearly by all, that they did not take,* not being parties to the indenture;" and it was held by the Court of King's Bench that the wife and daughter should take by way of remainder, the one after the other. That court undertook to draw a distinction between this case and that of *Windsmore* v.-*Hobart, supra* (erroneously cited as *Windsmore* v. *Hubbard*). But when a writ of error was brought before the Justices and Barons of the Exchequer, they seemed to doubt, especially on the third point, the reason of the doubt being whether the two cases could stand together, and, therefore, recommended a compromise, which was adopted. *Note*: this case is cited simply for the purpose of showing that it was agreed by all that the wife and daughter could not take except by way of remainder, for the case is really without authority, owing to the unsettled doubt expressed by the exchequer, at the hearing of the writ of error.

In *Hafner* v. *Irwin,* 4 Dev. & Bat., 433, it was held that

where the whole interest in property is conveyed to one person in the premises of the deed, but in the *habendum* is limited to another, the latter is repugnant to the former and void, and the property is vested in the grantee named in the premises, who may consequently maintain an action for it in his own name. The foregoing is a copy of the syllabus, but the case shows that the deed was to Hafner, his heirs, executors, &c., the property being all personal, and the *habendum* being in these words: "To have and to hold unto the said M. W. Curry, his heirs and assigns forever, in trust," &c., and the question was whether the plaintiff could maintain the action in his own name. In delivering the opinion of the court, Judge Daniel uses these words: "All the parts of a deed which precede the *habendum*, taken together, are called the premises, of which it is said, the office is rightly to name the grantor and grantee, and to comprehend the certainty of the thing granted. But though the grantee should first be named in the *habendum*, the grant to him will yet be good, *provided there was not another grantee named in the premises. Co. Litt., 26 b, note, or if there were, provided the estate given by the habendum to the new grantee was not immediate, but by way of remainder.*" *Note:* This case is not in point for the reason that the *habendum*, naming Curry as grantee, was clearly repugnant, and, therefore, void, as another person, Irwin, was named in the premises, but the case is cited merely for the language, which I have italicized, used in the opinion of the court.

The case of *Blair* v. *Osborne*, 84 N. C., 417, is directly in point, where the syllabus is as follows: "The *habendum* in a deed shall never introduce one who is a stranger to the premises, to take as grantee, but he may take by way of remainder. Therefore, a deed which, in the premises, gives a life estate to the mother grantee alone, and in the *habendum* to her and her children, operates to convey an estate for life to the mother, and an estate for life, in joint tenancy, in remainder to her children." An examination of this case will show that the deed there construed, like the deed in *McLeod* v. *Tarrant*, did not convey an estate for life to the mother in express terms, but such an estate was implied by the absence of words of in-

heritance. In the opinion, Ashe, J., uses this language: "The doctrine is laid down in Shep. Touch., 151, that 'one who is not named in the premises may nevertheless take an estate in remainder by limitation in the *habendum.*' Rolle Abr., 68. Hob., 313. In 3 Leon Cas., 60, it is said that the *habendum* shall never introduce one who is a stranger to the premises to take as grantee, but he may take by way of remainder."

One of the points decided in *Berry* v. *Billings,* 69 Am. Dec., 107 (44 Me., 416), is, that where no particular estate is mentioned in the premises, the quantity of the estate may be ascertained from the *habendum.* To same effect see Mart. on Conv., 92, where it is said: "But where no estate is mentioned in the granting clause, then the *habendum* becomes efficient to declare the intention, and it will rebut any implication which would otherwise arise from the omission in this respect in the preceding clause." In the same work, at pages 91, 92, I find the following words: "A person may take under the *habendum* who is not named as a grantee in the granting part of the deed, provided there is no repugnance between these two clauses. But when the grant is to one person, the *habendum* cannot be to him and another person to take as joint tenants or tenants in common, for in such case the *habendum* is at variance with the grant. However, a person not being a grantee may be named to take by way of remainder."

To same effect see 3 Washb. Real Prop., page 466, of the 5th edit., where it is said: "Where the grant is indefinite from its generality in respect to the estate in the lands conveyed which it is intended to create in the grantee, the *habendum* serves to define, qualify or control it. Thus a lease of land to one, *habendum* to him and his heirs, conveys a fee." And at page 468, the same author says: "If, however, the person who is to take is not named in the grant, he may be ascertained if named in the *habendum,* since there is no repugnancy between the two, and the grant alone takes effect. A stranger to the deed may take by way of remainder, though not named in the premises; but otherwise one shall not take a present interest jointly with another unless named in the premises."

From these authorities the following inferences may be

drawn: 1st. That where one person is named in the premises as the grantee, and he and another are both mentioned in the *habendum*, such other person cannot take an immediate interest, because not named in the premises, though he may take by way of remainder, or a use may be declared in his favor, provided the language of the *habendum* can be given such effect without violating any of the rules of law.    2d. That where no person is named in the premises as grantee, then resort may be had to the *habendum* to ascertain who the grantor intended to take.    3d. That where there are no words of inheritance in the premises, in which case the grantee would take only a life estate by implication, then resort may be had to the terms of the *habendum* to ascertain the quantity of the estate intended to be conveyed, and those terms may, if sufficient, rebut such implication.

Applying these principles to the case in hand, it would seem that Mrs. McGilvary could take no estate whatever under the deed in question. She is not named as grantee in the premises, and A. B. McGilvary *is* there named, and hence resort cannot be had to the *habendum* to ascertain the grantee.    If she could take at all it would be by way of remainder, or as *cestui que use*. She cannot take by way of remainder, because a remainder cannot be created by deed where the estate of the first taker is a fee. And as the estate granted by the premises to A. B. McGilvary must be enlarged into a fee by the express terms of the *habendum*, it follows that there can be no remainder. Neither can she take as *cestui que use*, for there is no language in the deed, either in the premises or the *habendum*, declaring any use.

I, therefore, concur with the Circuit Judge in his construction of the deed, and I also agree with him in the view which he has taken of the second question, for the reason which he has given. It seems to me, therefore, that the judgment of the Circuit Court should be affirmed.

Judgment reversed.

### BICKLEY v. COMMERCIAL BANK.

1. CERTIFICATE OF DEPOSIT—PAROL TESTIMONY.—A certificate acknowledging a deposit of money with "C. J. I., Manager," promising repayment of the deposit with interest, and signed "C. J. I., Manager," cannot, in action thereon against a bank of which C. J. I. was president, be shown by parol testimony to have been a deposit in such bank, there being no evidence that the president had any authority to receive deposits or had ever been designated as manager of the defendant bank, or had ever so signed himself.

2. IBID.—IBID.—A certificate of deposit promising to repay the amount stated with interest on a day certain, is more like a promissory note than a receipt, and cannot be varied by parol testimony, as receipts may.

3. IBID.—BANK PRESIDENT—CASES CRITICISED.—This case distinguished from other cases in which there was fraud or mistake, or in which the depositor had an account in the bank and paid his money over to the cashier or teller, or could not read.

4. IBID.—CAUSE OF ACTION—EVIDENCE.—While the complaint did not set out the certificate of deposit as plaintiff's cause of action, yet it was the cause of action reduced to writing, and only this writing could be received as evidence of the contract of deposit.

5. PRODUCTION OF WRITTEN PAPERS—EVIDENCE.—If a written paper is in court, it may be called for without notice being previously given to produce; and a witness may be asked as to payments of interest to her on a certificate of deposit not in suit, in contradiction of plaintiff's testimony, that the defendant bank had never paid interest on certificates of deposit.

6. DEPOSITS—PRESIDENT OF BANK.—The defence being that plaintiff's money when deposited went to the credit of the president of the bank, not as president, but as manager of another business, the judge, in charging the jury that the bank would be liable if the money went into the bank, should have added the words, "as the money of the plaintiff."

7. BANKS—OFFICERS—FRAUD.—This charge properly declared the law as to the liability of a bank for the fraud, &c., of its agents.

8. AN EXCEPTION based upon a misconception of the charge to the jury overruled.

9. CHARGING JURIES.—FACTS—The judge properly refused to charge, that if the jury believed that plaintiff's money was placed by the president of the defendant bank to his credit as manager of another business, it could not be said to have reached the bank as the money of the plaintiff, for such a charge would have trenched upon the province of the jury, and, also, have confined the issues within too narrow limits.

10. WRITTEN INSTRUMENTS.—The trial judge must construe written instruments; and as there was nothing in this certificate of deposit to indicate

28—39

any connection of the defendant bank therewith, the judge should have so charged as requested.

11. CHARGE ON FACTS.—The trial judge cannot charge the jury as to the force and effect of the testimony.

12. BANK PRESIDENTS—DEPOSITS—ONUS PROBANDI.—It would seem that the president of a bank has not, ordinarily, the right to receive deposits into his bank. And where a deposit was paid to the president, and the depositor sues the bank for its recovery, it is incumbent upon the plaintiff to show that the president had authority, express or implied, to receive the deposit, or that it was actually received by the bank as plaintiff's money.

13. NEW TRIAL—APPEAL.—The refusal of a motion for new trial on the facts is not reviewable on appeal.

Before IZLAR, J., Richland, April, 1892.

In this case, Hon. Ernest Gary, judge-elect of the Fifth Circuit, sat in the seat of Mr. Justice McGowan, who was disqualified by interest. It was an action by J. D. Bickley against Commercial Bank of Columbia, S. C., commenced in February, 1892. The judge charged the jury as follows:

It is incumbent upon the plaintiff to prove the allegations of his complaint by the preponderance of the evidence, before he can recover; the burden of the proof is upon him. Has he sustained these material allegations of his complaint by the preponderance of the evidence? This is the main and important question for your consideration and determination. If he has done so, he is entitled to a verdict at your hands for the amount of the deposit, $800, with interest at the rate of six per cent. from the date of deposit, payable semi-annually, in accordance with the terms of the contract. If, however, he has failed to satisfy you by the preponderance of the evidence, your verdict should be for the defendant.

In determining this question, you are to consider all the circumstances which have been testified to in relation to the making of the deposit, the giving of the certificate of deposit and the disposition of the money by Mr. Iredell. If the money was handed to Mr. Iredell to be deposited in the "Commercial Bank, of Columbia, S. C.," and was so deposited, or went into the custody and control of the defendant bank, the bank would be liable, notwithstanding it was not one of the duties

of the president to receive deposits, and although he was not authorized as president to receive deposits or to give certificates therefor. If the money was given to Mr. Iredell to be deposited in the co-operative association, of which Mr. Iredell was the manager, and it was so understood by the parties at the time, then the plaintiff cannot recover in this action. And this would also be the case if it was understood that Mr. Iredell was to deposit it in the old partnership bank, of which Mr. Iredell was the manager.

In passing upon the question as to whether or not the deposit was made by the plaintiff with the defendant bank, you must look to the circumstances, and ascertain, if you can, the nature of the whole transaction and the understanding and intent of the parties. If you believe from the evidence that Mr. Iredell, the president of the defendant bank, asserted, at the time the deposit was made or the money was left with him, that the certificate delivered to the plaintiff was the certificate of the bank, and that the bank would be responsible therefor, and that this assertion was made under circumstances which were, in your opinion, sufficient to give the plaintiff the right to believe that it was the acknowledgment and act of the bank of which he was then president, and that it was with that bank the money was deposited, and with which the plaintiff was then dealing; and that the plaintiff was not dealing with him individually, and the plaintiff did at the time believe that such certificate was the acknowledgment and act of the defendant bank, then I charge you that the defendant is liable therefor.

Again, I charge you, that the principal is liable to third persons for the frauds, deceits, concealments and misrepresentations of his agent in the course of his employment, although the principal didn't authorize, or justify, or participate in, or, indeed, know of such misconduct. The principal in such case holds out his agent as a person fit to be trusted, and thereby, in effect, warrants his fidelity and good conduct in all matters within the scope of his agency. If the president of a bank commits a fraud relative to a subject that does concern his duty to the bank, in dealing with strangers and other persons having business with the bank, the corporation will be liable

to such third person or persons for such acts and misdeeds of its president and agent. In passing upon this question, you are to determine the credibility of all witnesses; that is a question for you; you have heard them testify, you have seen their manner of testifying, and you are to judge of the credibility of these several witnesses, and to give such weight to their testimony as in your judgment you think it deserves. You are to reconcile all conflicts in testimony; that is peculiarly your province.

I am requested by defendant's counsel to charge you the following propositions:

1st. "That the ordinary duties of a president of a bank do not authorize him to receive deposits, and a depositor who leaves his money with the president of a bank is not entitled to recover the amount from the bank, unless it is further shown that the money was actually received by the bank to the credit of the depositor, or that the president was especially authorized to receive deposits." I say, as general law, that proposition might be true, but so far as it conflicts with what I have already charged you, I refuse it.

2d. "That if the jury believe that the Bickley money was placed by Capt. Iredell to his credit as manager of the old bank, it cannot be said to have reached the bank as the money of the plaintiff." That I refuse to charge.

3d. "That if the jury believe that the plaintiff did deposit the money with C. J. Iredell, manager, either of the old bank or of the co-operative association, he cannot recover from the bank in this action." I have charged you on that subject, and in effect charged you that.

4th. "That the bank is not responsible for money obtained by Capt. Iredell by any unusual devices, and is responsible for the acts of its president only when within the scope of his authority and in the usual course of business." I so charge you.

5th. "That there is nothing on the face of the instrument sued on in this case to show that the defendant is responsible for the amount, and the word 'manager' after his name does not of itself indicate that he was contracting for the new bank."

I refuse to charge you that, because it involves the question of fact which you are to consider and determine.

6th. "That if the jury believe that Capt. Iredell did tell the plaintiff that 'the bank' would be responsible for the money, if he understood, or should have understood, the reference to be to the old bank, the jury cannot find for the plaintiff." I refuse to charge that.

7th. "That the burden is upon the plaintiff to show that the president of the bank had the authority to receive deposits." I decline to charge that.

8th. "That solitary instances of payment of funds to another officer than the receiving teller are impotent to alter established principles." As a general principle of law, I presume that to be so.

Mr. Lyles: Perhaps it might be well to call attention upon one point in the jurors' minds, where your honor said that the bank is liable for the frauds of its president. I think your honor did not clearly enough indicate to the jury that it was only his frauds in the conduct of the business which was committed to him.

The Court: What I did say was this, as I have it written here: "Now, if the president of a bank commits a fraud relative to a subject that does concern his duty to the bank." If you come to the conclusion, from the preponderance of the evidence, that the plaintiff is entitled to recover, the form of your verdict will be, we find for the plaintiff so many dollars—which will be the amount of this deposit, with interest at the rate of six per cent. per annum, payable semi-annually, from the date of deposit up to the present time—you will say, we find for the plaintiff so much money, writing it out in words, and not in figures. If you come to the conclusion that the money was not deposited in the Commercial Bank, and the defendant was not responsible for it, why the form of your verdict will be, we find for the defendant.

The jury found a verdict for the plaintiff for $873.20.

The defendant moved on the minutes for a new trial, which being refused, it appealed on the following grounds:

1. Because the plaintiff and other witnesses were allowed to testify orally as to the alleged agreement between the plaintiff and the defendant, when it appeared that there was a written agreement between him and C. J. Iredell covering the transaction, with no latent ambiguity therein, and without any allegation in the complaint of fraud, imposition or mistake.

2. Because the plaintiff and other witnesses were allowed to testify as to the conversations with C. J. Iredell, to connect the defendant with said agreement, and to contradict the terms thereof where it was ambiguous between the parties thereto, and bore no evidence upon its face that it was made in behalf of the defendants, and there was no allegation in the complaint of fraud, imposition or mistake.

3. Because the plaintiff was allowed to testify that said Iredell told him that the defendant was responsible for the certificate produced.

4. Because the plaintiff was allowed to testify that he supposed that he was depositing his money with the defendant bank, and relied upon it for the same.

5. Because the witness, Mrs. Gibson, was allowed to testify as to the contents of a certificate which she claimed had been paid to her by the defendant, when no notice to produce the same had been given to the defendant.

6. Because defendant's motion for a non-suit was refused.

7. Because, in his charge to the jury, that "if the money was handed to Mr. Iredell to be deposited in the Commercial Bank, of Columbia, S. C., and was so deposited, and went into the custody and control of the defendant bank, the bank would be liable, notwithstanding it was not one of the duties of the president to receive deposits, etc." His honor did not qualify the charge by any addition to the effect that the bank would be liable only in case the money went into its custody or control as the money of the plaintiff.

8. Because his honor charged the jury, that if they believed "from the evidence that Mr. Iredell, the president of the defendant bank, asserted at the time the deposit was made or the money was left with him, that the certificate delivered to the plaintiff was the certificate of the bank, and that the bank

would be responssble therefor; and that this assertion was made under circumstances which would, in his opinion, give the plaintiff a right to believe that it was an acknowledgment of the bank, of which he was then president, and that it was with that bank the money was deposited, and with which the plaintiff was then dealing, and that the plaintiff was not dealing with him individually, and the plaintiff did at the time believe that such certificate was the acknowledgment and act of the defendant bank, then I charge you that the defendant is liable therefor."

9. Because his honor did not, upon the request of the defendant, qualify his charge, "that the principal is liable to third persons for the frauds, deceits, concealments and misrepresentation of his agent in the course of his employment," by the statement that it was only for the frauds of such agent in the conduct of the business committed to him.

10. Because his honor refused defendant's first request to charge, "that the ordinary duties of a president of a bank do not authorize him to receive deposits, and the depositor who leaves his money with the president of a bank is not entitled to recover the amount from the bank, unless it is further shown that the money was actually received by the bank to the credit of the depositor, or that the president was specially authorized to receive deposits.

11. Because his honor refused to charge defendant's second request, "that if the jury believe that the Bickley money was placed by Captain Iredell to his credit as manager of the old bank, it cannot be said to have reached the bank as the money of the plaintiff."

12. Because his honor refused defendant's fifth request to charge, "that there is nothing on the face of the instrument sued on in this case to show that the defendant is responsible for the amount, and the word manager after his name does not of itself indicate that he was contracting for the new bank."

13. Because his honor refused defendant's sixth request to charge, "that if the jury believe that Captain Iredell did tell the plaintiff that 'the bank' would be responsible for the money,

if he understood, or should have understood, the reference to be to the old bank, the jury cannot find for the plaintiff."

14. Because his honor refused to charge defendant's seventh request, "that the burden is upon the plaintiff to show that the president of the bank had the authority to receive deposits."

15. Because his honor refused defendant's motion for a new trial, upon the ground that the verdict was contrary to the law and the evidence.

*Messrs. Lyles & Muller*, for appellant.

*Mr. J. S. Verner*, contra.

September 4, 1893. The opinion of the court was delivered by

MR. CHIEF JUSTICE MCIVER. The action in this case was brought by the plaintiff to recover from the defendant the sum of eight hundred dollars, besides interest, alleged to have been deposited with defendant by the plaintiff. The complaint contains three paragraphs: 1st. The allegation that defendant is a corporation, duly organized under the laws of the State for the purpose of carrying on a general banking business in the city of Columbia. 2d. That on the 21st of October, 1890, the plaintiff deposited with defendant the above mentioned sum of money, which said sum defendant promised to pay to the plaintiff's order, one year after said date, with interest thereon at the rate of six per centum per annum, payable semi-annually from said date. 3d. That the said sum of money, with interest as aforesaid, is now due by plaintiff to defendant, and although plaintiff has made demand for the payment thereof, defendant refuses to pay the same. The defendant answered, admitting the allegations contained in the first paragraph, but denying each and every other allegation contained in the complaint.

For a better understanding of the questions presented by this appeal it will be well to state certain facts, as to which there seems to be no dispute. Some time in March, 1889, the defendant corporation was chartered, under the act entitled "An act to provide for and regulate the incorporation of banks in this State" (19 Stat., 212), and one C. J. Iredell was made its first president, and was such at the time of the trans-

action which forms the basis of this action. For several years previous to the incorporation of this bank, the said C. J. Iredell, in copartnership with one Levi Metz, had been conducting a private bank, under very much the same name as the defendant corporation, which was under the management of said Iredell, and he was in the habit of signing his name in the conduct of that business, "C. J. Iredell, manager." For the sake of convenience, this private bank will hereinafter be designated as the "partnership bank," while the defendant corporation will be designated as the "chartered bank." There was testimony tending to show that, prior to the organization of the chartered bank, the plaintiff had deposited money, on more than one occasion, with the partnership bank, receiving certificates of deposit signed "C. J. Iredell, manager;" and there was also testimony tending to show that after the chartered bank was organized, the partnership bank discontinued business, and Iredell opened an account on the books of the chartered bank in the name of "C. J. Iredell, manager," upon which were credited collections made for the partnership bank, and against which checks were drawn to pay claims against the partnership bank. Iredell also testified that he proposed to organize "a depositors' co-operative association," which he intended to carry on under the name of "C. J. Iredell, manager," but this scheme seems to have fallen through.

At the trial, and while the plaintiff was on the stand as a witness, a paper was introduced, of which the following is a copy:

"Columbia, S. C., October 21, '90. I hereby certify that James D. Bickley deposited with C. J. Iredell, manager, eight hundred dollars, payable to his order upon the return of this certificate properly endorsed. It is agreed that said sum of money shall remain on deposit for one year from date thereof, that interest on this amount shall be at the rate of 6% per annum, payable semi-annually." (Signed) "C. J. Iredell, Manager." Which was delivered to the plaintiff by Iredell when he got plaintiff's money. Against the objection of defendant, plaintiff was permitted to testify to the conversation which passed between Iredell and himself at the time the paper was

delivered to him, to the effect that Iredell assured him that his money would be deposited with the chartered bank, and that this paper was intended to evidence that fact. Appellant insists that this parol testimony was inadmissible, and the first four exceptions raise the question as to the admissibility of this testimony.

As is said by Mr. Justice Story in *Shankland* v. *Corporation of Washington*, 5 Peters, at page 394: "It is certainly very difficult to maintain that, in a court of law, any parol evidence is admissible substantially to change the purpose and effect of a written instrument, and to impose upon it a sense which its terms not only do not imply, but expressly repel." It is quite clear that the terms of this paper not only do not imply, but expressly repel, the idea, that the chartered bank was in any way bound thereby, or in any way referred to therein. On the contrary, the paper in express terms refers to, and purports to bind, a totally different person, for in law Iredell as manager of the partnership bank, or as manager of the Depositors' Co-Operative Association and as president of the chartered bank, are entirely distinct and different persons. So that even if it should be conceded that Iredell, as president of the chartered bank, had the power to bind the bank by such a paper as this (a concession which I am not now prepared to make), there is nothing whatever, either in the body of the paper or in its signature, to which alone we can look, which shows that he attempted or intended to exercise such a power. The rule is thus stated in 1 Greenl. Evid., sec. 275: "When parties have deliberately put their engagements into writing in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, was reduced to writing; and all oral testimony of a previous colloquium between the parties, or of conversation or declarations at the time when it was completed, or afterwards, as it would tend, in many instances, to substitute a new and different contract for the one which was really agreed upon, to the prejudice

possibly of one of the parties, is rejected." To same effect see *Falconer* v. *Garrison*, 1 McCord, 209.

It is very possible that if the parol testimony in question had been offered to show of what, or for whom, C. J. Iredell was manager, it would have been competent (inasmuch as the terms of the paper itself did not disclose that fact) under the cases of *Mechanics' Bank of Alexandria* v. *The Bank of Columbia*, 5 Wheat., 326; *Baldwin* v. *Bank of Newberry*, 1 Wall., 234; *Ligon* v. *Irvine*, 1 Rich., 502; *Dupont* v. *Mt. Pleasant Ferry Co.*, 9 Rich., 255. But here the evidence was offered for no such purpose. On the contrary, it was offered for the purpose of showing that the contract upon which the plaintiff sued was made with an entirely different person from the one named in the paper delivered to the plaintiff as evidence of said contract—the paper showing that the contract was made with C. J. Iredell, manager, while the parol testimony objected to was intended to show that it was made with the chartered bank through its president, and that, too, without the slightest evidence tending to show that the president had any authority whatever to make such a contract, or had ever, in any instance, signed his name as manager of the chartered bank, or had in any way ever been designated as such. The cases cited to show that a receipt may be explained by parol evidence, have no application, as the paper in question, an ordinary certificate of deposit, has none of the elements of a receipt, but, on the contrary, is more like an ordinary promissory note, for it is certainly an obligation to pay a specified sum of money at a time stated, with interest at a specified rate. In *Miller* v. *Austen*, 13 How., 218, a paper practically identical in form with this, was held to be a note, upon which the endorser was held liable, as in case of an ordinary note.

The respondent, however, relies strongly upon the case of *Steckel* v. *First National Bank of Allentown*, 93 Penn. St. Rep., 376, reported also in 39 Am. Rep., 758, where several cases are collated in a note. That case is not in point here, for several reasons. The opening sentence of the opinion is in these words: "The principal cause of complaint in this case is, that the learned judge of the court below withdrew from the jury

the consideration of the question of fraud, upon the ground
that there was not sufficient evidence to submit it;" and in a
subsequent part of the opinion the following language is found:
"The plaintiffs, after ascertaining the fraudulent character of
the transaction, tendered the certificate to the bank, and de-
manded the payment of the original deposit. In other words,
they rescinded the contract on the ground of fraud. If their
allegations are true, they had a right to do so, and proceed
upon the original cause of action." From this it would seem
that the action was based upon the ground of fraud, and as
fraud and mistake constitute exceptions to the general rule as
to the admissibility of parol evidence to explain or vary a
written contract, it is somewhat difficult to understand the
application of that case to the one now under consideration,
where neither fraud nor mistake is alleged.

Again, in that case the deposit was made over the counter of
the bank with the teller of the bank, in the presence of the
cashier, officers specially charged with the safe keeping and
handling the funds of the bank, while here the deposit is
claimed to have been made with the president of the bank, an
officer who does not ordinarily handle the funds of the bank,
gives no bond, and who was not shown to have had any au-
thority, either express or implied, to receive deposits, unless
such authority is incident to his office as president—a matter
which will be presently considered. Again, in that case it was
shown that the plaintiffs kept a regular account with the bank,
and were in the habit of making deposits and checking against
the same in the usual manner, while here the transaction now
in question seems to have been the first which the plaintiff
claims to have had with the chartered bank, though there is
evidence that the plaintiff had had similar transactions with
the partnership bank, through the said C. J. Iredell. The same
remarks apply, in the main, to the cases mentioned in the note
[in 39 Am. Rep., 761], the strongest of which is *Zeigler* v. *First
National Bank of Allentown*, 93 Penn. St. Rep., 393, in favor of
plaintiff's view, where it also appeared that the plaintiff, Zeig-
ler, could not read, and was, therefore, liable to be more easily
imposed upon. But the case of the *First National Bank of Al-*

*lentown* v. *Williams*, reported in the same note above referred to, seems to be more like the case in hand; and there it was held that the bank was not liable for a deposit made with its president under the circumstances there stated.

It is urged, however, that the action here is not upon the written certificate of deposit, a copy of which has been set out above, and, therefore, the principles above stated do not apply. As has been heretofore said in *Park* v. *Brooks*, 38 S. C., 300, it is never technically accurate, though quite common, to speak of an action on a note, or other instrument in writing whereby one person promises to pay money to another, for, "properly speaking, a note is never the cause of action, but it is the breach of the promise evidenced by the note which constitutes the cause of action, and the action is upon such breach, and not upon the note." So here, while it is quite true that the plaintiff does not set out the certificate of deposit in his complaint, but simply alleges the making of the deposit of a certain sum of money, together with a promise to pay the same at the time stated, and a failure on the part of the defendant to comply with such promise, yet so soon as it appeared that the contract had been reduced to writing, no other evidence than such writing could be resorted to for the purpose of showing what were the terms of the contract, in the absence of any allegation of fraud or mistake. So that the circumstances that the action does not purport to be upon the certificate of deposit, cannot affect the question. It seems to me, therefore, that in any view which may be taken of the matter, the parol evidence objected to was inadmissible; and this being so, the motion for a non-suit should have been granted, as there does not seem to be any other evidence tending to show a contract between the plaintiff and the defendant bank.

While this would be sufficient to dispose of the appeal, yet it may not be amiss to consider very briefly the other grounds of appeal. The fifth ground of appeal cannot be sustained. If the paper in question was in court at the time, no previous notice to produce it was necessary. *Reynolds* v. *Quattlebaum*, 2 Rich., 140. Moreover, the object was to con-

tradict the testimony of C. J. Iredell by showing that the defendant had paid the witness interest on deposits at the rate of six per centum, and this the witness might have proved without reference to the paper, as it was collateral to the issue on trial. The sixth ground has been disposed of by what has already been said.

As to the seventh exception, in view of the fact that the real defence was, that plaintiff's money was deposited by Iredell in the defendant bank, not to the credit of the plaintiff, but to the credit of Iredell, manager, it seems to me that the charge on this point should have been qualified as demanded by defendant's first request to charge.

The eighth ground complains of error in instructing the jury as to the effect of the view which might be taken by them of the testimony hereinbefore held to be incompetent, and under that holding the eighth ground must be sustained.

The ninth ground cannot be sustained, for the charge shows that the instructions therein referred to were sufficiently guarded.

The tenth ground is based upon a misconception of the charge. The Circuit Judge did not refuse to charge, "that the ordinary duties of the president of a bank do not authorize him to receive deposits," and in the form in which this exception is stated, it cannot be sustained.

The eleventh exception cannot be sustained, as the request upon which it was based trenched upon the province of the jury, and, moreover, confined the issue between too narrow limits.

The twelfth exception is sustained. It is the province of the judge to construe written instruments, and certainly there was nothing on the face of the certificate of deposit to indicate that the defendant bank had any connection with it.

The thirteenth exception is open to the objection, that to charge as there requested would require the judge to invade the province of the jury, by instructing them as to the force and effect of the testimony.

The fourteenth exception must be sustained. If, as the Circuit Judge intimated, correctly, as I think, that to receive deposits is not one of the duties incident to the office of a president of a bank, then to make a bank responsible for a deposit so received, the burden of proof in a given case is upon the plaintiff to take his case out of the general rule, either by showing that the president in such case had express authority to do so, or that such authority should be inferred from all the circumstances surrounding the transaction, or that the money of the depositor was actually received by the bank as his money, in either of which cases the bank would be liable. But to make it liable, it is incumbent on the plaintiff to show that the exceptional circumstances exist. It is earnestly insisted by counsel for plaintiff that it is a duty incident to the office of president to receive deposits, and, therefore, that as the deposit sued for in this case was received by the person who was, at the time, president of the defendant bank, the bank is liable even if nothing else is shown. I am not prepared to accept this doctrine. On the contrary, it seems to me that the weight of authority, as shown by the cases cited by appellant's counsel,[1] as well as of reason, is opposed to such a view. The authorities cited by the counsel for plaintiff to sustain his view rest alone upon the case of *Hazleton* v. *Union Bank*, 32 Wisc., 34, in which the point here under consideration was not really decided, though there is a remark in that case which does sustain plaintiff's view. But that case is not authoritative here, and, so far as the point under discussion here is concerned, does not seem to rest upon sound principles. In addition to this, the question as to the general authority of a president to receive deposits does not properly arise in this case, as the Circuit Judge did not distinctly pass upon this question, and what he did say seemed rather to deny such general authority on the part of the president of a bank.

The fifteenth ground, as has been frequently said, raises no question which this court can properly consider.

[1] Morse Bank., 89–91, 153, 155, 157, 207; 10 Wall., 675; 2 Am. & Eng. Enc. L., 179, note; Story Agency, §§ 114, 115; Ang. & A. Corp., §§ 298, 302; 22 Gratt., 58; 16 W. Va., 578.

It seems to me, therefore, that the judgment of the Circuit Court should be reversed, and the case remanded to that court for a new trial; and this view having been concurred in by the other members of the court, it is so adjudged.

---

### JUMPER v. COMMERCIAL BANK.

1. BANK PRESIDENT—CERTIFICATE OF DEPOSIT—EVIDENCE.—The rulings in Bickley v. Commercial Bank, next case *ante*, as to parol testimony to affect a written certificate of deposit, and the powers of a bank president to receive deposits, reaffirmed and followed.
2. EXCEPTIONS overruled where not specific, not material and too general.

Before WALLACE, J., Richland, October, 1892.

Action by Catharine Jumper against Commercial Bank of Columbia, S. C. For a proper understanding of this case, see Bickley v. Commercial Bank, next case *ante*. Verdict was for plaintiff, and defendant appealed. In this case, as in Bickley's case, Mr. Ernest Gary sat in the place of Mr. Justice McGowan.

*Messrs. Lyles & Muller*, for appellant.

*Mr. J. S. Verner*, contra.

September 4, 1893. The opinion of the court was delivered by

MR. JUSTICE GARY. This case is very similar to that of James D. Bickley against Commercial Bank of Columbia, S. C., heard at the same term of court, in which a very elaborate and exhaustive opinion has just been delivered by Mr. Chief Justice McIver. An extended statement of the facts is, therefore, unnecessary. The principles of law announced in that case are decisive of the principal exceptions in this case.

The certificates of deposit in this case, which were introduced in evidence against the objection of the appellant, are as follows:

"Interest bearing certificate with contract. Commercial Bank of Columbia, S. C. June 28th, 1890. I hereby certify that Mrs.

Catharine Jumper has deposited in the Commercial Bank of Columbia, S. C., five hundred twenty-five and 00–100 dollars, payable to her order, upon the return of this certificate properly endorsed. And it is agreed between the said Commercial Bank and any and all endorsers of this certificate, that the sum of money above mentioned shall remain on deposit in said bank for one year from date hereof. And it is further agreed between said parties, that the amount named in said certificate shall draw interest at the rate of six per centum per annum, payable semi-annually. (Signed) C. J. Iredell, manager of the Commercial Bank of Columbia, S. C., per James Iredell." The other certificate is in the same form, the only difference being as date and amount deposited.

The appellant's exceptions are as follows: 1. Because his honor allowed the plaintiff and the witness Bickley to testify as to conversations with C. J. Iredell tending to affect the written instrument sued on. 2. Because he refused to allow defendant's counsel in his cross-examination of the witness Bickley to interrogate him as to the certificates which had been held by him in the old bank, similar to the one sued on in this case. 3. Because he ruled out the testimony of the witness Iredell, taken by commission, as to the certificate stub, and as to whether the plaintiff knew where she was depositing her money. 4. Because he ruled out portions of the answers of the witness Iredell to the 11th interrogatory. 5. Because he refused defendant's motion for a non-suit. 6. Because he stated in his charge to the jury that the old partnership bank had sold its name to the defendant bank. 7. Because he charged the jury that the defendant bank had authorized Mr. Iredell to receive deposits for the new bank. 8. Because he charged the jury that the resolution of the board of directors authorizing the president to establish a savings department to be run in connection with the bank conferred upon him authority to receive deposits for the bank. 9. Because he charged the jury that if said Iredell received the deposits under authority of that resolution, the bank was responsible for its repayment. 10. Because he charged the jury that the question of the authority of said Iredell as president of the defendant bank to

receive deposits had been taken out of the scope of the general
law by the resolution of the board authorizing the establishment
of a savings department.    11.   Because he refused defendant's
1, 2, 4, 6, 8, 9, 11 and 12 requests to charge.

The first and fifth exceptions are sustained, for the reasons
announced in the case of Bickley against this defendant,
above mentioned.   The second and third exceptions are
overruled.

The fourth exception is not specific enough to be considered.
The view which the court takes of the testimony offered by the
plaintiff to vary the terms of the certificates of deposit,
shows that the errors complained of in the 6th, 7th, 8th,
9th and 10th exceptions are not material and need not be
considered.  The 11th exception is too general for consideration.

The judgment of the Circuit Court is, therefore, reversed
and the case remanded to that court for a new trial.[1]

ROBERTSON v. TILLMAN.

1. CONSTITUTIONAL LAW—STATUTES—PUBLIC DEBT.—Whenever a new debt is
contracted by the State for extraordinary expenditures, it must be created
by a statute which has passed both branches of the General Assembly by
a vote of two-thirds of the members, to be recorded by name on the jour-
nals of each house respectively (art. IX., § 7), after it has been approved
by a vote of two-thirds of the voters at a general State election (art. XVI.);
but bonds and stock issued in exchange for, or in redemption of, other
evidences of indebtedness then outstanding, creates no new debt, and may
be authorized by an act of the legislature passed as acts ordinarily are
(art. IX., § 10).   Therefore, the act of 1892 (21 Stat., 24), providing for
the redemption of the State debt which matured July 1, 1893, was valid
and constitutional, though not passed by a recorded two-thirds vote nor
authorized by a vote of the people.

2. IBID.—IBID.—IBID.—The issue and sale of the new bonds for the purpose
of redeeming the old, and the deposit of the proceeds of such sale in the
State treasury, from which it can be drawn by law only for the purpose
of paying the old debt, is not the creation of a new debt or the increase of

[1]This completes the cases of November Term, 1892.—REPORTER.

the public debt, even though necessarily for a short time the old bonds and the new are both outstanding.

3. CASES CRITICISED.—This case distinguished from the Bond Debt Cases, 12 S. C., 200, and Whaley *v.* Gaillard, 21 S. C., 560.

4. PUBLIC DEBT—INTEREST—ORDINARY EXPENDITURE.—The new bonds having been issued before the maturity of the old debt, so that a fund would be provided for the punctual payment of the old debt, the currency of interest on both series for the intervening period, did not operate as an increase of the public debt based upon an extraordinary expenditure of money, the payment of interest on the public debt being an ordinary annual expenditure.

This was an original application to this court by Edwin W. Robertson, bondholder of old debt and taxpayer, for a writ of injunction to restrain B. R. Tillman, governor, and W. T. C. Bates, state treasurer, from issuing new bonds under their contract with the purchasers.

*Messrs. Robertson & Moore,* for petitioner.

*Messrs. Townsend,* attorney general, *Inglesby & Miller* and *John N. Steele,* contra.

May 15, 1893.   The opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER.   This is an application, addressed to this court in the exercise of its original jurisdiction, instituted by the plaintiff, as a citizen and taxpayer of this State, to enjoin and restrain the defendants from issuing the bonds of this State, to the amount of five million two hundred and fifty thousand dollars, to the Baltimore Trust and Guarantee Company, under a contract between said company and the defendants, heretofore adjudged to be valid by this court, in the case of *Evans* v. *Tillman,* 38 S. C., 238, upon the ground that the act of the General Assembly purporting to authorize such issue is unconstitutional and void.   The defendants have demurred to the petition presented by the plaintiff, and thereby admit all the material allegations of fact made by the plaintiff.   So that the only question presented for our determination is purely one of law, viz: whether the act above referred to is unconstitutional.

This act is entitled "An act to provide for the redemption of that part of the State debt known as the brown consol bonds and stocks by issue of other bonds and stocks," and was duly approved by the Governor on the 22d of December, 1892. 21 Stat., 24. And it being admitted by the pleadings that said act "was not passed by a vote of two-thirds of the members of each branch of the General Assembly, recorded by yeas and nays on the journal of each house respectively," it is claimed by the plaintiff that it was not passed in conformity to the requirements of section 7, article IX., of the Constitution of this State, and has not, therefore, the force of law. That section of the Constitution reads as follows: "For the purpose of defraying extraordinary expenditures, the State may contract public debts; but such debts shall be authorized by law for some single object, to be distinctly specified therein; and no such law shall take effect until it shall have been passed by a vote of two-thirds of the members of each branch of the General Assembly, to be recorded by yeas and nays on the journal of each house respectively; and every such law shall levy a tax annually sufficient to pay the annual interest of such debt."

It is very clear that if the act in question can properly be regarded as authorizing the issue of bonds for the purpose of defraying extraordinary expenditures, it would be unconstitutional, because not passed in the mode prescribed by the above quoted section of the Constitution. The material inquiry, therefore, is, whether the act in question is to be tested by the provisions of section 7 of article IX. of the Constitution, or by the provisions of section 10 of the same article, which reads as follows: "No scrip, certificate, or other evidence of State indebtedness shall be issued, except for the redemption of stock, bonds, or other evidences of indebtedness previously issued, or for such debts as are expressly authorized in this Constitution." For while the language used in section 10 is negative in form, yet it is clearly a negative pregnant, and necessarily implies that scrip, &c., may be issued in the cases excepted from the prohibition, to wit: "for the redemption of

stock, bonds, &c., previously issued, or for such debts as are expressly authorized in this Constitution."

It seems to us very clear that these two sections of the Constitution (the seventh and tenth) relate to two entirely distinct and different matters. The former authorizes the contracting of a public debt for the purpose of obtaining money to defray extraordinary expenditures, while the latter authorizes the issue of scrip or other evidences of indebtedness for the purpose of redeeming bonds or stocks previously issued; and we think it equally clear that the bonds authorized to be issued by the act of 22d December, 1892, are intended to be, and can only be, issued for the purpose of redeeming bonds and stocks previously issued, and not for the purpose of obtaining money to defray extraordinary expenditures. The terms "extraordinary expenditures" necessarily imply new obligations or debts which had not been previously incurred, over and above the ordinary current expenses of the government, and hence it was wisely provided in the seventh section of the Constitution that every law authorizing the contracting of a new debt should distinctly state the object for which it was to be contracted, and that it should not take effect unless it was passed by a two-thirds vote, to be recorded by yeas and nays on the journal, in order that the taxpayers might be able to understand distinctly what was the purpose of contracting such debt, and who of their representatives voted for the same; and, as a further protection to the taxpayers, it was subsequently provided by the amendment of 1873, incorporated as article XVI. of the Constitution (the terms of which will be hereinafter more particularly considered), as a still further safeguard, that no new debt should be contracted without a vote of the people. But the scrip or other evidences of indebtedness authorized to be issued by section 10 of article IX. of the Constitution, being for the purpose of redeeming bonds or other evidences of indebtedness previously issued, and not for the purpose of creating any new debt, there was no necessity for providing any such safeguards as are found in section 7 of article IX. and in article XVI. of the Constitution, because the bonds issued under the authority of section 10 would be practically

nothing more than a change in the form of the evidences of debt previously contracted by proper authority.

It is further urged by the plaintiff that the act of 1892, authorizing the issue of the bonds now in question, violates art. XVI. of the Constitution, above referred to. That article reads as follows: "To the end that the public debt of South Carolina may not hereafter be increased, without the due consideration and free consent of the people of the State, the General Assembly is hereby forbidden to create any further debt or obligation, either by the loan of the credit of the State, by guaranty, endorsement or otherwise, except for the ordinary and current business of the State, without first submitting the question as to the creation of any such new debt, guaranty, endorsement or loan of its credit to the people of this State at a general State election; and unless two-thirds of the qualified voters of the State, voting on the question, shall be in favor of a further debt, guaranty, endorsement or loan of its credit, none such shall be created or made."

It is very manifest that the object of this constitutional provision was to prevent the General Assembly from creating any new debt of the State, "except for the ordinary and current business of the State," unless the mode therein prescribed shall be observed. So that the material inquiry now is whether the bonds to be issued under the authority of the act of 1892, will fix upon the State any new or additional debt. While it may be true, in one sense, that where a debtor borrows money for the purpose of paying a debt previously contracted, the bond which he gives to secure the payment of the money thus borrowed is the evidence of a new debt, from which it is argued that if the proper State authorities shall issue the bonds authorized by the act of 1892, and sell the same for the purpose of obtaining the money necessary to redeem the brown consols, a new debt will thereby be created, in violation of the provisions, as well of art. XVI. of the Constitution as of section 7 of art. IX. of the Constitution. Yet this is not only too narrow a view, but is inconsistent, not only with the general scope of the provisions of the Constitution, but also with the express provisions of section 10 of art. IX. That section, as we have

seen, necessarily implies that the General Assembly is invested with full authority to issue bonds for the redemption of bonds previously issued by proper authority, without pursuing the mode prescribed either in section 7 of art. IX. or in art. XVI. of the Constitution; and as we think that the word "redemption" as used in section 10 means not merely that a new bond may be issued in exchange, or as a substitute, for an old bond, but also that a new bond may be issued for the purpose of obtaining the money necessary to pay or redeem the old bond, it is clear that section 10 authorizes the issue of bonds for the purpose of obtaining money with which to pay bonds previously issued. Indeed, the most natural signification of the word "redemption" implies payment rather than exchange or substitution, though both modes may be resorted to. See 2 Rap. & Law. Law Dic., 1079; 20 Am. & Eng. Enc. Law, 607, 620–21, 638.

If, therefore, section 10 authorizes the issue of bonds for the purpose of raising money for the redemption of bonds previously issued by competent authority, it follows necessarily that the Constitution authorizes the employment of all the means necessary for the accomplishment of that object. And as it would be practically impossible to obtain the money necessary to redeem bonds previously issued, at their maturity, if the new bonds could not be issued until the old bonds matured, the result would be to make the State a defaulter, which certainly could not have been intended by the framers of the Constitution, and hence the language used in the Constitution must necessarily be so construed as to prevent such a result. We cannot accept the view so strongly urged by counsel for plaintiff, that if the new bonds are issued before the brown consols are all paid and cancelled, the debt of the State will be increased to the extent of such brown consols as are outstanding at the time the new bonds are issued. Such alleged increase is nominal rather than real, for when the money is received from the sale of the new bonds, and not only placed in the State Treasury, but actually appropriated to the payment of any outstanding brown consols, and its application to any other purpose whatsoever is expressly forbidden by the terms of the act in question, all outstanding brown consols are,

in effect, paid, and no longer constitute any part of the debt of the State. Any other view would render nugatory the provisions of section 10, art. IX., unless such provisions should be construed as so limiting the authority to issue bonds for the redemption of bonds previously issued as that such redemption could only be effected by an exchange, and not by a sale of the new bonds—a construction which, as we have seen, is inadmissible—for if all or any of the holders of the brown consols should decline or fail to surrender their bonds and receive in exchange the new bonds bearing a less rate of interest, the object contemplated by section 10 of art. IX. of the Constitution, and sought to be carried out by the act of 22d December, 1892, would be partially, if not wholly, defeated.

We are unable to discover anything in the *Bond Debt Cases*, 12 S. C., 200, or in the case of *Whaley* v. *Gaillard*, 21 *Id.*, 560, cited and relied upon by counsel for plaintiff, which conflicts withh the views hereinbefore presented. The question raised in the present case was not raised in either of those cases, and was not, therefore, considered or decided. The language quoted by counsel in argument from those two cases must be understood as applying only to the questions there raised, and has no application to a totally different question. In those cases the inquiry was as to the power of the General Assembly to pass an act without the required constitutional majority prescribed in section 7 of article IX. and in article XVI. of the Constitution, authorizing the issue of new bonds to redeem, by refunding or exchange, previously existing valid obligations of the State, and the decision was, that the General Assembly did have the power to pass an act, without the constitutional majority prescribed, providing for the issue of new bonds to redeem outstanding valid obligations of the State by refunding or exchange, under the provisions of section 10 of article IX. of the Constitution; but the court was not called upon to decide, and did not decide, and, as we think, did not even intimate any opinion as to whether such redemption could or could not be effected by sale as well as by exchange.

The quotation from *Whaley* v. *Gaillard*, at page 580, relied

on by counsel for plaintiff, can have no application here, for the language there used referred, in express terms, to the provisions and effect of the consolidation act of 1873, under which many bonds had been funded, some of which were ascertained to be not valid obligations of the State, and the plain meaning of what was there said is, that inasmuch as said invalid bonds never constituted any part of the debt of the State, any bonds issued under the provisions of the consolidation act of 1873, in exchange for such invalid bonds, would create a new debt, and would, therefore, be unauthorized, inasmuch as it was admitted that the consolidation act had not been passed in the mode prescribed by the Constitution for the creation of a new debt. Hence, even if the practical effect of the consolidation act, fully carried out, would be to *reduce*, and not to *increase*, the debt of the State, yet any bond issued under that act to redeem a bond which had been previously issued without competent authority, and, therefore, not constituting a valid obligation of the State, would have the effect of making that a debt of the State which had never been so before— would create a new debt—and would, therefore, be invalid, because the act authorizing its issue had not been passed in the only mode by which an act authorizing the creation of a new debt could constitutionally be passed. But here the act in question authorizes the issue of new bonds for the redemption of the brown consols, all of which have heretofore been ascertained to be valid and unquestionable obligations of the State, and hence the question considered in the case of *Whaley* v. *Gaillard*, just adverted to, cannot arise.

Finally, it is urged that the provision in the act of 22d December, 1892, authorizing the issue of new bonds, bearing interest at the rate of 4½ % per annum, from the date of their issue, would have, and has had, the effect (under the contract made for the sale of the new bonds which has received the sanction of this court in the case of *Evans* v. *Tillman*, 38 S. C., 238,) of increasing the public debt to the extent of the interest on the new bonds from the first of January, 1893, to the first of July, 1893, during which period the interest on the brown consols is also running, and that for this

ROBERTSON *v.* TILLMAN.

reason the act in question is unconstitutional, because not passed by the required constitutional majority, and because it was not submitted to a vote of the people. It will be observed, however, that section 7 of article IX. of the Constitution only relates to debts contracted for the purpose of defraying *extraordinary expenditures*, and it does not seem to us that the *current* interest on the public debt can properly fall into that class of expenditures. On the contrary, it is one of the ordinary expenses of the government, annually recurring, which must be provided for by taxation annually. See *Bond Debt Cases*, 12 S. C., at page 288. It is clear, therefore, that section 7 has no application. It will also be observed that article XVI. of the Constitution, which was manifestly adopted for the purpose of throwing additional safeguards around this matter of contracting a debt of the State, expressly excepts from its operation debts contracted for the ordinary expenses of the State, and, as we have seen, the current interest on the public debt properly belongs to that class of expenditures; showing that the true intention of the Constitution was not to place the same restrictions upon the power of the General Assembly to provide for the payment of the current interest on the public debt as it had been deemed proper to place upon their power to contract a debt of the State, and that it was never intended that the current interest on the public debt of the State should be treated or considered as any part of the public debt, in the sense of those terms as used in those constitutional provisions restricting the power of the General Assembly in contracting a debt of the State.

Besides, if as we have seen, section 10 of art. IX. of the Constitution confers the power to issue bonds for the redemption of bonds previously issued, either by exchange or sale, and if as we have also seen, the grant of such power carries with it the power to do what is necessary to accomplish the purpose intended, it seems to us that the General Assembly must necessarily be invested with power to make such provisions in regard to the current interest as may be found necessary to accomplish the purpose intended. Any other view would, in certain contingencies, render section 10 absolutely nugatory. For if it

should so happen, either from adverse circumstances or from a general rise in the rate of interest, that the State should find itself unable to provide for the redemption of its debt, except by increasing the rate of interest on the bonds to be issued for that purpose, then it would become impossible to accomplish the object intended by that section—the redemption of the debt previously incurred—either by sale or exchange, if the amount by which the rate of interest is increased, should be regarded as a new debt in the sense of those terms as used in the restrictive provisions of the Constitution.

We are of opinion, therefore, that in no view of the case can the objections urged against the "act to provide for the redemption of that part of the State debt known as the brown consol bonds and stocks by issue of other bonds and stocks," approved 22d of December, 1892, be sustained, and there is, therefore, no ground for the injunction prayed for.

The judgment of this court is, that the application for injunction be refused and that the petition be dismissed.

---

STATE *EX REL.* HOOVER v. TOWN COUNCIL OF CHESTER.

STATE *EX REL.* GROESCHEL & CO. v. SAME.

1. MANDAMUS—USE OF STATE'S NAME.—Whether a relator, praying a writ of mandamus to compel a town council to issue a liquor license, under the law, can use the name of the State without the consent of the Attorney General, raised, but not determined.

2. IBID.—DISCRETION—ESTOPPEL.—Whether a town council had the right to refuse a liquor license not considered; but the town council having placed their refusal on record upon the ground that they had no power to grant the license prayed for, they would seem to be estopped from now raising as an additional ground that they had the discretionary right of refusal.

3. STATUTES—JOURNALS—EVIDENCE—CASES REVERSED.—Where an original bill and an act duly ratified and approved show on their face that the bill originated in the House of Representatives, received three readings in both houses and the act was duly signed by the president of the Senate and the speaker of the House of Representatives, and approved and signed by the

Governor, and deposited with the Secretary of State, the court cannot look to the journals of the two houses to show that the bill did not originate in the lower house, did not receive three readings in both houses and was not duly ratified, the true rule being that such an act is sufficient evidence that it passed the General Assembly, and it is not competent to impeach such an act by the journals of the houses, or any other evidence, other than evidence of such prerequisites as the organization of the houses, the presence of a quorum and the record of votes upon the journals when so required by the Constitution. State *v.* Platt, 2 S. C., 150, and State *v.* Hagood, 13 *Id.*, 46, overruled.

4. IBID.—TITLE.—Under an act entitled "An act to prohibit the manufacture and sale of intoxicating liquors as a beverage within this State, except as herein provided," a provision declaring that no liquor licenses shall be granted after a date therein named, is sufficiently included in the title.

5. IBID.—CONSTITUTIONAL LAW—LIQUOR LICENSES.—Forbidding licenses to private parties to sell intoxicating liquors is within the power of the General Assembly over the regulation of the liquor traffic; and where a party asks for a mandamus to compel the granting of such a license where a statute has forbidden it, the mandamus will be refused, and thereupon other alleged unconstitutional provisions in the same statute cannot be considered.

These were original applications to this court for writs of mandamus, as stated in the opinion.

*Mr. S. P. Hamilton,* for relators.

*Mr. Townsend,* Attorney General, contra.

May 16, 1893.    The opinion of the court was delivered by

MR. JUSTICE POPE.    The relator by petition, in each of the above entitled proceedings, asks that this court will issue a mandamus to the respondent, requiring that a license shall be granted to the petitioners respectively as liquor dealers in the town of Chester, in this State, from the 2d day of January, 1893, up to and inclusive of the 31st day of December, 1893. Both petitions, being based upon facts identical in character, have been heard together. The respondent denies the right of each petitioner and traverses some of the allegations of fact. Under such circumstances, by an agreement of counsel for relators and respondent, it was referred to Thomas S. Moorman,

Esq., to take the testimony as to the facts in dispute.  The report of such testimony was made to this court.

At the hearing before us the following facts were disclosed: In 1888 (20 Stats., 140), the town council of Chester were authorized by the General Assembly of this State to grant licenses to sell spirituous and intoxicating liquors under certain restrictions and modifications.  Under the general laws of this State pertaining to such matters, no license could be given for a longer period than one year and not extending beyond the 31st day of December of any year.  On the 2d day of January, 1893, the relators, after a strict compliance with all the require-· ments of the statutes of this State as well with all the ordinances and regulations of the town of Chester, applied for a license as retail liquor dealers to begin on the 2d January, 1893, and ending on the 31st day of December, 1893.  The respondent, however, refused to grant a license beyond the 30th day of June, 1893, alleging as the basis for such action on their part that the State had passed an act, approved on the 24th day of December, 1892, whereby all licenses to be granted by any towns or cities in this State should cease and determine on the 30th day of June, 1893, and providing pains and penalties upon all persons who should disregard such legislation, and this refusal of the town of Chester with the above ground therefor was put upon the minutes of such town council.  The relators, under protest at every step, paid for and took out licenses until 30th June, 1893, but conceiving they were entitled to licenses up to 31st December, 1893, they have applied to this court, in its original jurisdiction, for the writ of mandamus to force such license from the respondents, and allege that the act of December 24, 1892, was unconstitutional on the following grounds:

1. Because if said town council (of Chester) had any discretionary power to grant or refuse licenses to sell spirituous or intoxicating liquors under the act of 1888, the said town council of Chester never exercised their discretion.

2. Because the act of 1888 and chapter LV. of the General Statutes were not repealed by "an act to prohibit the manufacture and sale of intoxicating liquors as a beverage within this State, except as herein provided," the said last named act

being approved December 24, 1892 [1]—the said last named act being void.

3. That said act never acquired the force of law in this State, because the original bill which was sent from the Senate to the House was altered and changed by Ira B. Jones, speaker of the House of Representatives, at the time or after it passed the House, and amended as he saw fit, when it appears in the journal of the House of date of 23d December, 1892, that no such changes, alterations, or amendments were ever sanctioned or ordered by the House of Representatives.

4. That the original bill substituted for the Roper bill was a bill pure and simple to raise a revenue for the State of South Carolina, and originated in the Senate, contrary to the Constitution of this State.

5. Because the original bill was one whose object was to raise a revenue for the State, and such object was not expressed in its title.

6. Because said bill, not being an amendment to the Roper bill, never received three readings in the House, never became an act, and is void.

7. Because no power was ever given to the legislature by the people of South Carolina to create for the State a monopoly in a lawful mercantile business to the exclusion of her own citizens.

8. Because the act which was enrolled and ratified by the two houses of the General Assembly and approved by the governor was not the bill passed by the two houses.

9. Because section 2 of said act violates section 3 of article III. of the Constitution wherein it clothes the governor of the State, as chairman of the board of control, with power prohibited by said section.

10. Because it was never delegated by the people of South Carolina, in the Constitution of 1868, to the State of South Carolina, to enter into a mercantile business to sell spirituous liquors, and to carry on such business to the exclusion of her own citizens.

11. That no power was ever delegated to appropriate fifty

[1] 21 Stat., 62.

thousand dollars to carry on such business by the State as given in section 18 of said act.

12. That sections 23 and 25 of said act violates the Constitution of the United States.

The attorney general of this State interposed before the hearing, denying the right of petitioners to use the name of the State, when no consent had been given to them therefor. We remark that the point raised by the attorney general is one of serious consequences to the relators, for if it should be determined that only those are entitled to the use of the State's name who have the consent of the attorney general for such purpose, our duty might terminate at an early stage, but, under the peculiar circumstances of these petitions, we have determined to waive the consideration of this objection, neither affirming nor denying the proposition of the attorney general.

Nor will we undertake to canvass the question suggested by the respondent as to the exercise of a discretion by the town council of Chester, under the law, to refuse the application of petitioners for a license. Indeed, we feel that the town council having elected to place their refusal to grant a license to the petitioners upon the ground that the act of the General Assembly of December 24th, 1892, forbade any other license than that granted by them (which ground they placed upon the minutes of the said town council), they are estopped from raising this additional ground of refusal.

We prefer to pass directly and squarely upon such questions only as relate to the claims set up by the relators to have licenses issued to them, without undertaking to consider or decide whether the act of 24th December, 1892, commonly known as the dispensary act, contains other features not applicable to these cases in conflict with the Constitution of this State; and before proceeding to the consideration of these questions, we desire to say that our judgment must be considered as to those issues and none others. A different course on our part would be extra-judicial. The relators assail the constitutionality of the act in question substantially on these grounds:

1. (*a*) That it is an act to raise revenue for the State and

hence should have originated in the House of Representatives, whereas, on the contrary, the relators allege it was first considered in the Senate. (*b*) That every act should relate to but one subject and that subject must appear in the title thereof. (*c*) That the Constitution requires that a bill before it becomes an act must be read three times on three several days in each house, whereas it is alleged that this act did not receive three readings on three several days in the House of Representatives. (*d*) That the Constitution requires that a bill which has passed each house shall be enrolled and ratified, whereas it is alleged that such bill was not so enrolled and ratified.

2. That the act is fatally defective: (*e*) Because the governor of the State is made one of the board of control as provided for in this act, in violation of the Constitution of the State. (*f*) Because the act creates a monopoly in the State in the sale of intoxicating liquors, thus violating the Constitution of the State. (*g*) Because the act in its provisions exceeds the legislative power confided by the State Constitution to the General Assembly. (*h*) Because no power is vested in the General Assembly by the Constitution to appropriate $50,000 to purchase liquors to be sold by agents of the State.

3. That this act, in sections 23 and 25, violates the Constitution of the United States.

The objections indicated as (*a*), (*c*), and (*d*) will be considered together. The original bill which has been enrolled and ratified in the Senate-house, as is evidenced by the signatures of the president of the Senate and the speaker of the House of Representatives, and also approved by the governor of the State, and duly deposited thereafter in the office of the secretary of state, shows on its face that it originated in the House of Representatives, received three readings in each house, and was thereafter duly enrolled and ratified. But it is contended by the relators that notwithstanding this due regularity of the enrolled act, yet that the journals of the two houses fail to correspond in every particular with the entries of amendments on the original bill. Thus is presented for our consideration the question that has given rise to not only much discussion in the courts of the different States of

this Union, but also a contrariety in the decisions by such courts of such question. Nor has our own State Supreme Court been free from either difficulty in its past history.

We feel that this is a proper occasion to place this court fairly and unanimously on record in this matter. There have been two decisions by this court on this subject, and both most unsatisfactory, there having been a strong dissenting opinion in each: Chief Justice Moses in the case of *The State* v. *Platt*, 2 S. C., 150, and the present Chief Justice in the case of *The State* v. *Hagood*, 13 S. C., 46. The latter thus declared (p. 64): "It is an entire mistake to suppose that this rule rests upon the idea, that any peculiar sanctity should be attached to the great seal of the State. The question to be determined in cases of this kind is one of fact: what are the terms which have been used by the legislature in a statute, not what the construction of admitted terms should be, nor whether certain requirements of the Constitution have been complied with, which are questions clearly within the scope of judicial cognizance. If an act as enrolled, signed by the officers of the two houses, with the seal of the State attached, and bearing upon its face the approval of the governor, is not to be regarded as conclusive of the terms it contains, then, indeed, is the question as to what is the written law of the land involved in the greatest uncertainty. If courts can go behind such an act and inquire whether each and every word of it has actually received the assent of the legislature, then the question very naturally occurs, how far can they go, and what kinds of evidence may be resorted to? Are the journals conclusive, or can they, as is said to have been done in one of the Illinois cases (*Turley* v. *County of Logan*, 17 Ill., 151), receive parol evidence, and in recollection of members and by the manuscript notes of the clerk amend the journals and then alter the terms of the enrolled act? If so, then rights which depend upon a statute are held by the most shifting and uncertain terms.  *  *  *  But if it should be argued that the journals are to be regarded as conclusive and that no other evidence can be received, then the question very naturally arises, why should the journals, made up, as they are, hastily, amidst the excitement and confusion incident to most

legislative bodies, by subordinate officers of the two branches of the General Assembly, be entitled to any more credit than the enrolled act reported by committees of the bodies themselves as correctly enrolled and ready for ratification and authenticated by the signatures of the presiding officers?"

This dissent of our Chief Justice was preceded in the same line by the very carefully prepared opinions as found in *Pangborn* v. *Young*, 3 Vroom, 29, and *State* v. *Swift*, 10 Nev., 176. Much satisfaction was derived by the adherents of what may be called the Illinois idea, by which the doors of inquiry are thrown wide open in assailing the absolute verity of a duly enrolled act, by the decision of the United States Supreme Court in the case of *Gardner* v. *The Collector*, 6 Wall., 499, where the court held that when it became necessary to ascertain the date of the approval by the president of an act of Congress, there being no entry of the year of such approval endorsed on the enrolled act deposited in the office of the secretary of state, it was competent to supply such needed information from the journals of the two houses. But since *Gardner* v. *The Collector* was decided, the United States Supreme Court, in a very carefully and ably prepared opinion pronounced by Mr. Justice Harlan, in *Field* v. *Clark*, 143 U. S., 649, have decided that "the signing by the speaker of the House of Representatives and by the president of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress; and when the bill thus attested receives the approval of the president, and is deposited in the department of state according to law, its authentication, as a bill that has passed Congress, is complete and unimpeachable."

In the case thus cited, care is taken to restrict the meaning of *Gardner* v. *The Collector, supra,* and, in addition, this language occurs: "The signing by the speaker of the House of Representatives and by the president of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the president, that a bill thus attested has received, in due

form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill thus attested receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable. As the president has no authority to approve a bill not passed by Congress, an enrolled act in the custody of the secretary of state, and having the official attestation of the speaker of the House of Representatives, of the president of the Senate, and of the president of the United States, carries on its face a solemn assurance by the legislative and executive departments of the government, charged, respectively, with the duty of enacting and executing the laws, that it was passed by Congress. The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed Congress, all bills authenticated in the manner stated, leaving the courts to determine, when the question properly arises, whether the act so authenticated is in conformity with the Constitution. It is admitted that an enrolled act thus authenticated is sufficient evidence of itself, nothing to the contrary appearing upon its face, that it passed Congress.

"But the contention is that it cannot be regarded as a law of the United States if the journal of either house fails to show that it passed in the precise form in which it was signed by the presiding officers of the two houses and approved by the president. It is said that under any other view it becomes possible for the speaker of the House of Representatives and the president of the Senate to impose upon the people as a law a bill that was never passed by Congress. But this possibility is too remote to be considered in the present inquiry. It suggests a deliberate conspiracy, to which the presiding officers, the committees on enrolled bills and the clerks of the two houses must necessarily be parties, all acting with a common purpose to defeat the expression of the popular will in the mode prescribed by the Constitution. Judicial action based upon such a suggestion is forbidden by the respect due to a co-ordinate branch

of the government. The evils that may result from the recognition of the principle that an enrolled act, in the custody of the secretary of state, attested by the signatures of the presiding officers of the two houses of Congress and the approval of the president, is conclusive evidence that it was passed by Congress, according to the forms of the Constitution, would be far less than those that would certainly result from a rule making the validity of congressional enactments depend upon the manner in which the journals of the respective houses are kept by the subordinate officers charged with the duty of keeping them." The views of Mr. Justice Harlan on this subject were concurred in by every member of the court. Not only so, but in the recent case of *United States* v. *Ballin,* 144 U. S., 1, *Field* v. *Clark, supra,* was approved.

We have been thus careful to reproduce the language of the two opinions in order that it may be seen how this matter of difference is gradually approaching a solution in accordance with the views we entertain. We should refer to the recent decision in Mississippi (*Ex parte Wren,* 63 Miss., 512), where Mr. Justice Campbell as the organ of the court pronounced a learned and exhaustive opinion, agreeing entirely with the views hereinbefore announced, and which overruled *Brady* v. *West,* 50 Miss., 68, which last case had been decided at variance with the views lately adopted by the Supreme Court of Mississippi. Every one admits that the English rule has unvaryingly upheld the doctrine for which we shall and do contend.

Therefore, however unpleasant it may be to reverse previous decisions of this court, still after full and mature consideration we feel it to be a duty we owe the State that the case of *The State* v. *Platt, supra,* should be and is hereby overruled, and as the case of *The State* v. *Hagood, supra,* was really decided upon the authority of Platt's case, it follows necessarily that the case of Hagood must fall when the foundation upon which it rests is taken away. We announce that the true rule is, that when an act has been duly signed by the presiding officers of the General Assembly, in open session in the senate-house, approved by the governor of the State, and duly deposited in the office of the secretary of state, it is sufficient evidence, nothing

to the contrary appearing upon its face, that it passed the General Assembly, and that it is not competent either by the journals of the two houses, or either of them, or by any other evidence, to impeach such an act. And this being so, it follows that the court is not at liberty to inquire into what the journals of the two houses may show as to the successive steps which may have been taken in the passage of the original bill. It will be observed that this conclusion by no means negatives the power of the court to inquire into those prerequisites fixed by the Constitution, and of which prerequisites the journals of the two houses are required to furnish the evidence. Such, for instance, as the organization of the two houses, the presence of a quorum, the votes of two-thirds of the members by ayes and noes to be entered on the journals in certain cases.

So far as objection (*b*) is concerned, we need say but little, for the meaning of this section of the Constitution has received repeated adjudication at the hands of this court. *Morton, Bliss & Co.* v. *Comptroller General,* 4 S. C., 430; the *Bond Debt Cases,* 12 *Id.*, 200; *Whaley* v. *Gaillard,* 21 *Id.*, 560; *Conner* v. *Railway Company,* 23 *Id.*, 434. In the last case quoted, this court quotes with approval what is said in *San Antonio* v. *Mehaffy,* 96 U. S., 315: "When an act of the legislature expresses in its title the object of the act, the title embraces and expresses any lawful means to achieve the object, thus fulfilling the constitutional injunction that every law shall embrace but one subject, and that shall be expressed in its title." Applying the principles decided by these cases to the act we are now considering, we are unable to see that it does not fully answer the requirements of this section of our Constitution.

Lastly, we consider the subdivisions (*f*), (*g*), and (*h*), and also division numbered 3. As to these several points embodied in these four objections, wherein it is claimed that the act we are now considering is in violation of certain provisions of our Constitution as well as that of the United States, the Constitution in forbidding the granting of licenses to retail only question really involved here is whether said act violates we do not see how such questions can arise in this case. The

spirituous liquors beyond the 30th day of June, 1893, and to that question we have confined our attention, and having reached the conclusion that the said act, being in effect an act to regulate the sale of spirituous liquors, the power to do which is universally recognized, it is quite clear that there is nothing unconstitutional in forbidding the granting of licenses to sell liquors except in the manner prescribed by the act. But whether the act contains other features not affecting the right of relators to the licenses claimed by them is a question that cannot properly arise in these cases, and cannot, therefore, be considered, for, as we have said above, it would be extra-judicial to do so.

It is the judgment of this court, that the prayer of each of the petitioners be denied, and the petitions for mandamus be dismissed.

---

STATE v. WELDON.

1. CRIMINAL LAW—EVIDENCE—WRITTEN PAPER.—Where a written note, purporting to have been written by A to B, proposing a robbery of a stated store, was picked up in such store the morning after its robbery, and A was afterwards heard in jail to upbraid B for not coming at the time he (A) had told him (B) to come in the note that he (A) had written to B, and B denied all knowledge of the matter, and there was no other testimony that connected either A or B with this note, the note was properly admitted as against A, but it was incompetent evidence as against B.

2. IBID.—IBID.—OTHER OFFENCES.—Where A was discharged after admitting a robbery of the prosecutor's store, and then declared that he intended to make his support without working for it, his admission of that robbery was properly received as evidence on his trial for a subsequent robbery of this same store soon thereafter.

3. IBID.—IBID.—DEAF MUTES.—Where a deaf mute is offered as a witness, there is no error in receiving his testimony through sworn interpreters, who say that they can readily understand, and make themselves understood by, this mute, even though they are not generally experts in conversation with deaf mutes.

Before HUDSON, J., Sumter, March, 1893.

This was a prosecution of Wash Weldon and Henry Prescott for housebreaking and larceny, charged to have been committed on the 20th December, 1892. The opinion states the case.

*Messrs. T. B. Fraser* and *H. L. B. Weels,* for appellants.

*Mr. Wilson,* Solicitor, contra.

May 22, 1893. The opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER. In this case the defendants were indicted and tried jointly for housebreaking and larceny, alleged to have been committed on the 20th December, 1892, by breaking open the window of the prosecutor's store and stealing therefrom sundry articles mentioned in the indictment of a value exceeding twenty dollars. The jury having found both defendants guilty, they appeal upon the following grounds: "1. Because his honor erred in admitting the note purporting to have been written by Wash Weldon to Henry Prescott, without any proof that it had been written by Wash Weldon, or received by Henry Prescott. 2. Because his honor erred in admitting testimony of a separate and distinct offence, said to have been committed by the defendant, Wash Weldon, some time before the offence charged in the indictment. 3. Because his honor erred in admitting the testimony of an uninstructed deaf mute without expert testimony as to his competency."

As to the first ground of appeal, the facts, as gathered from the "Case," appear to be as follows: On the morning after the store had been broken into, the prosecutor, D. A. Outlaw, picked up from the floor of the store a piece of paper, purporting to be a note written by the defendant Weldon to his co-defendant Prescott, dated on the 20th December, 1892 (the day on which the testimony showed the store to have been robbed), in which the former proposed to the latter to join him in robbing the store. When this note was first offered in evidence, the Circuit Judge declined to receive it, suggesting to the solicitor that he had better offer some evidence of the handwriting, but saying that he would not then make any ruling

upon the point, but would wait until further testimony was adduced. Subsequently, a fellow-prisoner with defendants testified that he heard a conversation in the jail between the two defendants, in which Weldon said to Prescott, "that if he had come when he got that note, that they could have gotten away with the goods before being caught; then answered Mr. Henry Prescott, that he did not have anything to do with the goods." The witness further stated that the note referred to "was a note that Wash Weldon said that he wrote to Henry Prescott for him to come and assist him carry off some goods." After this, and other testimony not relating to the note in question, had been adduced, the solicitor again offered the note in evidence, saying that he could not prove the handwriting, and upon objection the court ruled as follows: "I will allow 'it to be read. I will allow it read as a circumstance. It will be read as a paper found in the store the morning after the robbery." The note was then read, of which the following is a literal copy, preserving the misspelling and want of any punctuation marks:

"Mister henry prescut

"I dos want u to meett me att old Outlaw store hee is gone to belo Sumter ann we wold have itt oll our wa henry Span will go into wid uss I woul had u wid uss befour but I dint no u wuod like lt now u meet mee dar shour and we will had it all rite dount lett no body see dis. I will be dar sure Wash Weldon.

"too mister henry prescut.    December 20 1892."

While we think there was enough in the testimony to justify the admission of the note as evidence against the defendant Weldon, who was shown by the testimony to have written such a note as that offered in evidence, we are unable to discover any testimony which in any way connects the defendant Prescott with the note. On the contrary, he seems to have denied any connection with the matter when he was upbraided by the other defendant in the conversation in jail. It seems to us that it would be a dangerous doctrine to hold that simply because a note purporting to be addressed to a third person was picked up in a store on the morning after such store was robbed, it would constitute even a circumstance tending to show

that the person to whom the note purported to be addressed was implicated in the robbery; for such a doctrine would put it in the power of a malignant person to implicate the most innocent individual in a crime. It seems to us, therefore, that while the note was properly received as evidence against Weldon, it was incompetent evidence as against Prescott, in the absence of any testimony tending to connect him with the note. For this reason we think the defendant Prescott is entitled to a new trial.

Coming, then, to the second ground of appeal, it appears from the "Case" that the prosecutor when on the stand testified that, owing to the fact that his store had been previously broken into, he had taken special precautions to fasten up his store securely, as he supposed, on the day before the robbery was committed for which these defendants were indicted; but he then said nothing as to who had committed the previous robberies. Subsequently, however, he was permitted to testify, against the objection of counsel for the defendants, that the defendant Weldon admitted to the prosecutor that he had previously robbed the store, while he was in the employment of the prosecutor, for which he was discharged. While it is quite true that the general rule is that where a person is on trial for one offence, it is not competent to receive evidence tending to show that he had previously committed other offences, even of the same character, yet there are exceptions to this rule; and where the evidence tends to show that the series of offences are so connected together as practically to constitute a continuous transaction, then it is competent to receive evidence of such continuous offences. See Wharton Crim. Evid., sections 31 *et seq.; Regina* v. *Cobden*, 3 Fost. & Finl., 835; *Regina* v. *Rearden*, 4 *Id.*, 76. See, also, *State* v. *Robinson*, 35 S. C., 340. Now in view of the fact that Weldon had been discharged from the service of the prosecutor, Outlaw, on account of these previous robberies, and especially in view of the fact that he had declared "that he did not intend to work, and that if he did not make his support out of old Outlaw he would make it out of somebody else," we are not prepared to

say that the evidence objected to was incompetent as against Weldon.

The third ground of appeal cannot be sustained. In Whart. Crim. Ev., sec. 375, it is said: ''Deaf and dumb persons were formerly regarded as idiots, and, therefore, incompetent to testify; but the modern doctrine is, that if they are of sufficient understanding, and know the nature of an oath, they may give evidence, either by signs, or through an interpreter, or in writing. A deaf mute may be permitted to express himself in writing, if this be the mode in which he can be better understood, or through a sworn interpreter by whom his signs can be interpreted: Such interpretation is not hearsay, nor is it excluded by the fact that the witness can write.'' See, also, 5 Am. & Eng. Enc. Law, 121, where the rule is thus stated: ''Deaf and dumb persons may be witnesses if any person can be found who can interpret their signs to the court and jury upon oath, or if they can write and read writing, so that the questions and answers may be conveyed in writing.'' These authors seem to be well sustained by the cases which they cite. See especially *Ruston's Case,* 1 Leach Cr. Cas., 408, where a deaf mute was examined as a witness in a case of larceny, through his sister as interpreter, who had acquired the facility of communicating with the witness by signs. None of the cases, so far as we have examined, require what is called expert testimony, but all of them recognize the doctrine that any person who is able to communicate with the deaf mute by signs may be sworn as an interpreter. In this case, two witnesses were sworn as interpreters, one the prosecutor and the other a disinterested third person, both of whom testified that they, at different times, had had the deaf mute in their employment, that he was very intelligent, and that they had but little difficulty in communicating with him by signs. It seems to us clear, therefore, that there was no error in receiving the testimony of the deaf mute through the medium of an interpreter.

The judgment of this court is, that the judgment of the Circuit Court as against the defendant, Wash. Weldon, be affirmed, but as against the defendant, Henry Prescott, that it be re-

versed, and that the case be remanded to the Circuit Court for a new trial so far as said Henry Prescott is concerned.

---

## FERGUSON v. HARRIS.

1. MARRIED WOMAN'S CONTRACTS.—Where a married woman gives her note in payment for lumber used in the construction of a house on her land, she cannot avoid the payment of this note by a plea that she, as a married woman, had no power to make such a contract.
2. IBID.—AGENCY—RATIFICATION.—When Mrs. H., a married woman, employed G. & H. to build a house for her on her land, and G. & H. purchased lumber from C., which was actually used on this house, C. charging the account on his books to Mrs. H., who afterwards, under threat of the filing of a builder's lien, gave her note to C. for the amount due, Mrs. H. is liable to C. on such note.
3. IBID.—MORAL CONSIDERATION.—In this State, a written promise to pay a debt is binding on the promisor if based upon a perfect moral obligation, even though such moral obligation did not arise from a once existing but now extinguished legal obligation. *Authorities reviewed.*

Before ALDRICH, J., Greenville, November, 1892.

This was an action by Alice C. Ferguson, as administratrix of L. B. Cline, against Mary A. Harris, commenced October 20, 1891, to recover the amount of a note given May 26, 1886, and due at one day. The charge of the judge to the jury was as follows:

Gentlemen of the jury, this is an action brought by Mrs. Alice C. Ferguson, as administratrix of the estate of L. B. Cline, now dead, against Mrs. Mary A. Harris, to recover $551.38, with interest thereon at the rate of ten per cent. from the 25th of May, 1886. This note, as alleged there in the complaint, was given to the intestate. Mrs. Harris, in her answer, admits that all of the allegations in the complaint are substantially true, and her defence is, that she was, and still is, a married woman, and that at the time this note was executed, it was not with reference to a contract made with her, nor that the debt was contracted or authorized by her, and

that neither she nor her estate received any benefit from it, etc. You will read the pleadings, and you have heard the statement that the note was signed under duress; that counsel says he withdraws, only leaving it in for the purpose of evidence in the case on other branches. Ordinarily I go right on to charge what I think is the law of a case, but counsel have presented some requests to charge.

I will read the defendant's request to charge: I. "That the power of a married woman to contract is limited, and is confined to such contracts which are as to her separate estate, and relate to the same." That is true. Under the law of this State a married woman shall have power to bequeath her property as if she were unmarried, and so on. (The court here read sec. 2037 General Statutes.)

II. "That when any person endeavors to hold a married woman liable for any contract made by her, that the burden is upon such person to prove that the contract related to and concerned the separate estate of the married woman before she can be held liable upon such contract." That is correct, as I read you the law. While she has absolute power within the limits that the law gives her, outside of these limits she cannot contract.

III. "That a married woman can not be surety to her husband or any other person, nor can she assume the obligation of her husband or any other person, unless the consideration of her assuming such debt be a release of herself from some obligation binding upon her, or some other consideration having reference to her separate estate." I so charge you.

IV. "That if the jury believe, from the evidence, that the debt for which the note of Mrs. Harris was given was the debt of Gilreath & Harris, for which they were themselves liable, that Mrs. Harris is not bound by the contract, unless the consideration of her assuming the debt of Gilreath & Harris was the release by Gilreath & Harris to her of some obligation she was due them, or was some other consideration having reference to her separate estate." I so charge you.

V. "That if the jury believe, from the evidence, that the material in question was purchased by Gilreath & Harris, and

that they incurred a debt therefor, the fact that such material was used on Mrs. Harris' house could not make the note given by Mrs. Harris for this material a contract with reference to her separate estate, unless it appears that there was a release by Gilreath & Harris to her of some obligation she was due them, or unless there was some other moving consideration having reference to her separate estate.'' I so charge you.

VI. ''That the fact that Mrs. Harris got the benefit of the material can not affect the question, if the jury believe, from the evidence, that such material was purchased by Gilreath & Harris, and that they assumed payment therefor. That such fact alone, without other consideration, does not make a note given by Mrs. Harris in satisfaction of the debt of Gilreath & Harris a contract as to her separate estate.'' That I charge, subject to the modification that she might ratify contracts made for her benefit, if it appears that she did so.

VII. ''That the fact that Mr. Cline charged the material on his books to Mrs. Harris can not make the debt her own, unless it appear either that she ordered the material herself, or authorized some one to make the purchase for her.'' That I charge you, subject to what I say hereafter, that authority may have been given in the first instance, or if, after some one bought them for her, she confirmed the purchase of them.

VIII. ''That forbearance on Mr. Cline's part to issue a mechanic's or builder's supply lien for the material can not be a valid consideration of the note, or make such note a contract with reference to the separate estate of Mrs. Harris, unless it appear that Mr. Cline had a right to issue such lien.'' Well, that is correct. Now, it is necessary for me to tell you what the law is, and I can do it better by reading the act to you—it is not long. (The court here read sections 2350 and 2351 of the General Statutes.)

IX. ''That, under the facts of this case, Mr. Cline had no right to the issuance of a builder's supply lien.'' That I decline to charge, because it is a question of fact whether he had that right or not.

Now the plaintiff's requests to charge are as follows: I. ''That an agency may be either express or inferred from circumstances,

and if the jury believe from the evidence that Gilreath, Harris & Co. superintended the building of Mrs. Harris' house, that it was built by day labor, that they purchased the material for the house, and that Mrs. Harris received and retained the benefit of such services, the agency of Gilreath, Harris & Co. for Mrs. Harris is established." That I charge you, together with this—if you find all of the facts necessary to constitute an agency. Now you may contract with a person in terms to act as your agent, or you may make a contract with a man to do and perform certain things for you, and not a word be said about his being your agent, yet if the contract that you make with him really makes the man act as your representative, makes him your agent, why he in law is your agent, though perhaps the term "agency" was not used.

II. "That if the jury believe from the evidence that Gilreath, Harris & Co. were the agents of Mrs. Harris in buying material for the house, Mrs. Harris is bound as principal for all purchases made by them in the course of such agency, whether bought by Gilreath, Harris & Co. upon their own account or not." That raises a question of fact and states a proposition of law correctly. Did Gilreath & Harris undertake this work as the agents of Mrs. Harris or did they undertake it as contractors? You see the difference. If they were acting for Mrs. Harris, then they represented her. If they took it as contractors dealing with her, then Gilreath & Harris and Mrs. Harris stood at arm's length, so to speak, one dealing with the other.

III. "That where an agent purchases goods for his principal, in the course of his agency, the principal is bound, although the agent purchased in his own name, and the seller was ignorant of the agency and charged the goods to the agent personally." That is correct. The maxim of the law is that he who does by another does for himself, he who acts for another acts for himself, and if an agent in the course of his agency goes on to carry out what he is instructed to do, why the principal is bound by it.

IV. "That if the jury believe from the evidence that Mrs. Harris did not agree with Gilreath, Harris & Co. that they should build her house for a specified sum, by a certain time, in a certain way, Gilreath, Harris & Co. cannot be regarded as

independent contractors." That I refuse to charge you, because they might have made some other contract which these terms do not cover as independent contractors; they might have made an agreement not to exceed a specified sum or that it would be done in a certain time. But the idea means this: That if Gilreath & Harris had a contract with Mrs. Harris, then that contract made them independent contractors, and unless they were contractors then they must have been acting in some other way than as contractors, as stated.

V. "That if the jury believe from the evidence that Gilreath, Harris & Co. were not the agents of Mrs. Harris, but that they bought the material on their own account, and that Mrs. Harris received the benefit of the material in her house and afterwards gave her note therefor, such conduct on Mrs. Harris' part constitutes a ratification of such unauthorized act of Gilreath, Harris & Co., and she is liable on the note." That I charge you, with the modification that they not only bought this material, but used it in the building to benefit her separate estate. That request is correct, and proceeds on this theory, that a man employed as agent may employ another to carry out his transaction, that is where the agency is created in the first instance; but if a man does a certain act in the name of, or concerning another person, does it voluntarily at the time, and that person comes in and acquiesces and ratifies the conduct of this man who acts as agent, then that ratification is as complete as if it had been made in the first instance.

VI. "That a contract made by a married woman, by which she obtains building material for the construction of a dwelling house on a lot owned by her, is a contract with reference to her separate estate, and she is bound by it." That I charge you as correct; and in regard to the ratification, I hold that any contract which a married woman has the right to make in the first instance, if some one else goes forward and does what she wants done in the first instance and she ratifies that act, it is just as much hers as if she had made it.

VII. "That a married woman has the same power to ratify a contract with reference to her separate estate that she would

have had to make the original contract." I have just stated that.

VIII. "That a married woman has the power to authorize an agent to make a contract for the benefit of her separate property, and she also has the power to ratify such a contract made by one not authorized so to contract." That I charge you, pro-vided that if at the time she made the ratification she was informed and knew what she was doing, had full information.

IX. "That if the jury believe from the evidence, that the inducement which led Mrs. Harris to give this note was that Mr. Cline would forbear to file a mechanic's lien on her house, and that he did forbear, such forbearance is a good considera-tion to support the note." Well, that would depend on whether, as a matter of fact, Mr. Cline did have a right to file a mechanic's lien; if he had a right to file it, and Mrs. Harris induced him, by a promise to pay the money, not to file the lien, she would have a right to make that contract.

X. "That if the jury believe from the evidence, that Mrs. Harris received the benefit of the material furnished by Mr. Cline, and has paid no one for it, and subsequently gave her note to Cline for it, the moral obligation to pay for what she has received the benefit of is a sufficient consideration to sup-port such subsequent express promise." That I charge you, and it is this: that if you have my property in your possession, and you have not paid anybody for it, and you say to me, let me keep it and I will pay you for it, and give me a note for it, then the fact that you have got my property is the considera-tion for the note or for the promise to pay. That is common sense, and that is common justice, and it is law, too.

XI. "That giving a note upon an executed consideration, the benefit of which the maker has received, is equivalent to a previous request, and if given under these circumstances by a married woman for materials furnished and used in the con-struction of her dwelling house, it is a contract 'as to her sep-arate property,' in the sense of the act of 1882, and she is liable thereupon." That I charge you, as I charged all these requests, with reference to what I have said all along.

I don't think that there is anything else that I care to say.

Your verdict, if you find for the plaintiff—that is, that if you find Mrs. Harris should pay this note—you will calculate the interest from the date of its maturity up to to-day at ten per cent.; add the principal and interest together, if you find all that, and your verdict will be: We find for the plaintiff so many dollars; if you find that, write it out in words, not in figures. If you find for the defendant, your verdict will be: We find for the defendant.

The jury found a verdict for plaintiff for the whole amount of note and interest, and on this verdict judgment was entered.

Defendant appealed on six exceptions. The *first* exception alleged error in the modification of defendant's sixth request to charge, quoting it. The *second* exception alleged error in charging plaintiff's fifth request, and the remarks made thereon. The *third* exception alleged error in charging plaintiff's eighth request. The *fourth* exception alleged error in charging plaintiff's tenth request. The *fifth* exception alleged error in charging plaintiff's eleventh request. The *sixth* exception alleged error in the addition made by the trial judge to plaintiff's sixth request to charge.

*Messrs. Benet, McCullough & Parker*, for appellant.

*Messrs. Cothran, Wells, Ansel & Cothran*, contra.

June 12, 1893. The opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER. This was an action brought by the plaintiff, as administratrix of L. B. Cline, deceased, to recover a certain sum of money for which the defendant had executed her note to said Cline. The execution of the note was admitted by the defendant, but she set up three defences: 1st. That she was a married woman at the time that the contract was executed, and she had no power to make such a contract. 2d. That there was no consideration for the contract evidenced by the note. 3d. That the note was signed under duress. The third defence was very properly abandoned at the trial, as there was no evidence to sustain it. As to the first defence, inasmuch as the undisputed facts show that the note was given for a bill of lumber furnished by Cline and

actually used in the construction of a house on defendant's land, which was her separate estate, it is difficult to see how such a defence could be sustained.

So that, as it appears to us, the only real controversy in the case arises out of the second defence, was there any consideration for the note? For a proper understanding of this question a brief statement of the facts is necessary. It appears that the defendant, being desirous of having a house built upon her separate estate, entered into some arrangement with the firm of Gilreath & Harris (the latter being the husband of defendant), who were engaged in the business of furnishing building materials, the nature of which was not very clearly disclosed by the testimony. The undisputed facts are, however, that the lumber for which the note was given was furnished by Cline and used in the construction of defendant's house, and the bill for the same was charged to the defendant on the books of Cline. After the lumber was furnished and so used, Cline demanded payment from defendant, who declined to pay unless Cline would deduct the amount of an account which Gilreath & Harris held against Cline, which deduction Cline declined to make, alleging that such account should be set off against a claim which he held against another firm of which Gilreath was a member. Whereupon, under a threat from Cline that he would file a mechanic's lien, the defendant signed the note in controversy.

Under the charge of the Circuit Judge (which, with the exceptions, should be incorporated in the report of the case), the jury found a verdict for the plaintiff, and defendant appeals upon the several grounds set out in the record. Without considering these grounds *seriatim*, we propose to consider what we understand to be the several questions made thereby. Inasmuch as there was no evidence that the lumber was ever charged to Gilreath & Harris on the books of Cline, but, on the contrary, it was charged to the defendant, and no evidence that Gilreath & Harris were ever held by Cline to be liable to him, the question whether the defendant, being a married woman, could assume the payment of a debt due by a third person (Gilreath & Harris), even though the debt was contracted for

articles used in the construction of a house erected on defendant's separate property and for her use, cannot properly arise in this case, and need not, therefore, be considered.

Granting, for the sake of the argument, that Gilreath & Harris, without previous authority from defendant, had ordered the lumber from Cline, we see no reason why the defendant could not, after receiving the benefit of the lumber, adopt the previously unauthorized act of Gilreath & Harris, and assume the payment for the materials used for the benefit of her separate estate; and especially would this be so in a case like this, where the undisputed testimony shows that the lumber was charged to her and not to Gilreath & Harris, thereby demonstrating that the credit was extended to her and not to Gilreath & Harris. It is very true, that if Gilreath & Harris, without authority, ordered the lumber, the defendant would have been under no obligation, either legal or moral, to accept the lumber, but might with perfect propriety have repudiated the unauthorized act of Gilreath & Harris. But when she accepted the lumber and allowed it to be used in the construction of the building which she desired constructed on her separate estate, she thereby assumed at least a moral obligation to pay for the same, and when by her subsequent express promise, as evidenced by the note in question, she agreed to pay the amount of the lumber bill, she unquestionably became legally liable therefor.

It is earnestly urged, however, that a mere moral obligation is not sufficient to constitute a valid consideration for an agreement to pay money, unless such moral obligation rests upon a previous legal obligation, the power to enforce which has been lost by reason of some positive rule of law. It must be admitted that the weight of modern authority elsewhere does seem to support the rule invoked. 1 Pars. Con., 434; 3 Am. & Eng. Enc. Law, 840. But the distinguished author first cited, who states the modern rule as follows: "A moral obligation to pay money or to perform a duty is a good consideration for a promise to do so, where there was originally an obligation to pay the money or to do the duty, which was enforcible at law, but for the interference of some rule of law.

Thus a promise to pay a debt contracted during infancy, or barred by the statute of limitations or or bankruptcy, is good, without other consideration," is bound to admit that the modern rule is not "very creditable to the common law." Both of these authors admit that the rule was originally otherwise. The new departure, as it may be called, seems to rest upon a learned note to the case of *Wennal* v. *Adney*, 3 Bos. & Pul., at page 249. It seems to me, however, that a more correct view of the law is presented in a note to the case of *Comstock* v. *Smith*, 7 Johns., at page 89.

All of the authorities admit that where an action to recover a debt is barred by the statute of limitations, or by a discharge in bankruptcy, a subsequent promise to pay the same can be supported by the moral obligation to pay the same, although the legal obligation is gone forever; and I am unable to perceive any just distinction between such a case and one in which there never was a legal, but only a moral, obligation to pay. In the one case, the legal obligation is gone as effectually as if it had never existed, and I am at a loss to perceive any sound distinction in principle between the two cases. In both cases, at the time the promise sought to be enforced is made, there is nothing whatever to support it except the moral obligation, and why the fact that, because in the one case there was once a legal obligation, which, having utterly disappeared, is as if it had never existed, should affect the question, I am at a loss to conceive. If, in the one case, the moral obligation, which alone remains, is sufficient to afford a valid consideration for the promise, I cannot see why the same obligation should not have the same effect in the other. The remark made by Lord Denman, in *Eastwood* v. *Kenyon*, 11 A. & E., 438, that the doctrine for which I am contending "would annihilate the necessity for any consideration at all, inasmuch as the mere fact of giving a promise creates a moral obligation to perform it," is more specious than sound, for it entirely ignores the distinction between a promise to pay money which the promisor is under a moral obligation to pay and a promise to pay money which the promisor is under no obligation, either legal or moral, to pay. It seems to me that the cases relied upon to

establish the modern doctrine, so far as my examination of them has gone, ignore the distinction pointed out in the note to 7 Johns. above cited, between an *express* and an *implied* promise resting merely on a moral obligation, for while such obligation does not seem to be sufficient to support an *implied* promise, yet it is sufficient to support an *express* promise.

But, whatever may be the rule elsewhere, it seems to me that in this State the rule is, that "a moral obligation is a sufficient consideration to support an express *assumpsit* made after the obligation incurred. It is equivalent to a previous request. But it must be such an obligation as is denominated by moralists 'perfect;' an obligation of justice, and not of benevolence or piety merely." *McMorris* v. *Herndon*, 2 Bail., 56. In that case, Harper, J., in delivering the opinion of the court, quotes with approval the following language used by Lord Mansfield in *Hawkes* v. *Saunders*, Cowp., 290: "Where a man is under a moral obligation which no court of law or equity can enforce, and *promises*, the honesty and rectitude of the thing is a consideration." The case of *McMorris* v. *Herndon* has been expressly recognized in *Lewis* v. *Lewis*, 3 Strob., 532, and the same doctrine is announced in *Glasgow* v. *Martin*, 1 Strob., 89. These cases show clearly that the moral obligation resting upon the defendant to pay for the lumber used in the construction of her house constituted a sufficient consideration for her express promise to pay for the same, as evidenced by the note in question.

Under this view, it seems to us unnecessary to inquire more particularly into the other grounds of appeal.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

---

## WOODWARD v. WILLIAMSON.

1. AMENDMENT—APPEAL.—Is an order permitting an amendment to the answer at once appealable?

2. IBID.—Assuming that an amendment of the answer changing substantially

the defence was permitted at the trial, it would seem that it should be determined by the rule that governs amendments before trial, when plaintiff, as in this case, was granted a continuance because of the amendment.

3. IBID.—ESTOPPEL—CONTINUANCE.—Where defendant in action for partition denied plaintiff's title, and asserted title in defendant, there was no substantial change of the defence in an amendment to the answer which permitted a special plea of estoppel in support of the title alleged in the original answer. In such case the plaintiff was properly given time to meet the new allegations alleged.

4. IBID.—ACCEPTANCE.—An amendment to the answer having been allowed on payment of twenty dollars to plaintiff, the acceptance by plaintiff of this sum of money operated as a consent by plaintiff to the amendment so ordered.

5. APPEAL.—An order not appealed from not considered on appeal from another order in the same cause.

Before WITHERSPOON, J., Aiken, April, 1892.

Action by Arabel V. Woodward against James Williamson for partition, commenced August 12, 1891.

*Mr. John Gary Evans,* for appellant.

*Messrs. Henderson Bros.,* contra.

June 12, 1893.    The opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER. The plaintiff brings this action for partition of certain real estate, and an account for the rents and profits thereof. In her complaint she alleges that one Vandy George died seized and possessed of the real estate in question, leaving as his only heirs at law his widow, Elizabeth George, and his daughter, Ancibel, now Ancibel V. Woodward; that the said Elizabeth George conveyed her undivided interest, being one-third, in the said land to the defendant, James Williamson, who is now in possession thereof, receiving the rents and profits to the exclusion of plaintiff. The defendant answered: 1st. Denying each and every allegation contained in the complaint. 2d. Alleging that he is the owner of said land and is in possession thereof. 3d. "That he alleges, that if the plaintiff ever had any right or title to the lands described in the complaint, she is estopped from asserting the same, be-

cause of her conduct, statements and representations concerning the same made to the defendant, upon which he acted." Upon reading the pleadings, a demurrer was interposed by plaintiff to the third paragraph of the answer, which being sustained, defendant moved to amend said paragraph, which motion was refused.

Thereupon the defendant moved to amend the second paragraph of his answer, so that it should read as follows: "That he alleges that he is the owner of the land described in the complaint (because on the 14th day of February, 1888, he purchased the tracts of land described in the complaint from Elizabeth George, for valuable consideration paid and made secure, and that before and at said time, and since, the plaintiff represented to this defendant that said Elizabeth George was the owner of said lands, and that the plaintiff had no interest therein, and that defendant acted on said representations), and is in possession thereof;" the amendment being indicated by the words enclosed in parenthesis. This amendment was allowed, "upon condition that the defendant pay to the plaintiff the sum of twenty dollars within thirty days from the date of this order," which condition was complied with by the payment to the plaintiff's counsel by counsel for defendant of the said sum of money within the time prescribed, at which time the amended answer was served. When the order allowing the amendment was granted, the Circuit Judge "stated to plaintiff's counsel that if the amendment worked a surprise he would continue the case, which being claimed the cause was continued." From this order allowing the amendment the plaintiff appeals upon the following ground: "Because his honor erred in allowing the defendant, James Williamson, to amend his answer by inserting new matter, and thereby changing substantially his defence while said cause was upon trial."

Waiving for the present the question whether such an order is appealable, and not deciding that question, we propose to consider the case on its merits. Inasmuch as the "Case" does not show that the order allowing the amendment was made "during or after the trial," it is not clear that the amendment falls within the limitation pre-

scribed in section 194 of the Code, as construed in *Hall* v. *Woodward*, 30 S. C., 564. But as it is stated in the argument of plaintiff's counsel that the case had previously been referred to the master to take and report the testimony, and that the case came up for trial upon the testimony thus taken and reported, and as this statement seems to be admitted, impliedly at least, by defendant's counsel in his argument, we are willing to consider the question raised by this appeal as if the amendment had been made during the trial; though we must say that after the plaintiff was offered and had accepted a continuance of the case, the reason, as given in *Hall* v. *Woodward, supra,* why an amendment should not be allowed during the trial where the claim or defence is substantially changed, would not apply.

But waiving this, we propose to consider whether the amendment allowed did substantially change the defence set up by defendant in his original answer. That defence was of a two-fold character. 1st. A general denial of the facts alleged in the complaint upon which plaintiff based her claim to partition. 2d. An assertion of title in the defendant to the land of which plaintiff sought partition. The amendment allowed made no change in this defence, but simply permitted defendant to state in a definite form *how* he claimed his title, which had previously been asserted in a general form. It was, therefore, no change in the defence originally set up, but merely a change in the mode of stating it, and that is clearly within the province of an amendment. Before the plaintiff could recover, under the pleadings as originally framed, it would be necessary for her not only to establish her own allegations, but to overcome the proof which defendant might make in establishing his own title. She must have assumed the position of a plaintiff in an action for the recovery of real estate, and the defendant might simply fold his arms, or might show a better title in himself or any one else; and to do this it would not, ordinarily, be necessary for him to set out in his pleadings the several links in his chain of title. While, therefore, it may be that the defendant would not be permitted to offer evidence of an estoppel without pleading it

specially; yet when he was permitted to do so, he did not thereby change his defence, which, after all, was superior title in himself, whether derived from estoppel or otherwise. The amendment allowed, therefore, effected no change in his defence, but, at most, removed obstacles to his offering certain evidence to sustain his defence, which still remains the same. Of course, where such an amendment may operate as a surprise to the other party, the court would always undoubtedly do, as was very properly done in this case—afford time to meet the new allegations proposed to be relied upon to support the defence originally pleaded in a general form.

There is also another ground upon which the order appealed from must be sustained. That order having been granted upon condition that a certain sum of money should be paid by defendant to plaintiff, the latter, by accepting the money, is estopped from disputing the validity of the order, upon the principle that a party cannot be permitted to accept the benefit and at the same time repudiate the corresponding burden, upon condition of which he receives the benefit. If the order was invalid and void, then the plaintiff certainly had no right to the money paid as a condition of the allowance of the amendment; and when it was received, it operated as a consent to the amendment allowed upon condition of such payment.

It may be proper for us to add that, inasmuch as there is no appeal from the order sustaining the demurrer to the third paragraph of the answer, and refusing leave to amend that paragraph, that matter is not before us, and, therefore, we have not felt at liberty to consider it, and this court must not be considered as either approving or disapproving the same.

The judgment of this court is, that the order appealed from be affirmed, and that the case be remanded to the Circuit Court for trial under the pleadings as amended.

GREENE v. TALLY.

1. APPEAL—ERRORS.—Where the judgment of the Circuit Court reverses the judgment of the trial justice without stating any grounds, the judgment of the Circuit Court must be reversed on appeal, unless it appears that some of the exceptions before him required a reversal.

2. TRIAL JUSTICE—TESTIMONY DE BENE ESSE.—Testimony taken by a notary public in another State, by order of the trial justice, after four days' notice of the application for the order, affidavit of materiality and non-residence, and interrogatories to be propounded, and the testimony so taken certified under official seal, and the "Case" not showing that the other requirements of the law (Act of 1883, 18 Stat., 313) were not complied with, was properly admissible in evidence.

3. EVIDENCE—OPINION.—An interrogatory, whether certain transactions between plaintiffs and defendant "constituted indebtedness," did not call for a conclusion of law when it was only a portion of interrogatories which brought out all the details of these transactions.

4. EXCEPTIONS—APPEAL—RECORD.—An exception sustained which imputed error to the Circuit Judge in sustaining an exception to the trial justice in admitting hearsay testimony, where the "Case" does not show that the trial justice received any such testimony.

5. APPEAL FROM TRIAL JUSTICE—FACTS—APPEAL.—This court cannot reverse the Circuit Judge's ruling, that the testimony was insufficient to sustain the judgment of the trial justice, even if persuaded that the Circuit Judge was mistaken.

6. IBID.—NEW TRIAL.—Where the testimony is insufficient to sustain the judgment of a trial justice, the Circuit Judge on appeal should order a new trial, and not simply reverse the judgment appealed from.

7. GENERAL EXCEPTIONS not considered.

Before ALDRICH, J., Greenville, December, 1892.

Action by Greene, Rea & Co. against J. A. Tally.

*Mr. J. C. Jefferies,* for appellant.

*Mr. A. Blythe,* contra.

June 13, 1893.    The opinion of the court was delivered by

MR. CHIEF JUSTICE MCIVER.    The plaintiffs brought this action in a trial justice court on an account for goods sold and delivered by plaintiffs to defendant, and having recovered

judgment there, the defendant appealed to the Court of Common Pleas, where it was heard by his honor, Judge Aldrich. Upon hearing the appeal the Circuit Judge signed the following order: "Upon hearing the exceptions to the trial justice judgment in this case, after argument of counsel, it is ordered that the exceptions be sustained and the judgment of the trial justice be reversed, with costs of appeal." From this order plaintiffs appeal upon the several grounds set out in the record. Inasmuch as the order sustaining the appeal gives no reason for the conclusion reached by the Circuit Judge, we are left to conjecture as to the grounds upon which he based his conclusion. The phraseology of the order implies that he sustained *all* of the exceptions to the judgment of the trial justice, and, therefore, if there was any one of the exceptions improperly sustained, the order appealed from must be reversed, unless it appears that some other exceptions rendered it necessary to reverse the judgment of the trial justice.

For a proper understanding of the questions raised by this appeal it is necessary to make the following statement derived from the "Case." It appears that the summons was personally served on the defendant on the 22d of September, 1892, and the 12th of October, 1892, was the day appointed for the trial. On the 11th of October, 1892, defendant's counsel was served with a notice in writing by plaintiff's counsel that at the expiration of four days from the service of the notice, application would be made to the trial justice "for a commission to take the testimony *de bene esse* in writing of Ed. L. Greene in answer to the within interrogatories." To this notice was appended an affidavit of the materiality of the witness, and of his residence beyond the limits of the State, to wit: at Yadkin College, N. C. Pursuant to this notice the trial justice, on the 15th of October, 1892—the trial of the cause being continued until the 19th of October, 1892—granted an order appointing W. S. Owens, a notary public of Yadkin College, N. C., to take the testimony above referred to. It appears from the certificate of said W. S. Owens, under his notarial seal, that the testimony was taken on the 17th of October, 1892, and enclosed to the trial justice. When the case came up for trial, on the 19th of

October, 1892, both parties announcing themselves as ready for trial, plaintiff's counsel moved to open the testimony, which was objected to by defendant's counsel, upon what ground does not appear, but the objection was overruled and the testimony was read. Thereupon the plaintiffs rested, and defendant offering no testimony, the trial justice, after hearing argument of counsel, rendered judgment in favor of the plaintiffs for the amount of their account.

The first exception to the judgment of the trial justice was that the commission to examine the witness above named "was improvidently, prematurely and illegally issued," and the same question substantially is raised by plaintiffs' first ground of appeal from the order of the Circuit Judge. It will be observed that it does not appear upon what grounds the commission to take the testimony, was claimed to be either improvidently, prematurely or illegally issued, and we are, therefore, left to conjecture what were the grounds. We must suppose that the position relied upon was taken under the provisions of section 849 of General Statutes as it originally read, overlooking the amendments made thereto by the act of 1883 (18 Stat., 313), for while by the section as it originally read, such testimony could only be taken by the trial justice himself, "or cause the same to be done by another trial justice," by the amendment the testimony may be taken not only in that way, but also by any "other officer authorized by law to administer oaths." And as a notary public is an officer authorized by law to administer oaths (Gen. Stat., § 523), even when a resident of another State (see act of 1888, 20 Stat., 1, as amended by the act of 1891, 20 Stat., 1041), provided he "shall use his official seal," it is clear that the testimony taken by a notary public in North Carolina, and certified to under his notarial seal, was duly taken and admissible in evidence.

If, however, the ground of objection was, that the parties to the cause did not "have notice thereof in time to be present, if they, or either, should choose to be present," as required by section 849, as it originally read, a sufficient answer would be that defendant did have notice, on the 11th of October, 1892, of the proposed examination, which was not had until

the 17th of that month; and it does not appear that this notice did not afford sufficient time for him to be present at the examination of the witness if he so desired. But, in addition to this, the amendment of 1883, above referred to, after providing for the notice above referred to, adds these words: "or notice by either party to the other of interrogatories to be propounded to such witness, with four days' time given the party notified to prepare cross-interrogatories," &c. With this latter alternative the plaintiffs seem to have strictly complied. But if the objection was that the last proviso to the act, requiring that the examination, when taken by another, "shall be sealed up, with the title of the case endorsed, and conveyed by a disinterested person to the trial justice authorizing the same, or mailed and the postage prepaid," was not complied with, it is sufficient to say that there is nothing in the "Case" to show, or even indicate, a failure to comply with such requirement; and in the absence of any such showing, under the well settled rule, we would presume that the officers charged with this business had done their duty. We do not see, therefore, how, under any view of the matter, the first exception by the defendant to the judgment of the trial justice could have been properly sustained, and we are of opinion that the plaintiffs' first ground of appeal from the order of the Circuit Judge was well taken.

This would be sufficient to dispose of this appeal, for it does not seem to us that any of the other exceptions to the judgment of the trial justice, so far as they raise questions of law, which alone we can consider, were well taken. The second, third and fourth exceptions, raising, practically, the same questions as those raised by defendant's second, third and fourth grounds of appeal, seem intended to raise the question as to the competency of certain questions submitted to the witness Greene, and his answers thereto. These exceptions are so general in form that the specific grounds of objection are not very clear. They seem to be aimed at interrogatories three, four, and five. In the first, the question, substantially, was whether plaintiffs' firm had any transaction with the defendant; to which the only answer was "Yes;" and

we are unable to perceive what objection to either question or answer could justly be made. The fourth interrogatory was substantially to this effect: If you say your firm had any transaction, or transactions, with defendant, state when the same occurred, what was the nature of the same, and "whether or not the same constituted indebtedness." The answer was yes, had two transactions with defendant, the first on April 1st, 1892, and was for a bill of plug tobacco; the second on 27th April, 1892, and was for a bill of plug tobacco, "and that the same constituted indebtedness." Then follows a detailed statement of the items involved in each transaction, giving the number and sizes of the tobacco boxes, the kind of tobacco in each, the prices and the number of pounds. We are unable to perceive any valid objection to either question or answer, for though neither is couched in artistic language, and both might have been made more full and explicit, yet we see no valid objection to the competency of either question or answer. The words placed within quotation marks in the interrogatory as well as in the answer seem to be relied on as tending to extract an opinion of the witness rather than a statement of a fact. But viewed in the light of all the circumstances, it does not seem to us that such was the necessary or even legitimate effect of those words. See *Miller* v. *George*, 30 S. C., 526. The fifth interrogatory, which simply called for a statement of the dates and amounts of the transactions above referred to, was certainly not open to any valid objection, and the response thereto was clearly competent.

The fourth ground of appeal, which [alleges error in sustaining one of defendant's exceptions, which] seems to be based upon the idea that the witness was not confined to the statement of facts *within his own knowledge*, is well taken, for the reason that there is nothing in the "Case" which even tends to show that the witness was not speaking of his own knowledge, and nothing to warrant the assumption that he was testifying from hearsay.

As to the fifth ground of appeal, which imputes error to the Circuit Judge in holding that there was not sufficient evidence to support the judgment of the trial justice, we are com-

pelled to say that we have no jurisdiction to consider findings of fact in a case like this (*Nichols* v. *Railroad Company*, 23 S. C., 604), and, therefore, although we might think that the Circuit Judge erred in holding (if he did so hold) that the testimony, which we have held to be competent, was in-sufficient to sustain the judgment of the trial justice, yet we have no authority to reverse such ruling, if it was, in fact, made. The sixth ground has already been disposed of by what we have said in considering the first ground of appeal.

The seventh ground of appeal alleges error on the part of the Circuit Judge in simply reversing the judgment of the trial justice, instead of ordering a new trial. Not knowing exactly the ground upon which the Circuit Judge rested his conclusion, we are unable to consider this ground intelligently, though we may say that the whole case strikes us as one in which the Circuit Judge should, in the most unfavor-able view which could be taken of the plaintiffs' case, at most have granted a new trial, instead of simply reversing the judg-ment of the trial justice, which might possibly have the effect of finally adjudging the case adversely to the rights of the plaintiffs.

The remaining grounds of appeal are either too general in their character to warrant notice, or the points raised thereby, having been already passed upon, need not be further considered.

The judgment of this court is, that the order appealed from be reversed, and that the case be remanded to the Circuit Court for a new trial of the appeal under the views herein announced.

---

## STATE v. CRAWFORD.

1. RECEIVING STOLEN GOODS—INDICTMENT—PROOF.—Under an indictment for receiving stolen goods, knowing them to have been stolen, based upon section 2526*a* of General Statutes (19 Stat., 814), it is not necessary to state the time or place of the larceny, nor the value of the stolen property re-ceived, but the fraudulent intent and guilty knowledge must be alleged.

The value of the property stolen measures the punishment to be inflicted, but it is not necessary to trace all of it to the accused, nor to show that the property received was all received at the same time.

2. IBID.—HARMLESS ERROR.—In charging that if the defendant "did receive twenty dollars worth of the goods charged to have been stolen, and you so believe beyond a reasonable doubt, you will find him guilty," the trial judge did not commit error of law of which defendant could complain, and the verdict of guilty under this charge fixed the value of the goods received at not less than twenty dollars.

3. IBID.—OTHER ACTS.—Under an indictment for receiving stolen goods, evidence of other goods found in defendant's possession was admissible to show guilty knowledge.

4. IBID.—HARMLESS ERROR.—If there was error in admitting testimony of the finding of some of the stolen goods at another's house, to show that a larceny had been committed, it was an error not prejudicial to defendant.

5. CHARGE ON FACTS.—The trial judge, while ruling upon the admissibility of testimony during the progress of the trial, said: "It is hard enough to track these people, anyway." *Held*, not a charge upon the facts within the meaning of the constitutional inhibition.

Before KERSHAW, J., Anderson, October, 1891.

Indictment against Jerry Crawford for receiving stolen goods, knowing them to have been stolen. The case was submitted without argument.

June 26, 1893. The opinion of the court was delivered by

MR. JUSTICE MCGOWAN. At the fall term of the Court of General Sessions (1891) for the County of Anderson, the defendant was tried and convicted on the charge of receiving stolen goods, and sentenced to one year's imprisonment in the penitentiary, on the following indictment:

"The State of South Carolina—County of Anderson. At a Court of General Sessions * * * the jurors of and for the county aforesaid, in the State aforesaid, upon their oaths, present that Jerry Crawford, late of the county and State aforesaid, on the twenty-third day of January, in the year of our Lord one thousand eight hundred and ninety-one, with force and arms, at Anderson Court House, in the county and State aforesaid, ninety pounds of coffee, of the value of twenty-five dollars, of the proper goods and chattels of C. D. Nesbitt, S. F.

Trowbridge, W. P. Nesbitt and W. N. Trowbridge, partners, trading under the firm name of Nesbitt, Trowbridge & Co.; three hundred and thirty pounds of bacon, of the value of twenty-five dollars, of the proper goods and chattels of A. H. Ford; and three bolts of plaids, of the value of ten dollars, of the proper goods and chattels of George R. Pike, all of the value of sixty dollars, then lately before feloniously stolen, taken, and carried away, feloniously did receive and have, he, the said Jerry Crawford, well knowing said goods and chattels to have been feloniously stolen, taken and carried away, against the form of the statute in such case made and provided, and against the peace and dignity of same State," &c.

The counsel for the defendant moved that the solicitor be required to elect as to which act of "receiving" the defendant is tried on, and Judge Kershaw ruled that if the solicitor could prove any one of the allegations, it would be sufficient, and the trial proceeded. Much testimony was then offered, not, however, digested into a "Case," presenting the questions of law to be decided, but as it was given by the witnesses on the stand. It is all printed in the record. The case was submitted without oral or printed argument either for the State or the defendant. It is quite impossible to state the testimony, but the case cannot be made intelligible, without making a brief outline, merely to indicate its general character, and without professing to give the whole of it.

On or about January 23, 1891, such articles of property as bacon, coffee, and domestic plaids were missed from the freight cars of the railroad, at or about Belton, Anderson County. On the evening of January 23, 1891, Mr. Wilson, the depot agent at Belton, had placed in a freight car a box of bacon, consigned to A. H. Ford, of Williamston, which is above Belton, to be shipped that night, or early the next morning. When the box reached Williamston, it was found that the seals were broken, and that the box had been broken open and robbed of about 330 pounds of the bacon. Next day search was made at and around Belton, and some of the lost bacon was found at the house of the defendant, Crawford, who lived in the vicinity, within two or three miles of Belton. Some of

32—39

the pieces of meat found were fresh cut. When the discovery was made, Jerry returned one whole "middling" in a sack, and when interrogated on the subject, said, "that his boys had traded for the meat and brought it to his house; that they had unloaded cars, and were paid for their work in meat." It was not made to appear precisely how much of the lost meat was recovered from Jerry Crawford's house. There was testimony that the meat was worth 6, 6½ or 7 cents per pound.

W. N. Trowbridge, of the firm of Nesbitt, Trowbridge & Co., Piedmont, Greenville, proved that they had ordered in January, from F. W. Wagener & Co., Charleston, one sack of green coffee, which was sent forward, but never received by their firm at Piedmont, Greenville, worth twenty and one-half cents per pound. When parties were out hunting for the meat, which had disappeared at Belton, they found at the house of the defendant seventy-seven pounds of green coffee, in a bag concealed in a barrel. This was after the bacon was found at the house of defendant, as well as remembered, on the second Sunday of the March following. It further appeared, that there was shipped on the railroad a bale of cotton plaids, two hundred pounds, consigned to J. R. Pike, "Salem," above Walhalla, in Oconee County, which, at Walhalla, on January 12, 1891, was missing, and checked off "short." On the same occasion when the coffee was found, the parties also found a bolt of cotton plaids at the house of the defendant, believed to be some thirty or forty yards. Jerry said that his wife got the plaids in Anderson, &c. There was much more testimony, of which the above is a mere skeleton, but it is believed this will suffice to make intelligible the points of law raised.

The counsel of the defendant made the following requests to charge: "(1) The possession of a part of stolen goods is not evidence of receiving *all* of the property stolen. (2) When property is proved to have been stolen at different times, and there is no evidence of 'receiving' *all* of the goods at the same time, and no one article 'received' amounts to $20 in value, then the State may have made out three cases of petty larceny, but not one of grand larceny. (3) If the jury believe that the defendant received the coffee and the plaids *after* the bacon

was found at his house, and after the date alleged in the bill of indictment, then he cannot be convicted under this indictment for receiving the coffee or the plaids." Under the charge of the judge, the jury found the defendant *"guilty,"* and being sentenced to one year's imprisonment in the penitentiary, he now appeals to this court upon the exceptions:

I. Because his honor erred in admitting testimony of the finding of goods in the possession of the defendant at different times, when the larcenies of these goods were also committed at different times, without instructing the jury that the defendant must have received at least $20 worth of these goods at one time.

II. Because his honor erred in saying, during the trial: "It is hard enough to track these people at best," whereby the defendant was prejudiced before the jury, and his honor indicated to them his opinion on the facts of the case.

III. Because his honor erred in admitting the testimony of B. A. Wilson as to the finding of plaids similar to those found at the defendant's, at Leah Brown's house, in Belton.

IV. Because there was no testimony to show that the defendant received or had in his possession at any one time $20 worth of stolen goods.

V. Because his honor erred in refusing to charge the first request submitted by the defence, as follows: "The possession of a part of stolen property is not evidence of receiving all of the property which had been stolen."

VI. Because his honor erred in refusing to charge the defendant's second request to charge.

VII. Because his honor erred in refusing to charge the defendant's third request to charge.

VIII. Because his honor erred in charging the jury: "That according to the law as contended for by the defendant, if a party of rogues break into a store or any place else and distribute goods stolen therefrom in sums less than $20, there would only be petty larceny for each receipt and delivery of stolen goods, and we would have to go through with all this elaborate investigation in any one of the charges to establish the receipt of stolen goods. It is necessary that you should be satisfied

that the goods charged in the indictment were stolen; that they were the very goods described in that indictment, and that those particular goods, to the value of $20, were found in the hands of this defendant; that he received to that amount of the goods, whether they were found or not; if you are satisfied from the evidence that he had received $20 worth of these identical goods, charged in the indictment, then he is guilty," &c.

The case was submitted without statement or argument, but from the record, and especially exceptions 4, 5, 6, 7 and 8, it appears that throughout the trial it was assumed that the indictment was for "grand larceny," or possibly the "accessorial offence," for receiving the fruits of such a larceny "after the fact;" and consequently Jerry Crawford could not be convicted under the indictment, unless it was shown that he had received so much of the stolen property at one time, as amounted to the value of $20. We do not, however, understand that this indictment was for "larceny" at all, either petit or grand; but for the substantive statutory offence of "receiving stolen goods, knowing them to have been stolen," under section 2526a of General Statutes as amended in 1887 (19 Stat., 814), which provides as follows: "In all cases whatever, where any goods and chattels or other property of which larceny may be committed, shall have been feloniously taken or stolen by any person or persons, every person who shall buy or receive any such goods or chattels or other property, knowing the same to have been stolen, shall be held and deemed guilty of, and may be prosecuted for, a misdemeanor, and upon conviction thereof, shall be punished by imprisonment, although the principal felon or felons be not previously convicted, and whether he, she or they is or are amenable to justice or not: *Provided,* That when the chattel or other property stolen shall be of less value than twenty dollars, the punishment shall not exceed imprisonment in the county jail for thirty days or a fine of not more than one hundred dollars," &c.

It does not appear that at the trial there was any reference to this recent provision of the law, but we can not doubt that it was and is the law upon the subject of "receiving stolen goods," and that it was applicable to defendant's case. When

the statutes have made "receiving stolen property" a distinct substantive offence, the character or grade of that offence must depend alone upon the terms of the statute.   The indictment need not state the time or place of the "larceny," nor the value of the property "received."   It is necessary that the guilty knowledge should be alleged, as well as the fraudulent intent, but it is not necessary that the whole of the property should have come into possession of the accused.   It is enough if he "received" one of several articles.   Neither is it required that he should have received all the property at the same time.   See 20 Am. & Eng. Enc. Law, 431 and 446, and many references in the notes; *People* v. *Wiley*, 3 Hill (N. Y.), 194; 6 Ala., 845; 136 Mass., 170; *People* v. *Fitzpatrick*, 80 Cal., 538, and others.

It will be observed that the provisions of section 2526*a* are general, covering every conceivable case "for receiving stolen property," knowing it to be stolen.   At first view, it might seem that the proviso contains a qualification, but it has no requirement as to the value of the property necessary to be traced to the accused on trial—it may be to meet the possible case of confederates, each of whom may have received his share of the fruits of a common enterprise.   But, on the contrary, it would seem that the only purpose of the proviso was to reduce the punishment as therein declared, "when the chattels or other property stolen shall be of less value than twenty dollars," showing clearly that conviction was contemplated, even where the property stolen was of less value than $20.   The test as to the proper punishment being not the value of the property found in possession of the defendant, but the value of the whole property stolen.

The judge, among other things, charged the jury, "that if this old man did receive $20 worth of the goods charged in the indictment, knowing them to have been stolen, and you so believe beyond a reasonable doubt, you will find him guilty; if not, you will say 'not guilty.' "   Was that fatal error of law?   We think the defendant had no right to complain, for if there was error, it was in his favor.   But even under this charge, the jury found the defendant "guilty," and

in doing so necessarily found that the property stolen was not less in value than $20.

Exception 1 complains of error in admitting testimony of the finding of goods in the possession of the defendant at different times, without instructing the jury that the defendant must have received at least $20 worth of the stolen property at the same time. Evidence that other stolen goods were found in the possession of the defendant is admissible, for the purpose of showing guilty knowledge. *Com.* v. *Hills*, 10 Cush. (Mass.), 530. We have already endeavored to show that the law did not require the judge to charge that it was necessary to show that the defendant had received at least $20 worth of the stolen property at the same time.

Exception 3 charges that his honor erred in admitting the testimony of B. A. Wilson as to the finding of "plaids" similar to those found at the house of the defendant, at Leah Brown's house, in Belton. The judge seems to have considered the testimony "relevant" as tending to show that the missing bale of plaids was stolen at Belton. In no view of the testimony, however, could it do any any harm to the defendant, but, on the contrary, it was in his favor, as showing that other persons had some of the same article.

Exception 2 charges "that the judge committed error in saying, during the trial: 'It is hard enough to track these people anyway,' whereby the defendant was prejudiced before the jury, and his honor indicated to them his opinion on the facts of the case." The expression charged to have fallen from the judge, which, as alleged, was in violation of section 26 of article IV. of the Constitution, as indicating his opinion on the facts of the case, was not made in charging the jury, but in making a ruling, during the progress of the trial, as to the admissibility of testimony. As was said, in reference to a remark made by the Circuit Judge, under very similar circumstances, in the case of *State* v. *Turner*, 36 S. C., 534: "The judge was not expressing an opinion on the subject one way or another which by any possibility could reach and influence the jury, and it seems to us that it would be a great

stretch of construction to hold that such an incidental remark, made during the progress of the case, amounted to a violation of the provision of the Constitution which prohibits judges from charging juries as to matter of fact," &c.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

---

## NESBITT v. MOORE.

1. CONVERSION—MEASURE OF DAMAGES.—To secure advances made by defendant to one T., plaintiff deposited with defendant a chattel mortgage given to plaintiff by T. Defendant collected his debt out of the mortgaged goods, and then surrendered the mortgage to T., who destroyed it. *Held*, that the measure of plaintiff's damage was the value of the mortgage at the time of its surrender by defendant.

Before ALDRICH, J., Greenville, November, 1892.

This was an action by Niles Nesbitt against H. P. Moore and W. C. Moore, partners as H. P. Moore & Co., commenced in a trial justice's court on June 28, 1892. W. C. Moore testified that he was not a partner of H. P. Moore, and that "H. P. Moore & Co. advanced to Henry Todd, in the spring of the year 1891, supplies to the amount of $20.40, it having been agreed between Moore & Co. and Nesbitt that we might advance an amount additional to the fifteen dollars first advanced upon the written order of Nesbitt, and that the mortgage of Henry Todd to Nesbitt was to be security to the full amount thus advanced. We took additional papers on Todd to cover it, holding the Nesbitt mortgage as collateral."

*Messrs. Haynsworth & Parker*, for appellant.

*Mr. J. R. Bellinger*, contra.

June 26, 1893. The opinion of the court was delivered by MR. JUSTICE MCGOWAN. This action was instituted in the

trial justice court, before F. B. McBee, Esq.   The complaint, after allegation of copartnership of defendants (which turned out to be a mistake), alleged: "That the plaintiff did, on the 7th day of April, 1891, at Greers, in the County of Greenville, deposit with the defendants, as collateral security, for advances made by you to one Henry Todd, a certain chattel mortgage executed and delivered by the said Henry Todd to said Niles Nesbitt, for thirty-one and 50-100 dollars, dated January 1st, 1891, and due October 1st of the same year, and that afterwards the said Henry Todd paid to you the amount of said advances, and thereupon you delivered the said mortgage to the said Henry Todd, regardless of the rights of the said Niles Nesbitt, and thus enabled the said Henry Todd to destroy the said mortgage and dispose of the property covered thereby. The plaintiff has been damaged in the sum of thirty-five dollars, which defendants refuse to pay or deliver said mortgage to plaintiff upon demand therefor," &c.   The answer of the defendant was, first, a general denial, and, second, a counterclaim to the effect that plaintiff was indebted to H. P. Moore & Co. (composed of H. P. Moore alone) in the sum of six dollars, for two sacks of corn sold to plaintiff in June, 1891.

The case was heard without a jury by the trial justice, who took the testimony, which is all printed in the record, the important parts of which are as follows: "Greers, S. C., April 7, 1891.   This is to certify that we hold as collateral a mortgage, Henry Todd to N. Nesbitt, for $31.50, dated January 1st, due October 1, 1891.   Amount advanced $15.   (Signed) H. P. Moore & Co."

Niles Nesbitt testified: "That he had never seen the mortgage referred to in the receipt since it was turned over to Moore & Co., though he had demanded it a number of times. Does not know what has become of it, except that H. P. Moore told him that he had given it to F. H. Edwards, and that he had been damaged to the amount of the mortgage, which is $31.50, with interest since January 1, 1891, at eight per cent. The mortgage covered one horse, two hogs, homestead effects, and the crop of 1891 on the Crotwell place."

H. P. Moore testified: "I alone compose the firm of H. P.

Moore & Co. I made advancements in the year 1891 to Henry Todd, amounting to twenty dollars and forty cents. I also sold Nesbitt two sacks of corn, worth six dollars. Some time in the fall of 1891 I received a letter from Nesbitt appointing me his agent to collect the Todd debt. At that time Henry Todd had paid me nothing on that debt. I put the papers in the hands of F. H. Edwards for collection, and our debt against Todd was paid through Edwards."

F. H. Edwards testified as follows: "I acted as agent for H. P. Moore & Co. The paper given by Henry Todd to Nesbitt, assigned to H. P. Moore & Co., was given me for collection. The mortgage given by Todd to Nesbitt covered a horse and the crop of 1891. I sent to Henry Todd's house, but could not find the horse. [He was dead.] The crop was not gathered, but Todd ageeed to gather it and turn the crop over to Moore & Co. I watched the crop, and as it was gathered it was turned over to me, and I turned over the proceeds to H. P. Moore & Co. I levied on everything which was covered by the mortgage, and took everything which could be applied to the debt. When Todd had finished gathering the crop, I gave him the mortgage, being satisfied I had gotten everything which could be made out of him, or which the mortgage covered. The cotton taken to Moore was all that Todd had, so far as I knew. I did see a little shoat, weighing about fifty pounds, and worth about $2.50," &c.

Henry Todd said: "I gave a mortgage to Nesbitt, which covered a horse and the crop of 1891, and he said nothing about any thing else. I paid my debts with all I made last year. Edwards levied on everything I had. The horse died in June, 1891. I owed Moore & Co. $20.40, and it took every thing I had to pay him. I gave up every thing I had, and I have no other property. Moore's clerk told me to go to Edwards for the papers. I went to Edwards for my papers and he gave them to me, and I burned them up. I have never paid the Nesbitt debt, for I have nothing to pay it with," &c.

The trial justice gave judgment for the plaintiff for $29.70 against the defendant, H. P. Moore, saying in the report of the case only this: "In making up my judgment I allowed the

plaintiff the amount of the note and mortgage, with interest on the same from January 1, 1889, at eight per cent. per annum, deducting therefrom six dollars due the defendant by the plaintiff, and which was admitted by him, and which I have allowed." He gave no other reason for his judgment. From this judgment the defendant appealed to the Circuit Court; and Judge Aldrich, after argument, made the following order: "On hearing the appeal in this case, it is ordered, that the exceptions be and are hereby overruled, and the appeal dismissed, and that the judgment of the trial justice be affirmed."

The defendant now appeals to this court upon the following exceptions: "I. That the presiding judge erred in not holding as a matter of law, that no damages had been proved as a result to plaintiff of the delivery of the mortgage in question to Henry Todd: (1) Because the evidence was clear and uncontradicted that the mortgage had been fully exhausted before delivery as to all articles upon which it was a lien. (2) Because the said Henry Todd was at the time of delivery and at the time of trial utterly insolvent, and that the note and mortgage were of no value at such times. (3) Because the said Henry Todd admitted his indebtedness upon said note and mortgage, and the delivery thereof was neither intended nor operated as a release. II. That his honor erred in not holding that even though the plaintiff were damaged by the delivery to Todd of the note and mortgage in controversy, that such damage could not exceed the amount of the mortgage, less the amount collected of said Todd thereon, viz: $20.40, and less plaintiff's counter-claim of $6. III. That his honor erred in not holding that no damage had been proved to plaintiff in consequence of said delivery, there being proved no value for any articles claimed to have been included in said mortgage, and not seized thereunder, even though it be admitted that such articles were subject to said mortgage," &c.

The amount in this case is not large, but there is an important principle involved. Neither the trial justice who heard the case nor the Circuit Judge stated the grounds of the judgment, and, therefore, we will not undertake to go into the details, which might be improper, in view of the fact that the

case will have to go back to the circuit for a new trial. We think, however, that under the facts as shown, there was error of law, in holding and ruling that the true measure of damages, in such a case as this, was the face value of the note and mortgage, with interest from the date; that is to say, there was error of law in the principle applied. The elementary writers give the following as the definition of the term *damage:* "A sum of money adjudged to be paid by one person to another as compensation for a loss sustained by the latter in consequence of an injury committed by the former." Now assuming that there was an injury inflicted upon the plaintiff by the defendant or his agent, in yielding up the chattel mortgage to Todd, after he had applied the crop (the horse was dead) covered by the Nesbitt mortgage to the payment of the Moore advances, *what loss did the plaintiff sustain thereby? Not* certainly the original face value of the mortgage, but *its value* at the time of conversion. "The general rule of damages for the conversion of stock by the pledgee, is the value of the stock at the time of the conversion, with interest from that time to the time of trial, together with whatever incidental damage may have occurred." See 18 Am. & Eng. Enc. Law, 715, and notes.

What was the value of the chattel mortgage at the time it was surrendered by the agent of the defendant? It is quite clear that it was worth less at that time than its face value. By pledging it as collateral security for the advances by Moore, the plaintiff himself had disposed of so much of the mortgaged property as might be necessary to secure the advances. It turned out that (the horse being dead) it required the entire crop of Todd mortgaged to Nesbitt to be taken out of the mortgage to pay the advances, $20.40, and this being the act of the plaintiff, to that extent he certainly has no cause of complaint of Moore. It is not quite accurate to say that Todd paid the advances to the relief of the collateral security, for the truth is, that the money which paid the advances was taken out of the mortgage as collateral security. By accepting the pledge of the mortgage as collateral security for the advances, the defendant did not guarantee either the solvency of Todd

or the worth of the mortgage, but accepted the pledge as se-
curity, with an implied obligation that, after its use as allowed,
he would return it; that obligation was broken, and the loss to
plaintiff was the value of the paper at the time of that breach,
the conversion.

The judgment of the court is, that the judgment of the Cir-
cuit Court be reversed, and the case remanded to the Circuit
Court, that a new trial may be ordered in accordance with the
conclusions herein announced.

---

WATTS v. WITT.

1. RECOVERY OF REAL PROPERTY—FRAUD IN PLAINTIFF'S TITLE.—In action for
   the recovery of real property, the defendant in possession may defeat the
   claim of plaintiff by showing that plaintiff's title is defective by reason of
   fraud in one of the links in plaintiff's chain of title, without regard to the
   relation of such fraud to defendant's rights.

2. STATUTE OF FRAUDS—PART PERFORMANCE—TITLE.—Where a party takes
   and retains possession of land under a parol agreement that it will be
   conveyed to her whenever she makes full payment, and she does after-
   wards make such payment, there is such part performance as will take
   the agreement out of the statute of frauds, and entitle her to specific per-
   formance; and she is then in position to assail a deed fraudulently made
   for the purpose of defeating her right to specific performance.

3. VENDOR AND VENDEE—ADVERSE POSSESSION.—Where a party goes into
   possession of land under a parol agreement to receive deed when full pay-
   ment is made, while she cannot claim to hold adversely to the legal title
   before full payment made, unless she notifies the legal owner of her ad-
   verse claim, yet after such payment, her exclusive possession is adverse to
   her vendor, and ripens into title at the expiration of the statutory period.

Before WITHERSPOON, J., Orangeburg, September, 1891.

This was an action by Rhoda Watts against Jacob F. Witt
and Cornelia J. Witt for the recovery of a tract of land. Mas-
ter A. C. Dibble reported as follows:

The master for said county, to whom it was referred, by an
order of this court made in the above entitled action, and bear-

ing date June 1st, 1888, to hear and determine all the issues contained in and raised by the pleadings therein, and to report his conclusions thereon to this court, together with any special matter that may arise, would ask to report:

This is an action for the recovering of the possession of a tract of real estate in this county and for damages. It appears from the papers that it was originally commenced against the defendant, Jacob F. Witt, alone, the first summons being dated April 1st, 1876, but the time of the service of such summons on the said defendant is not shown, the original summons and complaint having been lost or mislaid, and a substituted copy of same having been filed and used under the order of this court, made November 19, 1887, by which order the said Jacob F. Witt had leave to answer the same within twenty days from the filing thereof. The said substituted summons and complaint were filed November 21st, 1887, and due notice of the filing of same was served upon the attorney of said Jacob F. Witt.

The said Jacob F. Witt thereupon answered the said complaint, alleging, among other things, that his wife, Cornelia J. Witt, was, at the commencement of said action, and at the time of filing his said answer, the owner of the premises described in the complaint as her separate property, and in the actual, exclusive and adverse possession thereof. On April 5, 1888, upon the application of the plaintiff, and after due notice to the said Jacob F. Witt, the court made an order granting leave to the plaintiff to amend her summons and complaint by adding the name of said Cornelia J. Witt as a party defendant therein, with proper words to charge her, and that the said Cornelia J. Witt be served with said amended complaint, and that they have twenty days to answer same, and that the case then proceed as if the said Cornelia J. Witt had originally been a party thereto. The said amended summons and complaint were served on said Cornelia J. Witt on April 12, 1888, and on the same day the amended complaint was served on the said Jacob F. Witt.

To the said amended complaint the defendants answered separately, the said Jacob F. Witt filing the same answer sub-

mitted by him to the original complaint in the action, contain-
ing three defences: First, a general denial; secondly, that
plaintiff is not the owner or entitled to the possession of said
premises, but that said Cornelia J. Witt, wife of said Jacob F.
Witt, is the owner of said property as her separate property,
and is in the actual, exclusive, and adverse possession thereof,
and that she has held and possessed the said premises adversely
to the pretended title of the plaintiff for more than ten years
last past under a claim of title in fee, exclusive of any other
right, and that his possession has been under the title of said
Cornelia J. Witt and in her right; and, thirdly, that at a sale
of said premises, had on April 6, 1874, he bid the same off for
the said Cornelia J. Witt, and in accordance with a previous
understanding between said Cornelia J. Witt and one J. R.
Watts, had said bid set down to said J. R. Watts, and that
afterwards said J. R. Watts, at the request of said Cornelia J.
Witt, paid said bid with moneys furnished by and belonging
to her, and took the conveyance in his own name, and although
acknowledging that said premises were purchased with funds
of said Cornelia J. Witt, the said J. R. Watts refused to exe-
cute a conveyance for same to her, but with intent to defraud
the said Cornelia J. Witt, and in violation of his trust, con-
veyed the premises to his wife, the plaintiff, who was, before
and at the time of the execution of said conveyance, fully in-
formed of the facts connected with said purchase, and of the
rights and equities of said Cornelia J. Witt, and that said con-
veyance of J. R. Watts to the plaintiff is without consideration,
fraudulent and void.

The defendant, Cornelia J. Witt, in her answer, makes the
same defences to the action as are set up in the answer of said
Jacob F. Witt, and specially pleads that neither the plaintiff,
her ancestor, predecessor, or grantor was seized or possessed
of the said premises, or any part thereof, within ten years be-
fore the commencement of this action against her, and that
she has held and possessed the said premises adversely to the
pretended title of plaintiff for ten years last past before the
commencement of this action against her, under a claim of
right exclusive of any other right; and she prays that the con-

veyance from J. R. Watts to the plaintiff be declared fraudulent and void, and that she have such other and further relief as is just and equitable.

I have held several references in the action, at which the parties were represented by their counsel, and have taken such testimony as was submitted by the parties, and they have been as fully heard as they desired to be, both in testimony and argument, and from the testimony taken, I find the facts to be as follows:

1. That on April 6, 1874, under a judgment of foreclosure, duly obtained and rendered in an action in this court, in which Charles B. Glover, assignee, was plaintiff, and Jacob F. Witt and others were defendants, the real estate described in the complaint was sold by E. I. Cain, then sheriff of this county, and was bid off by the defendant, Jacob F. Witt, in the name of one J. R. Watts, for the sum of fifty-three dollars.

2. That the said J. R. Watts afterwards, on April 24, 1874, complied with the terms of said sale by paying half of said bid, twenty-six and 50-100 dollars, in cash, and giving his bond, secured by a mortgage of said premises, to the said sheriff, for the credit portion of the purchase money (the other half of said bid, and the like sum of twenty-six and 50-100 dollars), with interest from date of sale, and payable April 6, 1875, which bond and mortgage were paid and satisfied by the said J. R. Watts on April 5, 1875, the amount then due being twenty-eight 35-100 dollars, and twenty-five cents for satisfying the mortgage upon the records in the register's office.

3. That before the said sale, and some time during the year 1873, the said Jacob F. Witt, acting as the agent of his wife, Cornelia J. Witt, and the said J. R. Watts agreed to go into the saw mill business together, and to use for the purposes of said business a tract of 100 acres, in Lexington County, in this State, and adjoining the tract in dispute in this case, a tract in the same county, on which the mill was located, and the tract in dispute—all of which real estate then belonged to the said Jacob F. Witt. They also agreed to purchase another tract of 887 acres, in said County of Lexington, in the name of said J. R. Watts, from one Livingston. The said Jacob F. Witt, at

this time, was very much involved in debt, and the above mentioned judgment of foreclosure, which covered the three tracts first above mentioned, had been obtained against him. They endeavored to saw up lumber enough in said saw mill business to pay off this mortgage debt, but failed to do so before a sale of the motgaged property, which was had on April 6, 1874, as above set forth.

4. That under a parol understanding and agreement had between the said Jacob F. Witt, acting as agent of his wife, Cornelia J. Witt, and said J. R. Watts, respecting the said lands, Witt was to attend the sale of the Orangeburg County land, being the tract now in dispute, and Watts the sale of the Lexington County land, which were sold on same salesday, and all of these lands were to be bid off in the name of said J. R. Watts, and the titles for same to be made to him, the milling business then to be continued. And the purchase money of these lands, and also of the Lexington tract, was to be paid from the proceeds of sales of lumber, and when the lands conveyed to Watts were paid for, he was to make title for same to the defendant, Cornelia J. Witt, the wife of Jacob F. Witt, and when the Livingston tract was paid for, she was to convey one-half interest in all the lands to J. R. Watts. And it appears that Mrs. Witt was also to have one-half interest in the Livingston tract.

5. That the amount of the purchase money of the tracts sold, and purchased under the said judgment of foreclosure, as aforesaid, was received by Watts out of the share of Mrs. Witt in the proceeds of sales of lumber sawed at said mill, and in all accounting afterwards had respecting the said mill business, the said amount was deducted from her share in the same. It does not appear, however, whether the purchase money of these lands was paid, in the first instance, from Mrs. Witt's share in this business, or whether it was paid by Watts from his own funds, and afterwards refunded to him. From all the circumstances, I am inclined to think the latter was the case. The testimony shows that $1,000 or $1,200 was paid on the Livingston tract from the general funds of the said mill business, but the mill business was discontinued in the latter

part of 1875, when Watts moved away; and it appears that this property was lost.

6. That on April 19, 1875, the said J. R. Watts conveyed the real estate in dispute to the plaintiff, his wife. 'This deed was recorded January 10, 1876. The consideration stated in the deed is $553; and it is also set forth therein that said conveyance is executed in accordance with an agreement entered into between the said Rhoda R. Watts and the said J. R. Watts at the time he purchased the said tract from the sheriff at public auction, the portion of the said agreement to be performed by the said Rhoda R. Watts having been fully performed by her. I am satisfied this paper was without any consideration, and that it was executed for no other purpose than to defeat any claim that Mrs. Witt may have had in the land under the before mentioned agreement and understanding between Witt and Watts respecting the said lands.

7. That some time in 1875, and after the purchase money of the land in dispute had been received by Watts from Mrs. Witt's share in lumber sold, Witt and his wife, the said Cornelia J., requested Watts to make conveyance of the property to her, and he promised that he would do so; and that at that time Witt and his wife were in the exclusive possession of said land, claiming and holding the same as the separate property of the said wife, and they have ever since then continued in the exclusive and adverse possession of said land, as the property of said wife, the defendant, Cornelia J. Witt, and that neither the plaintiff or her husband and grantor, the said J. R. Watts, has ever been in the possession of said property, or any part thereof, under a claim of title thereto.

Upon this statement of facts my conclusions are: 1. That the circumstances attending the sale and conveyance of the real estate in dispute from Sheriff Cain to J. R. Watts in 1874, do not establish a resulting trust in favor of the defendant, Cornelia J. Witt, as it has not been shown that the purchase money paid to the sheriff by Watts for the land and in settlement of his mortgage for the credit portion, was received before or at the time by Watts from the funds of Mrs. Witt. *Ex parte Trenholm,* 19 S. C., 135; *Brown* v. *Cave,* 23 *Id.,* 257. 2. Nor

does the parol agreement or understanding between the parties as to the said purchase of said real estate entitle the defendant, Cornelia J. Witt, to specific performance, as the said agreement or understanding is within the statute of frauds, and, therefore, void. *Lamar* v. *Wright*, 31 S. C., 75, and cases there cited. The case of *Coney* v. *Timmons*, 16 S. C., 378, cited by defendants' attorneys, is not in point in this case, as there was a change of possession in that case, which was sufficient to take the agreement out of the statute of frauds. Besides, in this case the party with whom the agreement or understanding was had, is not a party to this action, and it can hardly be contended that his grantor can be compelled to specifically perform a contract made by him.

3. Nor can the deed of conveyance from Watts to his wife, although without consideration, and executed for the purpose of defeating any claim of Mrs. Witt, under the understanding or agreement had at the time of sheriff's sale, be set aside and declared void, as the said Cornelia J. Witt has failed to sustain any legal or equitable claim to said real estate.

4. That the defendant, Jacob F. Witt, and his wife, the said Cornelia J. Witt, having been in the exclusive adverse possession of the real estate in dispute, and holding and claiming the same as the separate property of the said Cornelia J. Witt for more than ten years before the commencement of this action against her, she, the said Cornelia J. Witt, is entitled to recover in this action. It is true, that this possession and holding was commenced under a void agreement, but that makes no difference. A person holding adversely during the statutory period, under no agreement at all with the rightful owner, and without any title whatever, will be protected.

5. That the defendant, Cornelia J. Witt, should recover the real estate in dispute in this action; and that plaintiff should pay the costs of this action.

The Circuit decree, omitting its recital of the master's findings, was as follows:

I do not think that the master erred in his first, second, and third conclusions of matters of law, as alleged in the exceptions

of the defendant, Cornelia J. Witt, and said exceptions *are overruled.*

As J. R. Watts paid the sheriff the purchase money of the land, no *resulting trust* can arise in favor of the defendant, Cornelia J. Witt, under the parol agreement between herself and J. R. Watts, as found by the master. If the statute of frauds did not apply to said parol agreement, it could not be enforced in this action, as J. R. Watts, a party to said agreement, is not before the court.

It is alleged in the plaintiff's exceptions that the master erred in finding as matter of fact, and in concluding as matter of law, that the defendants have been in the *adverse* possession of the land in dispute for the statutory period, claiming the same as the separate property of the defendant, Cornelia J. Witt. This is the only ground upon which the master concludes that plaintiff's complaint should be dismissed. The legal and equitable defences interposed by the defendant, Cornelia J. Witt, are somewhat *inconsistent.* Under the equitable defence, she claims the land under the parol agreement between herself and J. R. Watts. The master finds that there was a parol agreement between J. R. Watts and Cornelia J. Witt with reference to the land, but concludes that said agreement can't avail the defendant, Cornelia J. Witt. As the defendants are in possession of the land under the parol agreement with J. R. Watts, the character of their possession under said agreement could not be construed to be *adverse* until J. R. Watts, or his grantee, was notified that the defendants did not claim the land under the parol agreement, but were asserting a claim to the land *independent of said agreement.* This has not been done by either of the defendants. On the contrary, the defendants have been urging their claim to the land in dispute under the parol agreement between J. R. Watts and the defendant, Cornelia J. Witt. I cannot concur in the master's findings as matter of fact, or in his conclusions as matter of law, that the defendants have been in the *actual exclusive adverse* possession of the land as the separate property of the defendant, Cornelia J. Witt, for the statutory period. To this

extent the master's report *is overruled,* and the plaintiff's exceptions to said report are sustained.

The evidence sustains the master's finding as matter of fact that the deed from J. R. Watts to the plaintiff was without consideration, and was executed for the purpose of defeating any claim that Cornelia J. Witt may have had to the land in dispute, and the plaintiff's first exception *is overruled.*

It is ordered and adjudged, that so much of the master's report as finds as matter of fact, as well as the master's conclusions as matter of law, that the defendants have had the actual exclusive adverse possession of the land in dispute, as the separate property of the defendant, Cornelia J. Witt, for the statutory period, as well as the master's conclusion that the defendant, Cornelia J. Witt, is entitled to recover in this action, and that the plaintiff pay costs, is *hereby overruled.* In all further respects the master's report is confirmed, and the exceptions to said report are overruled. It is further ordered and adjudged, that the plaintiff, Rhoda Watts, have judgment, with leave to enter up execution against the defendants, Jacob F. Witt and Cornelia J. Witt, for the recovery of the possession of the tract of land described in the complaint herein, with costs.

Defendants appealed.

*Messrs. Glaze & Herbert,* for appellants.

*Messrs. Johnstone & Cromer* and *Moss & Dantzler,* contra.

June 26, 1893.   The opinion of the court was delivered by

MR. CHIEF JUSTICE MCIVER. This was an action to recover possession of real estate. The facts of the case are so fully and clearly stated in the report of the master and in the decree of the Circuit Judge (both of which should be incorporated in the report of the case), that we deem it unnecessary to do more than to give an outline of the general facts necessary to a proper understanding of the two questions upon which this appeal must turn.

The land in dispute originally belonged to the defendant,

Jacob F. Witt, and was sold by the sheriff under a judgment against him on the 6th of April, 1874. At that sale the land was bid off by said Jacob F. Witt, in the name of one J. R. Watts, who paid the purchase money and took title to himself, under an alleged parol agreement made between Jacob F. Witt, acting as the agent of his wife, the defendant, Cornelia J. Witt, and the said J. R. Watts, that said Witt was to bid off the land in the name of said Watts and have titles made to him, but when said Watts was refunded the purchase money, he was to make titles to the said Cornelia J. Witt. The master's seventh finding of fact is in these words: "That some time in 1875, and after the purchase money of the land in dispute had been received by Watts from Mrs. Witt's share in lumber sold, Witt and his wife, the said Cornelia J., requested Watts to make conveyance of the property to her, and he promised that he would do so; and that, at that time, Witt and his wife were in the exclusive possession of said land, claiming and holding the same as the separate property of the said wife, and they have ever since then continued in the exclusive and adverse possession of said land, as the property of said wife, the defendant, Cornelia J. Witt, and that neither the plaintiff or her husband and grantor, the said J. R. Watts, has ever been in the possession of said property, or any part thereof, under a claim of title thereto." The master also finds as a fact, that on the 19th of April, 1875, the said J. R. Watts conveyed the land in dispute to the plaintiff herein, his wife, by a deed which was recorded 10th of January, 1876. But the master also finds as follows: "The consideration stated in the deed is $553; and it is also set forth therein, that said conveyance is executed in accordance with an agreement entered into between the said Rhoda R. Watts and the said J. R. Watts, at the time he purchased the said tract from the sheriff at public auction, the portion of the said agreement to be performed by the said Rhoda R. Watts having been fully performed by her. I am satisfied this paper was made without any consideration, and that it was executed for no other purpose than to defeat any claim that Mrs. Witt may have had in the land under the before mentioned agreement and understanding between Witt and

Watts respecting the said lands;'' and this finding of fact by the master is expressly sustained by the Circuit Judge.

Upon the facts as they appear in the report of the master and in the decree of the Circuit Judge, of which the foregoing is but a bare outline, two leading and controlling questions arise: 1st. As to the effect of the fact found both by the master and the Circuit Judge, that the deed from J. R. Watts to the plaintiff, constituting one of the links in her chain of title, was tainted not merely with constructive, but with actual, moral fraud. 2d. Whether the defendant succeeded in establishing her claim to hold the land in dispute by adverse possession.

As to the first question, both the master and the Circuit Judge seem to have treated the question as if it had arisen in a case where the defendant invoked the active interference of the court to set aside a deed for fraud, where it may be true that, as held below, a court of equity would not exert its power to set aside a fraudulent deed, except at the instance of a party who shows that he has suffered or is likely to suffer some prejudice to his legal or equitable rights by such fraud; hence when it was held below (whether correctly or not we shall presently consider) that the defendant had no rights of either character, under the parol agreement above referred to, she was not in a position to question the validity of the fraudulent deed to the plaintiff. We are inclined to think, however, that such a view is not applicable to the present case. Hence the action is not of that character. On the contrary, it is an action brought by the plaintiff to recover possession of real estate, of which she never had possession, and her right to recover depends solely upon the establishment of her superior legal title. She must, under the well settled rule, depend entirely upon the strength of her own title, and not upon the weakness of her adversary's. A defendant in possession may either fold his arms and await the establishment of plaintiff's title, or he may show a superior title in some third person, and until the plaintiff shows a title superior to all the world, the defendant is entitled to retain possession. When, therefore, it appears that one of the links in plaintiff's title is defective or void, for fraud or other cause, the plaintiff fails to estab-

lish superior title, and the action fails on that account. Any other view would permit a party to take advantage of his own wrong.

But waiving this, it seems to us that there is another ground upon which the ruling below must be held to be erroneous. That ruling rests upon the assumption that the parol agreement set up by the defendant was void under the statute of frauds. It has long been settled, however, that part performance will take a case out of this statute; and the practical inquiry here is whether there has been such part performance in this case as will have that effect. What is such part performance of a verbal agreement for the sale of land as will be sufficient to take the case out of the statute, is a question upon which much has been said in the various cases in which the question has arisen; and it must be admitted that there is no little conflict of opinion upon the subject. The doctrine that part performance of a verbal agreement for the sale of real estate will take a case out of the operation of the statute of frauds, is a creature of the Court of Equity, and rests upon the ground of equitable fraud (3 Pom. Eq. Jur., § 1409), or, as it is said in some of the cases, a court of equity will not permit a statute designed to prevent frauds to be used as an instrument to effect a fraud. Without undertaking anything like a review of the cases, it is sufficient for us to say here that we think the rule upon the subject is well stated in a note to 8 Am. & Eng. Enc. Law, at page 742–3, upon the authority of *Bechtel* v. *Cone*, 52 Md., 698, and *Rook* v. *Jameson*, 67 Iowa, 202, in the following language: "Where everything has been done on both sides, save the mere delivery of the deed, so that the holder of the legal title has become a bare trustee, equity will compel the delivery."

Now, in this case, it appears that the defendant, Cornelia J. Witt, was allowed to take and retain possession for about thirteen years after the parol agreement was made, and after the purchase money had been fully paid, and nothing remained to be done by either party except to deliver the deed, and under the rule she was entitled to specific performance of such agreement, and hence the deed under which plaintiff claims, having

been made with intent to defraud her and defeat her right to specific performance, was absolutely void, and vested no title whatever in the plaintiff. Indeed, since the cases of *Roberts* v. *Smith*, 21 S. C., 455, and *Sweatman* v. *Edmunds*, 28 *Id.*, 58, the question can scarcely be regarded as an open one in this State, for in both of those cases it was held, that one who purchases land and is let into possession, and pays the purchase money, is entitled to specific performance, and for all practical purposes must be regarded as the owner.

As to the second question, we are unable to concur in the conclusion reached by the Circuit Judge, and, on the contrary, think that the master took the correct view. It is proper for us to remark, that we do not understand that the Circuit Judge differed with the master as to the facts, but only as to the legal inference to be drawn from the facts. The question of adverse possession is a mixed question of law and fact. It is very manifest from the reasoning of the Circuit Judge, that he based his conclusion upon this branch of the case solely upon the ground, that the defendants being in possession under the parol agreement with J. R. Watts, the character of their possession under said agreement could not be construed to be *adverse* until J. R. Watts or his grantee was notified that the defendants did not claim the land under the parol agreement, but were asserting a claim to the land independent of said agreement; and this not having been done, the possession could not be regarded as adverse. In this we think there was error of law. The rule, as we understand it, is, that where one goes into possession of real estate under a parol contract to buy the same, he cannot claim to hold adversely to his vendor *until the purchase money is fully paid;* but when it is paid, he then holds, not in subordination to the rights of the vendor, but in his own right, and his possession from that time becomes adverse to the vendor; and if his possession continues for the requisite period, he acquires a title under the statute of limitations. 1 Am. & Eng. Enc. Law, 230. This doctrine has been expressly recognized in this State in the case of *Ellison* v. *Cathcart*, 1 McMull., 5, where it was held that "Possession and the payment of the purchase money is a good equitable title, and

a possession of ten years under such a title is good under the statute [of] limitations." The same doctrine has been recognized, impliedly at least, in several other cases. *Richards* v. *McKie*, Harp. Eq., 184; *Secrest* v. *McKenna*, 6 Rich. Eq., 72; *Bank* v. *Smyers*, 2 Strob., 28; and *Blackwell* v. *Ryan*, 21 S. C., 123. It seems to us, therefore, that in no view of the case can the plaintiff's complaint be sustained.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and that the complaint be dismissed.

---

## GIBBES v. MORRISON.

1. CASE CRITICISED.—James *v.* Smith, 2 S. C., 183, recognized and followed.
2. COURT OF COMMON PLEAS—RULE—JURISDICTION.—The duty imposed by statute upon a sheriff of putting a purchaser at tax sale into possession of the land purchased cannot be enforced by rule from the Court of Common Pleas, as that court has no jurisdiction to enforce by rule any duty imposed upon the sheriff by statute in a matter of which that court has not acquired jurisdiction in some recognized mode of proceeding, or by express statutory provision.
3. CASE CRITICISED.—This case distinguished from Scott *ads.* Carr, Riley, 193.
4. THE QUESTION OF JURISDICTION may be raised at any time, and it is properly raised by the court itself of its own motion.
5. CHANGE OF PROCEEDING.—There was no legal error on the part of the Circuit Judge in refusing to convert a proceeding by rule into one for mandamus.
6. TAX SALES—PURCHASER—COMPTROLLER GENERAL.—The statute which put the sheriffs of the State under the direction of the comptroller general in making tax levies and sales and paying over the proceeds, and which invested the comptroller general with the rights of plaintiffs in execution, does not confer any power upon that officer as to putting purchasers at tax sales into possession, and certainly confers no rights upon a purchaser at a tax sale.
7. STATUTES—EXPRESSIO UNIUS, &c.—The statutory provision, that a mortgagor may apply by rule to have satisfaction entered upon the record of his mortgage, does not authorize rules in other matters not enumerated.

Before FRASER, J., Berkeley, October, 1892.

This was a proceeding by rule against John B. Morrison, as sheriff of Berkeley County, instituted by James G. Gibbes.

*Messrs. McCradys & Bacot,* for appellant.

*Mr. E. J. Dennis,* contra.

June 26, 1893. The opinion of the court was delivered by

MR. CHIEF JUSTICE MCIVER. In this case the appellant filed his petition, addressed to the presiding judge of the Court of Common Pleas, setting forth, substantially, that he had become the purchaser of certain land in the County of Berkeley, which respondent had sold under a warrant or execution issued by the county treasurer of said county to enforce the payment of taxes on said land, and that although he had complied with the terms of said sale, and received titles from the said respondent, he had neglected and refused, upon demand, to put appellant in possession of said land, as required by the provisions of the act of 1887 (19 Stat., 862), and the amendments thereto, under which the sale had been made. Wherefore, the petitioner prayed for an order directing the said John B. Morrison, sheriff as aforesaid, to put the petitioner in possession of said land, as required by the statute.

On hearing this petition, his honor, Judge Fraser, issued an order requiring the respondent to show cause why the appellant should not be put in possession of the land mentioned in the petition. To this rule to show cause, the respondent made return, setting forth his reasons for not putting the appellant in possession of the land, but not raising any question of jurisdiction. These reasons need not be stated here, as, under the view which we take of the case, it would not only be unnecessary, but perhaps improper, for us to consider the merits. The Circuit Judge held, that as the execution under which the land was sold did not issue out of this court—the Court of Common Pleas—he had "no jurisdiction, by rule on the sheriff, to require him to perform duties imposed on him by law and under execution issued by some other authority than this court;" referring to a case in Darlington as sustaining his view.

The case alluded to by his honor is, doubtless, the case of

*James* v. *Smith*, 2 S. C., 183, which we think fully supports his view.    In that case the plaintiffs instituted proceedings, under the act of 1866 (13 Stat., 416), before a magistrate to eject the defendants, Smith and Bristow, alleged to be tenants of plaintiffs, from certain lands, and upon hearing the same the magistrate issued his warrant, directed to Thomas C. Cox as sheriff of said county, requiring him to eject said Smith and Bristow from said premises, and to put the plaintiffs in possession of the same.    The warrant having been lodged with the sheriff, and he having failed to execute the same, the plaintiffs applied to and obtained from the Court of Common Pleas a rule on the sheriff, to show cause why he should not be attached for a contempt, because of his failure to execute said warrant.    To this rule the sheriff made return, "and for cause submitted *inter alia* that the plaintiffs have no right to procure an attachment against him for contempt of court, for failing to execute the process of another and inferior jurisdiction."    The Circuit Judge held the return insufficient, made the rule absolute, ordered the sheriff forthwith to execute the warrant issued by the magistrate, and that upon his failure so to do by a day named, he be fined, and be imprisoned until he purged his contempt, and that a writ of attachment do issue to enforce the order.    From this order the sheriff appealed, upon the ground, amongst others, that the Circuit Judge "had no right to entertain a rule against the sheriff for failing or refusing to execute the process of an inferior tribunal, or any tribunal except his own court."    Pending this appeal the writ of attachment was issued and the sheriff was arrested and imprisoned thereunder, whereupon he applied to the chief justice for a writ of *habeas corpus*, which was granted, and upon hearing the return thereto the sheriff moved for and obtained his discharge.    In granting the order of discharge, Moses, C. J., rendered an elaborate opinion, holding that the Circuit Court of Common Pleas has no jurisdiction, upon a mere rule to show cause, to attach a sheriff for contempt, in failing to execute a warrant issued by a magistrate in a civil proceeding, directed to the sheriff and legally in his hands for execution.    This opinion was subse-

quently adopted by the Supreme Court upon the hearing of the appeal as expressive of the law applicable to the matter.

Upon the same principle, we must hold that the Court of Common Pleas has no jurisdiction to enforce by rule the performance of any duty imposed upon the sheriff by statute in a matter of which said court has not acquired jurisdiction in some recognized mode of proceeding, unless expressly authorized so to do by some statutory provision; and none such has been brought to our attention in this case. It seems to us, therefore, that there was no error on the part of the Circuit Judge in declining to take jurisdiction in this case, without indicating any opinion as to the right of the appellant to be put into possession of the land, and in remitting him, without prejudice, to any other proceeding he may be advised to institute.

It is true that the case of *Scott* ads. *Carr*, Riley, 193, does furnish an instance in which the Court of Common Pleas did take jurisdiction of a rule on the sheriff to show cause why he had failed to collect an execution issued by a court martial for the enforcement of a fine imposed for a default in the performance of militia duty; but in that case the question of jurisdiction was not raised either by the parties or by the court, and is in no way alluded to in the opinion; possibly for the reason that the statute (act of 1833) authorizing the issue of executions for the payment of fines imposed by a court martial provided that the duties of the sheriff in respect thereto should be performed "under the same penalties as are now imposed by law for not returning process issued by any court of this State;" and it may be that the words just quoted were regarded as sufficient to place executions issued by a court martial upon the same footing as executions issued by any of the courts of this State, and hence enforceable by rule and attachment. At all events, the question of jurisdiction not being raised or considered in that case, it furnishes no authority in conflict with the view which we have adopted upon the authority of the case of *James* v. *Smith, supra,* where the question was raised and elaborately considered.

The fact that the question of jurisdiction was expressly

raised by the sheriff in his return to the rule, in *James* v. *Smith,* while here the respondent raised no such question in his answer to the rule, is a matter of no consequence.

For it is too well settled to admit of argument that a question of jurisdiction may be raised at any time, even by the court, *ex mero motu.* In this case, it was not only the right of the Circuit Judge to raise the question of jurisdiction, but, if not his duty, it certainly was eminently proper for him to do so. No court ought to be expected to grant an order which it has no means of enforcing; and we do not see how the order applied for here could have been enforced, except by attachment for a contempt; and this the authorities above cited show could not be resorted to.

Nor do we think there was any error on the part of the Circuit Judge in declining to convert this application into a proceeding for mandamus; but, even if there was such error, there certainly was no *error of law* in refusing to do so.

Finally, appellant invokes the benefit of the provisions of section 9, added to the act of 1887 by the act of 1888 (20 Stat., 51), as amended by the act of 1890 (20 Stat., 652). But that section, if at all applicable to the present case, is, as it seems to us, rather adverse than favorable to the appellant's view. That section, as it now stands, or at least so much of it as relates to this matter, reads as follows: "The sheriffs of the several counties in this State, in making levies and sales, in making returns, and in paying over money collected under tax warrants or executions placed in their hands by county treasurers, shall be subject to the direction and under the control of the comptroller general of the State, in like manner as they now are to plaintiffs in execution; and the comptroller general is hereby invested with all the rights and privileges of a plaintiff in execution to invoke and obtain the aid of the court to compel refractory sheriffs to discharge their duties in the enforcement of tax executions," &c.

The object of this provision, judging from its phraseology, seems to be nothing more than to invest the chief fiscal officer of the State with power to enforce *the collection of taxes* under

executions placed in the hands of the sheriffs, and has no reference to any other duties required of the sheriff. If that officer collects the taxes and pays them over to the proper authorities, the comptroller general has nothing more to do with the matter. It is no concern of his whether the sheriff performs his duty *to the purchaser* of land under an execution for taxes—for instance, whether he puts the purchaser into possession or not. That is a matter which concerns the purchaser, and not the State or its chief fiscal officer. The provision is manifestly designed to secure the prompt collection of the taxes, and not intended to give the comptroller general general supervision and control of the sheriffs in the discharge of their official duties, but only so far as to enforce prompt collections of taxes, and prompt payment over of the same. But if we are in error in this view, we do not see how appellant's case is helped by this provision. This is not a proceeding instituted by the comptroller general, and, on the contrary, so far as appears, that officer has nothing to do with it, and, perhaps, knows nothing of it. So that, even if it should be conceded that the comptroller general has the power, by rule on the sheriff, to compel him to put a purchaser, at a sale made by him under a tax execution, into possession, no such power has been exerted in this case.

The suggestion made in the argument that the provision made in section 1793 of the General Statutes affords an instance in which the court has been authorized to issue a rule to show cause in a matter not involved in any action or proceeding pending in the court, cannot avail the appellant. That is a special provision applicable only to a particular matter; and from it no inference can be drawn favorable to appellant, but rather the contrary, under the maxim, *expressio unius est exclusio alterius.*

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

## McCREERY v. GARVIN.

1. STATEMENT OF NOTES NOT AN OPEN ACCOUNT.—In action on a bond to recover the amount due by notes and drafts secured by such bond, a statement of the drafts and notes upon which plaintiffs base their claim is not an open account, and, therefore, not irrelevant under the pleadings nor inadmissible in evidence.

2. CORPORATION—AGENTS—WRITTEN PAPER.—Where a corporation by formal written action appointed a business agent, it was for the court to define his relations to the corporation; and parol testimony upon this matter was incompetent. The corporation is bound by all acts of the agent within the scope of his agency, and no private limitations upon his powers could affect the rights of those who dealt with him in ignorance of such limitations.

3. NONSUIT.—There being some testimony to support the claim of plaintiffs under their complaint, a nonsuit was properly refused.

4. CORPORATION—AGENT—INSTRUCTING JURY.—Where the undisputed testimony shows that a mercantile corporation appointed a business agent in writing, and a bond was given by the stockholders individually, which bond recited the purchase of goods from plaintiffs, and provided for their payment and the payment of subsequent purchases, and such agent acted during the time that notes for these purchases were executed and delivered to plaintiffs by this agent for the corporation, the trial judge did not err in charging the jury that this agent had authority to sign these notes, even though the resolution appointing him declared that he was to act under the supervision of the board of directors.

5. ASSIGNMENT FOR CREDITORS—ACCEPTANCE—ATTORNEY.—The attendance of a creditor at a meeting of creditors of a debtor who has made a general assignment, and his participation in the selection of an agent to act with the assignee, and a letter by the attorney of such creditor to such agent, directing him as to the sale of the assigned goods, and bidding him to confer, if in doubt, with the writer, was not an acceptance of the terms of the assignment, and the trial judge properly so instructed the jury. If the attorney had accepted, it would not have bound the client.

Before HUDSON, J., Aiken, October, 1892.

Action by T. A. McCreery & Co. against Robert Garvin and seven others, commenced February 26, 1892.

*Messrs. Henderson Bros.* and *John Gary Evans*, for appellants.

*Messrs. J. W. Muller* and *Croft & Chafee*, contra.

June 26, 1893.   The opinion of the court was delivered by

Mr. Chief Justice McIver.   The plaintiffs bring this action to recover from the defendants the amount alleged to be due by the Farmers' Alliance Trade Medium, a corporation formed under the general incorporation law of the State, to the plaintiffs, the payment of which was secured by the bond of the defendants.   In their complaint, plaintiffs set out a copy of this bond; allege that the said corporation is indebted to them in the sum stated therein, "upon its bills and promissory notes made and delivered to the plaintiffs under their said firm name; that all of said bills and notes were at maturity presented to the said Farmers' Alliance Trade Medium for payment, but were not paid; of all which the defendant had due notice, and that the condition of the said bond has been broken, and there is now due thereon" the sum stated.   The defendants answered, admitting the execution of the bond above referred to, but denying each and every other allegation in the complaint.

The condition of the said bond, which was executed on the 17th of June, 1891, is as follows: "Whereas the Farmers' Alliance Trade Medium, a body corporate, doing business at Wagener, in Aiken County, in said State, and now indebted to T. A. McCreery and B. B. McCreery, partners as aforesaid, in divers sums of money for goods sold and delivered; and whereas it has been mutually agreed between the said parties that the said T. A. McCreery & Co. shall and will extend and give to the said Farmers' Alliance Trade Medium a line of credit on such goods, wares and merchandise as the said Farmers' Alliance Trade Medium shall, from time to time, order in the line of the business of the said T. A. McCreery & Co.   Now the condition of this obligation is such, that if the said Farmers' Alliance Trade Medium shall, from time to time, and at all times hereafter, well and truly pay, or cause to be paid, to the said T. A. McCreery & Co. all sums of money they may owe them by bill or note as the same matures and becomes payable, and further shall pay on demand all other sums of money they may owe them on any account, as well as all sums that are now contracted as that which may hereafter be contracted, then this

obligation to be void, otherwise to remain in full force and virtue."

Before proceeding to discuss the questions made under defendants' first defence, it is well to state certain undisputed facts, as well as certain other facts as to which there is a conflict of testimony. The Farmers' Alliance Trade Medium was incorporated "to do a general merchandise business," and received its charter on the 5th of July, 1890. 20 Stat., 1012. At a meeting of the directors of said corporation, held on the 3d of November, 1890, the following action of the board was taken: "Moved and seconded, that we elect H. J. McLane president, and G. W. Busbee secretary, and G. S. Baggott treasurer of the board of directors for the ensuing year. Moved and seconded, that we elect J. E. Busbee business agent for the year, at $50 per month, including clerk hire and all bookkeeping necessary pertaining to the house; also to act under the supervision of said board." The notes in question here were all given after the date of the bond, and were signed "Farmers' Alliance Trade Medium. J. E. Busbee, Manager." And the same is true of the draft, except that it is signed "J. E. Busbee, Manager." Two of the notes purport to be also signed "H. J. McLane, President." But there was no proof of his signature, and, on the contrary, he denied that he had ever signed either of said notes.

A meeting of the stockholders of the Farmers' Alliance Trade Medium, attended by a large majority of the stockholders, was held on the 29th of January, 1892, at which the plaintiffs' agent, accompanied by Mr. Muller as his counsel, appeared and presented a statement of plaintiffs' claims, amounting to $4,078.86, whereupon it was "Resolved, that the settlement of the business between the Farmers' Alliance Trade Medium and T. A. McCreery be adjusted between the attorneys, Muller and Henderson Bros.; further agreed, that the house be locked and the key turned over to Captain G. A. Lucas." Mr. McCreery, in his testimony, says that the statement thus referred to was nothing more than a statement of the amount of the draft, with the credits to which it was entitled, and a statement of the several notes with the amounts and dates thereof, showing

34—39

the total amount due thereon, with interest, to be the said sum of $4,078.86, a copy of which statement accompanies his testimony. He also testified that no objection to, or denial of, any item mentioned in this statement was made by any of the parties, and there was no testimony to the contrary; but Mr. Mc-Creery's further statement that the notes themselves were presented, along with the statement, is denied by the witnesses for the defence, though they all admit that the statement was presented and a copy furnished to the meeting. It further appears from the testimony that some time in January, 1892, but at what precise date does not appear, J. E. Busbee was removed from his position as business agent, and one Williams appointed in his place; but as the draft and all the notes, relied upon as evidences of indebtedness on the part of the Farmers' Alliance Trade Medium to the plaintiffs, bear date prior to the 1st of January, 1892, we suppose the precise date of Busbee's removal is not material.

The jury having rendered a verdict in favor of the plaintiffs, upon which judgment was duly entered, defendants appeal upon the several exceptions set out in the record.

The first and sixth exceptions may be considered together. In the first, error is imputed to the Circuit Judge in permitting plaintiffs to prove the alleged indebtedness of the Farmers' Alliance Trade Medium by introducing its account with the plaintiffs, when the complaint declared upon the promissory notes and drafts, and not upon an open account; and in the sixth it is claimed that the judge erred in refusing defendants' second request to charge that the action being upon the bond, and the breach assigned being the non-payment of bills and promissory notes—not open accounts—plaintiffs cannot recover the amount of such open accounts. Both of these exceptions are taken under a misconception of the facts. The plaintiffs did not offer to prove any indebtedness by open account, but relied upon the draft and notes given to close the open accounts, and there was, therefore, nothing upon which the request to charge could have been based. Hence, even if it could properly be held, in view of the express stipulation in the bond, not only that the Farmers' Alliance Trade Medium

should pay all sums due by bill or note, but "further shall pay on demand all other sums of money they may owe them *on any account,*" that the plaintiffs could recover only such sums of money as were evidenced by bill or note, and could not recover any sum due by open account, yet that could not affect the present case, for here there was no offer to prove any open account, and no attempt to recover thereon. What is termed an open account was, in fact, nothing more than a mere statement of the draft and notes upon which the plaintiffs based their claims.

The second exception imputes error to the Circuit Judge in rejecting the testimony of the witness, "H. J. McLane and others as to the relations between J. E. Busbee and the Alliance Trade Medium, and what Mr. Busbee did, and how he acted, and by what authority he acted." In view of the fact that the relations of Busbee to the Alliance Trade Medium had been established by a formal act of the board of directors of the corporation, expressed in a resolution of the board spread upon their minutes, we think that the parol testimony offered was clearly incompetent. If the board found that Busbee was either incompetent or unfaithful in the discharge of the duties of the position to which they had appointed him, the remedy was in their own hands, one to which they subsequently resorted, but too late to affect the present case. After having appointed Busbee as their business agent, and allowed him to remain in that position for more than a year, the corporation would be bound by all of his acts within the scope of his agency (which will be presently considered), and no private instructions or limitations placed upon his general authority could affect the rights of those with whom he had been and was dealing as business agent of the corporation, unless such private instructions or limitations were brought to the notice of those with whom he had thus been dealing; and of this there was no pretense.

The third exception alleges error in refusing the motion for a nonsuit. This exception is so manifestly untenable that one of the counsel for appellants is compelled to disclaim any reliance upon it. We do not, therefore, deem it

necessary to consider it, as it is too clear for argument, for there was certainly some testimony (and we must say we think quite sufficient) to sustain plaintiff's claim.

The fourth and fifth exceptions may be considered together. They practically raise the question whether the Circuit Judge erred in refusing to leave the question to the jury whether Busbee had authority to sign the notes in question, and on the contrary charging the jury that Busbee did have authority so to do. As we understand it, an agency may be established either by express appointment or by acts and declarations of the principal, holding out one as his agent, or by subsequent recognition and ratification of acts done by one claiming to be the agent. Inasmuch as in this case the agency of Busbee was constituted by express appointment in writing, we need not consider whether he was held out to the world as agent, or whether his acts as such were subsequently ratified by the alleged principal. The undisputed evidence in this case is that the Farmers' Alliance Trade Medium was a corporation duly chartered for the purpose of carrying on "a general merchandise business," which necessarily involved the purchase and sale of goods, wares and merchandise, and the recitals in the bond show that goods had been bought from the plaintiffs and indebtedness had been incurred therefor, and the express purpose of the bond was to secure the payment thereof, as well as to secure "a line of credit" with the plaintiffs for the purchase of other goods; which necessarily implied buying on a credit, and securing the payment for such purchases in the usual way of giving bills or notes. Now as a corporation can only act through some individual as its agent, and as the minutes of the board of directors showed that J. E. Busbee had been appointed its business agent, and as the undisputed testimony showed that he was acting as such agent during the time when the notes in question were given, we do not think that there was any question of fact to be left to the jury, and there was no error on the part of the Circuit Judge in giving the instructions complained of; and hence neither of these exceptions can be sustained. See 1 Am. & Eng. Enc. Law, 363, and notes.

It is contended, however, that the concluding words of the

resolution, appointing Busbee as business agent—"also to act under the supervision of said board".—had the effect of limiting the general authority conferred by such appointment. We cannot so construe those words. We suppose that an agent, or other officer, of a corporation governed by a board of directors always acts under the supervision of such board; but that by no means implies that such agent can do no act except such as may be expressly approved by the board. So much for the questions arising under the first defence set up in the answer.

The defendants, however, as a second defence, claim that the defendants were released from liability under the bond, upon the ground that the Farmers' Alliance Trade Medium made an assignment for the benefit of its creditors on the 19th of February, 1892, and that the plaintiffs practically accepted the same, and thereby released the defendants from any liability. The undisputed facts in relation to this branch of the case are substantially as follows: On the 19th of February, 1892, the said corporation made an assignment for the benefit of its creditors, providing, amongst other things, that the residue of the proceeds of the assigned property (after paying expenses, &c., as we understand) should be applied to the payment *pro rata* of the claims of such creditors as should accept and release *in writing* the corporation from any unpaid balances due thereon. In pursuance of the statute, a meeting of the creditors was duly called by the assignee, at which the plaintiffs were represented by their counsel, Mr. Muller, and upon his motion, he representing a majority in amount of the claims presented, G. A. Lucas was appointed agent of the creditors. At this meeting, Mr. Muller stated in writing that the plaintiffs "would not accept the terms of the assignment by agreeing to discharge the Farmers' Alliance Trade Medium of all liability by accepting their *pro rata* share of the funds under the deed of assignment; but, to the contrary, they refused to come in and accept said terms, and appeared at the meeting solely for the purpose of electing an agent of the creditors."

A very short time after this meeting, Mr. Muller wrote a letter to Mr. Lucas, informing him of his appointment as agent, and saying: "Under the laws of the State, you are to act on

behalf of the creditors jointly with the assignee (J. E. Busbee).
Our idea, and the idea of the assignee, is that the goods should
be sold in bulk.  Mr. Busbee said yesterday that Gantt & Gantt
wanted to buy the entire stock and store fixtures.  Don't make
any sale until you have conferred with either myself or Croft
& Chafee, my associates.  If at any time you are in doubt as
to your duties, write to either C. & C. or myself."  This con-
duct on the part of the counsel for plaintiffs, it is contended by
appellants, operated substantially as an acceptance of the terms
of the assignment by the plaintiffs, and as a release of any un-
paid balances due after the application of plaintiffs' *pro rata*
of the proceeds of the assigned property, and thereby released
the defendants from liability under their bond; or, at least, that
the question, whether it did so operate, should have been left
to the jury.  This view the Circuit Judge declined to accept,
and, on the contrary, charged the jury, that such conduct on
the part of the plaintiffs' attorney did not amount to an accept-
ance of the assignment, and, therefore, the defendants were not
thereby discharged.  This constitutes the basis of appellants'
seventh, eighth and ninth exceptions.

These exceptions cannot be sustained.  The question whether
the plaintiffs had accepted the terms of the assignment de-
pended solely upon the construction of written documents, and
there was no question of fact to be left to the jury.  We agree
entirely with the construction adopted by the Circuit Judge.
The fact that the plaintiffs, by their counsel, attended the
meeting of creditors called for the purpose of appointing an
agent, and participated in the appointment of such agent, cer-
tainly cannot operate as an acceptance of the assignment, or
even as an indication of a purpose to do so.  Such meetings
are always held before the time expires within which creditors
are allowed to determine whether they will accept or not.  In-
deed, whether an agent shall be appointed or not, and who he
shall be, may be a very material element to be considered in
determining the question of acceptance, as upon that may de-
pend the faithfulness and efficiency of the administration of
the assigned assets.  Hence, even where a creditor has made
up his mind not to accept the terms of the assignment, he has

a perfect right, secured to him by statute (section 2006 *et seq.*, General Statutes), to attend a meeting called for the purpose of appointing an agent, and participate therein, for it is important to the interests even of a non-accepting creditor that the assets of the assigned estate should be faithfully and efficiently administered. It is quite clear, therefore, that the fact that the plaintiffs, by their counsel, attended the meeting called for the purpose of appointing an agent could not possibly be construed as amounting to an acceptance of the assignment. See *Jackson* v. *Patrick*, 10 S. C., 203–4; *Jaffray* v. *Steedman*, 35 *Id.*, 33. For like reasons, we do not see how the letter of Mr. Muller to the agent, Lucas, could be regarded even as an intimation that plaintiffs intended to accept the assignment, much less as an actual acceptance. But even if Mr. Muller, acting as an attorney at law, had undertaken, in express terms, to accept and release, on the part of the plaintiffs, his act would not have been binding on them. *Gilliland* v. *Gasque*, 6 S. C., 406.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

---

## BRATTON v. LOWRY.

1. MARRIED WOMEN—CASE CRITICISED.—The law as to the liability of married women on notes signed by her, as declared in the case of Hibernia Savings Institution *v.* Luhn, 34 S. C., 186, approved.

2. IMPEACHING VERDICTS.—New trial moved for on the ground that a juror had declared that the verdict was rendered or hastened by an alarm of fire in the town, properly refused. Verdicts should not be disturbed by declarations of jurors made after their discharge.

3. RECEIPTS—AGREEMENT—CONSTRUCTION.—Plaintiff holding a note signed by A and B, who were wife and husband, and another note signed by B and endorsed by A, had a settlement of other matters with B, and as a result of that settlement executed the following paper: "Received of B $133, balance due me on final settlement to this date, the same to be credited on the note due myself by A and B." Plaintiff entered a credit of $133 on the note of B endorsed by A. *Held*, that so much of this receipt

as declared that the credit should be given on the note due by A and B, was evidence of an agreement had between the parties which should have been construed by the court, and construed to refer to the note signed by A and B and not to the note signed by B and endorsed by A.

4. NEW TRIAL NISI ordered by the Supreme Court.

Before ALDRICH, J., York, April, 1892.

Action by J. Rufus Bratton against M. B. Lowry and John F. Lowry, commenced September 29, 1890.

*Messrs. Jones & Williams,* for appellants.

*Mr. W. B. McCaw,* contra.

June 27, 1893.   The opinion of the court was delivered by

MR. JUSTICE MCGOWAN.   The defendant, M. B. Lowry, is the wife of her codefendant, John T. Lowry, and the sister of the plaintiff, J. Rufus Bratton.   The complaint alleged that on July 13, 1885, M. B. Lowry and John T. Lowry, the former as principal and the latter as surety, covenanted with the plaintiff, J. Rufus Bratton, under their hands and seals, to pay to the plaintiff, J. Rufus Bratton, or to his order, the sum of five hundred dollars, borrowed money, with interest at ten per cent. from date, as will more fully appear by the following copy of the said note, to wit:

"One day after date, for value received, we or either of us promise to pay J. R. Bratton or order five hundred dollars, interest at 10 %.   Witness our hands and seals, this the 13th July, 1885.   (Signed)        M. B. LOWRY.     [L. S.]
                                   JOHN T. LOWRY.  [L. S.]"

It alleged that no part of the note had been paid, and demanded judgment thereon for the amount due and interest.

The defendants answered separately, and after being allowed to amend their answers, they were as follows: Mrs. M. B. Lowry admitted the execution of the note, but pleads that (1) she signed the note not as principal, but as surety; (2) interposes a general denial; (3) and for a further defence alleges that at the time she signed the note she was a married woman, and that said note was given for money borrowed by her husband,

John T. Lowry, and for his use, and was a contract which did not concern her separate estate. John T. Lowry also admitted the execution of the note sued on, but (1) denied that Mrs. Lowry signed the note as principal and he as surety; (2) claimed that on December 10, 1889, he paid the plaintiff in settlement $133, which should have been credited on the note in suit; and (3) that the note was given for money borrowed of plaintiff by himself, and did not relate to the separate estate of his codefendant, M. B. Lowry, who at that time was and is now his wife.

There was much conflicting testimony as to who made the contract for and received the borrowed money, for which the note sued on was given, and also as to the credit, which the defendants claimed should have been placed on the note in suit. The testimony is all printed in the record, including certain papers or "receipts," relating to the credit of $133, claimed by the defendants. It seems that upon some "settlement" between the parties, the plaintiff fell in debt to J. T. Lowry in the sum of $133; but as Lowry owed the plaintiff a larger sum, the agreement was that Lowry should receipt for that sum, and that Bratton would give him credit for the same. The following papers were proved: "No. 1. Received December 10th, 1889, of J. R. Bratton [J. T. Lowry] one hundred and thirty-three dollars, balance due me in final settlement to this date, the same to be credited on the note due myself by M. B. Lowry and J. T. Lowry. (Signed) J. R. Bratton." The respondent admitted that the name of "J. R. Bratton," in the body of the receipt, should be "J. T. Lowry." At the same date, J. T. Lowry gave J. R. Bratton the following receipt: "No. 2. Received December 10th, 1889, or Dr. J. R. Bratton, one hundred and thirty-three dollars, in full of all settlements up to date. (Signed) John T. Lowry." No. 3. At the time this settlement was made, John T. Lowry owed J. R. Bratton another note, as follows: "One day after date, for value received, I promise to pay J. R. Bratton or order one hundred and seventy-seven dollars. Witness my hand and seal, January 15, 1889. (Signed) John T. Lowry." This note was endorsed by Mrs. M. B. Lowry, and had written on it the following credit: "No. 4.

Rec'd December 10, '89, of J. T. Lowry, on the within note, one hundred and thirty-three dollars, and gave a loose receipt for the same." (This credit is in Dr. Bratton's handwriting.) The defendants insisted that the credit for $133 was erroneously placed on the note for $177 (No. 3), instead of the note in suit, and that the credit of that amount, as of the date of December 10, 1889, should be allowed in the verdict.

Under a full and careful charge upon the two principal points made, the jury found a verdict for the plaintiff for $837.50, being the whole amount, with interest, due on the note in suit, without allowing any credit. The defendants moved for a new trial on the minutes of the court, and that being refused, they now appeal to this court upon the following exceptions:

I. Because his honor erred in charging the jury that "where, however, a married woman borrows money or buys a horse from another, and by her conduct or representations induces the lender, or the vendor, as the case may be, to suppose that she is borrowing the money or buying the horse for her own use, when, in fact, her purpose (unknown to the party with whom she is dealing) is to obtain the money or the horse for her husband, or somebody else, she will be estopped from denying that what she herself had induced the lender or vendor to believe was true, upon the ground that it would be a fraud to allow her to repudiate a contract which she had induced the person with whom she dealt to believe she had the power to make, when, as a matter of fact, she had no such power. She is estopped from disputing that the fact is as she represented it to be." [1]

II. And in charging: "Now, gentlemen, the law is, that a married woman, under the power given to her by law, may borrow money, and when she borrows it, and takes possession of it, then the money becomes her separate estate, and she is liable to the person from whom she borrowed it. I think that covers very nearly all the law in the abstract in this case."

III. Because the foregoing charges were especially erroneous as applied to the case at bar, being a suit upon the joint and several note of wife and husband; and if the money was de-

_____

1 See 34 S. C., 186.

livered to her in the presence of her husband on said joint and several note.

IV. Because, it is respectfully submitted, his honor erred in charging the jury as follows: "Now, the question, then, is, to which debt was the $133 payment applied? Was it to the smaller note of $177, or to the $500 note, the cause of action? If it was applied to the $500 note, the cause of action, why, then, both defendants, if you hold them responsible, would be entitled to a verdict to that extent. If, however, under instructions of defendants, that was applied to the $177 note, then no credit could be allowed in this case. That is a question for you to determine." Whereas his honor should have construed the receipt No. 1 himself, which made the application to the note of "M. B. Lowry and John T. Lowry," and not have left the same to the jury to construe.

V. Because his honor erred in refusing the motion of appellants for a new trial on the ground that before the verdict was published, information was given to the court, by one of the jurors, that some of the jurors had said "the verdict was reached or hastened by an alarm of fire in the town."

VI. Because his honor erred in refusing the motion of appellants for a new trial on the ground that the jury should have credited the note in suit with $133 paid thereon on December 10, 1889, as evidenced by receipt "Exhibit B," &c.

Exceptions 1, 2 and 3 complain of error in the charge of the judge as to the rights of Mrs. M. B. Lowry, a married woman. There was conflicting testimony as to the question of fact—whether Dr. Bratton lent the money to his sister, for the benefit of her separate estate, or to her husband, John T. Lowry; but upon that subject, the jury found all the facts for the plaintiff. This court has so often, and so lately, considered the very question here made, that we do not think it can be necessary, or even proper, to go into the subject again. We see no error in the law as charged. See *Hibernia Savings Institution* v. *Luhn,* 34 S. C., 184, and the authorities there cited.

Exception 5 claims that the judge should have ordered a new trial, on the ground that before the verdict was published, in-

formation was given to the court by one of the jurors, that "some of the jurors had said that the verdict was rendered or hastened by an alarm of fire in the town." The judge, in refusing a new trial on that ground, fully indicated his ruling, saying that any member of the panel who did not concur in the verdict had the right to object before the verdict was published, but there was no such objection. The truth is, the court cannot lend a ready ear to disclosures coming from the jury room. The court is bound to take the verdict as rendered, and refuse to listen to any affidavits of jurors tending to impeach it. A contrary practice would lead to endless confusion. See *Smith* v. *Culbertson*, 9 Rich., 111; *State* v. *Tindall*, 10 *Id.*, 212; *State* v. *Nance*, 25 S. C., 172.

Exceptions 4 and 6 complain that the judge erred in referring it to the jury, to determine, as a fact, whether the credit of $133 should be placed on the small note for $177 (No. 3), or on the large note for $500, now in suit. We agree with the Circuit Judge, that a simple receipt for so much money may be explained or modified by parol on the principle stated in *Heath* v. *Steele*, 9 S. C., 86, as follows: "In itself, a receipt does not express the terms of any contract or meeting of the minds of the parties, but merely evidences by way of admission the fact stated in it; consequently, it is not governed by the rules that prescribes the effect of instruments adopted by parties as the special means of evidencing 'some compact or understanding had between them,' but like evidence, not enjoying any special privilege, it is capable of being contradicted or modified by other classes of evidence," &c. This shows that it is only to receipts pure and simple the doctrine applies, and that it does not include a case where "the instrument is adopted as the special means of evidencing some compact or understanding had between the parties." Is this not such a case? It seems to us that the matter here falls clearly within the exception declared. We think that the paper signed by Bratton, the plaintiff, marked "No. 1," was not only the acknowledgment of the receipt of so much money (in fact, no money was then received), but it was more—it was an undertaking that the money should be credited on a particular note,

describing it, though very imperfectly—"*to be credited on the note due myself by M. B. Lowry and J. T. Lowry.*"

This understanding, though expressed in a perfunctory manner, was in writing, and should have been interpreted by the court, instead of being referred to the jury. "The rule is well settled, that the construction of the terms of a written contract is a question for the court and not for the jury." *DeCamps v. Carpin,* 19 S. C., 124, and authorities cited. Then how should the court have interpreted the paper No. 1? It seems that the plaintiff, Dr. Bratton, had two notes, which J. T. Lowry and his wife had signed—one for $177, which John T. Lowry signed as maker, and his wife's name was written across the back as endorser; and the other note for $500, now in suit, which both M. B. Lowry and J. T. Lowry (and in the order stated) had signed as principals. Under these circumstances we can not doubt that the proper interpretation of the paper No. 1 was that the $133 was intended to be credited on the note now in suit, for $500, "*due John R. Bratton by M. B. Lowry and J. T. Lowry.*" We think this note thus signed, putting the name of Mrs. Lowry first, more fully answers the meagre description of the paper No. 1; that it should have been so interpreted by the Circuit Judge, and, under his direction, the credit given by the jury. It is not clear to us how the words, "to be credited on the note due myself by M. B. Lowry and J. T. Lowry," could refer to a note signed by J. T. Lowry, with his wife's name on the back simply as an endorser, when there was another note, signed "by M. B. Lowry and J. T. Lowry" as principals. In the view the court takes, the verdict should have been reduced by crediting the $133 on the $500 note, the cause of action, as of the date of December 10, 1889. The calculation on this basis shows that on April 12, 1892, when the verdict was rendered, the amount due was $704.65.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and a new trial ordered, *unless* within ten days after notice of this judgment the plaintiff, or his attorney of record for him, release on the record of this case all the verdict rendered, except the sum of seven hundred and four dollars and sixty-five cents; and re-

duced to that amount, the judgment for that sum be affirmed, as of the day the verdict was rendered.

---

MARSHALL v. PITTS.

1. LEGAL DEFENCE—JURY TRIAL.—An action was instituted for the specific performance of an agreement for the purchase of land, or else for its sale in payment of the purchase money; and one, who was not a party to the agreement, was made a party to the action under the allegation, that he was in possession, claiming an interest. This defendant answered, asserting title in himself (1) by a parol partition and possession thereunder between himself and a cotenant under whom plaintiffs claim, and (2) by adverse possession. *Held*, that the issue raised by this answer should have been tried by a jury on the law side of the court.

2. INTERMEDIATE ORDER—EXCEPTION—APPEAL.—*It seems* that the failure to except to an order refusing a trial by jury, at the time the order was rendered, does not preclude the party from raising the question by exceptions and appeal after final judgment; but the better practice is to except at the time the intermediate order is made.

3. LEGAL DEFENCE—JURY TRIAL—ESTOPPEL.—The fact that this defendant was a party to an action of foreclosure of mortgage under which the plaintiffs purchased the title of her whom this defendant alleges to have been his cotenant before the parol partition was made, does not affect his right to a jury trial of the legal issues raised by his answer.

Before HUDSON, J., Oconee, February, 1892.

This was an action by Albert C. Marshall and others as Marshall, Graves & Co. against Y. J. H. Pitts and others.

*Messrs. Stribling* and *Shelor*, for appellants.

*Messrs. Thompson & Jaynes* and *Cothran, Wells, Ansel & Cothran,* contra.

June 29, 1893.　The opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER.　The land which is the subject-matter of this action is a part of a tract of 812 acres, which belonged formerly to J. D. and W. R. Kay, and they,

by deed dated 5th of March, 1878, conveyed the same to M. A. Pitts and Y. E. Pitts jointly.   On the 20th day of September, 1879, a portion of this land, containing 120 acres, being the lower part of the 812 acre tract, was sold and conveyed by M. A. Pitts and Y. E. Pitts to one Adams by deed dated on said last mentioned date, leaving the said M. A. Pitts and Y. E. Pitts as owners, and in possession of the remaining 692 acres.   After this sale was made, and some time in the year 1879, appellant claims that a parol partition of the remaining 692 acres was made between the appellant, Y. E. Pitts, and his mother, M. A. Pitts, and that each of them went into possession of their respective portions, though no deeds were made until the 9th day of November, 1888, the reason for the delay in executing the deeds being, as testified to by the appellant, that they could not get a surveyor to run the dividing line.

In the meantime, however, the defendants, Y. J. H. Pitts [1] and M. A. Pitts, executed a mortgage, bearing date 11th July, 1881, to one Davis, in which the land mortgaged was described as follows: "A certain tract or parcel of land in Oconee County, South Carolina, on waters of Colonel's Fork, and containing four hundred acres, adjoining lands of David Dickson, Andrew Cox, and others."   This mortgage having been duly assigned to the plaintiffs, they brought their action to foreclose the same, to which the appellant, Y. E. Pitts, was made a party as a person having, or claiming to have, some interest in the mortgaged premises.   To this action, said Y. E. Pitts failed to make any answer, and the plaintiffs having recovered judgment of foreclosure, the land described in the mortgage was offered for sale by the master on saleday in March, 1887, and bid off by plaintiffs, and on the 11th day of March, 1887, the plaintiffs and the defendants, Y. J. H. Pitts and Martha A. Pitts, entered into an agreement in writing whereby the plaintiffs were to take titles for the land and reconvey the same to the said Y. J. H. Pitts and M. A. Pitts, upon the compliance by them with the terms of said agreement.   These defendants having failed to comply, and the plaintiffs having obtained a

[1] Husband of M. A. Pitts.

title for the said land from the master on the 25th of July, 1887, instituted this action praying for specific performance of said agreement, and, in default thereof, that the premises be sold, or that said agreement be rescinded and possession of said premises be delivered to plaintiffs.    To the complaint in this action, the appellant, Y. E. Pitts, who was made a party as a person in possession of the premises, answered, claiming title to the said premises under the parol partition above referred to, and by adverse possession thereof for more than the statutory period.    The defendant, R. F. White, was also made a party, as one claiming to hold a junior mortgage on the premises; but as his rights are not presented for consideration by this appeal, they need not be stated or considered.

When the case was first called for hearing before his honor, Judge Hudson, defendants moved for a trial by jury, but the motion was refused, and an order granted referring the case to the master to take and report the testimony.    To this action of the court no exception was filed and no notice of appeal was given until the filing of the final judgment in this case.    The case was afterwards heard by his honor, Judge Aldrich, upon the testimony as taken and reported by the master, and he rendered a final judgment in favor of the plaintiffs.    From this judgment the defendant, Y. E. Pitts, alone has appealed upon the several grounds set out in the record.    But under the view which we take of the first ground, it is not necessary, and would, perhaps, be improper for us now to go into any question as to the merits, inasmuch as there must be a new trial, so far as the appellant is concerned.

The first ground raises the question whether the appellant was entitled to a trial by jury.    Inasmuch as there is no pretense that the appellant was a party, either to the mortgage 1    through which plaintiffs claim or to the agreement, specific performance of which is sought, it is clear that the case, as against the plaintiff, can only be regarded as an action to recover possession of land, of which appellant is admitted, by the complaint, to be in possession, which he, by his answer, claims to hold by paramount title derived from two distinct sources: 1st. The alleged parol partition and possession there-

under.  2d.  Adverse possession.  It was, therefore, clearly a case in which appellant was entitled to demand a trial by jury, and the refusal of this demand was erroneous, and entitles him to a new trial.  If it should be contended (though no such point is raised in the argument for respondents) that appellant, by failing to except to the ruling whereby he was denied the right of trial by jury at the time such ruling was made, precluded him from raising the question on the appeal from the final judgment, we do not think, under the recent cases of *McCrady* v. *Jones*, 36 S. C., 136, and *Capell* v. *Moses*, *Ibid*, 559, and the authorities therein cited, that such a position could be sustained.  While it would be the better practice to note an exception to any intermediate order at the time it is made which a party may desire to have reviewed by this court upon appeal from the final judgment, yet those cases show that an omission to do so is not fatal.

It is urged, however, that the appellant is estopped from setting up title to the land in question by his failure to answer the complaint in the action for the foreclosure of the mortgage; but whether that was so or not, is a question proper to be determined when the issue of title is presented for trial before the proper tribunal.  Indeed, we can very well understand that the appellant might have supposed that he was made a party to that action solely because the *legal* title was still in him and his mother jointly, and that the object was merely to divest him of such legal title to the mortgaged premises, but what was the true location of the mortgaged premises was not and could not then have been raised; and in order to make the estoppel available, it would be necessary to assume that the appellant then knew that the mortgage covered the portion of the land to which he now claims title, a matter which seems to have been gravely questioned in this very case.  But without undertaking to decide or even to intimate any opinion as to the effect of the estoppel claimed, we think it sufficient to say that defendant being in possession of the land to which he sets up a claim of title, he had the right to have the question of title tried by a jury before he could be ousted of his possession.

35—39

Upon this ground alone, and without considering or determining any question as to the merits, the case must go back for a new trial, so far as the rights of the appellant are concerned.

The judgment of this court is, that the judgment of the Circuit Court be reversed, so far as it affects the rights of the appellant, and that the case be remanded to that court for a new trial, by the proper tribunal, of the issues presented by appellant's answer, and that as to all of the other defendants the said judgment be affirmed.

---

HUNTER v. MOORE.

1. CASES CRITICISED—SUPREME COURT—PROHIBITION.—This court adheres to its ruling in State *ex rel.* Richland County *v.* City Council of Columbia, 16 S. C., 412, and 17 *Id.,* 80, that this court has no original jurisdiction to issue a writ of prohibition, except in the exercise of a supervisory control over the court to which it is directed; but a town council is not one of these "other courts in the State," within the meaning of art. IV., sec. 4, of the Constitution, and certainly is not such a court when engaged in the issue of municipal bonds.

2. PROHIBITION—CHANGE OF PROCEEDING.—A petition to this court for a writ *of prohibition cannot be converted at the hearing into an application for injunction.*

3. IBID.—IBID.—Petition for a writ of prohibition dismissed without prejudice.

Original application to this court by John J. Hunter, a citizen and taxpayer of Yorkville, against Walter B. Moore, intendant, and the wardens of the town of Yorkville, praying a writ of prohibition to prevent the town council of Yorkville from issuing $16,000 of municipal bonds, to provide a water supply for the town of Yorkville. Rule to show cause was issued and return made.

*Messrs. C. E. Spencer, Hart & Hart, T. F. McDow,* and *Richard W. Hutson,* for petitioner.

*Messrs. W. B. McCaw* and *D. E. Finley,* contra.

June 29, 1893.   The opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER.   This is a petition, addressed to this court in the exercise of its original jurisdiction, praying that this court will issue its writ of prohibition restraining and prohibiting the town council of Yorkville from issuing its bonds, upon certain grounds set forth in the petition.

In the outset, we are confronted with a question of jurisdiction, and, under the view which we take of that question, it becomes not only unnecessary, but improper, for us to consider or determine any question involving the merits.   If this court, in the exercise of its original jurisdiction, has no authority to issue a writ of prohibition in a case like this, then, clearly, it would be a usurpation of power on the part of this court to undertake to do so; and this the court, one of whose functions it is to keep all subordinate tribunals within the limits of the jurisdiction assigned to them by the Constitution and laws, would be very far from willing to undertake.

This question of jurisdiction has been twice maturely considered in the comparatively recent case of *The State ex relatione Richland County* v. *The City Council of Columbia*, 16 S. C., 412, and again in the same case, reported in 17 S. C., 80, where a rehearing was allowed solely for the purpose of enabling counsel to discuss the question of jurisdiction, which had not been raised or argued at the original hearing. It was there conclusively determined that the Supreme Court, in the exercise of its original jurisdiction, has no authority to issue a writ of prohibition, unless it is directed to one of the courts of the State, for the purpose of enabling the Supreme Court to exercise a supervisory control over the court to which it is directed.   In view of the full discussion of this question in the two opinions rendered in the case above referred to, we do not deem it necessary to undertake to add anything to what is there said; but are content to rest our conclusion here upon the reasoning employed and the authorities cited in those two opinions.   So that the only remaining question in this case is, whether the writ of prohibition asked for here is to be directed to one of the courts of the State for the purpose of keeping it within the limits of its jurisdiction. . It seems to us too clear

for argument that the town council of Yorkville is not one of the courts of the State referred to in section 4 of article IV. of the Constitution, though invested, it may be, with certain judicial powers for certain prescribed purposes; and even if it could be regarded as *a court* when exercising such powers, it most assuredly could not be regarded as acting as *a court* in authorizing the issue of the bonds here in question. See what is said in the case above cited, in 17 S. O., at page 82.

This question of jurisdiction, though not raised here, was brought to the attention of counsel on the argument here, but without arguing it, the counsel for petitioner suggested that this court might treat the petition as an application for injunction and not for a writ of prohibition. But by what authority this court could undertake to make such a radical alteration in the form of the proceeding which the parties saw fit to adopt and act upon, we are at a loss to conceive. Indeed, it might be open to serious question whether, even if a formal amendment had been applied for, an amendment changing entirely the nature of the proceeding, suggested at the close of the argument, could have been properly allowed under the provisions of section 194 of the Code. Besides, in view of the admonition of the danger of confounding two distinct modes of proceeding from a desire to do, what is supposed to be justice in a particular case, contained in *Leonard's Case*, 3 Rich., 113, this court would be slow to adopt such a course.

It seems to us clear, therefore, that, under any view of the case, this court has no jurisdiction to issue the writ of prohibition prayed for; and for that reason only, without considering or intimating any opinion as to the merits, the petition must be dismissed.

The judgment of this court is, that the petition be dismissed for want of jurisdiction, without prejudice to the right of the petitioner to institute such other proceeding as he may be advised as appropriate to the relief which he seeks.

WILSON v. FLORENCE.

1. MUNICIPAL BONDS—CITY ELECTION—INJUNCTION.—A city council was authorized to issue municipal bonds for internal improvements, "the right to issue said bonds" to "exist in a majority vote of the city, as hereafter provided; that no one shall be entitled to vote on said question unless he or she is the owner of property within the corporate limits of said city, and has returned and paid taxes on $100 worth of property the year previous to such voting; and on each $100 worth of property so returned and paid for, the person or persons shall be entitled to one vote." The question of the issue of such bonds was submitted to a vote of the electors of the city, each elector casting one vote for every $100 worth of property on which he had paid taxes, and a majority of the votes so cast approved the issue, but the affirmative vote was not a majority of the votes which would have been cast under this statute, if the property of estates and corporations had been voted. *Held*, that the issue of the bonds was not authorized, as it could only have been authorized under this power; and this court enjoined their issue.

This was a proceeding originally instituted in this court by John Wilson against the city council of Florence to enjoin the defendant from the issue of municipal bonds.

*Mr. J. P. McNeill*, for plaintiff.

*Mr. W. W. Harllee*, contra.

July 19, 1893.   The opinion of the court was delivered by

MR. JUSTICE McGOWAN. This is a petition addressed to this court in the exercise of its original jurisdiction by the plaintiff, John Wilson, a citizen and taxpayer of the city of Florence, of this State, praying for a writ of *injunction* to restrain and enjoin the municipal authorities of the said city from issuing bonds of the corporation in the sum of twenty-five thousand dollars, to be used for internal improvement of the said city, such as boring and completing artesian wells, building city hall, purchasing and laying terra cotta piping, and such other "improvements" as are needed, as provided by the act of the legislature "to incorporate the city of Florence," ratified December 24, 1890 (20 Stat., 868), of which section 20 is as fol-

lows, viz: "That the said mayor and aldermen [of Florence] may, for the purpose of internal improvements, borrow money, issue bonds or scrip therefor, bearing not a greater interest than seven per cent., payable at such time as they may think advisable, and payable out of the taxes and income of the said city: *Provided,* Said principal of bonds and scrip shall at no time exceed fifty thousand dollars: *Provided, further,* That the right to issue said bonds or scrip (in sums exceeding one thousand dollars) shall only exist in a majority vote of the city, as hereafter provided. That no one shall be entitled to vote on said question unless he or she is the owner of property within the corporate limits of said city, and has returned and paid taxes on one hundred dollars' worth of property the year previous to such voting, and on each one hundred dollars' worth of property so returned and paid for, the person or persons shall be entitled to one vote. The manner of holding said election shall be provided for by the city council of said city," &c.

The petition, among other things, states that on May 15, 1893, the mayor and aldermen of the city resolved to issue bonds of the corporation in the sum of $25,000, provided the property holders of said city expressed their wish, at an election to be held for that purpose, for the issue of said bonds. That such election was ordered under section 20 of the act of incorporation above copied; that the clerk of the council, by their direction, furnished those named as managers a poll list taken from the city tax books for the year 1892, showing the number of voters of said city, and the respective amounts of property returned and taxes paid, but excluding from said poll list all property of "estates" and "corporations" in the city; that the election was held accordingly, and the managers made return to the council, showing a majority of votes in favor of issuing the bonds, but showing at the same time that this alleged majority was reached by excluding from the estimate the property of all "estates" and "corporations" in the city, which, if taken into consideration, would have reversed the result by many votes, as follows:

Property of resident citizens.............................$624,900

Property of non-residents................... ................. 54,400

Property of corporations.............................. ........ 168,400

Property of "estates"........................... ................ 66,400

                                                    $914,100

This amount of property (1 for every $100) authorized votes 9,141.

Majority ............................... ........ ....................4,571

Votes actually cast........ ............................................3,592

   Less than a majority............... .......................... 979

That, notwithstanding the value of the property and the number of votes actually cast, the city council are proceeding to make the issue of municipal bonds as proposed, and, in doing so, are transcending their authority under the incorporation of the city.

But it is contended that, in view of an election under the provisions of section 20 of the act of incorporation, the city council had the right to exclude from the estimate the property of "estates" and "corporations" within the limits of the city, and that, having rightfully excluded such property from the estimate, there was as to the remaining property a clear majority in favor of issuing the bonds. As well as I can understand, the view is, that such property could be left out of the estimate, for the reason that there is no one who can rightfully vote such property. This is not necessarily so, but, even if it were, the very fact that the property is necessarily included in the estimate affords at least some protection, for, under certain circumstances, as here, *no vote* is well nigh as effective as *a vote.* We have not been able to discover in the act any authority to exclude from the estimate any property in the city, no matter who may be owner thereof.

It is manifest that it was the intention of the legislature in all elections to create corporate debts to make the owners of property, being liable for such debts, the sole judges of the question whether such debts should or should not be contracted. The bonds contemplated were declared to be "payable out of the taxes and income of the said city;" each hundred dollars'

worth of property was given a vote, and, it seems, whether the owner of the property was a man or woman. The act itself expressly declares "that the right to issue such bonds shall *only exist in a majority vote of the city, as hereafter provided;"* that is to say, according to the value of the property within the limits of the city, and the scale of voting therein provided for. Has there been *"a majority vote of the city?"* Certainly not a majority of votes *per capita;* nor of the property within the city, according to the provisions of section 20 of the act of incorporation. The object of the act is plain, and its terms clear and explicit, without any exception, condition, or qualification whatever as to the ownership of the property in the city; and we do not think that this court has the right to remove any of the safeguards of the act, or the dispensing power to disregard any part of it.

The judgment of this court is, that the prayer of the petitioner be granted, and that the city council of Florence be enjoined from issuing the bonds ($25,000) in question.

--------------------

## STATE v. SULLIVAN.

1. MOTION TO DISMISS APPEAL.—The consideration of a motion to suspend an appeal and vacate an order of stay postponed until the decision of the appeal on its merits, the two matters being intimately connected.
2. CHANGING PLACE OF TRIAL—JURORS—SHERIFF.—The Circuit Judge ordered the trial of a homicide case to be had in another county, after being satisfied by the oath of witnesses in court that the sheriff was a brother of the person who was killed, had taken part in the drawing of the jurors and, by deputy, in serving them, and would continue to hold the office of sheriff for four years. *Held,* that there was no error in the order changing the place of trial, and that the Court of General Sessions of the county to which the case was transferred had jurisdiction to try it.
3. IBID.—ESTOPPEL.—Can a defendant object to his trial in another county to which the trial has been removed on his motion?

Before IZLAR, J., Anderson, February, 1893.

This was an appeal from an order directing the trial of J.

Mims Sullivan to be had in Anderson County. The State moved to dismiss the appeal, upon which motion the following order was passed April 24, 1893,

PER CURIAM. This is a motion to dismiss the appeal taken by the defendant "from the order and rulings of his honor, Judge Izlar, made on the 13th and 14th days of February, 1893, upon the ground that said appeal is premature and cannot be heard, as no final judgment has been rendered in the cause;" and also a motion to vacate and set aside an order made by Mr. Justice Pope on the 15th of February, 1893, staying all further proceedings in the Court of General Sessions for Anderson County in this case until the appeal above mentioned can be heard and determined, upon the ground "that the said justice had no authority to make such an order." After a careful consideration of this motion, it seems to the court that the questions involved in this motion are so intimately connected with the questions arising on the appeal, as that it will be conducive to the ends of justice, as well as in conformity to the previous practice of this court in similar circumstances, that the questions involved in this motion should be considered in connection with the questions involved in the appeal, so that this court, having the whole case before it, may be the better enabled to determine satisfactorily, the several questions involved.

It is, therefore, ordered, that the further consideration of the questions involved in this motion be suspended until the appeal can be heard; and inasmuch as the appeal could not be heard during the time allotted for the hearing of cases from the Circuit (the Eighth) to which this case belongs, it is ordered, that the appeal in this case be set down for argument in this court on the 26th day of May next, after the regular call of the cases from the several Circuits, as heretofore assigned, shall have been completed. It is further ordered, that the clerk of this court do forthwith furnish the counsel engaged in this cause with certified copies of this order.

The order of Judge Aldrich transferring the case to Anderson County was as follows:

Upon the call of this cause for trial, the defendant submitted in writing a challenge to the array of jurors, both grand and petit. It appearing, however, that the grand jury was drawn before the commission of the homicide with which the defendant stands charged, so much of the challenge as applies to that jury was withdrawn upon the argument, by counsel for the defence. As to the petit jury, it was proven, by the evidence of the clerk, the sheriff, the deputy sheriff, and the jury commissioner, that Perry D. Gilreath, Esquire, the sheriff of Greenville, is the half brother of Herman G. Gilreath, with the felonious killing of whom the defendant stands charged in the indictment; that J. H. Ballenger, who summoned the petit jury, is the nephew of the sheriff's wife, and was specially deputized by the sheriff to serve the venire; that the sheriff has agreed to be responsible in part for the fees of counsel who have been employed to assist the solicitor in the prosecution of the cause; that the sheriff was present in the clerk's office when the names of the jurors were drawn from the jury box; that the jury commissioner drew the names from the box, and read them from the slips, while the clerk made a list of them, and the sheriff took each slip from the jury commissioner and placed it in an envelope to be sealed up; that the jury box was kept locked and sealed in the clerk's office, at the request of the jury commissioner, and there is no proof that it has been tampered with.

These being the facts, counsel for the defendant move that the jury be quashed, and that, inasmuch as the sheriff has just been re-elected for a term of four years, the case be removed to another county for trial. After hearing argument on both sides, I conclude, as matter of law, that the action of the sheriff in taking part in the drawing of the jury, he being the half brother of the deceased, renders it, so far as trial of this cause is concerned, an illegal jury; that in law the return of a jury by a general or special deputy of the sheriff is the act of the sheriff, the act of agent being the act of the principal; and that a jury returned by a sheriff who is a half brother of the deceased, to try the person charged with the murder of the said deceased, is illegally drawn as far as that cause is con-

cerned. It is old and well-established law that the jurors must be returned by an impartial and disinterested officer, and that an officer who is the father, son, brother, half-brother, or other close kinsman of the deceased, in a case of this nature, is not impartial, and not disinterested. The challenge is, therefore, sustained as to this point; and the array of the petit jury quashed for the purposes of this cause.

I think the jury box was properly kept in the clerk's office, and the challenge is overruled as to this ground.

It is due to the sheriff to say, and the court takes pleasure in saying, that it is evident that he acted conscientiously in these matters, and under the undoubted belief that he was simply performing a duty imposed upon him by law. It is not questioned that he acted honestly and fearlessly. He was required by the statute to summon a jury for this court. The statute does not provide for such a contingency as this, and it is not at all surprising that, being merely an executive officer, he should have unwittingly fallen into the error complained of. That he appreciated the delicacy of his position is shown by the fact that he appointed for the return of this jury a special deputy not related by blood to the deceased.

It is ordered, that for the purposes of this cause the array of petit jurors be quashed, upon the ground that neither the sheriff nor his deputy was lawfully qualified to draw or to summon them. And it appearing to the court from the testimony that the same condition of things is likely to continue in Greenville County, it is further ordered, that the record in this cause be transferred to Anderson County, and that the cause do stand for trial in said county of Anderson.

In accordance with this order, the record in the case was sent to the clerk of the Court of General Sessions for Anderson County, and entered upon the docket of that court for trial at the February term, 1893.

On the first day of said term (February 13th, 1893), in the said Court of General Sessions for Anderson County, Hon. James F. Izlar presiding, a suggestion was made orally to the court, on behalf of the defendant, that the change of venue or

place of trial of the cause had been ordered and directed by his honor, Judge Aldrich, at Greenville, as above set forth, solely upon the ground of inconvenience, as appeared by the order; that an application for removal was not made to the said judge, "supported by affidavits that a fair and impartial trial cannot be had in the county (of Greenville) where such prosecution was commenced," as provided by the Constitution and statute, as the sole ground upon which, and the only manner in which, the said court for Greenville had the power to change said place of trial; and that the Court of General Sessions for Anderson County was, therefore, without jurisdiction to try the cause.

In the course of argument the presiding judge asked defendant's counsel, "What is the motion before the court?" and remarked, "that without some motion there is nothing to which the argument can be directed, and there can be nothing for the court to decide." To this Mr. Heyward, one of the counsel for defendant, replied in substance, "We have no motion to make." The presiding judge replied, "That being the case, I shall treat it as a motion to change the place of trial back to the county of Greenville, for want of jurisdiction of this court."

After argument the court ruled as follows: "I find this case on the docket of this court, the trial docket, and I presume that it is rightfully here. I have heard nothing in the argument of the motion which satisfies my mind that I should send it back. The motion is, therefore, overruled.

Defendant at once gave notice of appeal from this ruling.

The grounds of appeal were as follows:

I. That his honor, the presiding judge, erred in holding that the court of General Sessions for the County of Anderson has jurisdiction of the cause, and in ordering the cause to trial in said county. *a.* Because it is submitted that his honor, Judge Aldrich, had no authority to change the place of trial of said cause upon the grounds stated in the order of November 16, 1892, and the said court at Anderson, therefore, acquired no jurisdiction under said order. *b.* Because it is submitted that said cause could not be transferred from the County of Greenville to any other county, except upon a showing made by affidavits, to the satisfaction of the presiding judge, that a

fair and impartial trial cannot be had in said County of Green-ville, which showing was not made in this case.   *c.* Because it is submitted that the order of his honor, Judge Aldrich, in so far as it was intended to change the place of trial of the cause, is null and void.

II. That his honor, the presiding judge, erred in holding practically that he was bound by the order of his honor, Judge Aldrich, whether the same was valid or not.

III. That his honor, the presiding judge, erred in ordering the defendant to proceed to trial on Circuit after service of written notice of intention to appeal to this court.

*Messrs. S. W. Melton, Perry & Heyward, J. W. Gray,* and *J. A. McCullough,* for appellant.

*Mr. Ansel,* solicitor, contra.

July 19, 1893.   The opinion of the court was delivered by

MR. JUSTICE POPE.   There was a preliminary question raised in this case by the motion of respondent to dismiss the appeal upon the ground that under the laws of this common-wealth regulating appeals in criminal cases, an appeal to this court does not lie against any interlocutory order of the Court of General Sessions, but that such appeal must wait until after final judgment.   This court, by its order dated April 24th, 1893, directed that this motion be considered along with the questions involved in the appeal itself, to be heard on the 26th May, 1893.

The fundamental question presented by the appeal is as to the jurisdiction of the Court of General Sessions for Anderson County to try the defendant for a crime alleged to have been committed in Greenville County, in which latter county the defendant resided; where the homicide occurred; and where a true bill had been found in the Court of General Sessions.   We will not reproduce the orders of Judges Aldrich and Izlar and the grounds of appeal.   They will be set forth in the report of the cause.   But, in order that the contention may be mani-fest, a brief recital of the facts will be made.

J. Mims Sullivan was charged with the murder of Herman G. Gilreath on the 14th day of June, 1892, in the County of Greenville. At the July term, 1892, of the Court of General Sessions for Greenville County, a true bill was found against said Sullivan for such alleged murder. Sullivan gave notice at such term of such court that he would move to change the place of trial to another county upon the ground that he could not obtain a fair and impartial trial in Greenville County; but there was a continuance ordered by Judge Fraser upon the ground of the absence of witnesses material to the defence. At the November term, 1892, of the Court of General Sessions for Greenville County, while Judge Aldrich was presiding, the defendant Sullivan moved to quash the panel of petit jurors summoned to serve at that term upon the ground that Perry D. Gilreath, Esq., as sheriff of Greenville, who was the half brother of the deceased, Herman G. Gilreath, had acted as a member of the board of jury commissioners for that county, and by which board such panel of petit jurors had been selected, and, also, that said Perry D. Gilreath, Esq., as such sheriff, had summoned, or caused to be summoned, every one of such petit jurors for attendance upon the court at that term. Before this motion to quash the panel of jurors was heard by the court, in open court, in answer to the question of the solicitor, the defendant Sullivan, through his counsel, announced that he would insist, at the same time and in the same connection, upon his motion for a change of place of trial to another county.

Testimony was then introduced, and substantiated the foregoing allegations of fact. This testimony was at the time reduced to writing by the official stenographer. Care was taken to inform the court that no reflection upon the high character of the sheriff was intended—all his actings officially were statutory—and, we may add in passing, that such care was observed by all the counsel in this court. At the hearing before Judge Aldrich, it was established by testimony that Perry D. Gilreath, Esq., had just been re-elected sheriff for four years. On the 16th November, 1892, Judge Aldrich made an order, whereby he quashed the panel of petit jurors, and also ordered the record of the cause to be transferred to the

Court of General Sessions of Anderson County, a county adjoining Greenville and in same Judicial Circuit, for trial.    At the February term, 1893, of the Court of General Sessions for Anderson County, Judge Izlar presiding, the defendant Sullivan objected to the jurisdiction of the Court of General Sessions for Anderson County to try his cause.    The Circuit Judge overruled his objection, and ordered the trial to proceed two days succeeding the date of his order.    From this order Sullivan appealed, and having filed the return of his appeal in the office of the clerk of the Supreme Court of this State, an order staying all further proceedings until after the appeal was heard by the Supreme Court was made at chambers by Mr. Justice Pope. In view of the gravity of the charge against the defendant, appellant, this court has determined to waive the further consideration of the preliminary motion of respondent to dismiss the appeal, and pass directly upon the vital issue tendered by the appellant, the alleged want of jurisdiction by the Court of General Sessions of Anderson County to try this defendant.

The arguments by counsel on both sides of the controversy were not only very able, but very comprehensive in the attacks upon and the defences of the conclusions of the Circuit Judge.    It may be stated, however, that after a very careful consideration of the arguments and the many authorities relied upon for their support, we are satisfied that if this court should be convinced that the decision of the Circuit Judge is in accord with section 2 of article V. of our State Constitution and the act of the General Assembly designed to carry such constitutional provision into practical operation, there will be no necessity to enter upon the wide field suggested by counsel.    Let us, therefore, patiently consider this provision of the Constitution and statute.    The section of the Constitution in question is as follows: "It shall be the duty of the General Assembly to pass the necessary laws for the change of venue in all cases, civil and criminal, over which the Circuit Courts have original jurisdiction, upon a proper showing, supported by affidavits, that a fair and impartial trial cannot be had in the county where such trial or prosecution was commenced."
The Statute of the State reads as follows: "The Circuit Courts

shall have power to change the venue in all cases, civil and criminal, pending therein, and over which such courts have original and appellate jurisdiction, by ordering the record to be removed for trial to any county adjoining the county in which such action or prosecution was commenced, or to any county in the discretion of the presiding judge: *Provided,* That the application for removal shall be made to the judge sitting in regular term by some party interested, supported by affidavits which shall satisfy the judge before whom the application is made that a fair and impartial trial cannot be had in the county where such action or prosecution was commenced: *Provided, further,* That twenty days notice of such application shall be given to the adverse party." Gen. Stat., § 2114; 14 Stat., 84, 339.

By the "Case" it is established that every requirement of the Constitution and statute in relation to a change of place of trial was met in the cause at bar, unless we should hold that by the use of the word "affidavit" in each, no other mode, of similar effect and solemnity, could be adopted in lieu of "affidavits," at the hearing of such motion, for the purpose of satisfying the judge that a fair and impartial trial could not be had in Greenville County. It must be borne in mind that both the Constitution and statute contemplated that a change of venue, as it is called, should be obtained on a motion therefor, and that the usual method of submitting motions, where questions of fact are involved, is upon affidavits. What is involved in law by the term affidavit? A statement of fact under oath reduced to writing, certified to by the officer before whom the same is made, and usually, though not necessarily, unless required by statute, signed by the affiant. What is the object aimed at under the Constitution and statute? To satisfy the mind of the judge who hears the motion that a fair and impartial trial could not be had in the county where the action or prosecution was begun, and this conviction of the judge must be founded on *sworn statements.* In the case at bar, the defendant, appellant, introduced the witnesses in open court; these witnesses were sworn in the presence of the judge, and their statements reduced to writing at the time and place

by the official stenographer.    We hold this to be a satisfactory
compliance with all the requirements on this subject.

3    And, if it were necessary, we would go further and hold
that the moving party, the appellant here, should not
be allowed to deny this result.

It is the judgment of this court, that the judgment of the
Circuit Court be affirmed, and that the cause be remanded to
the Court of General Sessions for Anderson County for trial
there.

MR. CHIEF JUSTICE McIVER.    I concur in the result.    It
seems to me that, after the Circuit Judge had reached the con-
clusion that the challenge to the array of the petit jurors must
be sustained, upon the ground that such jurors had been
drawn and summoned by officers who, by reason of their rela-
tionship to the deceased, could not lawfully be regarded as
impartial and disinterested officers, it must necessarily be con-
sidered that he, at the same time, determined that the accused
could not obtain a fair and impartial trial by jurors so drawn
and summoned, and hence a proper case for an order changing
the place of trial was presented.    If, under the circumstances
appearing in the case, fair and impartial jurors could not be
legally obtained in the County of Greenville, the accused could
not there obtain a fair and impartial trial; and if, as it like-
wise appears, these circumstances were likely to continue for
at least four years, it is quite clear that the accused could not
obtain that speedy trial guaranteed to him by the Constitution;
and hence it was not only the right, but the duty, of the Cir-
cuit Judge to grant the order changing the place of trial.

MR. JUSTICE McGOWAN.    I concur.    I think that the sworn
evidence that sustained the challenge to the array of petit
jurors was quite sufficient to authorize the transfer of the case
to the County of Anderson for trial.

36—39

### TRAVERS v. JENNINGS.

1. DEPOSITION—SEAL OF OFFICER.—The statute which requires the deposition of a witness taken by a notary public to "be by such officer sealed up" and forwarded to the court of trial, "and remain under his seal until opened in court" (18 Stat., 373), is not complied with by the mere sealing up of the deposition in an envelope, but the seal of the notary, or his name across the flap of the envelope, must appear, as an authentication of the package. Not so appearing in this case, the deposition was improperly received in evidence.

Before ALDRICH, J., Greenville, November, 1892.

The opinion states the case upon the point decided.

*Mr. John R. Bellinger,* for appellants.

*Messrs. Earle, Orr & Mooney,* contra.

July 24, 1893. The opinion of the court was delivered by

MR. JUSTICE POPE. S. W. Travers, of Richmond, Virginia, dealing in commercial fertilizers, had shipped $1,702 of fertilizers to W. A. Jennings, J. S. Setzer, James A. Thomasson and John H. Austin, doing business as merchants in the city of Greenville, S. C., under the firm name of Jennings, Setzer & Co., in the early months of 1891, in pursuance of a contract for that purpose between such parties. Two notes, each for $851, maturing respectively the 1st and 15th days of December, 1891, were executed by such firm to the plaintiff, Travers, therefor. J. S. Setzer retired from said firm say on the 14th April, 1891, the remaining partners assuming all the liabilities of the firm of Jennings, Setzer & Co. The firm assumed the name of Jennings & Co. Default was made in the payment of the two notes as they matured respectively. An assignment was made by Jennings & Co.

The contention between the parties to this suit does not arise as to the debt represented by the two notes, but grows out of a palpable contradiction between the parties as to *the contract* in relation to the commercial fertilizers shipped by the plaintiff to the defendants; it being alleged by Travers, the plaintiff,

that all moneys for which such fertilizers should be sold by the firm, and all notes and securities taken when sales were made on a credit, should be the property of Travers until said notes of the firm were fully paid, and that such evidences of indebtedness should be held by the said firm in trust, to collect and pay the same to Travers, the plaintiff, until the firm's two notes were paid, and that the terms of such contract were evidenced by a writing entered into on the 21st January, 1891, and signed by both the plaintiff and defendants.   On the contrary, it was alleged by the members of the firm of Jennings & Co. that such paper writing was signed by Setzer, against the express agreement of the partners composing the firm of Jennings & Co. made with the plaintiff, which was well known by the plaintiff, and that the express agreement for such purchase was an out and out purchase on a credit as represented by the two notes due on 1st December and 15th December, 1891, respectively; and that such sale by the plaintiff was an unconditional one.

Testimony of S. W. Travers and E. Thomas Orgain, witnesses residing in Richmond, Virginia, was taken by commission in that city, under the act of the General Assembly of this State.   18 Stat., 373–375.   When this testimony was offered, its reception was objected to, because the envelope was not sealed with the seal of the notary public before whom it was taken, and who had forwarded the same by mail.   The Circuit Judge (Judge James Aldrich) admitted the testimony.   Quite a number of witnesses were examined.   After a verdict of the jury upon the two issues submitted to them, the Circuit Judge filed a decree in favor of the plaintiff on every issue.   The three defendants, Jennings, Thomasson, and Austin, now appeal on six grounds, but as, in the view of this court, it will be only proper for us to pass on one, we will not reproduce any others:

"1. That his honor, the Circuit Judge, erred in admitting in evidence, against the objection of defendants, the testimony of Travers and Orgain taken before a notary public in Richmond, Virginia, the envelope containing the same not being sealed with the seal of the notary, as required by law."

The description of the facts connected with the envelope and its contents, as taken from the "Case" itself, is as follows: "On one side of the envelope was written the name and address of the clerk of the Circuit Court for Greenville County, with the names of the witnesses examined and of the notary, and the title of the cause. The envelope was securely sealed with mucilage or some other adhesive matter or substance. On the other side of the envelope there was written, or stamped, the word 'registered.' The envelope did not appear in any way to have been opened or tampered with."

The text of the third section of the act of 1883 (18 Stat., 373,) is as follows: "Every deposition taken under the provisions of the two preceding sections shall be retained by the officer taking it until he delivers it with his own hand into the court for which it is taken, or it shall, together with a certificate of the reasons, as aforesaid, of taking it, and of the notice, if any, to the adverse party, *be by such officer sealed up* and directed to such court and forwarded to such court either by mail or express, and *remain under his seal* until opened in court." (Italics ours.) This court has had occasion several times to pass upon the provisions of this act, but not upon the point now presented. *Featherstone* v. *Dagnell*, 29 S. C., 46; *Bulwinkle* v. *Cramer*, 30 *Id.*, 156; *Pelzer Manuf. Co.* v. *Sun Fire Insurance Company*, 36 *Id.*, 264; *Stoddard* v. *Hill*, 38 *Id.*, 386. In the case first cited, this language occurs: "The act of 1883 (18 Stat., 373,) confers special privileges upon certain prescribed conditions, and, according to the well settled rule, a party cannot avail himself of such privileges without complying with the conditions prescribed." To the same effect, in regard to a similar statute, has the United States Supreme Court expressed itself, as will be seen in *Bell* v. *Morrison*, 1 Peters, 355, and *Shutte* v. *Thompson*, 15 Wall., 161.

The respondent suggests that the sealing of the envelope, in which the deposition is enclosed, means the closing of the parts of the envelope so that they will firmly adhere together; it might be with sealing wax, or wafers, or any other tenaceous substance; that mucilage or gum having been used in this instance, so that the package appeared closed up until opened

REP.]                    April Term, 1893.

in court, with no pretence that it was tampered with, and with no allegation of fraud, the depositions were properly admitted. It is quite true that the word ''sealed'' has acquired an enlarged meaning even when applied in the law.    In the earlier times, wax upon which some impression was made was understood by the act of sealing.  Gradually, however, it was allowed that some symbol adopted by the maker in lieu of the actual seal was allowed in law.    This, it seems to us, ought to be the crucial test in such matters, namely, the adoption by the party who is required to seal of something in its stead.

Applying this test to the matter now under consideration, has the notary chosen any symbol or other substitution in lieu of an actual seal?  The act of the legislature states that the officer before whom the deposition is made shall seal up the same, and also, that it shall remain under his seal until opened in court.    Does not this statute require some act on the part of the notary by which he shall evince that the package sent to the court is his work?  If he had used sealing wax and had stamped thereon his notarial seal, or had used sealing wax and had written his name across the same, or if he had written his name across the flap of the envelope after he had caused it to adhere to the body of the envelope, it seems to us that any one of these methods would have answered the demands of the statute in this respect.    While in this particular case no harm might have resulted to the cause of justice if the depositions were declared legal, yet we ought always to remember that it is very dangerous for courts of justice to recognize methods that may lead to mischief, or that methods of doubtful form once recognized may carry concealed in their folds the seed of evil which may sap or destroy right and justice.  Such being our views, we cannot hesitate as to our duty in the premises. Probably it is due to the parties to this cause to state that we have not announced our views upon the other grounds of appeal here presented, because we have thought, as a new trial must be ordered on the first ground if it alone had been presented, it were better that all the questions in the case should be considered anew without any expression of opinion from us thereon. It is the judgment of this court, that the judgment of the Cir-

cuit Court be reversed and that the cause be remanded to the
Circuit Court for a new trial.

TURNER'S MOTION.

*IN RE* STATE v. TURNER.

1. MOTION AFTER REMITTITUR SENT.—In a case involving human life, this
   court, after judgment of death on Circuit, approved on appeal and remit-
   titur sent down, entertained a motion for leave to apply to the Circuit
   Court for a new trial on the ground of after discovered evidence.
2. NEW TRIAL ON NEW EVIDENCE.—But the showing by affidavits not having
   made out a *prima facie* case for the granting of such new trial on Circuit,
   but only offered cumulative parol testimony as to matters brought out at
   the trial, and not material, the motion was refused. MR. CHIEF JUSTICE
   MCIVER *dissenting*.

This was a motion presented to this court as stated in the
opinion.

*Messrs. Bomar & Simpson, Nicholls & Moore, Duncan & San-
ders, Johnstone & Cromer* and *Melton & Melton,* for the motion.

*Mr. Schumpert,* solicitor, contra.

July 25, 1893.    The opinion of the court was delivered by
MR. JUSTICE POPE.    George S. Turner was convicted of the
crime of murder and sentenced to death.    From this judgment
he appealed to this court, when the judgment below was af-
firmed, and the cause remanded to the Circuit Court for the
purpose of a new day being fixed for his execution.    36 S. C.,
534.    When the prisoner was brought into the Circuit Court
for this purpose, he interposed a motion for a new trial upon
the ground of after discovered evidence.    The Circuit Judge
declined to entertain the motion for want of jurisdiction.    An
appeal was taken from this order of the Circuit Judge.

1    This court sustained the conclusion of the Circuit Judge,
but in tenderness for human life, allowed the appellant
to move before us on the 27th June last for leave to apply to

the Circuit Court for a new trial upon the ground of after discovered evidence.[1]   This course was adopted by the appellant, and it now becomes our duty to announce our conclusion.

All that this court ever requires in such cases is that the proofs tendered shall *prima facie* support the demand.   The permission to make this motion is an extraordinary advance from the earlier days of the commonwealth.   In the *State* v. *Harding*, 2 Bay, 267, decided in the year 1800, the court of last resort in this State unanimously denied that one convicted of a capital offence was entitled to a new trial upon after discovered evidence, using this language: "That the discovery of new evidence after trial (which is so frequently made a ground on motions for new trials) was not a good ground for a new trial, because, on a sufficient affidavit of the absence of witnesses in criminal as well as in civil cases, the court will always postpone the trial in order to give the prisoner an opportunity to procure their attendance and be better prepared at the next court, and that it might have a very mischievous tendency, to establish a precedent of this kind, after a trial and

---

[1] This order was filed May 26, 1893, and was as follows:

PER CURIAM. In this case defendant has appealed from an order of his honor, Judge Norton, refusing to entertain jurisdiction of a motion for a new trial upon the ground of after discovered evidence, who based his refusal upon the sole ground that he had no power to do so after the former appeal in this case had been dismissed, and the case remitted to the Circuit Court for the sole purpose of having a new day assigned for the execution of the sentence heretofore imposed. While this court, for reasons which will be stated in an opinion hereafter to be filed, fully concur in the view taken by the Circuit Judge, yet, owing to the gravity of the case, and *in favorem vitæ*, judgment to that effect will not now be rendered, but the case will be retained in this court for the purpose of enabling the appellant, if he shall be so advised, to move this court, at the earliest practicable day, for leave to apply to the Circuit Court for a motion for a new trial upon the ground of after discovered evidence, in accordance with the established practice in such cases, where, pending an appeal, the appellant desires to obtain leave to make such a motion in the Circuit Court. If, however, the appellant shall fail to move this court, after due notice to the solicitor, for such leave, on the first day of the next sitting of this court, which will be on the 27th day of June next, then the present appeal will be dismissed. It is further ordered, that the clerk of this court do forthwith furnish certified copies of this order to the counsel engaged in the cause.

conviction and after all the evidence of the State had been fully disclosed; as it was easy to foresee that a man whose life was in danger would, in every case, even to gain time, make use of a pretext of this kind to create delay, but more especially by the assistance of confederates he might be enabled to procure unprincipled men to be witnesses, to contradict the evidence on the part of the State and thereby defeat the ends of justice."

But it seems, since those early days, the rigor of the law has been so abated that new trials may be granted, even after conviction, upon the ground of after discovered evidence. *State* v. *David*, 14 S. C., 428; *State* v. *Workman*, 15 *Id.*, 540; *State* v. *Chavis*, 34 *Id.*, 132; *State* v. *Price*, 35 *Id.*, 273. In each of these cases thus cited the motion was made *before* the Supreme Court had passed upon the judgment of conviction in the Circuit Court. This distinction in our decisions, together with other matters relating to this subject, will be presented in the judgment of this court, not yet filed, prepared by Mr. Justice McGowan, in the appeal from Judge Norton's refusal to entertain this motion.[1] This court, in a carefully prepared opinion delivered by Chief Justice McIver, as found in *Sams* v. *Hoover*, 33 S. C., 401, has declared: "To justify the granting of a motion for a new trial upon the ground of after discovered evidence, the moving party must establish, to the satisfaction of the court before which the motion is made, at least three facts: 1st. That the proposed new evidence was discovered after the former trial. 2d. That it could not, by the use of due diligence, have been discovered in time to be offered at the former trial. 3d. That it is material. *State* v. *Workman, supra; Durant* v. *Philpot*, 16 *Id.*, 116."

In the case at bar, the moving party has met, at least by a *prima facie* showing, the first and second requirements. What is the *status* of his showing, *prima facie*, as to *the materiality* of the after discovered evidence? We have carefully reviewed the entire case presented at the hearing of the appeal on its merits, and have most carefully studied the affidavits of the proposed witnesses. Candor compels us to admit that we are

---

[1] See next case, *infra*.

satisfied that this proposed testimony is not material, and does not warrant that the motion should be granted. Much of the proposed testimony relates to the condition of heart of the deceased to the prisoner. There was no effort at concealment of this fact at the former hearing. It was proved by the State's own witnesses that Edward H. Finger had drawn his double-barreled shot-gun upon the prisoner on the 14th or 15th November, 1889, at the time and on the occasion when the prisoner sought, in the open day, in the home of Mrs. Finger and her children, to visit the daughter whose ruin he had accomplished, and a knowledge of which ruin had just been received by her brother, the deceased, Edward H. Finger, and that the prisoner on that occasion only saved his life by springing behind a tree and drawing his pistol. The prisoner was aware of the result that might follow his illicit intimacy with his sister-in-law, for he had told her, some months before the tragedy: "When your brother Ed. finds out what I have done, I expect I will have him to kill."

It was proved by the prisoner that he knew Edward H. Finger wished to take his life; his wife and son had both so warned him. A witness, Tom Petty, had testified at the trial that Edward H. Finger had, in the city of Spartanburg, on the salesday in February, 1890, declared that he intended to take Turner's life. It was testified to by every witness examined for the State and the defence on the trial, and who was present at the homicide, that as the deceased and three others were driving their wagons laden with guano past the storehouse of Turner, on the 7th day of March, 1890, angry words passed between the deceased and the prisoner, and that Edward H. Finger first spoke such angry words; that the prisoner was standing in the door of his storehouse, and when dared into the public highway by Edward H. Finger (who was at that time standing in such highway), went out to, or near to, such highway, and immediately thereafter the homicide occurred. It is true that the prisoner at such trial testified that, after this dare from Edward H. Finger, he left his position in the door of his storehouse in order to go to his gin house. The testimony on the part of the proposed new witnesses to reinforce this peace-

ful purpose on the part of George S. Turner was very vague. Those new witnesses of the tragedy itself, J. W. Gallman, A. T. Bridgers and W. G. Johnson, add nothing that is material to what was covered at the trial by the witnesses both for the prosecution and the defence.

In an effort to make out a *prima facie* showing before this court on such a motion as the present, in order that permission may be accorded to go before a Circuit Judge to move for a new trial upon after discovered evidence, the moving party should show facts external to those which transpired at the trial. Great caution, also, must be observed by this court in passing upon such showing, "because, as it is said by a learned judge, there are but few cases tried in which something new may not be hunted up, and also because it tends to perjury." *State* v. *David*, 14 S. C., 432.

It is the judgment of this court, that the motion for leave to apply to the Circuit Court for a new trial upon after discovered testimony, be refused.

MR. JUSTICE McGOWAN. *I concur* in the result with Mr. Justice Pope. Without attempting to review the sad story, it may be enough to say, that the matter submitted to the court by affidavits, consisted of statements of verbal testimony, not offered at the trial, which for the most part was "merely cumulative;" and if offered, I cannot conscientiously say, *"would in all probability have changed the result."*

MR. CHIEF JUSTICE McIVER, *dissenting.* I find myself compelled, most reluctantly, to dissent from the conclusion reached by the majority of the court in this case. There are many considerations which induce me to regret that I cannot agree with my brethren, for whose judgment, learning, and ability I entertain such high respect. Some of these considerations it will be needless to state, while others it would be, perhaps, improper even to allude to in a judicial opinion, and I shall, therefore, confine myself simply to a statement, in brief form, of the reasons why I am unable to concur in the view taken by the majority of the court.

This court, not having been invested by the Constitution

with jurisdiction to consider or determine any question of fact in a case like this, cannot undertake, and has never undertaken, to decide whether a person who has been convicted of any offence is or is not entitled to a new trial upon the ground of after discovered evidence, for the reason that such a decision necessarily involves the decision of questions of fact. Hence, as far as this court has ever gone is to suspend the appeal, by which the Circuit Court has lost the jurisdiction of the case, and to permit a motion for a new trial, upon the ground indicated, to be made to the Circuit Court, which is invested with jurisdiction to hear and determine questions of fact. But even this will not be done unless a *prima facie* showing is first made here; and this is required for the purpose of preventing unnecessary delay in the administration of justice by motions for a new trial based upon frivolous grounds, and so manifestly unfounded as not to show even a *prima facie* ground for a new trial. Hence this court, in considering motions of this kind, has always confined itself strictly to the question whether a *prima facie* showing has been made, and has invariably declined to express any opinion as to the *sufficiency* of the showing, leaving that matter entirely to the Circuit Court, which alone has jurisdiction to decide it; and in some cases this court has expressly said that the court below, in deciding that question, was not to be influenced by the fact that this court had granted the appellant permission to make such motion.

It seems to me, therefore, that the only question is, whether the appellant has made such a *prima facie* showing as would warrant this court in suspending the determination of the case until the appellant can have an opportunity of making his application to the Circuit Court for a new trial upon the ground of after discovered evidence. Without going into any discussion of the facts disclosed by the affidavits submitted upon the hearing of this motion, which, under the circumstances, would certainly be unnecessary, if not improper, I feel bound to say that a *prima facie* showing was made; but whether sufficient to require the granting of a new trial is a wholly different question, upon which I do not feel at liberty to express, or even

indicate, any opinion. That is a matter solely for the consideration of the Circuit Court, which, no doubt, would give it all proper consideration, and would pay due regard to the wise caution found in *State* v. *Hardin*, 2 Bay, 268.

Motion refused.

---

### STATE v. TURNER.

1. MOTION FOR NEW TRIAL—JURISDICTION—APPEAL.—Motions for new trial on the ground of after-discovered evidence must be made in the first instance in the Circuit Court, but if after the case has been brought by appeal to the Supreme Court, and not yet heard, this court must be applied to to suspend the appeal, with leave to make the motion on Circuit.

2. IBID.—IBID.—REMITTITUR.—But after a defendant has been sentenced to death, his sentence affirmed on appeal and remittitur sent down, with instructions to assign a new day for the execution of the sentence, the Circuit Court cannot, without previous leave of the Supreme Court, entertain such a motion.

Before NORTON, J., Spartanburg, January, 1893.

The opinion fully states the case.

*Messrs. Bomar & Simpson, Nicholls & Moore, Duncan & Sanders, Johnstone & Cromer* and *Melton & Melton,* for appellants.

*Mr. Schumpert,* solicitor, contra.

July 25, 1893. The opinion of the court was delivered by

MR. JUSTICE MCGOWAN. The defendant, George S. Turner, was indicted, tried and convicted of the murder of E. H. Finger at the July term (1891) of the Court of General Sessions for Spartanburg County, and was thereafter sentenced to be hanged on the first Friday of October of said year. The solicitor and the counsel for the defendant, waiving the necessity for a regular "Case," agreed upon the following statement of facts:

"From the judgment and sentence the defendant duly appealed to this court. On this appeal the judgment of the Circuit

Court was affirmed, and on the 2d of December, 1892, the re-mittitur affirming the judgment and remanding the case to the Circuit Court in order that a new day might be fixed for the execution of the sentence heretofore imposed upon the defend-ant, was duly filed in the office of the clerk of the said Circuit Court for Spartanburg County.

"Thereafter the defendant gave due notice to the solicitor of a motion for a new trial as follows: 'Please take notice that in the above stated case, we will move before his honor, Judge J. J. Norton, at 10 o'clock A. M., at Spartanburg C. H., on the 25th inst., or as soon thereafter as counsel can be heard, for a new trial herein, upon the printed case, pleadings and all pro-ceedings herein, as well as upon affidavits, copies of which will be furnished to you. January 21, 1893.' These affidavits were thereafter duly served upon the solicitor. At the January term of the Court of-General Sessions for Spartanburg County, when the defendant was brought before the court, but before he was called upon to present himself in order that a new day might be set for the execution of the sentence heretofore pronounced upon him by the court, to wit: on the 28th of January, 1893, an attempt was made by counsel for defendant, who stated they desired to make a motion for a new trial upon said notice and affidavits. The court, upon objection being made by the soli-citor to the hearing of this motion, on the ground that the court had no power or jurisdiction to hear or entertain it, after argument *pro* and *con*, refused to hear or entertain this motion, on the ground that it had no *power, discretion or jurisdiction* to do so.

"After this the defendant was called upon to present himself for sentence, and after he was called upon to state, according to the usual formula, why a new day should not be set for the execution of the sentence heretofore pronounced upon him, answered, through his counsel, that he again renewed his mo-tion for a new trial on after discovered evidence. The court thereupon again ruled that it had no power, discretion or juris-diction to hear or entertain it. Thereupon the court passed the following order: Notice of a motion for a new trial on the ground of after discovered evidence, together with the affida-

vits upon which it was based, having been duly served upon the solicitor, and the defendant having been brought before the court for the purpose of having a new day fixed for the execution of the sentence heretofore pronounced upon him by this court; and being there before the court, before he was called upon to present himself in order that a new day might be set for the execution of said sentence, the motion was made to the court for a new trial upon the ground of after discovered evidence. Whereupon the solicitor objected to the motion being entertained or heard by the court, upon the ground that the court had no discretion, jurisdiction or power to entertain or hear this motion, after the judgment of this court had been affirmed upon appeal by the Supreme Court, and the remittitur had been sent down to this court for the purpose of fixing a new day for the execution of the sentence heretofore pronounced upon the defendant by this court.

"The question of jurisdiction being thus raised, argument was heard upon it alone, and not upon the merits of the application or the sufficiency of the testimony contained in the affidavits to support it. After argment of counsel, *it is adjudged:* That this court has no discretion, jurisdiction or power to entertain or hear this motion after the judgment of this court had been affirmed upon appeal by the Supreme Court and the remittitur sent down, directing that a new day be fixed for the execution of the sentence heretofore imposed upon the defendant. The defendant being then called upon to present himself for sentence, and being called upon to state, according to the usual formula, why a new day should not be fixed for the execution of the sentence of this court heretofore pronounced upon him, answered, through his counsel, that he again desired to make his motion for a new trial upon the *ground of after discovered evidence,* as set forth in affidavits as hereinbefore stated, and now sought to be introduced. Whereupon it is adjudged that this court has no discretion, jurisdiction or power to hear or entertain said motion, &c. J. J. Norton, presiding judge."

His honor thereupon fixed the second day of June, 1893, as the day for the carrying out and executing the sentence of this court heretofore pronounced upon the defendant. Thereafter

the defendant appealed to this court, charging thas his honor, the presiding judge, erred in the following particulars: (1.) In ruling that he did not have the discretion, power or jurisdiction to hear or entertain the motion for a new trial. (2.) In holding that he had no power or jurisdiction, except to assign a new day for the execution of the defendant. (3.) In ruling, when the defendant was called on, according to the usual formula, to state what he had now to say why a new day should not be set for the execution of the sentence heretofore imposed upon him, that he had no discretion, jurisdiction or power to hear or entertain the motion for a new trial. (4.) In not ruling and holding that he had the power, discretion, and jurisdiction to hear and determine the motion for a new trial.

All the authorities agree that the power of courts of general jurisdiction to entertain motions for new trials existed at common law, and is inherent in them, and statutory provisions with reference to new trials should be considered rather as limitations upon, than grants of, power in the premises. Formerly in this State, by the statutory regulations, Circuit Judges did not have the power to hear motions for new trials, but such motions were always made in the then Appeal Court. But, as stated by the late Chief Justice, in the case of *State* v. *David,* 14 S. C., 431: "Since the adoption of the Constitution of 1868, the grant of power therein to the present Supreme Court does not embrace the hearing of such motions. The power to hear motions for new trials is, in its nature, *an appellate power,* and appellate jurisdiction is expressly denied to the Supreme Court, except as to cases in chancery. While this is true as to the Supreme Court of this State, yet the Circuit Courts are invested with full power on this subject. By act of the General Assembly, it is expressly declared 'that Circuit Courts shall have power to grant new trials in all cases where there has been a trial by jury, for the reasons for which new trials have usually been granted in courts of law of the United States,' " &c.

It seems to be the established general law that, under certain circumstances, the courts will order new trials on account

of *subsequently discovered evidence.* It is stated in 16 Am. & Eng. Enc. Law, 564: "Where, since the trial, the unsuccessful party has discovered new evidence which would, in all probability, have changed the result, he may move for a new trial, on the ground of newly discovered evidence. But such application is looked upon by the courts with distrust and disfavor, and is only granted under the following restrictions" [need not be stated here]. There are fixed statutory provisions regulating the ordinary motions for new trials, either on *the minutes* of the Circuit Judge, or upon appeal to the Supreme Court, for alleged error of law in the proceedings below. All these, however, relate to matters which were considered in the *first trial.* But a motion for *a new trial upon the ground of subsequently discovered evidence* being exceptional and based upon facts *outside of these*, which were considered in the first trial, is not within the ordinary machinery provided upon the subject, and, from the nature of things, must depend somewhat upon the circumstances of the case and general principles. Probably from this cause there seems to be some confusion and contrariety of opinion upon the subject, especially in reference to the following particulars: as to *when* the application shall be made, and in what court. All the authorities agree that it should be made *promptly*, before an ordinary appeal from the first judgment is taken, if the alleged facts upon which the motion is based have then been *"discovered."* When the cause has been tried only in the Circuit Court, there can be no doubt that that court has power, in a proper case, to reopen and rehear it. See *State* v. *David*, 14 S. C., 428.

If, however, an ordinary appeal to the Supreme Court from the judgment of the *first trial* has been taken, and is pending in the Supreme Court, the Circuit Court for the time has lost jurisdiction of the case, and the Supreme Court has acquired it. In that state of things, the Circuit Court cannot grant a *new trial for any cause.* But the moving party may make application to the Supreme Court *to suspend* the hearing of the appeal in the ordinary course, and *recommit* the same to the Circuit Court, to allow him an opportunity to make a motion to the Circuit Court for a new trial, upon after discovered evidence,

upon the proper *prima facie* showing being made to this court. See *Tarrant* v. *Gilletson,* 14 S. C., 620; *State* v. *Young,* 35 *Id.,* 590; *Archer* v. *Long, Ibid.,* 588. In the last case cited above, the court say: "It has been the practice of this court for several years *to suspend* the hearing of an appeal, and remit the cause to the Circuit Court to allow the moving party an opportunity to make a motion in the Circuit Court for a new trial on after discovered evidence, upon a proper showing being made to this court. When an appeal is filed in this court, the Circuit Court loses jurisdiction thereof, and this court assumes jurisdiction. In a case like this, therefore, in order to give the Circuit Court jurisdiction, it is the practice of this court, whenever a *prima facie* case is shown by the moving party justifying it, to suspend the hearing in the Supreme Court, so as to allow the party making the same to present to the Circuit Court his grounds for a new trial, which court alone judges of their sufficiency. What guides us is whether *the moving party has presented a prima facie case;* and we do not look into the merits of the ground," &c.

If, however (in criminal cases), such application is not made to the Supreme Court until *after* the regular appeal there has been allowed to progress to final judgment adverse to the defendant, which has been "remitted" with the record to the Circuit Court, is it then within the power or discretion of the Circuit Court to hear and determine *a motion for a new trial upon the ground of after discovered evidence?* We cannot think so. It may be that, in such case, jurisdiction is returned to the Circuit Court with the remittitur sent down; but only for the express purpose of carrying out the final judgment of this court, in having a new day appointed for the execution of the sentence previously pronounced upon the defendant. A different ruling, in the language of Chancellor Gaillard in *Lang* v. *Perkins,* cited in *Ex parte Knox,* 17 S. C., 214, involves the inconsistency: "That after a case has been solemnly determined by this court in the last resort, a single judge in the Circuit Court might cause the decision to be again brought into question. This cannot be. It would utterly destroy the symmetry of the law, tend to prolong litigation and to produce endless confusion."

It is true, that in the case of *State* v. *David*, 14 S. C., 428, *supra*, there is the sentence cited by the counsel for the defendant: "It· is within the discretionary power of the court still to hear, even after judgment entered, *and even after the judgment has been affirmed on appeal*," citing as authority for the proposition the case of *McMicken* v. *Webb*, 6 How., 293 (a misprint, as we suppose, for *Mersereau* v. *Pearsall*, 6 How. Prac. Rep., 293). The record of that case shows that "it was a motion by the defendant to set aside the judgment and report of referees, and for a new trial for mistake and subsequently discovered evidence. It appears that the judgment had been appealed from and *affirmed* at the *general term*, but *not* in the Court of Appeals, the court of last resort in the State of New York, and that the opinion cited was that of *Judge Shankland, sitting sole at special term for the County of Broom;* and, therefore, the case affords no analogy whatever to one where the judgment has been *affirmed* by a court of last resort, like our Supreme Court. Besides, the point to which the remark was addressed was really *not involved in the David case*, and, therefore, was a plain *obiter dictum*.

We, therefore, concur with the Circuit Judge, that he had no power, discretion or jurisdiction to entertain and decide the motion for a new trial made before him in the Circuit Court. *No error*.

And finally, the question arises as to whether in such case there is *any power of any kind* to further consider the matter, without regard to the merits or demerits, of which, of course, we know nothing. In England, a recommendation to pardon affords the remedy for one *whose conviction should not stand*. In South Carolina, certainly there can be no *judicial relief*, without some preliminary action on the part of the Supreme Court. In the case of *Whaley* v. *The Bank of Charleston*, 5 S. C., 262, there was a petition for leave to file a bill, in the nature of a bill of *review*. The court refused the motion, using these guarded terms: "Even assuming our right to control the judgments of the court, so as to subject them to our review and reversal, we see nothing in the matter before us to require our interference," &c. In the case of *Knox & Gill* v. *R. R. Com-*

*pany,* 5 S. C., 74, the court said: "Whatever may be our views in regard to any control which we may be authorized to exercise over the judgments and decrees of the court, or how far *ex mero motu* we are at liberty to reconsider them, we will answer when a proper case may so require," &c.

It would seem, therefore, that in the opinion of eminent judges, there may exist some power in the courts to control even after final judgment; but, as said by Judge Kershaw in *Ex parte Knox,* 17 S. C., 214: "While it is evident that the power must rest somewhere, it is as evident that the rule has not been established." This court heard an application in behalf of the defendant, for leave to apply to the Circuit Court for an order granting a new trial, upon the ground of after discovered evidence, in accordance with the established practice in such cases, where, pending an appeal, the appellant desires to obtain leave to make such a motion in the Circuit Court. That motion a majority of the court felt constrained to refuse; and the only duty now remaining for the court to discharge, is the painful one of making the final orders.

It is the judgment of this court, that Judge Norton's order, refusing a motion for a new trial on the Circuit, be affirmed, and that the case be again remanded to the Circuit Court, in order that a new day may be assigned for the execution of the sentence heretofore imposed upon the defendant.

---

MOORER v. ANDREWS.

1. INJUNCTION BOND—DAMAGES.—A temporary injunction restraining defendant from cutting and selling wood having been dissolved after the expiration of two weeks, and judgment afterwards rendered for the defendant, the plaintiff was liable under his injunction bond for the reasonable fee of defendant's attorney for his ordinary services in procuring a dissolution of the injunction, and also for the loss of profits of a two weeks' supply of wood under a then existing contract, but not for loss of subsequent profits resulting from the departure of his hired labor.

2. A GENERAL EXCEPTION not considered.

Before KERSHAW, J., Orangeburg, January, 1892.

After judgment for the defendant in the case of Sarah A. Moorer *et al.* against J. H. Andrews *et al.*, the defendant obtained an order from Judge Aldrich, after notice, referring it to the master to ascertain and report the damages sustained by defendants under an injunction bond given by plaintiffs when they obtained an interlocutory injunction on November 29, 1884, which was vacated on December 15, 1884. The master reported *inter alia* as follows:

The evidence taken establishes the following facts:

1. That at the time of the service of the said injunction order upon the defendant, J. Hesse Andrews, he was under contract with one George H. Cornelson to furnish him 1,800 cords of wood, and to deliver to said Cornelson at least eighteen cords a week, with the privilege to said Cornelson to increase the quantity of wood to be delivered to thirty-six cords a week, should it be necessary; that the price to be paid the said J. Hesse Andrews by said Cornelson, under his said contract, was $1.75 per cord, which price yielded a profit to Andrews, clear of expenses, of ninety-five cents per cord; and that, for the purpose of carrying out said contract, the said J. Hesse Andrews had in his employ, at the time of service of said injunction order, about thirty or thirty-five hands, some of them from Barnwell and some from Sumter County, all of whom were engaged in cutting wood upon the lands in the possession of the defendant Andrews, and which were the lands in controversy between the plaintiffs and himself in this action; that said injunction order stopped said defendant Andrews from cutting and delivering wood under the said contract with Cornelson, and his hands became scattered, so that when the injunction was dissolved, and he could resume cutting and hauling, he could get but a small force of hands, insufficient in number to enable him to fully comply with his contract with Cornelson, and by reason thereof he failed to deliver to said Cornelson, under his said contract, not less than five hundred cords of wood, upon which he lost his profits.  *  *  *

3. That the said J. Hesse Andrews paid to James F. Izlar,

Esq., his attorney in said action, for his services in respect to the dissolution of the said injunction, a counsel fee of $250, and under the circumstances, which appear from Judge Izlar's testimony to have been extraordinary, I think the charge was a reasonable one.   *   *   *

I find from the testimony that $100 would have been a reasonable charge under ordinary circumstances.

Upon the facts found, my conclusions are:   *   *   *

2. That the defendant, J. Hesse Andrews, is entitled to damages for his losses arising from his inability to comply with his contract with Cornelson, this inability having been occasioned by the injunction; and the measure of said damages is the profits on the quantity of wood which he failed to deliver under his said contract, by reason of the said injunction.   *   *   * In the case at bar, the loss of profits by Andrews under his contract with Cornelson was the natural, actual and proximate result of the plaintiffs' injunction; and the same can be ascertained with certainty, and said profits are not involved in speculation and doubt.   He was to furnish Cornelson with a specified number of cords of wood, at a price certain, which yielded him a net profit of ninety-five cents a cord, he lost his profits on not less than 500 cords of wood, and is entitled to his damages therefor, amounting to $475.   The plaintiffs and their sureties would, I think, have been entitled to reduce the amount of such damages, if it had appeared that Andrews had sold any part of the 500 cords on which he lost his profits by reason of the injunction, but the testimony does not show any such circumstance.   The claim of the defendant Andrews for expenses of a hauler, feed of mules, and advertisements for hands, are disallowed as damages, as he receives the net profits on the wood, after deducting all expenses.

3. That the defendant, J. Hesse Andrews, is entitled, as a part of his damages, to what would be a reasonable counsel fee, under ordinary circumstances. The extraordinary circumstances which were considered by Judge Izlar when he made charge for his services in dissolving the injunction cannot be considered in fixing damages.   One of the matters which entered into his charge was the effect a decision of the motion in favor of An-

drews would have on the general case, and under the authorities this cannot be sustained. See *Exum* v. *Livingston*, 19 S. C., 229; *Hill* v. *Thomas, Ibid*, 236. Nor do I think the additional inconvenience to counsel, occasioned by his being a member of the General Assembly at the time, can form an element in the charge, so far as the plaintiffs and their sureties are concerned. I have found that $100 would be a reasonable counsel fee, and that amount is allowed.

4. That as the damages proven exceed the sum stated in the undertaking, $500, the defendant, J. Hesse Andrews, is confined to that amount for his recovery of damages herein.

Plaintiffs' exceptions to this report were as follows: 1. Because the said master erred in his finding and conclusion by which a counsel fee was allowed to counsel of J. Hesse Andrews, defendant. 2. Because the said master erred in his finding and conclusion by which the sum of $475 was allowed to said defendant for the loss of profits.

The Circuit decree was as follows:

Hearing the report of the master on the question of damages sustained by the defendant, J. Hesse Andrews, by reason of the injunction herein and exceptions thereto, and after hearing Mr. Browning and Mr. S. Dibble in support of the exceptions, and Mr. Glaze contra, it appears to the court that the exceptions taken by the plaintiffs to the item of four hundred and seventy-five dollars, allowed as the profits on five hundred cords of wood, should be sustained, and that the sum of $34.20, the profits on two weeks' cutting and delivery, being the item claimed in the account of J. Hesse Andrews for thirty-six cords, at ninety-five cents per cord, be allowed, in lieu of the sum allowed by the master, making the total of the damages $134.20. And that the report of the master thus modified be in other respects confirmed, and that as modified it stand as the order of this court in the premises.

*Messrs. Izlar, Glaze & Herbert,* for appellants.

*Messrs. M. I. Browning* and *S. Dibble,* contra.

September 6, 1893. The opinion of the court was delivered by

MR. JUSTICE POPE. This action was heard by his honor, Judge Kershaw, upon exceptions to the report of the master, and now comes on to be heard in this court upon an appeal from the decree of the Circuit Judge.

It seems that the plaintiffs brought an action in the Court of Common Pleas for Orangeburg County to restrain the defendant Andrews from cutting down and disposing of by sale the timber growing upon a certain tract of land of which Mrs. Ann C. Andrews was in possession at the time of her death, and which subsequently was in the possession of said defendant Andrews; to restrain said defendant from renting out and receiving the rent from said lands; and, finally, for a partition of said lands. On the application of the plaintiffs, Judge Fraser, at chambers, on 29th November, 1884, granted an order of injunction against Andrews, but required the plaintiffs to execute a bond with sureties, to be approved by the clerk of such court, in the penalty of $500, conditioned to pay to said Andrews such damages, not exceeding $500, as he may sustain by reason of such injunction, if the court should finally determine that the plaintiffs were not entitled to such injunction. The plaintiffs executed the bond, with H. M. Moorer and John L. Moorer as sureties. This order of injunction was served upon the defendant Andrews on the 3d December, 1884. But he, on the 15th day of December, 1884, moved, upon due notice, before his honor, Judge Pressley, to vacate such order of injunction, and, after a full hearing thereof, Judge Pressley did vacate and set aside such injunction. And at the hearing of the action on its merits in the Circuit Court, the defendant prevailed, from which judgment no appeal was taken.

Now the defendant Andrews takes the initiative against the plaintiffs and their two sureties, H. M. Moorer and John L. Moorer, to require them to pay the $500 stipulated in their bond to obtain the original order of injunction, alleging that his damages were $666.70. The practice, in such cases as the present, has been fixed by this court. *Livingston* v. *Exum*, 19 S. C., 223; *Hill* v. *Thomas, Ibid*, 231, and the present case follows the precedents there laid down. The master for Orange-

burg took the testimony and heard the parties. By his report he found that the defendant Andrews was damaged by the order of injunction obtained by the plaintiffs beyond $500, but recommended judgment for that sum. Upon exceptions to this report, Judge Kershaw held and decreed that Andrews was only entitled to a judgment for $134.20, thus overruling the master's report for the most part.

And now J. Hesse Andrews appeals to this court, on the following grounds: "1. Because his honor erred in overruling the master's report and sustaining the plaintiffs' exceptions to the item of $475 damages allowed to this defendant as the profits lost on five hundred cords of wood, which defendant was prevented by said injunction from selling and delivering as per his contract, and in disallowing to him said profits. 2. Because the master having found as a matter of fact that the defendant, J. Hesse Andrews, by reason of the injunction in this case, failed to deliver to George H. Cornelson, under his contract, not less than five hundred cords of wood, upon which the said J. Hesse Andrews lost his profits, amounting to $475, his honor erred in overruling said finding of the master and in not allowing the profits on said five hundred cords of wood to the said defendant, J. Hesse Andrews, as part of his damages. 3. Because his honor erred in not sustaining the report of the master, both as to his findings of fact and his conclusions of law."

At the hearing before the master and the Circuit Judge both parties to this contention seemed to fully recognize that when the plaintiffs and their sureties signed the bond in order to obtain an injunction against Andrews, they thereby became liable to pay to him, in case they failed to maintain their right to the injunction, whatever damages Andrews sustained therefrom up to $500. This was as it should be. To invoke the writ of injunction is no light matter. In case it is improvidently sought and obtained, reparation should be made therefor to the party aggrieved. The contention between the parties to this controversy arises from an effort on the part of Andrews to hold the parties to the injunction bond liable for $475, profits lost in 500 cords of wood, which he

alleges he was unable to have cut and delivered under his contract with George H. Cornelson, by reason of the operation of the order of injunction served on him on the 3d day of December, 1884, and annulled by Judge Pressley on the 15th day of December, 1884. Both the first and second exceptions are directed to these particular damages. We have carefully examined the whole testimony, having been impressed by the earnest zeal of appellants' counsel. We cannot hesitate as to our duty in the premises, for a careful attention to the testimony convinces us that Judge Kershaw was right. Let these exceptions be overruled.

The last exception is too general to receive attention here. We have heretofore endeavored to impress counsel with the determination of this court to enforce the rule which requires grounds of appeal to be specific, not general. Let the exception be overruled.

It is the judgment of this court, that the judgment of the Circuit Court be affirmed.

---

CARTER MERCHANDISE COMPANY v. DICKSON.

1. CASE CRITICISED—ESTOPPEL.—The case of Lites *v.* Addison, 27 S. C., 226, recognized and followed; and where one purchased a due bill on the assurance from the maker that it would be soon paid, the maker is estopped from assailing it for want of consideration when afterwards sued by this purchaser.

2. PARTNERSHIP—MARRIED WOMAN—PLEA.—A debtor cannot resist the action of a partnership, his creditor, on allegation and proof that one of the firm is a married woman. The plea of such disability is a personal privilege of the married woman.

Before ALDRICH, J., Oconee, October, 1892.

Action by Carter Merchandise Company against J. M. Dickson, commenced June 4, 1892.

*Messrs. Thompson & Jaynes,* for appellant.

*Messrs. Stribling & Shelor,* contra.

September 14, 1893. The opinion of the court was delivered by

MR. JUSTICE POPE. J. H. Dickson, on the 21st day of March, 1892, purchased from J. J. Haley 58,000 shingles, at $1.50 per thousand, on a credit for thirty days, and delivered a due bill therefor, of which the following is a copy:

"Westminister, S. C., March 21, 1892. Due J. J. Haley eighty-seven dollars, to be paid inside thirty days, for (58) fifty-eight thousand shingles. (Signed) J. M. Dickson." This due bill was not paid at its maturity. On the 11th day of June, 1892, for full value, J. J. Haley sold said due bill to the Carter Merchandise Company, a firm of merchants composed of Thomas N. Carter, Mourning J. Carter and Jesse Carter, but before said firm would purchase said due bill, they made inquiry of J. M. Dickson as to its validity, and received assurance that it would be paid in a week or ten days, and after this assurance such firm purchased.

J. M. Dickson having failed to pay, the Carter Merchandise Company brought suit thereon in a court of trial justice. In this suit defendant offered the plaintiff firm judgment for $70, interest and costs. This offer being refused, the defendant Dickson sought to prove failure of consideration in both the quantity and quality of shingles sold to him by Haley. The trial justice held that the defendant was estopped from such a plea. The defendant also demurred to the capacity of plaintiffs to sue, because one member of the firm was a married woman. The trial justice overruled the demurrer, and gave judgment against defendänt for the full amount, both principal and interest, of the due bill. An appeal was then taken to the Circuit Court, where, after a full hearing, the court sustained the judgment of the trial justice.

From this last judgment an appeal was taken to this court on three grounds: "1. Because his honor, the presiding judge, erred in holding that the defendant is estopped from pleading a failure of consideration as to the due bill sued on, and affirming the judgment of the trial justice court on the question of

estoppel.  2. Because the presiding judge erred in holding with the trial justice, that under the evidence the defendant was estopped from pleading failure of consideration.  3. Because the presiding judge erred in holding that the plaintiff has legal capacity to sue, it being a copartnership, having for one of its members a married woman, who has no power under the law to enter into a contract of copartnership."

It seems to us that the first two grounds of appeal are disposed of by the case of *Lites* v. *Addison*, 27 S. C., 226.  In the case cited, the note made by Addison to Traylor was past due when Traylor sold the same to Lites, but Lites before purchasing made inquiry of Addison as to the note, and was informed "that he had given the note, it was all right, and he expected to pay it the first of January." Subsequently the consideration of the note failed, but this court, in a carefully prepared opinion of the present chief justice, held that Addison was estopped as against Lites to plead a failure of consideration.  In the case at bar, the due bill of Dickson was past due.  The purchaser, the plaintiff, before the purchase made inquiry of the maker, and it is a fact found both by the trial justice and the Circuit Judge that the plaintiff-firm, in reliance upon the statements as to its validity and his intention to pay at a very early date, made by Dickson, the maker, then purchased the note.  Clearly in such a case as the present, good faith would be broken if Dickson should be allowed at this day to interpose the plea of a failure of consideration.  These grounds of appeal are dismissed.

Nor can we find any merit in the third ground of appeal. It is difficult for us to conceive of any injury to the defendant that could possibly arise from his payment of the due bill to the plaintiff firm.  He certainly owes the debt. Haley has in writing directed its payment to the firm. The mere fact that one member of the firm is a married woman cannot alter the debtor's relation to that firm.  If any power exists in this particular married woman to avail herself of any personal privilege or protection because of her coverture, she certainly has not exercised it in this instance.  It is not in the

power of this defendant to set up for her any personal privi-
lege against her solemn protest.

It is the judgment of this court that the judgment of the
Circuit Court be affirmed.

---

JACKINS v. DICKINSON.

1. DEMURRER—IMPROPER JOINDER.—The Code does not authorize a demurrer
   to the complaint on the ground that two causes of action are "jumbled
   together," unless they are such as cannot be united in the same complaint;
   in which case the objection must be taken by answer, or demurrer in
   writing, or will be deemed to have been waived.
2. IBID.—SEPARATE CAUSES OF ACTION.—Where the complaint alleges work
   done by plaintiff for defendant at an agreed price, and defendant's contract
   to pay therefor at all events, and then proceeds to allege the sources from
   which defendant was to collect the money with which to make payment,
   and that defendant had agreed to appropriate collections to plaintiff's
   demand, the complaint does not state two separate causes of action.
3. UNCERTAINTY IN COMPLAINT—REMEDY.—Where the allegations of the com-
   plaint are uncertain and confused, motion, after due notice given, to re-
   quire a more distinct statement, is the proper remedy. Motion without
   notice cannot be considered if objected to.

Before NORTON, J., York, October, 1892.

The complaint was as follows:

The plaintiffs, complaining of the defendant herein, show to
the court:

1st. That the plaintiffs, William A. Jackins, Allen B. Crosby
and W. R. Lipscomb, are partners, doing business under the
firm name of Jackins, Crosby & Company.

2d. That on the 22d day of October, 1889, the plaintiffs,
partners as aforesaid, entered into an agreement and contract
in writing with the defendant, P. P. Dickinson, to construct
and grade a portion of the roadbed of the Charleston, Cincin-
nati and Chicago Railroad, in the County of Rutherford, State
of North Carolina.

3d. That the plaintiffs proceeded, under said agreement and

contract, to construct and grade said roadbed, and have done and performed work thereon, as directed and required by the engineer designated in said contract, of the amount and value of twenty-one thousand eight hundred and twenty-five dollars and eighty-five cents ($21,825.85), a particular description and statement of which is set forth in the schedule "B" hereto annexed.

4th. That the said sum of money became due and payable to the plaintiffs, by the defendant, on the first day of July, 1890, and that no part thereof has been paid, except the sum of thirteen thousand four hundred and seventy-seven dollars and seventy-two cents ($13,477.72), leaving a balance due the plaintiffs by the defendant of eight thousand three hundred and forty-eight dollars and thirteen cents ($8,348.13), and the plaintiffs are entitled to said balance, and interest thereon from the said last mentioned date.

5th. The plaintiffs have in all respects faithfully performed the conditions and stipulations of said agreement on their part, and the sections of the railroad upon which the work was done and performed have been accepted by the railroad company, track laid, and trains running over the same.

6th. The defendant was a sub-contractor of and under the Massachusetts and Southern Construction Company, a body corporate, and contracted and agreed with the plaintiffs to receive and collect from said corporation and pay to the plaintiffs, punctually on the twentieth of every month, in cash, the amounts due the plaintiffs by the defendant, as ascertained by the engineer's estimates.

7th. That the defendant has received and collected from the Massachusetts and Southern Construction Company, in bonds, coupons and cash, more than enough to pay the plaintiffs' demand in full, but neglects and refuses to do so, and could have, with due diligence, realized and collected the full amount in cash and paid it over to the plaintiffs, but neglected and failed to do so, to the damage of the plaintiffs $8,348.13, and interest thereon from the first day of July, 1890.

Wherefore, the plaintiffs demand judgment against the defendant for eight thousand three hundred and forty-eight dol-

lars and thirteen cents ($8,348.13), with interest thereon from the first day of July, 1890, and for costs.

*Messrs. Hart & Hart,* for appellant.

*Messrs. N. W. Hardin* and *W. B. McCaw,* contra.

September 15, 1893. The opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER.   As one of the questions made by this appeal arises upon a demurrer to the complaint, it will be proper to state briefly the substantial allegations contained in the complaint, though perhaps it will be more satisfactory to the profession that the complaint should be set out *in haec verba* in the report of the case.   The first paragraph contains simply an allegation of the partnership of the plaintiffs.   2d. That plaintiffs entered into a contract in writing with defendant to construct and grade a portion of a certain railroad. 3d.   That plaintiffs did the work contracted for to the amount and value of the sum stated, a particular statement of which is set forth in a schedule annexed.   4th.   That the said sum of money became payable on the 1st day of July, 1890, and that no part thereof has been paid except a specific sum stated, leaving a balance due, the amount of which is stated, which is still unpaid, and that plaintiffs are entitled to said balance, with interest from said date.   5th.   That plaintiffs have in all respects complied with the stipulations contained in said contract, and that the work done by them has been accepted by said railroad company, which has laid their track and are running their trains over the same.   The 6th paragraph is as follows: "The defendant was a sub-contractor of and under the Massachusetts and Southern Construction Company, a body corporate, and contracted and agreed with the plaintiffs to receive and collect from said corporation and pay to the plaintiffs punctually on the twentieth of every month in cash, the amounts due the plaintiffs by the defendant, as ascertained by the engineer's estimates."   And the 7th paragraph is in the following language: "That the defendant has received and collected from the Massachusetts and Southern Construction Company, in bonds, coupons and cash, more than enough to

pay the plaintiffs' demand in full, but neglects and refuses to do so, and could have, with due diligence, realized and collected the full amount in cash and paid it over to the plaintiffs, but neglected and refused to do so, to the damage of the plaintiffs $8,348.13, and interest thereon from the first day of July, 1890."

After setting out the itemized statement above referred to as part of the complaint, showing the amount of the work done and the prices charged therefor, which, after deducting payments, leaves the balance above referred to as damages, the "Case" contains the following statement: "Immediately after the reading of the complaint, and without reading his answer, the defendant interposed an oral demurrer and motion in words as follows: For that the complaint states two causes of action jumbled together, in that it states a cause of action on an alleged contract, and a cause of action sounding in damages; and defendant demurs to so much of the complaint as attempts to state a cause of action sounding in damages after first stating an action on a contract; and defendant moves that all of section (paragraph) seven of the complaint, after the words, 'refuses to do so,' be stricken out, for that the complaint does not state facts sufficient to set forth two separate causes of action, to wit: an action on contract and an action for damages."

The Circuit Judge overruled the demurrer and denied the motion. Whereupon the defendant appeals, alleging error in overruling the demurrer, and refusing the motion upon the grounds contained in the foregoing statement, extracted from the "Case."

We do not think there was any error in overruling the demurrer. It will be observed that the demurrer is not based upon the ground that the complaint does not state facts sufficient to constitute a cause of action, for it is very clear that such a ground could not be sustained, as the allegations contained in paragraphs one to five, inclusive, unquestionably do state a good cause of action. Nor is it based upon the ground, that two causes of action have been improperly united in the complaint, for that could only be taken by a demurrer in writing, and unless so taken, the objection is

waived.   Code, § 169.   Indeed, as we understand it, counsel
for defendant, at the argument here, very properly repudiated
any such position, as it is very manifest that such a position
could not be sustained even if the complaint could be regarded
as an attempt to state two causes of action.   But the only
ground upon which the demurrer is based is "that the com-
plaint states two causes of action jumbled together."   It would
be quite sufficient to dispose of this ground, to say that we do
not see that the Code contemplates or provides for any such
ground of demurrer, unless the two causes of action are such as
cannot be properly united in the same complaint, and then the
objection cannot be taken by an oral demurrer, but must be
taken either by demurrer or answer in writing; and if not so
taken, the objection is deemed to have been waived.

It is contended, however, by counsel for defendant, that his
oral demurror should be regarded as a demurrer "to so much
of the complaint as attempts to state a cause of action
sounding in damages after first stating an action on con-
tract," and it is claimed that the allegations contained
in that part of the complaint (paragraphs six and seven) are
not sufficient to constitute a cause of action, without supple-
menting those allegations by others found in a previous part of
the complaint.   This position is based upon the assumption,
that there was an attempt on the part of the plaintiffs to set
forth in their complaint two separate and distinct causes of
action; and this assumption we are not inclined to adopt.   The
plaintiffs' real cause of action was the failure of the defendant
to pay them for certain specified work at certain specified
prices, and the further allegations contained in paragraphs six
and seven of the complaint amounted to nothing more than a
statement of the source from which defendant expected and had
agreed to obtain the money necessary to make payments to the
plaintiffs.   It will be observed that it nowhere appears in the
complaint that the payments which defendant had contracted
to make to the plaintiffs were to be dependent upon the amounts
which he might be able to obtain from the Massachusetts and
Southern Construction Company.   On the contrary, the alle-
gations of the complaint, which, under the demurrer, must be

taken as true, show clearly that the defendant contracted to pay the plaintiffs the amount specified, at all events; and the further allegations, that the defendant had agreed to collect, punctually, from the said company the amounts necessary to enable him to make such payments, cannot be properly regarded as an attempt to state a further and additional cause of action.

It seems to us that the defendant has mistaken his remedy, if, in fact, he was entitled to any.   If the allegations contained in the complaint were so confused or uncertain as to leave him in doubt as to what was the real cause of action upon which plaintiffs relied, his remedy was by motion, upon due notice, to require the plaintiffs to make their allegations more distinct and certain, and not by demurrer.  It is true that a motion was made to strike out the latter part of paragraph seven of the complaint; but without stopping to consider whether that was the appropriate motion, it is sufficient to say that it does not appear that any notice of such a motion was given, and as counsel for respondent have relied upon the want of notice, which they had a right to do, that would be sufficient to justify a refusal of the motion.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

---

## MOORE v. DICKINSON.

1. CASE CRITICISED—ELECTION OF CAUSE OF ACTION.—The ruling in Jackins *v.* Dickinson, *ante*, 436, applied to a similar complaint in this case; and there not being two causes of action, there was no error in refusing to require the plaintiff to elect between the alleged two.

2. LETTER—BEST EVIDENCE.—Testimony as to declarations by an agent of defendant of admissions contained in a letter from defendant to this agent, was improperly received in evidence, there being no testimony to show that the letter was lost.

3. DECLARATIONS OF AGENT.—In action on a railroad construction contract, whereby defendant was to pay plaintiff, a sub-contractor, out of moneys received from A for construction, defendant's agent, in managing and

38—39

carrying on the business and paying for the work done, was not shown to be an agent of defendant in collecting moneys from A, and, therefore, his declarations of what defendant said to him about receiving money from A was not admissible in evidence against defendant.

4. CHARGING JURIES—WEIGHT OF TESTIMONY.—In commenting upon Greenleaf's statement in his work on Evidence (cited by counsel), that verbal admissions must be received with caution, the trial judge did not err in instructing the jury that they were not bound by Mr. Greenleaf's argument, but must determine for themselves the weight to be given to the evidence of alleged admissions.

Before NORTON, J., York, October, 1892.

This was an action by John S. Moore and Brevard D. Springs, partners as Moore & Springs, against P. P. Dickinson, commenced in January, 1891.

*Messrs. Hart & Hart,* for appellants.

*Mr. William Munro,* contra.

September 15, 1893. The opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER. This case, in some of its features, is so much like the case of *Jackins, Crosby & Co.* v. *Dickinson,* heard and determined at the present term [*ante,* p. 436], that we need only to refer to what we have said in the opinion filed in that case as sufficient to dispose of the first two grounds of appeal in this case. For if, as we have held in that case, the complaint (practically the same as in this case, so far as the demurrer was concerned,) did not purport to state two causes of action, there was, of course, no error in refusing the motion to require the plaintiffs to elect the cause of action upon which they would go to trial.

The present case, however, differs materially from the case referred to in some of its features. Here the defendant, in his answer, set up by way of defence that, by the express terms of the contract upon which the plaintiffs based their action, he was under no obligation to pay to the plaintiffs anything for the work which they had done until he had received pay-

ment from the Massachusetts and Southern Construction Company (called in the contract, by a clerical error, the Charleston, Cincinnati and Chicago Railroad Company). So that, in this case, it became, and was, a material inquiry whether the defendant had received, or ought to have received, from the Massachusetts and Southern Construction Company the money with which to pay the plaintiffs, and failed to do so by reason of his own fault or negligence. The claim on the part of the plaintiffs was that the money had been offered to the defendant, accompanied with a statement from the president of the construction company "that if he needed it, he should have it, because it was due him; but if he took it, it would bring about a crisis in the scheme of the 3 C's system; and, in consequence of that statement, Col. Dickinson had allowed it to be diverted from North Carolina to Tennessee."

Upon this point, there was a conflict of testimony; and when one Adams was offered as a witness to prove that he heard one Colton, the alleged agent of Dickinson, say that he had heard, through letters from Dickinson, what is quoted above, his testimony was objected to, upon two grounds, as we understand it: 1st. Because the letters referred to were the highest evidence. 2d. The declarations of Colton, as to what he had learned from Dickinson, were mere hearsay, and were, therefore, incompetent. The objection was overruled, and this ruling is made the basis of the third ground of appeal. When the testimony of Adams as to what he had heard from Colton was first offered, counsel for defendant objected, unless there was further proof of agency. Testimony was then offered to show that Dickinson resided in New York, and that Colton was his general agent, residing on the line of the railroad under construction in North Carolina; that he made the contracts with defendant's sub-contractors, signed the checks by which they were paid, and had full control and management of the work from Rutherford to Marion, in North Carolina. After hearing this testimony, the Circuit Judge ruled the question competent.

Thereupon the witness Adams proceeded to state that he had information from Col. Dickinson that the money—when an

objection was again interposed, upon the same ground as before, and also upon the ground of hearsay. The "Case" does not show any ruling as to this objection, and the witness proceeded to say that Colton stated that he had received letters from Col. Dickinson—when objection was again made, on the ground that the letters are the highest evidence. Upon this, likewise, there does not appear to have been any ruling. The examination of the witness then proceeded as follows: "Q. Did you have any conversation with Mr. Colton about this matter that I asked you? A. I did. Q. What did he say? A. He stated, as I was about to say before, that we would have had our money, but that promises that had been made to Col. Dickinson hadn't been fulfilled by Mr. Harris," followed by the statement quoted above to the effect that Harris had offered the money to Dickinson, at the same time saying that if it was taken it would bring about a crisis in the affairs of the railroad company, in consequence of which statement Dickinson had consented that the money should be diverted from North Carolina to Tennessee.

It seems to us that this testimony should have been rejected, if upon no other ground, that the witness was manifestly speaking of information derived from Dickinson through letters, which were, of course, the highest evidence, and in the absence of any testimony tending to show that such letters had been lost or destroyed, the testimony as to the contents of such letters was incompetent. There is also another ground upon which we think the testimony was incompetent. While the rule is well settled that, after the agency is established, the acts, declarations or admissions of the agent, within the scope of his agency, are competent evidence against the principal, yet it is equally well settled that such acts, declarations or admissions, as to matters not within the scope of the agency, are not competent evidence against the principal. 1 Greenl. Evid., §§ 113, 114; 1 Am. & Eng. Enc. Law, 410. Now while in this case there is abundant testimony to show that Colton was the agent of Dickinson in managing and carrying on the work of constructing the railroad in North Carolina, we do not find any testimony tending

to show that Colton was agent for collecting the money from the Massachusetts and Southern Construction Company, and, therefore, any declaration or admission made by Colton as to what Dickinson had said to him in reference to such collections, was merely hearsay, and as such incompetent.    It seems to us that the only just inference that can be drawn from the testimony is that Dickinson, residing in New York, attended to that himself, and that Colton had nothing to do with it. Colton's declaration as to what Dickinson may have said to him, in relation to a matter which does not appear to have been within the scope of his agency, should have been held incompetent.

It only remains to consider the fourth ground of appeal, which is in these words: "For error (after defendant's counsel had read section 200 of Greenleaf on Evidence to the jury) 4  in charging the jury as to the weight to be given by the jury to casual (alleged) declarations of the defendant, made more than two years before trial."   We do not understand that the Circuit Judge, in his charge to the jury, gave them any instructions as to the weight to be given by the jury to the alleged declarations of the defendant.   After alluding to the fact that defendant's counsel had quoted "as law, from an author of the highest respectability, Mr. Greenleaf on Evidence, he proceeded to use the following language: "But what Mr. Greenleaf says there is not law to you, but is the logical argument of a very learned judge of great experience, and if it corresponds with your experience or with your observation, it would be binding upon you.   But that argument, while it is a very strong one, may or may not be adopted by you in passing upon the facts of this case.   Of course, gentlemen, your experience is valuable, and you are presumed to be able to determine whether or not a witness who attempts to testify from mere memory, even to a conversation, has not been mistaken in his hearing of the conversation, or is mistaken in his memory of the conversation, or whether he is wilfully misstating the conversation.   If you are satisfied that he is wilfully misstating it, of course, you will put no dependence in him; but all past transactions depend upon human testimony in one form or an-

other, and it is for you to say what testimony produces belief in your minds of the existence of a fact. You are not bound, because it is read out of a book (to say), that certain testimony does not produce a belief in your mind. It may not produce it, but it may."

We see no error of law in these observations to the jury. Section 200 of Greenleaf does not purport to lay down any definite rule of law upon the subject under consideration, but at most suggests that verbal admissions should be received with great caution, for the reasons there indicated, which the judge expressly stated constituted a very strong argument. He did not advise or instruct the jury to disregard the caution there suggested, but, on the contrary, simply instructed the jury that, after all, it was for them to determine the question according to the way in which it affected their own minds, as they were solely responsible for such determination. This was precisely in accord with what was said in *Com.* v. *Galligan*, 113 Mass., 202, cited in a note to section 200 of Greenleaf on Evidence—that the value or weight of the testimony "is wholly a matter for the jury."

By reason of the error suggested in the third ground of appeal, there must be a new trial.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and that the case be remanded to that court for a new trial.

---

CHARLESTON, &c., R. R. COMPANY v. LEECH.

1. PARTITION—BURDENS.— A tenant in common released a right of way to a railroad, which was built. The other tenants then instituted proceedings for compensation for the right of way so occupied; whereupon the railroad company brought action to require partition to be made between these tenants in common. The court so ordered, and directed the partition to be so made that the releasor's portion should include so much of the roadbed as would be just to the cotenants. Before partition made, this releasor died intestate, leaving her cotenants as her heirs to her portion of this land, which portion exceeded in value all damage done by the con-

struction of the railroad. *Held*, that to the releasor should properly be assigned as her portion that part of the common property upon which she had placed a burden, and her right descending to her heirs with this burden, but worth more than her share, and these heirs now owning all the tract, they must be enjoined from further proceedings for compensation.

Before WALLACE, J., York, April, 1893.

The case was brought to this court by plaintiff on the following exceptions: I. Because his honor erred in holding that the bill cannot be sustained in its present shape; and erred in dismissing the original and supplemental complaints, and vacating the order of injunction. II. Because his honor erred in holding that the heirs at law of Mrs. M. E. Leech did not take the land, or her interest in it, *cum onere*, and were not bound (as she was bound) to afford plaintiff every reasonable facility for the beneficial use of the easement granted by its grantor and their ancestor. III. Because his honor erred in not holding that the children of Mrs. M. Eliz. Leech took her interest in the land charged with the easement by her granted, and that such interest must be subjected to the payment of any amount that the plaintiff might be required to pay for compensation and damage. IV. Because his honor erred in not granting a perpetual order of injunction, it appearing that the value of the interest in the lands descended to the children of Mrs. M. E. Leech is in excess of the damages and compensation claimed for the right of way and construction of plaintiff's roadbed over the entire tract.

*Mr. G. W. S. Hart*, for appellant.

*Mr. C. E. Spencer*, contra.

September 15, 1893. The opinion of the court was delivered by

MR. CHIEF JUSTICE MCIVER. This is the third appeal in this case, the first having been reported in 33 S. C., 175, and the second in 35 S. C., 146, where the general nature of the case and of the facts may be found. It is only necessary now to state generally that the object of the action was to require

Mrs. M. Elizabeth Leech to demand partition of a tract of land in which she had an undivided one-third interest, in order to make effective her grant to the plaintiff company of the right of way for its railroad over her land; and that, until such partition was made, [to stay] the proceedings which had been instituted by the other defendants for an assessment of damages done to said land (in which they had an undivided two-thirds interest) by the construction of plaintiff's railroad over the same. The result of the first appeal was to remand the case, "for the purpose of enabling the Circuit Court to proceed with the partition, in the meantime suspending any further proceedings under the petition filed by the minor defendants for compensation and damages until the partition has been effected."

In pursuance of this direction from the Supreme Court, the Circuit Court ordered a writ of partition to issue, expressly requiring that "the clerk shall insert in the writ a special direction to the commissioners that they must, if the same be practicable, other things being equal, partition the said lands so that the railroad bed and right of way of the railroad company shall lie upon the part (if any) assigned to Mrs. Leech; and if not the entire railroad bed and right of way, then as much thereof as the commissioners shall find it practicable, other things being equal, to include upon the lands (if any) assigned to Mrs. Leech." From this order the second appeal above referred to was taken; not, however, upon grounds affecting the present inquiry, but simply as to the mode of selecting the commissioners. The result of that appeal was to affirm the order from which the foregoing quotation has been made.

After the said order for partition thus affirmed had been made, and before it was executed, Mrs. M. Elizabeth Leech departed this life intestate, leaving as her heirs at law her children, being all of the other defendants in this case, except the guardian *ad litem,* J. Edward Leech. Thereupon the plaintiff, having first obtained leave of the court for that purpose, filed its supplemental complaint, setting forth the death of Mrs. M. E. Leech, leaving as her heirs at law her children above stated; that her undivided interest in the said land, bur-

dened with the easement granted by her to the plaintiff, has descended to her said children, and they propose to take the same as an inheritance from their mother, and that such interest "is of value not less than five times the value of the land taken for plaintiff's roadbed and right of way over the tract, and of all damages resulting therefrom;" and, after stating that two of the defendants have attained their majority since the commencement of this action, demand judgment that the defendants may be perpetually enjoined from further prosecuting the proceedings instituted by them to obtain compensation and damages for the right of way thus taken by plaintiff.

To this supplementary complaint the defendants answered, denying each and every allegation therein; but at the hearing below all of these allegations, as stated by his honor, Judge Wallace, in his decree, were admitted. In that decree the Circuit Judge, after stating that since the death of Mrs. Leech, "the plaintiff contends that the issuing of the writ in partition, heretofore ordered, has now become impossible, and that the special proceedings of the minor defendants for damages should be perpetually enjoined," rendered judgment as follows: "I cannot sustain the bill in its present shape; and the writ being now waived by the plaintiff, it is adjudged that the complaint and supplemental complaint be dismissed, with costs, and that the temporary injunction heretofore granted against the special proceedings for damages, be and the same is hereby vacated." From this judgment plaintiff appeals upon the several grounds set out in the record.

For a proper solution of the questions raised by the present appeal it will be necessary to ascertain and fix definitely what are the points which have heretofore been decided, and which have thereby become the law of this case, and then to inquire into the effect of the admitted facts which have subsequently occurred. It has undoubtedly been determined that the plaintiff had a right to require that Mrs. Leech should have partition made of the land, in which she held an undivided interest, in order that her grant of the right of way over her own share of the land should be made effective; and it is equally certain that the court has determined that such parti-

tion should be so made as to throw the right of way upon that portion of the land which would fall to her share upon such partition, provided it would be practicable to do so without prejudice to the rights of the children, the other tenants in common. The question, then, is as to the effect the admitted facts—that Mrs. Leech died intestate, before partition was actually effected, leaving as her heirs at law the other tenants in common, who are now entitled, not only to their original undivided two-thirds as heirs of their father, but also to the remaining one-third as heirs of their mother, which is conceded to be worth much more than any damages which they might be entitled to recover under the special proceeding instituted by them—should have.

There can be no doubt that the court in its former decisions proceeded upon the principle that justice and equity required that the burden of the easement which Mrs. Leech had granted to the plaintiff over her undivided and unascertained portion of the land, should be placed upon that portion of the land which should be subsequently ascertained to be hers in severalty, provided it was practicable to do so without prejudice to the rights and interests of the other cotenants. It is upon this principle that the court has frequently held that when one tenant in common has put improvements upon the common property, while he is not entitled to compensation for such improvements, yet when partition comes to be made, it shall be so made as to allot to the improving tenant the part which he has improved, if the same can be done without prejudice to the interests of his cotenants. *Scaife* v. *Thomson,* 15 S. C., 337, besides many other cases. It seems to us that this principle should work both ways; and where a tenant in common has undertaken to place a burden upon the common property, partition should be, if practicable, so made as to allot to such tenant in common the portion upon which the burden has been placed. See *Young* v. *Edwards,* 33 S. C., 404. This being so, it follows that if partition had been made before the death of Mrs. Leech, and if it had proved practicable to so make the partition as to throw the right of way upon the share of Mrs. Leech, and she had then died, her heirs at law would take her

share of the common property burdened with the easement which she had placed upon it, and would not have been entitled to any compensation or damages; for her heirs certainly would not be entitled to any higher rights than she had, and she certainly would not be entitled to any compensation.

Apply these well settled principles to the facts of the case as now presented. While it is true that the defendants are now entitled to the whole of the land, yet it must be remembered that their title to the whole is not derived from the same source. They hold their original two-thirds as the heirs at law of their father, while their right to the remaining one-third is derived from their mother as her heirs at law, and, of course, they must take such right subject to any burden which she may have placed upon it. And as the court has heretofore determined that the mother's share should, if practicable, be so laid off as to include the right of way, it seems to us that, following the theory upon which the court has heretofore proceeded in this case, the defendants must take the share of the mother burdened with the easement which she had placed upon it. While it is true that, under the facts as now presented, it would be impracticable to make the partition originally ordered, and, therefore, impracticable to determine whether such partition could be so made as to throw the right of way upon the share allotted to Mrs. Leech, without prejudice to the rights of the other cotenants, yet it is obvious that the practical result intended by the court may be reached even under the changed state of the facts. That result manifestly was to relieve the plaintiff from liability for damages by throwing the right of way, if practicable and with due regard to the rights of the other cotenants, upon the share to be allotted to Mrs. Leech, so that she, and others claiming under her, would take such share burdened with the easement which she had placed upon it.

Since then the defendants have become the owners of the whole of the land, and the partition as originally contemplated cannot now be made; and since it is manifest that the right of way can now be thrown entirely upon the share to which Mrs. Leech would have been entitled if she were still living, without any detriment to the rights of the other cotenants, as they are

now the owners of the whole of the land, it is clear that the theory upon which the court has heretofore acted may still be carried out, by regarding that as done which the court intended should be done: that is, by considering that it has proved practicable to make such a partition of the land as would throw the entire right of way on the share of Mrs. Leech, without prejudice to the rights of the other cotenants in their original two-thirds interest; for it is conceded that the value of the remaining one-third which they have acquired by inheritance from their mother far exceeds any damages which may have been done to the land by the construction of the railroad, and hence they are no longer entitled to any damages.

The judgment of this court is, that the judgment of the Circuit Court be reversed and that the case be remanded to that court, with instructions to grant the perpetual injunction, as prayed for in the supplementary complaint.

---

CUDD v. WILLIAMS.

1. REFERENCE—ACQUIESCENCE.—In an action for the specific performance of an agreement for the payment of money, the answer alleged fraud in the transaction and demanded an accounting, and the Circuit Judge, over defendant's objection, referred the case to the master to hear and determine the issues of law and of fact, and make his report thereon, with leave to all parties to except. *Held*, that the defendants having failed to except to this order until after final judgment, having attended the references and participated in the hearings and trials, this court will not now declare error in the original order of reference.

2. IBID.—A CIRCUIT JUDGE cannot set aside an order of reference made by his predecessor.

3. VENDOR AND VENDEE—PRIOR FRAUDS.—Where plaintiffs purchased the stock of goods of defendant's husband, and then gave to him a half interest therein for his services, and afterwards sold their remaining half interest to defendant for value, defendant cannot be heard to resist payment for her purchase by showing fraud in the purchase by plaintiffs from her husband.

4. MARRIED WOMEN—PURCHASE.—Parties owning a half interest in a stock of merchandise may lawfully sell such half interest to the wife of the owner

of the other half interest; and she will be liable for the price of her purchase.

Before KERSHAW and FRASER, JJ., July, 1891, and January, 1892.

Action by J. N. Cudd and O. S. Roberts, partners as Cudd & Roberts, against S. B. Williams and T. A. Williams, her agent.

*Messrs. Bomar & Simpson* and *J. K. Jennings,* for appellant.

*Mr. Stanyarne Wilson,* contra.

September 15, 1893.   The opinion of the court was delivered by

MR. JUSTICE McGOWAN.   S. B. Williams is the wife of her codefendant, T. A. Williams, a merchant of Spartanburg.   The action was brought to require the defendants to perform their part of an alleged parol agreement for a lot of goods sold and delivered by the plaintiffs to the defendant, Mrs. S. B. Williams, for the agreed price of $1,880.20.   The testimony is voluminous (all in the record), and we think the careful statement made by the master, H. B. Carlisle, Esq., upon reference to him, will sufficiently explain the facts.   He states: "That in March, 1890, the defendant, T. A. Williams, becoming embarrassed and being threatened with suit, sold out his entire stock of goods in bulk to the plaintiffs, Cudd & Roberts.   The consideration for the sale was $1,000 in money and $3,000 in notes, to be paid from the sale of the stock of goods.   The $4,000 amounted to fifty per cent. of the cost value of the goods, and seems to have been considered by the creditors at the time as a fair price.   In addition to the consideration above mentioned, Williams was to have for his services one-half of the profits of the concern, and was to give his time to the business. The business ran on under these arrangements, Cudd & Roberts buying new goods and placing them in the stock to enable them to sell off the old articles more profitably, until the first of January, 1891, when an accounting was held, stock taken, and it was found that they had on hand $4,941.86.   Accord-

ing to the original trade, one-half of this belonged to Mr. T. A. Williams, and under contract made at the time with T. A. Williams, as agent for Mrs. S. B. Williams, Cudd & Roberts sold her their half of the goods and credits on hand for seventy-five per cent. of the inventory, amounting to $1,853.50. Besides this, there were some goods overlooked amounting to $75. This action was brought to enforce this agreement."

The defendants answered, claiming, among other things, (1) that the original transaction between T. A. Williams and Cudd & Roberts was fraudulent, and that a court of equity would not interfere in the matter, because they do not come into court with clean hands; (2) that Mrs. Williams is a married woman, and on that ground she is relieved from any liability; and (3) that if it should be determined that plaintiffs had any such interest, and that any sum whatever was due to them from the defendants, S. B. Williams and T. A. Williams, as her agent, then these defendants say that there should be a full accounting between them and the said plaintiffs; and on such accounting, defendants say that the plaintiffs will be due them a considerable sum of money. Further answering, these defendants allege, by way of counter-claim, in case an accounting is refused in this action, that plaintiffs are justly indebted in the sum of $500 to the defendant, S. B. Williams, &c. Wherefore, the defendants demand that the complaint be dismissed; or, failing in that, that the accounting be had between plaintiffs and defendants, and that plaintiffs be required to pay such sum as may be found due on such accounting, &c.

It seems that the case first came up before his honor, Judge Kershaw, who, on August 10, 1891, granted an order (the defendants' attorneys objecting) that it be "referred to the master to take the testimony herein, to hear and determine the issues of law and of fact, and make his report to this court, and that all parties be allowed to except thereto." There was no appeal taken at that time from the order of reference; but under it the master held references, the attorneys of the defendants being present, offering testimony and arguing the cause. The master made his report, recommending that the defendants be required to perform their contract, by paying

the amount claimed in the complaint. No exception was made to this report upon the ground that the order referring the case was illegal and void.

The exceptions to this report were heard by his honor, Judge Fraser, who held as follows: "One of the questions raised before me at the hearing was as to the right to refer this case 'to the master to hear and determine the issues of law and fact,' though not among the exceptions to the master's report. Whether this is a law case, as I am inclined to think it is, or a case on the equity side of the court, I have no right now to consider the validity of the order of reference made August 10, 1891. I cannot review the order made by my predecessor." He sustained the exceptions as to the liability of the husband, T. A. Williams, and overruled them as to Mrs. S. B. Williams, and thereupon ordered and adjudged that the plaintiffs have leave to enter up judgment against the defendant, Mrs. S. B. Williams, for the sum of $1,880.20, and that the complaint be dismissed as to the defendant, T. A. Williams.

From this decree the defendant, Mrs. Williams, gave notice of appeal from the order of Judge Kershaw referring the case to the master, and also from the decree of Judge Fraser on the merits, and will ask a reversal or modification of the decree, on the following grounds: "I. That his honor, Judge Kershaw, erred in ordering said cause referred to the master, over the objections of the defendant. II. That his honor, Judge Fraser, erred in holding that he had no right to consider the validity of the order of reference made by Judge Kershaw, and in not ordering an issue to a jury, as asked for by defendant. III. In holding that there was no sufficient evidence of fraud in the transactions between plaintiffs and T. A. Williams. IV. In holding that, even if there was fraud in such transactions, only the creditors of T. A. Williams could take advantage of it, and that the defendant could not set it up as a defence in this case. V. In not holding that there was no consideration for the alleged contract between the plaintiffs and defendant, and that she was not bound thereby. VI. In not holding that, being a married woman, defendant had no right or capacity to make any such contract, and that she is not bound thereby," &c.

Exceptions 1 and 2 make the first question, whether the plaintiffs had the right to have the case referred to the master over the objection of defendants. Was it a law case or a suit in chancery? At the time the question was made before Judge Kershaw, the only guide in the matter was the pleadings; and it seems to us that the answer of the defendants, in setting up fraud on the part of the plaintiffs in the transaction out of which their claim arose, and in claiming an account in reference thereto, presented features of equitable cognizance which would have authorized the old Court of Equity to take jurisdiction of the case. We cannot say that his honor, Judge Kershaw, should have regarded this as "an action either for the recovery of money only, or of specific real or personal property." See *Pelzer, Rodgers & Co.* v. *Hughes,* 27 S. C., 418. Besides, while the defendants did object to the order of reference when made, we fail to find in the record that they gave notice of appeal therefrom, which they might have done. But, on the contrary, they seem to have acquiesced in the order by attending references under it, examining witnesses, and arguing the case at every stage down to the final decision below, when for the first time they gave notice of appeal, not only from the judgment of his honor, Judge Fraser, on the merits, but, also, from Judge Kershaw's previous order of reference. Of course, it is quite clear that Judge Fraser did not err in refusing to set aside Judge Kershaw's order referring the case, for the double reason, that no such exception was before him, and, also, that he did not have the power to set aside the order of his predecessor. No motion was made before him for "issues from chancery," and if there had been, it was discretionary with him whether he would grant them. *Rollin* v. *Whipper,* 17 S. C., 32.

Exceptions 3 and 4 make the point, that Mrs. Williams cannot be made liable upon her contract to pay for the goods, for the reason that the goods sold to her by the plaintiffs arose out of a fraudulent transaction with her husband.

We agree with the Circuit Judge that there is no sufficient evidence of fraud in the prior transactions between the plaintiffs and the defendant, T. A. Williams. Mrs. Williams

received the goods as her own property, and why should she
not be made to pay for them according to contract? But if
there was fraud in the prior transactions of her husband with
the plaintiffs, Mrs. Williams had no connection with it. The
fraud alleged was only against the creditors of Williams, and,
as we understand it, no such creditor is here complaining. If
the plaintiffs acquired the goods improperly, we cannot see
how that should furnish Mrs. Williams an excuse for the vio-
lation of her agreement to pay for them.

Exceptions 5 and 6 complain that Judge Fraser erred "in
not holding that, being a married woman, the defendant had
no right or capacity to make any such contract, and
that she is not bound thereby." We agree with the
Circuit Judge that there is nothing in our cases which
holds that a married woman may not purchase the share of
one or more joint tenants, or tenants in common, even if the
other interests are held by the husband. The husband and
wife may make partition if they so desire, but the formation
of a partnership instead thereof is a matter with which the
seller has nothing to do and cannot control.

The judgment of this court is, that the judgment of the Cir-
cuit Court be affirmed.

---

## MURRAY v. AIKEN, &c., COMPANY.

1. RES JUDICATA—INTEREST.—A surety company having been held liable on
   appeal for the default of its principal (reversing the Circuit decree), less
   the balance due by the principal to the assured, the Circuit Court after-
   wards properly held the surety company liable for interest on its indebted-
   ness, from the date of demand, to an amount not exceeding the penalty of
   its security bond.

2. IBID.—IBID.—CASE CRITICISED.—In naming the figures of the balance for
   which the surety company would be liable, this court, on the former ap-
   peal (37 S. C., 488), did not adjudicate upon the question of interest on
   such balance, but merely used the figures as an illustration of the prin-
   ciples upon which the liability was to be determined.

3. APPEAL COSTS—LOSING PARTY.—Where the principal issue on an appeal

is between codefendants, and it is decided substantially in favor of the defendant, appellant, against the defendant, respondent, but not for the entire sum claimed, this defendant, appellant, is entitled to have the costs of appeal taxed in his favor against the defendant, respondent, who must be regarded as the losing party on appeal, and not against the plaintiff.

Before FRASER, J., Aiken, April, 1893.

This was an action by Joseph E. Murray against the Aiken Mining and Porcelain Manufacturing Company, the Fidelity and Casualty Company and the Bank of New York Banking Association. See 37 S. C., 468, for the former appeal. So much of the Circuit decree as relates to the question of the appeal costs is fully extracted in the opinion of this court; so much as relates to the question of interest was as follows:

In *Union Bank* v. *Sollee*, 2 Strob., 390, it was decided, that in an action of debt on the official bond of the cashier of a bank for overdraft, the bank was entitled to interest from the time the cashier went out of office, or from a demand if one had been made earlier. I am of opinion that the plaintiff is entitled to recover against Murray interest on $3,934.76 from the 26th September, 1888, when he was directed to deposit the money in the Aiken Bank, and refused to do so, to the 18th January, 1893. This amount, calculated at seven per cent., would amount to $1,192.10, but the liability of the Fidelity and Casualty Company is limited to so much of the interest as will, with the amount already paid ($3,934.76), amount to $5,000—that is to say, to $1,065.24.

It is claimed that, by the decision of the Supreme Court, the amount to be paid by the Fidelity Company to the bank is fixed at $3,934.76, and that the Circuit Court cannot add to this amount the interest which the Supreme Court has not allowed. There is no doubt that a judgment of the Supreme Court modifying a judgment of the Circuit Court is the final judgment in the cause, and it is not in the power of the inferior court to alter it in the slightest particular. It is remitted, not to be reheard in, but to be enforced by, the Circuit Court. The remittitur which section 12 of the Code directs to be sent to the Circuit Court must be the guide of the Circuit

Court in executing the judgment or decree on which it is issued. Where the direction contained in it is precise and unambiguous, it is the duty of the Circuit Court to carry it into execution, and not to look elsewhere for authority to change its meaning. Where there is uncertainty or ambiguity in the mandate, the court below have unquestionably the right to resort to the opinion of the Supreme Court delivered at the time of the decree, in order to assist them in expounding it. *West* v. *Brashear*, 14 Peters, 51.

Now, in this case, what was the judgment of the Supreme Court? It is found in these words, which are embodied in the remittitur: "It is the judgment of this court, that the decree of the Circuit Court be modified on the principles herein announced." What principle was announced on the point we are now considering? This, and this only, that in an equity suit like the present, Murray has the right to set off against the claim of the company for the money embezzled by him the amount which the company owed him at the time. It is true, the justice who delivered the opinion used the figures which had been established by the evidence as an illustration of the principle just as he immediately afterwards used the figures, as reported in the *Bank* v. *Heyward*, for the same purpose. I am of opinion that the decree of the Supreme Court was not intended to fix the amount to be paid by the surety, but to fix the principle which must be applied in ascertaining that amount.

And I am confirmed in this by the fact that the question of interest was not, and could not have been, brought to the attention of the court, because the Circuit decree had denied the right of the bank to recover anything from Murray's surety. On the appeal from that decree the question of interest could not properly arise, and I do not believe that the Supreme Court intended to pass upon this question, and take away the legal right of the bank to interest without giving it an opportunity to be heard. I have no doubt of my right to entertain this question now, as for the first time raised in the case. *Jones* v. *Massey*, 14 S. C., 307.

*Messrs. Croft & Chafee,* for appellants.

*Mr. Samuel Lord,* contra.

September 16, 1893.   The opinion of the court was delivered
by

MR. JUSTICE McGOWAN.   This case has been in this court
before.   The following is a statement of case for the Supreme
Court: It was commenced for the purpose of settling the affairs
of the Aiken Mining and Porcelain Manufacturing Company,
an insolvent corporation.   The answers in the cause presented
a controvery between *two* of the defendants therein, viz: appel-
lant and respondent above named, in regard to the liability of
the former to the latter, claiming as assignee the benefit of the
bond of the former to the said insolvent company, guaranteeing
the fidelity of its secretary and treasurer.   The decree of the
Circuit Court, made July 23, 1891, was adverse to the respond-
ent herein, the Bank of New York, who thereupon appealed to
the Supreme Court.   The Supreme Court on November 7, 1892,
made a decree setting out fully the said controversy, modifying
the circuit decree in regard to the controversy in favor of the
said respondent, the Bank of New York.   The decision con-
cludes as follows:

"Now, therefore, under the terms of its contract, the defend-
ant, Fidelity Company, must be prepared to answer for the
default of the assured; but there must be this limitation thrown
about its liability, namely, it must only be required to pay the
difference between $6,000 and the sum of $2,065.24—that is to
say, it must pay the sum of $3,934.76.   It is proper that we
should explain this result.   This is an equity suit, and, there-
fore, we must apply its principles.   When $6,000 of the money
of the Aiken Company passed into the hands of its secretary
and treasurer, that corporation was his debtor in the sum of
$2,065.24, and upon the principles advanced in the case of
*Bank* v. *Heyward,* 15 S. C., 296, we think this result will follow.
In the case last cited, the teller was dismissed from his office,
and on his settlement with the bank retained from the funds in
his hands the amount he conceived the bank owed him as a
salary for the year, $1,500; but it was determined that only

$250 was due him, and judgment was duly proved against him for $1,250. Here the secretary and treasurer was dismissed from his office. He claimed, though, that the company was his debtor, and in this very action the amount he claimed of the company has been allowed him. * * * It is the judgment of this court, that the decree of the Circuit Court shall be modified on the principles herein announced, and in all other respects confirmed. Let the cause be remanded to the Circuit, with directions to carry into effect the modification herein provided."

The appellant herein, the security company, then paid the sum of $3,934.76, without prejudice of the latter to its claim for appeal costs and disbursements, and interest on said sum of $3,934.76. The amount of such costs of appeal and disbursements were taxed by the clerk at $224.90, and there is no dispute as to items and amounts. The clerk, however, decided that these costs should be taxed against Murray, the plaintiff in the original case, as follows: "The Bank of New York and the Fidelity and Casualty Company were parties defendant. The case was tried in the Court of Common Pleas, and afterwards on appeal by the Supreme Court. The Bank of New York to some extent reversed the decision of the Circuit Court. It is now claimed by the Bank of New York that its codefendant, the Fidelity and Casualty Company, should pay the costs and disbursements incident to the appeal; the Fidelity and Casualty Company deny their liability to pay said costs. The case is one in equity. J. E. Murray is the plaintiff, and certainly one of the principal parties to the action. He brought the action, and it seems plain to me that he should pay the costs, and I so adjudge. There is nothing either in the Circuit decree, or in the opinion of the Supreme Court, which adjudges that the Fidelity Company should pay the costs to their codefendants, the Bank of New York. I, therefore, fail to see what right the Bank of New York has to claim that such company should pay the costs; hence I decline to tax the costs against said company, but, as above stated, do adjudge that the costs be taxed against the plaintiff. No dispute is made as to the amount of the costs and disbursements, and they are taxed as follows, to wit:

"Disbursements: Paid clerk of court for copy served, $7.65; Walker, Evans & Cogswell, for printing record, $140; preparing case, $10; appeal to Supreme Court, $15; argument in Supreme Court, $20; printing argument for Supreme Court, $31.95; total, $224.90."

The Bank of New York filed the following exceptions to said taxation: I. That the clerk erred in finding that the said costs and disbursements should be taxed against the plaintiff, because they all grow out of, and belong to, a controversy between two of the defendants, to wit: the Fidelity, &c., Co., and the Bank of New York, and the case in the Supreme Court was substantially between these parties alone. II. That the clerk erred in not holding that said costs and disbursements should be taxed in favor of said bank and against said Fidelity Company, for the aforesaid reason, and because the said last named company was the losing party on said appeal.

Thereupon the cause was again brought before the Circuit Court of Common Pleas for Aiken County, his honor, Judge Fraser, presiding, who held: (1) that the New York Bank was entitled to recover against Murray, interest on $3,934.76, from September 26, 1888, when he was directed to deposit the money in the Aiken Bank and refused to do so, to January 18, 1893. This amount calculated at seven per cent. would amount to $1,192.10; but the liability of the Fidelity Company is limited to so much of the interest as will, with the amount already paid, amount to $5,000—that is to say, $1,065.24. (2) His honor held as follows in reference to the question as to who was liable for the appeal costs: "The Fidelity and Casualty Company was not an original party to the bill. In the progress of the case, and upon its own application, the company was made a party, 'for the purpose of defending its own liability,' under the bond which it had given to the Aiken Company for the conduct of Murray. By the same order the Bank of New York (to whom this bond had been assigned) was also made a party, for the purpose of asserting its rights. Thenceforward the litigation was confined almost exclusively to those parties. The decision on circuit was in favor of the Fidelity Company against the bank, and from this decision the bank alone ap-

pealed.   The only respondent, as the record shows, who took
an active part in the contest before the Supreme Court, was the
Fidelity Company.    While upon some minor points the appeal
was overruled, the bank succeeded in reversing and modifying
the decree in the most important particulars.   In no respect
was it modified in favor of the Fidelity Company.   I am of
opinion that the bank is entitled to the appeal costs, because it
must be regarded as the prevailing party on the appeal, and
that the Fidelity Company should pay these costs, because the
decision was against them as active litigants.''

From this decree and decision as to costs, the Fidelity and
Casualty Company appeals to this court upon the following
exceptions: ''1. Because his honor should have sustained the
order of the clerk, taxing the costs against the Bank of New
York, and he erred in not so doing.   2. Because the Supreme
Court in its decision did not reverse the decree of Judge Norton,
but only modified it, and it did not follow as matter of law
that the costs were thereby thrown against the Fidelity Com-
pany; but, to the contrary, it would follow, under such cir-
cumstances, that the Fidelity Company was not liable for costs,
and his honor erred in not so holding.   3. Because the Su-
preme Court in its decision fixed the amount of the liability of
the Fidelity Company, and did not allow interest upon the
same; and it is respectfully submitted that the Circuit Judge
erred by increasing such liability by adding interest thereto.
4. Because, it is submitted, the liability of the Fidelity Com-
pany upon its bond was not known until fixed by the Supreme
Court, and that said defendant is not liable for interest upon
such before the same was ascertained, and the Circuit Judge
erred in so deciding.   5. Because the extent of the liability of
the Fidelity Company upon its bond was specifically stated in
the decision of the Supreme Court; such question is, there-
fore, *res adjudicata;* and it was error in the Circuit Court in
reopening and passing upon the same,'' &c.

In the view which the court takes, there is really but two
questions in the case.   *First.* ''Was it proper to charge the
Fidelity Company with the interest on the $3,934.76,
after it was demanded from the Aiken Company? or

is that question *res adjudicata?*" It is true, that the Supreme Court, in its first decision in the case (37 S. C., 488), did not expressly declare that the amount of Murray's default should bear interest from the time it was demanded and refused; but such was then and now is the law. See *Bank* v. *Heyward*, 15 S. C., 296, in which the recovery was had for the amount of the default, *with interest as an incident added thereto*. It is impossible to suppose that the Supreme Court intended by their *silence* as to interest to overrule in any particular the very case cited as authority for the decision then being rendered.

It is, however, insisted that the former judgment of this court, which reversed the first judgment on the circuit, without making any reference whatever to the interest on the amount recovered, must be regarded as in legal effect a final adjudication of the incidental question of interest; that it was, indeed, equivalent to an express adjudication, that the bank, as the assignee of the bond in contention, was not entitled to interest on the amount recovered. We can not accept this view. It is quite clear that the question of interest was never before Judge Norton, nor before this court on appeal, and, of course, was never actually adjudicated. On the contrary, we agree with Judge Fraser, that the matter of interest was never considered, and that by using the figures this court did not intend to fix definitely the amount to be paid by the Fidelity Company, but to fix the principles, which must be applied in ascertaining that amount, when the case went back to the circuit, under the express terms of the judgment of the court: "Let the case be remanded to the Circuit Court, with directions to carry into effect the modification herein provided." See *Jones* v. *Massey*, 14 S. C., 307, and *Busby* v. *Mitchell*, 29 *Id.*, 447.

*Second.* The other question is, whether it was proper to charge the Fidelity Company with the costs of the appeal. In cases in chancery, costs are largely in the discretion of the Circuit Judge who heard the case, but if not otherwise ordered in the judgment, follow the event of the action, and are taxed against "the losing party." Code, sec-

tion 323. Judge Norton, who originally heard the case, made no order, of course, as to costs upon appeal from his own decree, and the Supreme Court can make no original order for costs in an equity case. Then, was it error on the part of the Circuit Judge to reverse the clerk's taxation of the costs upon the first appeal, and charge them to the Fidelity Company? That must depend upon the issue in that appeal and "the losing party" in it. There is no doubt that the principal issue on the appeal was between the Bank of New York as the owner of the indemnity bond and the Fidelity Company as to their liability thereon. That question was substantially decided in favor of the bank. The Fidelity Company was held liable on the indemnity bond, and whether the whole penalty of the bond, or a less sum on account of a set-off, was recovered, *there was a recovery*, and they must be considered as the "losing party" on the appeal, irrespective of the final result of the action. *Cleveland* v. *Cohrs*, 13 S. C., 397; *Huff* v. *Watkins*, 25 *Id.*, 245; *Sease* v. *Dobson*, 36 *Id.*, 554. We agree with the Circuit Judge that the bank is entitled to the appeal costs, because it must be regarded as the prevailing party on the appeal, and that the Fidelity Company should pay these costs, because it was the only respondent and active litigant in the Supreme Court, and the decision was against them.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

MR. CHIEF JUSTICE MCIVER concurred.

MR. JUSTICE POPE concurred in the result.

---

## LOEB v. MANN.

1. CLAIM AND DELIVERY—DAMAGES.—In an action of claim and delivery of personal property and for ordinary damages for its detention, the jury cannot include in their verdict for recovery damages based upon time lost by plaintiff and his expenditures for attorney's fees, traveling expenses and hotel bills in the prosecution of the action.

Before IZLAR, J., Abbeville, January, 1893.

Action by Leopold F. Loeb and others, partners as Loeb Bros. & Co., against W. D. Mann. J. S. Loeb, a witness for plaintiffs, was permitted to state that four packages of plaintiffs' goods were found in defendant's possession, and were recognized by him as such. Defendant objected to this testimony, insisting that the books of original entry, showing the consignment, were the best evidence, but the objection was overruled. Defendant offered in evidence the mortgage under which the defendant took possession, but it was ruled out, the subscribing witness not being present. The defendant appealed on the following exceptions: 1. Because the Circuit Judge erred in not requiring the production of the books of original entry, to prove the sale, especially when the plaintiff swore he carried a pocket ledger. 2. [Stated in the opinion.] 3. Because the Circuit Judge erred in refusing to allow proof, to the effect that the goods were seized under a certain mortgage, but required the testimony of the subscribing witnesses for this collateral purpose.

*Messrs. Parker & McGowan*, for appellants.

*Messrs. Graydon & Graydon*, contra.

September 21, 1893. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. This is an action of "claim and delivery" for certain articles of personal property. It seems that F. C. Perry was a retail liquor dealer in Abbeville; that he failed, having in his store the following articles, viz: two barrels of rye whiskey and two cases of fine brandy, worth in the aggregate $223.60; that these articles had been seized by the defendant Mann as sheriff, in behalf of one claiming to be a mortgage creditor of Perry, and that the articles were covered by his mortgage.

The plaintiffs are liquor dealers of Cincinnati, Ohio, and the complaint alleged that the aforesaid articles, although in Perry's store at Abbeville, were not his property, but had been "con-

signed" to him by the plaintiffs for sale upon their account, and that the defendant, W. D. Mann, the sheriff, wrongfully and unlawfully took said articles from the possession of Perry, and although demanded by the plaintiffs, the said defendant refused to deliver them, and still unjustly detains them from the plaintiffs, "to their damage two hundred dollars. Wherefore, the plaintiffs demand judgment against the defendant for the recovery of possession of the said goods, or in case a delivery thereof cannot be had, for the value thereof, the sum of $223.40, together with $200, their damages, and for the costs and disbursements of the action." The defendant answered, that he did not wrongfully and unlawfully take possession of said goods and chattels, but claimed that he seized the same under and by virtue of a certain mortgage to one Bieman by F. C. Perry, who was then in possession of said goods; and that after the seizure and before demand by plaintiffs, the defendant was enjoined from selling or disposing of said goods by the court until further order, which has never been made.

During the progress of the trial, J. S. Loeb, one of the plaintiffs, was allowed to testify that he was the traveling member of the plaintiffs' firm, and that in that capacity made his regular rounds about five times in the year, and he came to Abbeville to collect a debt; that he was shown the barrels and cases of liquor in the custody of the defendant, and upon demand and refusal to deliver the articles, he instituted the action, gave bond, and having the goods delivered to him, he shipped them off upon the Richmond and Danville Railroad. Among other things, he was allowed (over objection) to state what damages he had sustained by reason of the taking of the goods by the sheriff, the expenses he had incurred, such as railroad expenses and all that. (Objection of defendant overruled.) Witness proceeded: "Well, in all I have lost ten days' time. I have made one trip, besides the one here. When I came here for the goods, I came from Charleston, and returned just as I am doing now, and my time, at the least calculation, is worth $5 a day, and railroad fare $33 for the second trip; hotel bills $23, and my attorneys' fee is ten per cent. on the amount recovered, $22, aggregating $129.93. (Objection noted by request.")

Upon the subject of damages, the Circuit Judge charged as follows: "Now, as to damages, in case you should find for the plaintiffs, the successful party is entitled to damages in all cases where damages are claimed. The amount may be nominal, and it is for you to say what it shall be. In estimating the damages, you are to be governed by the evidence. You must not give remote or speculative damages, and in actions of this kind the case may arise where vindictive damages may be allowed; but I see nothing in this case which would warrant vindictive damages. There was nothing in the action of the sheriff to show that what he did was done maliciously, wantonly, or recklessly; and the mere statement of the complaint that it was 'wrongfully' done does not necessarily imply that it was a forcible and malicious taking," &c.

There was no evidence that the property itself had been damaged or even opened, or that the short delay had reduced the price. The verdict was for the plaintiffs (already in possession of the property), and fifty dollars damages. The defendant appeals upon several grounds; but, from the view which the court takes, it will not be necessary to consider any of them except the *second*, which is as follows: "Because the Circuit Judge erred in allowing the plaintiff, over specific objections, to swear that he was damaged in the sum of $129.93, included in which amount was an itemized statement as to the plaintiffs' alleged expenses, as follows: (1) ten days lost (computed), $5 per day; (2) railroad fare, $33; (3) hotel bills, $23; (4) attorneys' fees, ten per cent. on amount recovered, $22."

The complaint does not make any claim for special damage, and the Circuit Judge charged that the case was not one for vindictive damages, so that it must be considered as a plain and ordinary case for the recovery of personal property, and damages for its detention. "To recover damages for the detention of personal property (the property having been delivered), special damage cannot be recovered unless expressly alleged." *Lipscomb* v. *Tanner*, 31 S. C., 49. What is this special damage which cannot be proved without being specifically alleged? There is certainly a lack of clearness in the authorities on the subject, but it seems to us that

what are called "general damages," as contradistinguished
from "special damages," are admitted in evidence under a
general allegation—indeed, are inferred by the law itself—for
the reason that they are the immediate, direct and proximate
result of the act complained of, as, for instance, an injury to the
property itself, or its value, by detention, &c.; while damages
which, although the natural are not the necessary consequence
of the act, being outside of the "costs and disbursements"
allowed by law, and consequential in their nature, are not ad-
missible in evidence without special notice of the claim in the
allegations of the complant, and are, therefore, called "special
damages." It is elementary that damages, in the ordinary
sense, must be the immediate result of the act complained of.
See Woods Mayne on Damages, p. 48, and authorities in the
notes.

Section 326 of the Code provides that the prevailing party
may have taxed and inserted in the judgment "the sum of the
allowances for costs and disbursements, as prescribed by law,
the necessary disbursements, including the fees of officers al-
lowed by law, the fees of witnesses, the reasonable compensation
of commissioners in taking depositions, the fees of referees, and
the expense of printing the papers for any hearing when re-
quired by a rule of the court. The disbursements shall be stated
in detail and verified by affidavit," &c. See sections 2425 and
2428 of the General Statutes. It would seem that in an ordi-
nary case, where no special damage is asked for, this provision
would limit the compensation allowed by law to the prevailing
party, who had already the possession of his property.

But it is urged that this action of "claim and delivery" is
peculiar in this, that the law expressly gives to the prevailing
party damages in addition to costs and disbursements. It is
true that section 283 of the Code provides as follows: "In an
action for the recovery of specific personal property, if the
property have not been delivered to the plaintiff, or if it have,
and the defendant by his answer claims a return thereof, the
jury shall assess the value of the property, if their verdict be
in favor of the plaintiff, or if they find in favor of the defend-
ant, and that he is entitled to a return thereof; and may at the

same time assess the damages, if any are claimed in the complaint or answer, which *the prevailing party has sustained by reason of the detention or taking and withholding such property,*" &c. What damages? Why, surely such damages as "may have been sustained by reason of the seizure and detention of the property itself; that is to say, by direct and proximate injury of the property in question, or in reducing its value; and not for the purpose of allowing a party to reimburse himself as to consequential losses alleged to have been sustained in the prosecution of the case, in respect to the speculative value of time lost, and the payment of the bills of railroads and hotels, lawyers' fees, &c."

"The expenses incurred by a plaintiff in consulting an attorney and in obtaining a legal opinion upon the validity of his claim, is not recoverable as a part of the damages. Parties must do what they think right, and the expense of getting the experience of attorneys to advise is not to be repaid by the other party. Nothing of that sort can be allowed in damages, and every thing of that nature that a plaintiff is entitled to, will be allowed in the taxation of costs." 2 Add. Torts, 1188. See *Welch* v. *Railroad*, 12 Rich., 292; *Hill* v. *Thomas*, 19 S. C., 236; *Oelrichs* v. *Spain*, 15 Wall., 211; and Sedgwick on Damages, page 99. The case of *Welch* v. *Railroad Company*, from Richardson, was an action on the case to recover against the company damages for a lost trunk, and it was held that a lawyer's fees, which the plaintiff may be required to pay his counsel in the case, is not, in this State, to be allowed by the jury, in estimating the plaintiff's damages. Judge O'Neall, in delivering the judgment of the court, said: "It cannot be said to be a necessary result of the act done by, or negligence of, the defendant. If this had been a case in which vindictive damage could be given, and the jury had found in gross beyond the value of the article lost, then, indeed, this verdict could not have been disturbed. But in this case there is nothing that calls for such a verdict. It is, therefore, ordered, that a new trial be given, unless the plaintiff shall enter a remittitur," &c. This seems to be precisely in point.

In the case of *Oelrichs* v. *Spain*, 15 Wallace, *supra*, it was held

that counsel fees can not be allowed as part of the damage covered by an injunction bond, and Mr. Justice Swayne, in delivering the opinion of the court, said: "In actions of trespass, where there is no circumstance of aggravation, only compensatory damage can be recovered, and they do not include the fees of counsel. The plaintiff is no more entitled to them, if he succeed, than is the defendant if the plaintiff be defeated. Why should a distinction be made between them? In certain actions *ex delicto* vindictive damages may be given by the jury. In regard to that class of cases, this court has said: 'It is true, that damages assessed by way of example, may indirectly compensate the plaintiff for money expended in counsel fees, but the amount of these fees are not to be taken as a measure of punishment, or a *necessary element in its infliction.*' The point here in question has never been expressly decided by this court, but it is clearly within the reasoning of *Day* v. *Woodworth*, 13 How., 370, and we think it is substantially determined by that adjudication. In debt, covenant and assumpsit damages are recovered, but counsel fees are never included. So, in equity cases, where there is no injunction bond, only the taxable costs are allowed to the complainants. The same rule is applied to the defendant, however unjust the litigation on the other side, and however large the *expensa litis*, to which he may have been subjected. There is no fixed standard, by which the *honorarium* can be measured. Some counsel demand much more than others; some clients are willing to pay more than others; more counsel may be employed than are necessary," &c., &c.

We regard it as well settled in this State, both by decisions here and in the Supreme Court of the United States, that counsel fees are not allowable as part of the plaintiff's damages, for the reason that they can not be said to be the necessary result of the act done by the defendant. It is true, that the decided cases do not seem to be as full and clear in reference to the other items of expenditures claimed here as damages; but we confess that in respect to damages, we are unable to draw a distinction in principle between expenses incurred in paying lawyers' fees and in making a charge for the speculative loss of time and paying railroad and hotel bills, &c.

The judgment of this court is, that the judgment of the Circuit Court be reversed and a new trial ordered, *unless*, within ten days after notice of this judgment, the plaintiffs, or their attorney of record, release on the record of this case the verdict for fifty dollars damages; and, thus reduced, that the judgment giving the property to the plaintiffs, with costs and disbursements, be affirmed.

---

EDWARDS v. CHARLOTTE, &c., RAILROAD COMPANY.

1. SURFACE WATER—COMMON LAW IN SOUTH CAROLINA.—In action against a railroad company by an adjoining landowner to recover damages for injuries caused by surface water thrown back on plaintiff's land by a sand bank erected by defendant on its right of way, the trial judge did not err in charging the jury that defendant was not liable if the sand bank was necessary for the protection of its roadbed and right of way; for our General Statutes (sec. 2738) continues of force in this State the common law of England, except where it has been changed, and by that common law surface water is a common enemy, against which every landed proprietor has a right to take any measures necessary to the protection of his property, even if in doing so he throws it back upon a coterminous proprietor.[1]

2. IBID.—RAILROADS.—In the matter of protecting itself from the flow of surface water, a railroad company has the same rights as an individual landed proprietor.

Before WITHERSPOON, J., Aiken, April, 1892.

This was an action by Elizabeth Edwards and her husband against the C., C. & A. R. R. Company, commenced February 20, 1891. Verdict was for defendant, and plaintiff appealed.

*Messrs. Henderson Bros.* and *John R. Cloy*, for appellants, cited 28 S. C., 163; 34 *Id.*, 66; 37 *Id.*, 343; 34 A. & E. R. R. Cas., 143; 71 Mo., 237; 131 Mass., 491; 11 Tenn., 382; 16 S. E. Rep., 181; Lewis Em. Dom., § 566; 13 S. C., 99.

*Messrs. Croft & Chafee* and *B. L. Abney*, contra, cited some of

---

[1] For an exhaustive note on this subject, see 21 L. R. A., 593.

the cases stated in the opinion of this court, and, also, the following: 33 Kan., 374; 20 A. & E. R. R. Cas., 117, 103; Dill. Mun. Corp., § 798, and notes; Aug. Waterc., § 108; Add. Torts, 105; Hill. Torts, 584; 64 Ind., 167; 67 *Id.*, 201; 31 Am. Rep., 114; 3 *Id.*, 50; 10 Allen, 106; 87 Am. Dec., 625; 25 Wisc., 223; 29 *Id.*, 511; Cooley Torts, 574.

September 29, 1893.   The opinion of the court was delivered by

MR. CHIEF JUSTICE MCIVER.  The plaintiff, who is a married woman, joining her husband with her as a coplaintiff, brings this action against the Charlotte, Columbia and Augusta Railroad Company, to recover damages alleged to have been done to her property, as well as to her health, by reason of the obstruction by the defendant company of the natural flow of surface water over and across the right of way and railroad track of defendant.   The allegations in the complaint, substantially, are, that some time in the year 1867 the defendant company constructed its railway through the town of Graniteville, over and along Canal street of said town, running north and south, parallel with Horse Creek, a natural water course, on the west of the railway; that plaintiff is the lessee of certain premises, situate at the northeast corner of Canal street and Cottage, the latter being a street running perpendicular to the former; that on the eastern side of the town of Graniteville the land is hilly, and gradually slopes towards Horse Creek, and that the surface water which would accumulate on the eastern side was accustomed to flow, in part, down and along Cottage street, across Canal street, to said Horse Creek, previous to the construction of defendant's road, and for some time afterwards, without injury to plaintiff's premises, but that some time in the year 1878, "the defendant negligently, unlawfully and unnecessarily" erected a large sand bank at the intersection of Canal and Cottage streets, whereby the surface water was forced back on plaintiff's premises, and has continued to maintain and increase said sand bank.

The defendant claims that the sand bank complained of (which was constructed on defendant's right of way) was ne-

40—39

cessary to protect its roadbed and right of way from being undermined and washed away by the flow of the surface water, and, therefore, its construction was no invasion of the legal rights of the plaintiff, and the defendant is not liable for any damages which plaintiff may have sustained by reason of such obstruction of the flow of the surface water.   The Circuit Judge, in effect, charged the jury that the first question for them to determine was whether the construction of the sand bank was necessary for the protection of defendant's roadbed and right of way, and, if so, then the defendant was not liable. The jury, under this instruction, found a verdict in favor of the defendant, and judgment being entered thereon, the plaintiff appeals, upon the several grounds set out in the record. Under the view which we take, we do not deem it necessary to repeat these grounds, for the whole case, in our judgment, turns upon the inquiry whether there was any error in the instruction thus given to the jury.

It is not, and cannot be, denied that the rule in regard to interference with the flow of surface water is wholly different from that which prevails in regard to the waters of a natural water course.   We shall, therefore, confine our attention entirely to the rule as to surface water.   What that rule is has been the subject of debate in numerous cases in the other States, many of which we have examined in preparing this opinion.   Some of the States have adopted what is known as the civil law rule, while others seem to have adopted what is designated as the intermediate rule, while others again (a majority of the States, as is said in a note to *Goddard* v. *Inhabitants of Harpswell*, 30 Am. St. Rep., at page 391,) adhere to the rule of the common law.   In this State, so far as we are informed, there is no adjudication upon the subject, for what was said upon the subject by the late Chief Justice Simpson was "not intended as a final adjudication, and conclusive of said question in the future," as he himself expressly said in that opinion, but simply his own opinion as to the comparative merits of the several rules.

But in view of the express declaration of the law-making power, as embodied in section 2738 of the General Statutes, we

feel bound to declare, in the absence of any constitutional provision, statute or even authoritative decision to the contrary, that the common law rule must still be recognized as controling here, for that section expressly declares that: "Every part of the common law of England, not altered by this act nor inconsistent with the Constitution of this State, and the customs and laws thereof, is hereby continued in full force and virtue within this State in the same manner as before the passage of this act." Under the common law rule, surface water is regarded as a common enemy, and every landed proprietor has a right to take any measures necessary to the protection of his own property from its ravages, even if in doing so he throws it back upon a coterminous proprietor to his damage, which the law regards as a case of *damnum absque injuria*, and affording no cause of action.

This rule was applied in a case very much like the present— *Rowe* v. *St. Paul, &c., R. R. Co.*, 41 Minn., 384, s. c. 16 Am. St. Rep., 706; also, in *Cairo & Vincennes R. R. Co.* v. *Stevens*, 73 Ind., 278, s. c. 38 Am. Rep., 139; *O'Connor* v. *Fond DuLac, &c., Railway Co.*, 52 Wisc., 526, s. c. 38 Am. Rep., 753; *Johnson* v. *Chicago, &c., R. R. Co.*, 80 Wisc., 641, s. c. 27 Am. St. Rep., 76. See, also, *Chadeayne* v. *Robinson*, 55 Conn., 345, s. c. 3 Am. St. Rep., 55, and *Abbot* v. *Kansas City, &c., R. R. Co.*, 83 Mo., 271; s. c. 53 Am. Rep., 581, in which the case of *Shane* v. *Kansas City, &c., R. R. Co.*, 71 Mo., 237, relied upon by appellant, as well as the case of *McCormick* v. *Kansas City, &c., R. R. Co.*, 70 Mo., 359, are commented on and practically overruled, so far as the question now under consideration is concerned. These cases, as well as many others which might be referred to, together with those cited by respondent's counsel in his argument, abundantly show that there was no error on the part of the Circuit Judge in giving the instruction complained of to the jury.

The case of *Staton* v. *Norfolk & Carolina R. R. Co.*, recently decided by the Supreme Court of North Carolina, and reported in 111 N. C., 278, and 16 S. E. Rep., 181, seems to be much relied upon by the counsel for appellant. But we do not think it in point. The question there was different from that pre-

sented here, and the discussion was principally devoted to an inquiry into the rights acquired by a railroad company from the exercise of its right to condemn lands under the power of eminent domain, with which we are not concerned here. Here we freely and fully concede the doctrine laid down in that case, that a railroad company has no higher rights, in reference to the treatment of surface water, than an individual land proprietor; and that is as far as that case is applicable to the present. Besides, as we understand, North Carolina is one of the States which recognize the cival law rule in reference to surface water, and hence the decisions in that State would afford no assistance where the common law rule prevails. So, too, the cases of *Mills* v. *G. & C. R. R. Co.*, 13 S. C., 97, and *Wallace* v. *Rail Road Co.*, 34 *Id.*, 66, and again reported in 37 S. C., 336, being cases in reference to natural water-courses, and not cases of surface water, have no application to the present case. Nor are we able to discover anything in the case of *Gregory* v. *Layton*, 36 S. C., 93, which throws any light upon our present inquiry.

Under the view which we have taken, the other grounds of appeal become immaterial. For even if the alleged errors there complained of were well founded, the result reached would not have been affected. Assuming, as we must do, that the jury found as matter of fact that the sand bank complained of was necessary for the protection of defendant's right of way and roadbed, we are unable to see how the instructions complained of could possibly have affected the result. We may add, however, that we see no error in any of the instructions complained of.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

### PRINCE v. DICKSON.

1. JUDGMENT—PRESUMPTION OF PAYMENT.—A judgment is presumed to be paid after the lapse of twenty years, if there be no intermediate admissions or renewals.

2. IBID.—DISPROOF OF SERVICE.—Where proceedings to renew a judgment show proper service on their face, the order of renewal can be attacked only by a direct proceeding instituted for that purpose. It is final and conclusive in any subsequent collateral inquiry.

3. IBID.—COLLATERAL ATTACK.—Under summons to renew a judgment, a defence attacking the service of a former summons under which this same judgment had been previously renewed, is not an attack by direct proceeding; and, therefore, the regularity of the service of such former summons must be determined by the record itself.

4. SERVICE OF SUMMONS TO RENEW JUDGMENT.—Section 159 of the Code of Procedure *seems* to relate only to summons for the commencement of an action, and not to summons to renew a judgment.

5. IBID.—PRESUMPTIONS.—A certificate by a sheriff declaring a summons to have been personally served by his special deputy, is a sufficient certificate of service by the sheriff, and shows jurisdiction acquired by the court; and after a lapse of seventeen years, the court would assume, if necessary, that the sheriff was present when his deputy handed it by his direction to the defendant.[1]

6. A DEPUTY SHERIFF is not an officer, but a mere agent of the sheriff that employs and uses him.

7. JUDGMENT—PAYMENT—EVIDENCE.—Where defendant pleads payment of a judgment sought to be renewed, the plaintiff may introduce parol testimony to prove non-payment.

8. SUMMONS TO RENEW JUDGMENT.—A notice by judgment plaintiff to judgment defendant that a motion would be made at a specified time and place for an order to issue a new execution for the enforcement of the judgment, is all-sufficient as a summons to renew the judgment.

## Before WITHERSPOON, J., Chesterfield, September, 1892.

This was a summons issued by W. L. T. Prince, as administrator, served April 8, 1892, on Mary A. Dickson, to renew judgment obtained by the plaintiff against the defendant on September 14, 1866. The case turned on the proper service of

---

[1] See note in 19 L. R. A., at page 177.

a summons, upon which an order of renewal was passed on September 10, 1875.

*Messrs. H. H. Newton* and *A. A. Pollock,* for appellant.

*Mr. W. F. Stevenson,* contra.

September 29, 1893.   The opinion of the court was delivered by

MR. CHIEF JUSTICE MCIVER.   This was a summons to renew an execution issued to enforce a judgment, originally docketed on the 14th day .of September, 1866, which, as the plaintiff alleges, was renewed first by an order of court bearing date 10th September, 1875.   The defendant in her answer showed for cause why· said execution should not be renewed: 1st. "That the judgment debt which purports to be represented by the alleged execution has been fully paid and discharged in law.   2d. That she denies the allegation in the said summons contained, that the execution was renewed in 1875, and alleges that the pretended renewal thereof is void.   3d. That she is advised, and, therefore, alleges, that there is no valid record upon which to base an execution in this case.   4th. The re-spondent has been recently informed that there is a purported order of renewal of the alleged execution in the above cause. She is surprised at this, for the reason that no notice or sum-mons was ever served upon her informing her that application would be made to renew the execution in this case.   She is further informed that there is a notice in the record of this case which has upon it a certificate or statement purporting to be made by Sheriff Spofford, to the effect that by his special de-puty, Isham Drake, he served a copy of said notice upon her on the 2d day of January, A. D. 1875, at deponent's place of residence in Chesterfield County.   That the said certificate is based upon an erroneous statement of facts.   That Isham Drake never delivered to respondent any such copy notice or other paper on 2d day of January, 1875, nor at any other time." Appended to her answer was the affidavit of one Isham Drake, in which he says: "That he never served any papers for Sheriff Spofford on Mrs. Mary A. Dickson in his life, and that said

return, so far as it alleges service by this deponent, is erroneous, that he never did carry any paper of any kind from Sheriff Spofford to her."

The case came before his honor, Judge Witherspoon, for hearing, when the original record, showing that judgment had been duly entered as stated in the summons in the present case, and accompanying said record, as a part thereof, were the proceedings showing that the execution had been renewed in 1875, to wit: the summons, bearing date the 1st of January, 1875, calling upon defendant to show cause why a new execution should not issue, upon which were the following endorsements: "Lodged 1st January, 1875. (Signed) P. F. Spofford, S. C. C. By my special deputy, Isham Drake, delivered a copy of this notice to Mary A. Dickson personally, at her place of residence in Chesterfield County, on the 2d day of January, 1875, and left the same with her. (Signed) P. F. Spofford, S. C. C." Also, an affidavit of the plaintiff to the effect that no part of the judgment had ever been paid, but the same remains wholly unsatisfied for the whole amount; and an order signed by his honor, Judge Townsend, renewing the execution. The plaintiff in the case was permitted to testify, against objection by defendant, that no part of the judgment had ever been paid.

The Circuit Judge rendered judgment that the plaintiff was entitled to renew his execution, and granted an order of renewal accordingly. From this the defendant appeals, upon the several grounds set out in the record, which, under the view we take, need not be repeated here.

Inasmuch as more than twenty years had elapsed from the original entry of the judgment before the present proceedings were instituted, it is quite clear that defendant's plea of payment, by operation of law, would have to be sustained, unless the proceedings instituted in 1875 will rebut the presumption of payment arising from lapse of time. The real question, therefore, is as to the legal effect of those proceedings. If those proceedings show on their face that the court which granted the order of renewal in September, 1875, had then acquired jurisdiction of the person of the defendant by legal service of the summons by

which such proceedings were commenced, then, even if, in fact, no such service had been made, the order of renewal would be final and conclusive in any subsequent collateral inquiry into the validity and effect of such order of renewal, for its validity could only be inquired into under some direct proceedings in which alone could the question of fact as to whether such service was really made or not be determined. In other words, where the record of a judgment shows upon its face that the court rendering the judgment has acquired jurisdiction of the party against whom it is rendered, neither that party nor any other person can assail such judgment for want of jurisdiction, except by some direct proceeding instituted for the purpose of correcting any alleged error in what appears upon the record, and such record must be treated as importing absolute verity until it has been so corrected. *Turner* v. *Malone*, 24 S. C., 398; *Crocker* v. *Allen*, 34 *Id.*, 452.

Unless, therefore, the present proceeding can be regarded as a direct proceeding instituted for the purpose of correcting an alleged error in the record of the proceedings instituted in 1875, it is very obvious that the court could not now enter into any inquiry as to whether the defendant was in fact served with the summons by which that proceeding was inaugurated. It seems to us that it cannot be so regarded, for, in the first place, this proceeding was not instituted by the party claiming that there was an error in the record; and if the defence which is set up here should be allowed to prevail, the record would still stand as it stood before. This matter of correcting errors in records is too serious a matter to allow any laxity in the proceedings for that purpose. The public records are designed for the information of all persons who may have occasion to consult them, and hence the importance of the rule that a proceeding to correct an error in the record must be taken in the same case (*Crocker* v. *Allen, supra*), so that the inquirer may at once see that what purports to be a valid judgment is not so in fact. We do not think, therefore, that the defendant can be permitted, by way of defence to another proceeding, to set up an alleged error in the record; and hence any inquiry into the fact of service upon her of the summons

under which the order of renewal was obtained in 1875 was not competent to the inquiry here presented.

The question, therefore, is narrowed down to the inquiry, whether it appears by the record of the proceedings to renew the execution in 1875 that the court had then acquired jurisdiction of the person of the defendant in that proceeding. As will be seen by the endorsement found upon the notice or summons by which the proceeding to renew the execution in 1875 was inaugurated, which is copied above, the sheriff certified that by his special deputy he delivered a copy thereof to the defendant, and left the same with her, and it is contended by the appellant that was no proof of service at all, and hence that the record does not show on its face that the defendant was properly made a party. The ground upon which this contention seems to be made is, that by section 161 of the Code, in force at the time [now § 159], proof of service of the summons must be made as follows: "1. If served by the sheriff, his certificate thereof. 2. If served by any other person, his affidavit thereof." And as there was no affidavit of the special deputy who made the service (as it is assumed, erroneously as we think), there was no legal proof of service. In the first place, it will be observed that section 161 relates solely to the service of a summons by which a civil action *is commenced;* and as the summons here in question was not issued for the commencement of a new action, but a mere continuance of the original action (*McDowall* v. *Reed*, 28 S. C., 466), it may well be questioned, whether the legislature intended to require the same strictness of proof of service of a paper issued after the action was commenced as would be required for the service of a summons by which an action is commenced.

But waiving this and assuming, without deciding, for the present, that there is no difference in the requirement as to proof of service, it seems to us that the proof of service in this case was sufficent. Reading the endorsement according to its terms, it must be regarded as a certificate that the service was made by the sheriff, through his agent, or special deputy, as he is termed, and under the maxim, *qui*

*facit per alium facit per se,* it should be regarded as a certificate that the sheriff had made the service. The phraseology of the certificate is somewhat peculiar: "By my special deputy, Isham Drake, delivered a copy of this notice to Mary A. Dickson personally * * * left the same with her," signed by the sheriff in his official character, is equivalent to saying that he, by his agent, delivered the paper to the defendant, and left it with her, and that certainly would be a service by the sheriff. Suppose that the sheriff had handed the paper to Drake, with a request to deliver it to defendant, who was present at the time, standing on the other side of Drake, would not that be a service by the sheriff? and if necessary to sustain the return, the court would assume, after this lapse of time, that such were the facts. The extent to which the court has gone, in order to give effect to a sheriff's return, may be seen by reference to the case of *Matherson* v. *Moore,* 2 McCord, 315, cited by respondent's counsel.

It is earnestly contended, however, by the counsel for appellant that so much of the act of 1839 (11 Stat., 28,) as provided for the appointment of a special deputy, has been impliedly repealed by the act of 1870 (14 Stat., 332), and expressly repealed by General Statutes of 1872, page 829; and, therefore, there was no statute in force in 1875, authorizing the appointment of a special deputy at that time, and hence the alleged service by a special deputy of the summons to renew the execution in 1875 was illegal and void. This position is founded upon the erroneous assumption that a special deputy is an *officer,* whereas, in fact, he is nothing more than an *agent* of the sheriff. Accordingly it has been held that even a minor, who is incapable of holding any office, may act as a special deputy of the sheriff, and service made by him is legal and valid. *McConnell* v. *Kennedy,* 29 S. C., 190; *State* v. *Toland,* 36 *Id.,* 520. See, also, to same effect *Janesville & W. R. R. Co.* v. *Fisher,* 109 N. C., 1; reported, also, in 13 S. E. Rep., 698. In the absence, therefore, of any statute forbidding the sheriff to act through an agent or special deputy (and we know of no such statute), the sheriff, like all other persons, may, and oftentimes must, act through the agency of another.

It seems to us, therefore, that the record of the proceedings to renew the execution in 1875 shows on its face that the court had then acquired jurisdiction of the person of the defendant, and the order of Judge Townsend, passed on the 10th September, 1875, rebuts the presumption of payment of the original judgment by adjudicating that the same was still then due and unpaid; and as twenty years have not elapsed since the date of that adjudication, the said judgment, in the absence of any evidence (and there is none) of any payment thereon, must still be regarded as unsatisfied either in whole or in part. The cases of *State ex rel. McCall* v. *Cohen*, 13 S. C., 198, and *Barron* v. *Dent*, 17 *Id.*, 75, relied on by appellant's counsel, are not in point. For these cases originated in a trial justice's court; and what is more important, the record in neither of those cases purported to show any service by any competent authority, or rather any service by a person who could prove the service except by affidavit, and no such affidavit appeared on the record. It follows, therefore, that there was no error on the part of Judge Witherspoon in granting the order for the renewal of the execution.

This would be conclusive of the case; but it may be as well to refer briefly to some other points made by the grounds of appeal. The fourth ground is based upon alleged error on the part of Judge Witherspoon in allowing the plaintiff in execution to testify that the judgment debt had never been paid. As we understand the law, it is always necessary for a plaintiff, when he applies for a renewal of execution, to satisfy the court that the amount due on the judgment is still unpaid; and in this view the testimony objected to was clearly competent. Besides, it was directly in reply to the plea of payment set up in the answer of the defendant.

The seventh ground of appeal takes exception to the form of the notice issued to renew the execution in 1875, and the point of the objection seems to be that such paper was not in the form, and did not contain the requisites of a summons. We are not informed of any statute prescribing any form or any special requisites of a summons. As has been held in the case of *Genobles* v. *West*, 23 S. C., 154, a summons

is a mere notice addressed to the defendant, giving him information that a certain proceeding has been commenced for a certain purpose; and when the defendant was informed, by the notice here in question, that a motion would be made, at a specified time and place, "for an order to issue a new execution for the enforcement of the judgment above stated," it seems to us that all the essential requirements were complied with.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

---

TILLINGHAST v. BOSTON, &c., COMPANY.

MOORE v. S. C. FORSAITH COMPANY.

1. SUPREME COURT—FACTS IN LAW CASE.—Facts found by the Circuit Judge in a law case on a motion to set aside the service of the summons and to dismiss the complaint for want of jurisdiction, cannot be considered on appeal.

2. CONTRACTS—PLACE—CAUSE OF ACTION.—In the absence of any statement to the contrary, the place where a contract is made is presumably the place of its performance, and the cause of action arises at the place where it is to be performed.

3. ATTORNEY AND CLIENT.—The attorney of record in a pending action has no authority by reason of such relation to bind his client to the payment of a fee to the attorney of the other party, on the settlement of the case.

4. CONTRACT—PLACE OF PERFORMANCE.—A telegram and a letter sent from Boston to this State, if containing a promise to pay money to a citizen in this State, but saying nothing as to the place of payment, make a contract which is to be performed in Boston.

5. IBID.—CAUSE OF ACTION.—The breach of a contract, and not the contract itself, constitutes the cause of action.

6. FOREIGN CORPORATION—ACTION—CASE CRITICISED.—Where a foreign corporation is sued in this State on a contract made in another State, and there breached, and order of publication here obtained, followed by personal service at the home of the defendant, but no attachment issued, the court in this State did not by such service acquire jurisdiction of the defendant.   Pennoyer *v.* Neff, 95 U. S., 714, followed. [1]

---

[1] See note to Moyer *v.* Bucks, 16 L. R. A., 231.

7.  IBID.—SERVICE—ATTACHMENTS.—The provisions of the Code of Procedure relating to the service of summons on foreign corporations apply only to cases in which there is a proceeding *in rem.,* as, *e. g.,* a warrant of attachment.

8.  IBID.—IBID.—IBID.—ACTION.—These rules as to service on a foreign corporation apply as well to cases in which the contract was made and breached in this State.

9.  CASE CRITICISED.—This same case, as decided in 38 S. C., 319, reaffirmed.

Before HUDSON, J., Hampton, October, 1892.

These were two actions heard together—W. S. Tillinghast against the Boston and Port Royal Lumber Company and the S. C. Forsaith Machine Company, and James W. Moore against the S. C. Forsaith Machine Company. For former report, see 38 S. C., 319. The letter referred to in the opinion was as follows:

MANCHESTER, N. H., 5–5, '92.

*W. S. Tillinghast, Esq., Hampton C. H., S. C.*

DEAR SIR: In accordance with our promise by wire, we write you concerning the subject of your telegram to us on the 27th, reporting that Mr. Mitchell has returned and given us a statement of affairs at Almeda. We are not clear from him as to your claims, nor is there anything in your message to make same clear, and we ask you to have the kindness to advise us fully what you do claim from this company, and what you claim from the Boston and Port Royal Lumber Company, as we are willing to pay anything that is just therein.

But as we understood a reference was to be made, as agreed upon by both parties, as to what would be proper in the amount of fees, but this does not appear to materialize; will you have the kindness, therefore, to give us fully a statement of your claims, and they shall have prompt attention upon our part.

Yours respectfully,            W. E. DREW, *Agent.*

*Messrs. C. J. C. Hutson* and *L. F. Youmans,* for appellant.

*Mr. Jeff Warren,* contra.

November 3, 1893. The opinion of the court was delivered by MR. CHIEF JUSTICE MCIVER. These two cases were origi-

nally heard and considered · together by this court during November term, 1892, and on the 21st of February, 1893, this court filed its opinion, affirming the orders appealed from, as may be seen by reference to 38 S. C., 319. Subsequently the appellants filed petitions for rehearing, which were granted (38 S. C., 324), and the cases were reheard during the present term of this court. As we still think there are some differences in the facts of the two cases, notwithstanding the opinion of counsel to the contrary, we are of opinion that it will be better to consider the cases separately.

In the Tillinghast case, it appears that on the 7th of May, 1892, the plaintiff issued a summons against the two companies named as defendants herein, calling on them to answer the complaint dated and, we suppose, filed on the same day. In that complaint, the plaintiff alleges that he is an attorney at law, practicing in the courts of this State; that as such he had previously instituted an action in the name of one W. R. Smith against the Boston and Port Royal Lumber Company, alleging insolvency of said company, waste of assets, and asking that a receiver be appointed to take charge of said company's property for the protection of the rights of creditors and shareholders of said company; that he applied for and obtained an order for the appointment of a temporary receiver, who took charge of said assets; that prior to the day agreed upon for the hearing of the motion for the appointment of a permanent receiver, all the parties interested, either as shareholders or creditors of said Boston and Port Royal Lumber Company, met in the city of Boston, and settled their conflicting claims and interests; that as soon as the said adjustment was made, all parties being desirous that the proceedings for the appointment of a receiver should be discontinued, a telegram was sent by the S. C. Forsaith Machine Company, one of the defendants in the receiver case, that they would be responsible for the expenses of said case, which expenses included plaintiff's fee in said case, which expenses were to be ascertained by a reference; that on receipt of said telegram, an agreement, in writing, was entered into between the plaintiff herein, the said W. R. Smith, plaintiff in the receiver case, and E. F. Warren, Esq., attorney

for both of the defendants herein, a copy of which is exhibited as a part of the complaint; that upon the delivery of said agreement to the plaintiff herein, he took an order, discontinuing the receiver case, whereupon the assets of the Boston and Port Royal Lumber Company were surrendered by the temporary receiver; that the plaintiff herein, without success, attempted to have the reference contemplated by said agreement, and finally one Hiram Mitchell, who came here as agent, and was the agent of the S. C. Forsaith Machine Company, refused to have the reference, and left the county, returning to New Hampshire; that the Boston and Port Royal Lumber Company is a foreign corporation, created under the laws of the State of Maine, and doing business and owns real and personal property in Hampton County, S. C.; that the S. C. Forsaith Machine Company is a foreign corporation, created under the laws of the State of New Hampshire, and owning an interest in the stock or property aforesaid of the Boston and Port Royal Lumber Company, in Hampton County aforesaid; that plaintiff is a resident of South Carolina, and the contract for the payment of his fee as aforesaid arose and was made in Hampton County, S. C. And after other allegations as to the value of his professsonal services, the plaintiff demanded judgment for the same.

The following is a copy of the telegram referred to in the complaint: "Boston, Mass., April 9, 1892. To E. F. Warren, Hampton, S. C.: Discontinue all suits against lumber company and get the matter out of court, and we will be responsible for cost, to be ascertained by reference, as the lumber company will resume business. S. C. Forsaith Machine Company, Manchester, N. H." And the following is a copy of the agreement entered into after receipt of said telegram:

"THE STATE OF SOUTH CAROLINA, } *In Common Pleas.*
      County of Hampton.              }

"W. R. Smith, plaintiff, *v.* The Boston and Port Royal Lumber Co. Whereas all parties interested in above case have agreed to a settlement thereof; and whereas the S. C. Forsaith Machine Company, of Manchester, N. H., has agreed to pay W. S. Tillinghast, plaintiff's attorney, his fee herein (it being

conceded by all parties hereto that such fee is to be paid, under the law, out of the general assets of the Boston and Port Royal Lumber Company), such fee to be ascertained by a reference; and whereas it is agreed that the Boston and Port Royal Lumber Company will protect W. R. Smith in his interest as the same may appear. In consideration of the foregoing, the above entitled cause is to be withdrawn. It is further agreed that said reference to ascertain the amounts of said fees and costs will be held within next week before      if said fees and costs cannot be adjusted without such reference. (Signed) W. S. Tillinghast, plaintiff's attorney. E. F. Warren, defendant's attorney. W. R. Smith."

On the 5th of July, 1892, upon the usual affidavit of the plaintiff, an order of publication was granted by the clerk of the Court of Common Pleas for Hampton County, S. C., requiring publication to be made in the Manchester Daily Mirror, a newspaper published in the city of Manchester, State of New Hampshire, once a week for six successive weeks, and that a copy of the summons and complaint be forthwith deposited in the post office in Hampton, addressed to the S. C. Forsaith Machine Company, Manchester, N. H. Such communication appears to have been sent by registered letter on the 8th of July, 1892; but it does not appear that any publication was ever made; the plaintiff relying upon service of the defendant company, in New Hampshire, in lieu thereof, as appears by the affidavit (a copy of which is set out in the "Case") of one Daniel T. Healey, sheriff of the county in which the city of Manchester is located, made before one Thomas D. Luce, styling himself "Clerk Supreme Court" of said county, and certified to by him under his "hand and official seal," though no copy of such seal is affixed. It may be as well to state here that the action was dismissed as to the Boston and Port Royal Lumber Company, upon the ground that the complaint did not state facts sufficient to constitute a cause of action, and there being no appeal from the order entered to that effect, the case should now be considered as an action against the S. C. Forsaith Machine Company alone.

Upon the papers above set forth and referred to, a motion

was made before his honor, Judge Hudson, to set aside service of summons and complaint on the said defendant, made at their place of business, in the city of Manchester, State of New Hampshire, and to dismiss the complaint of plaintiff for want of jurisdiction, whereupon the following order was granted: "On hearing the pleadings in above stated case, and on motion of Jeff. Warren, attorney for the S. C. Forsaith Company, defendant, to set aside service of summons and complaint on the said defendant, made at their place of business in the city of Manchester, State of New Hampshire, and to dismiss the complaint of plaintiff for want of jurisdiction, counsel having been heard, it appearing to the satisfaction of this court that the defendant, S. C. Forsaith Machine Company, are a foreign corporation and non-residents of this State; that they have no property within the limits of this State, are represented by no agent and have no place of business therein; that the cause of action, to wit: the breach of the contract, did not arise within the limits of this State, and that service of summons and complaint was made in the city of Manchester, State of New Hampshire; ordered, that the complaint of plaintiff be dismissed, this court having no jurisdiction on the grounds above set forth." Subsequently the judge filed a paper setting forth more fully his reasons, a copy of which may be found in the former report of the case, in 38 S. C., 319, and which, therefore, need not be set out here.

From this order plaintiff appeals upon the three grounds set out in the record, which make substantially three questions: 1st. Was there error in holding that the cause of action did not arise in this State? 2d. Was there error in holding that the breach of the contract constituted the cause of action? 3d. Was there error in holding that, even if the cause of action arose in this State, the courts of this State could not take jurisdiction of an action *in personam* and render a personal judgment against a party served with the summons outside of the limits of this State?

To determine the first question, two inquiries present themselves: First. When was the contract made? Second. Where was it to be performed? These inquiries involve mixed

41—39

questions of law and fact; and, so far as the latter are concerned, the finding of the Circuit Judge is conclusive in a case of this kind. *Hester* v. *Raisin Fertilizer Co.*, 33 S. C., 609. But the rule of law is that, "in the absence of anything indicating the contrary, the place of the making of a contract is presumably that of its performance," as was said by Mr. Justice McGowan, in *Curnow* v. *Phœnix Insurance Company*, 37 S. C., 411, quoting with approval from Bish. Cont., sec. 1391; and as was held in *Rodgers* v. *Endowment Association*, 17 S. C., 410, the cause of action on a contract arises at the place where it is to be performed. Where, then, was the contract made, upon which the plaintiff bases his action, if, indeed, there was any such contract, a point which is not now before us, and upon which we do not desire to be regarded as even intimating any opinion. It does not appear that the plaintiff ever before had any professional connection with the S. C. Forsaith Machine Company, and if made at all, it must be traceable to the telegram copied above; and that was sent from Boston, Mass. We cannot regard the written agreement between Tillinghast, Warren and Smith, set out above, as any evidence of any contract on the part of the defendant company to pay anything. The fact that Mr. Warren was attorney for that company in a litigation then pending, could not invest him with authority to bind his client to pay money, without some authority other than that arising from his professional relations; and certainly the terms of the telegram conferred no authority to enter into such agreement. Indeed, the terms of that paper do not show that Mr. Warren undertook to bind his client to pay any sum of money whatever. On the contrary, the agreement contained nothing more than a recital of the fact that the defendant company had agreed to pay the fee of Mr. Tillinghast; and whether that recital was strictly correct or not, is not a question now to be considered.

If, therefore, there was any agreement on the part of the defendant company to pay the plaintiff's fee, it must be found in the telegram above referred to, and if it contains any promise to that effect, such promise was not made in

this State, but in Boston, and, under the rule above referred
to, must be there performed, as it is quite clear that there is
nothing in the telegram indicating the contrary.    Appellant
in his argument seems to rely somewhat upon a letter, printed
in the "Case," from the agent of the defendant company to Mr.
Tillinghast, as tending to show that defendant acquiesced in
the arrangement for the payment of plaintiff's fee.    But as we
did not consider that the terms of that letter indicated any such
acquiescence, we did not deem it important to set out that let-
ter in making our statement of the case.    Still, we would be
glad to have the letter incorporated in the report of the case,
in deference to the views of its importance by appellant's coun-
sel.    But even if that letter contained a positive promise to pay
the fee, or a direct admission of defendant's liability, such
promise, whether express or implied, was not made in this
State, but in the State of New Hampshire; and hence, under
the rule above stated, the cause of action could not be regarded
as arising in this State, as there is nothing in the letter indi-
cating that such supposed promise was to be performed else-
where.

As to the second question presented by the grounds of ap-
peal, we deem it only necessary to say that we cannot under-
stand how any contract can give rise to a cause of action until
there has been some breach of such contract.    The mere
fact that a person has entered into a contract with an-
other can give no cause of action, and none can arise
until there is some breach of such contract, which, therefore,
must be regarded as the cause of action.    The contract may
give a party the right to demand its performance according to
its terms, but there is no delict and no cause of action until the
other party refuses or neglects to perform some duty required
of him by the terms of the contract.    We do not think, there-
fore, that there was any error on the part of the Circuit Judge
in holding that the breach of the contract constitutes the cause
of action.

The third question presented by the grounds of appeal is
more difficult and is much more important than either of the
other questions.    The Code provides in section 148, that "civil

actions in the courts of record of this State shall be commenced
by service of a summons," and in subsequent sections, 155 and
156, proceeds to prescribe how such service shall be made.   In
section 155 the provision is, that if the action be against a cor-
poration, it must be by delivery of a copy of the summons to
certain officers or agents of the corporation, "but such ser-
vice can be made in respect to a foreign corporation only when
it has property within this State, or the cause of action arose
therein, or where such service shall be made within this State
personally upon the president, cashier, treasurer, attorney or
secretary thereof," followed by a special provision as to certain
specified corporations, which have no application to the pre-
sent case, as the defendant here is not one of the corporations
specified.   In section 156, provision is made for the service of
the summons by publication in certain specified cases, the only
one of which applicable here is couched in the following lan-
guage: "Where the defendant is a foreign corporation, has
property within the State, or the cause of action arose therein."
That section contains this further provision: "Where publica-
tion is ordered, personal service of the summons out of the
State is equivalent to publication," &c.   Section 158 provides
that in the cases mentioned in section 156, the service of the
summons shall be deemed complete at the expiration of the
time prescribed by the order for publication.   Section 159 pro-
vides how proof of the service of the summons shall be made,
and contains this language: "When the service is made out of
the State, after order of publication, the affidavit of the person
making the service shall be made before the clerk of any court
of record in the State or district in which such service shall be
made, who shall certify the same under his official seal," which
was afterwards amended by the act of 1884 (18 Stat., 745), so
as to include other officers besides such clerk.   Section 160
provides that: "From the time of the service of the summons
in a civil action, or the allowance of a provisional remedy, the
court is deemed to have acquired jurisdiction."

It must be admitted that, if we look alone to the provisions
of the several sections of the Code above referred to, there is
strong ground for the position taken by appellant, that,

if the cause of action arose in this State, the court had acquired jurisdiction of the defendant corporation. For in view of the findings of Judge Hudson, that the defendant was a foreign corporation, having no property within this State, that it was duly served with a copy of the summons in the State of New Hampshire, after order of publication had been made, we must take the facts so found, and there is no room for the objection, taken in the argument, to the proof of service as lacking the official seal of the clerk, as no such exception was taken below. So that the naked question now presented is, that even assuming that the cause of action in this case arose in this State, whether the courts of this State could acquire jurisdiction of this foreign corporation, which had no property in this State, through which it might have been reached by a proceeding *in rem*, at least so far as such property was concerned, simply by personal service on such corporation in another State.

This question, as it seems to us, has been conclusively settled in the negative by the highest authority in the case of *Pennoyer* v. *Neff*, 95 U. S., 714. In that case, Neff, being a non-resident of the State of Oregon, but owning property therein, the land in question, was sued on a money demand, in which action the State Court of Oregon undertook to acquire jurisdiction of the person of Neff by publication, under a statute of that State practically identical with our Code in this respect, and rendered judgment against him for the amount of such demand, and under the executions issued to enforce such judgment, the land was sold by the sheriff and bought by Pennoyer. Subsequently, an action was brought by Neff against Pennoyer, to recover possession of the land, in the Circuit Court of the United States for the District of Oregon, and carried thence by writ of error to the Supreme Court of the United States. The case turned upon the validity of the sale by the sheriff, or rather the validity of the judgment under which such sale was made, and the court held that the State Court of Oregon could not acquire jurisdiction of the person of a non-resident defendant in a personal action simply by service by publication, and hence that the judgment was a nullity. As is said by Mr. Jus-

tice Field, in delivering the opinion of the court, one of the well established principles of public law, respecting the jurisdiction of an independent State over persons and property, is: "That no State can exercise direct jurisdiction and authority over persons or property without its territory. Story Confl. Laws, ch. 2; Wheat. Int. Law, pt. 2, c. 2. The several States are of equal dignity and authority, and the independence of one implies the exclusion of power from all others, and so it is laid down by jurists, as an elementary principle, that the laws of one State have no operation outside of its territory, except so far as is allowed by comity; and that no tribunal established by it can extend its process beyond that territory, so as to subject either persons or property to its decisions."

This doctrine does not deny or interfere with the right of a State to acquire jurisdiction over the property of a non-resident *located* or found *within such State* by a proceeding *in rem*, for example, by attachment, or some proceeding in the nature of a proceeding *in rem*, provided for by the laws of such State; but under such a proceeding, no *personal* judgment can be rendered against the non-resident, and the judgment can only affect him so far as his property found in the State is concerned. See *Stanley* v. *Stanley*, 35 S. C., 94. The same doctrine had been previously laid down in *Galpin* v. *Page*, 18 Wall., at pages 367–8, where it is said: "Even the Court of King's Bench in England, though a court of general jurisdiction, never imagined that it could serve process in Scotland, Ireland or the colonies to compel an appearance, or justify a judgment against persons residing therein at the time of the commencement of the suit." The case of *Pennoyer* v. *Neff* has not only been recognized and followed in numerous subsequent cases, but, so far as we are informed, has never been questioned by any tribunal. Even the learned judge, Mr. Justice Hunt, who dissented in that case, did not question the doctrine for which we have cited the case, but based his dissent upon the sole ground that, inasmuch as Neff owned land within the State of Oregon at the time the action was commenced, in which the judgment in question was recovered, it could be subjected to such judgment even though no proceeding by attachment had been instituted.

It is true, that in that case the defendant was a natural person, and not, as here, a corporation, and that the service there was by publication, and not, as here, by personal service outside of the limits of the State.   But neither of these circumstances can make any substantial difference between that case and this; for in the case of *St. Clair* v. *Cox*, 106 U. S., 350, the doctrine of *Pennoyer* v. *Neff* was applied to a case of a foreign corporation, and it is there said: "The doctrine of that case applies, in all its force, to personal judgments of State Courts against foreign corporations;" and we are unable to discover any reason why it should be otherwise.   See, also, *Mexican Central Railway* v. *Pinkney*, 149 U. S., 194, where the same doctrine was applied in a case of a foreign corporation.   The other point of difference amounts to nothing, for the statute of Oregon, like our statute, expressly declares: "Where publication is ordered, personal service of the summons out of the State is equivalent to publication and deposit in the post office," thus putting the two modes of service precisely upon the same footing.   Besides, in the case of *Sugg* v. *Thornton*, 132 U. S., 524, where the doctrine of *Pennoyer* v. *Neff* was applied, the case shows that the party who objected to the jurisdiction of the Texas Court, on the ground that there had been no legal service upon him, was actually served in Wyoming Territory.

It is apparent from what is said in other cases that the Supreme Court of the United States recognize no difference in the two modes of service, so far as the question we are considering is concerned.   For in *Grover, &c., Machine Company* v. *Radcliffe*, 137 U. S., at pages 294–5, it is said, upon the authority of *Pennoyer* v. *Neff*, and other cases there cited, "that a personal judgment is without validity if rendered by a State Court, in an action upon a money demand against a non-resident of the State, upon whom no personal service of process within the State was made, and who did not appear."   And in *Wilson* v. *Seligman*, 144 U. S., at pages 44–5, the following passages from the opinion in *Pennoyer* v. *Neff* are quoted with approval: "Every State possesses exclusive jurisdiction and sovereignty over persons and property within its territory  *  *  *  no State can exercise direct jurisdiction and authority over per-

sons or property without its territory  *  *  *  it is in virtue
of the State's jurisdiction over the property of the non-resident,
situated within its limits, that its tribunals can inquire into
that non-resident's obligations to its own citizens, and the in-
quiry can then be carried only to the extent necessary to con-
trol the disposition of the property.  *  *  *  Where the en-
tire object of the action is to determine the personal rights and
obligations of the defendants, that is, where the suit is merely
*in personam*, constructive service in this form upon a non-resi-
dent is ineffectual for any purpose.    Process from the tribunals
of one State cannot run into another State, and summon par-
ties there domiciled to leave its territory, and respond to pro-
ceedings against them.  *  *  *  Process sent to him out of
the State, and process published within it, are equally una-
vailing in proceeding to establish his personal liability  *  *  *
A judgment which can be treated, in any State of this Union,
as contrary to the first principles of justice, and as an absolute
nullity, because rendered without any jurisdiction of the tri-
bunal over the party, is not entitled to any respect in the State
where rendered.  *  *  *  To give such proceedings any va-
lidity, there must be a tribunal competent by its constitution,
that is, by the law of its creation, to pass upon the subject mat-
ter of the suit; and if that involves merely a determination of
the personal liability of the defendant, he must be brought
within its jurisdiction by service of process within the State,
or his voluntary appearance."

These being the well settled principles, applicable to a case
like the one now under consideration, established by the
Supreme Court of the United States, a tribunal which
is invested with final jurisdiction in controversies be-
tween citizens of different States, it seems to us that we
are bound, if practicable, to put such a construction upon the
provisions of our Code, above referred to, as will bring it into
conformity with such principles.    This, we think, can be done
by construing the above mentioned provisions of our Code as
applying only to cases in which a warrant of attachment has
been issued, or to some other proceeding *in rem*, or in the
nature of a proceeding *in rem*, and not to cases of mere personal

actions, in which only a personal judgment can be obtained. For it must be remembered that an action cannot now, as formerly, be commenced by a writ of foreign attachment; but that now, under the Code, an attachment is merely a provisional remedy in aid of an action, and hence, to make it available, an action must be commenced in regular form, and judgment therein must be recovered before the attachment can yield the fruits which it is designed to produce. We are, therefore, compelled to construe the provisions of the Code above referred to, providing for the mode of making a non-resident a party to an action, as applying only to such actions as may be regarded as a proceeding *in rem*, and not applying to merely personal actions, in which only a personal judgment is sought or can be obtained.

This being a purely personal action, in which no warrant of attachment has been, or could be, obtained, inasmuch as the defendant has no property within this State, we think that the court never acquired jurisdiction of the defendant corporation, by service of the summons out of the State, and hence there was no error on the part of the Circuit Judge in dismissing the complaint for want of jurisdiction.

The second case mentioned in the title of this opinion, that of Mr. Moore, differs in at least one very material respect from the case just considered. Here the undisputed evidence is that the contract, which constitutes the basis of plaintiff's action, was made in this State, by a duly authorized agent of the defendant corporation, and subsequently ratified by the general agent of said corporation; and as there is nothing even tending to show that such contract was to be performed elsewhere, it must, under the rule announced in Mr. Tillinghast's case, be regarded as a contract made and to be performed in this State, and hence that the cause of action arose in this State. If this were all, then a different conclusion from that reached in the case first considered would follow. But, under the views which we have taken of the third question presented by the appeal of Mr. Tillinghast, we are compelled to conclude that the court never acquired jurisdiction of the defendant corporation by a simple service of the summons in the State of

New Hampshire; for in this case, as in the former, there was no warrant of attachment obtained, and none could have been, by reason of the undisputed fact that defendant, though a foreign corporation, had no property within the limits of this State. There was, therefore, no error on the part of the Circuit Judge in dismissing the complaint in this case for want of jurisdiction.

For the reasons hereinbefore stated, we must adhere to the judgment rendered at the former hearing. The judgment of this court is, that the judgment of the Circuit Court, in each of the cases stated in the title of this opinion, be reaffirmed.

---

ARMSTRONG v. HURST.

1. DISMISSAL OF APPEAL.—Objections to the hearing of an appeal not considered, because not deemed necessary under the view taken of the case by this court, and there being no formal notice of motion to dismiss.

2. ASSIGNMENT—PARTNERSHIP—CASE CRITICISED.—An assignment by partners of all the partnership property, exacting releases from preferred creditors, is not void as a partial assignment by reason of its failure to include the individual property of the assignors. Trumbo *v.* Hamel, 29 S. C., 520, approved and followed.

3. IBID.—IBID.—CONFESSION OF JUDGMENT.—An assignment of partnership assets, followed several months later by a confession by one of the partners to a creditor pending other suits, after an unsuccessful effort to set the assignment aside had been made and abandoned, did not show an intention to give such judgment creditor a preference.

4. CREDITOR CALLED IN—SCOPE OF ACTION.—*Doubted* whether a creditor, who comes in under a call for creditors in action to construe the assignment and the rights of creditors thereunder, can question the validity of the deed of assignment.

5. ASSIGNMENT—RELEASE—CASE CRITICISED.—A notice signed by attorneys at law, that their clients, naming them, accept the terms of a deed of assignment, and offer releases as thereby required, cannot be accepted as a release. Jaffray *v.* Steedman, 35 S. C., 33, approved and followed.

6. IBID.—IBID.—RATIFICATION.—Formal releases executed by these same parties after the time for releasing had expired, cannot be received as such a ratification of their attorneys' previous offer as will affect the rights of

other creditors which had vested on the expiration of the time for releases to be filed.

Before FRASER and ALDRICH, JJ., Greenville, August and December, 1892.

This was an action by Armstrong, Cator & Co. and others against Hurst, Purnell & Co. and others. The opinion states the case.

*Messrs. Perry & Heyward,* for appellants.

*Messrs. Earle & Mooney,* for plaintiffs.

*Messrs. Haynsworth & Parker,* for assignee.

November 3, 1893. The opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER. On the 27th of November, 1891, N. C. Dacus and M. M. Jordan, copartners in trade under the name and style of Dacus & Jordan, executed an assignment to J. C. Rogers of all their partnership property for the benefit of their partnership creditors. The deed of assignment provided amongst other things, after providing for the payment of all proper costs and charges incurred in preparing and executing said assignment, as follows: "And then if the money so realized be insufficient to pay all the creditors of the said Dacus & Jordan, then, in trust, first to pay any debts due the public, and the debts of such of the creditors of the said Dacus & Jordan as may, within sixty days from the date hereof, accept the terms of this assignment and execute a release of their claims against the said Dacus & Jordan, and that the balance, after paying said debts, be distributed among the other creditors of said Dacus & Jordan *pro rata,* without preference or priority."

It appears from the report of the master, to whom it was referred to hear and determine the issues of law and fact, and to call in all the creditors of Dacus & Jordan to prove their demands before him, that within the prescribed time some of the creditors, to wit: J. C. Rogers, A. M. Dacus, and R. B. Ligon, and J. B. Lewis, duly accepted the terms of the assignment

and filed releases of their claims with the assignee, and that on the 26th of January, 1892, Messrs. Perry & Heyward, as attorneys for certain of the creditors therein named, filed with the assignee a notice, of which the following is a copy: "To Mr. J. C. Rogers, assignee, Greenville, S. C.: Take notice that the creditors, whose names appear upon the list hereto attached, with their respective claims against the firm of Dacus & Jordan, hereby accept the terms of the assignment made to you by the firm of Dacus & Jordan (N. C. Dacus and M. M. Jordan), on the 27th day of November, A. D. 1891, and offer releases of their said claims respectively, as required by said assignment," and that none of the other creditors had attempted to comply with the terms of said assignment. It should be' here stated that about ten days after the service of the notice just set out, but after the expiration of the sixty days, the creditors therein mentioned executed and delivered formal releases of their claims against Dacus & Jordan.

It also appeared that at the March term, 1892, of the Court of Common Pleas for Greenville County, Smith & Stoughton, and others of the creditors of Dacus & Jordan, brought actions against Dacus & Jordan, to which no answers were filed, and they recovered judgments by default, which were duly entered on the 11th of April, 1892, and transcripts thereof were duly filed, on the same day, in the County of Anderson, where, it seems, N. C. Dacus, one of the members of the firm of Dacus & Jordan, individually owned certain property—real estate. In the meantime, however, N. C. Dacus, on the 7th of April, 1892, confessed judgment in favor of J. C. Rogers for the sum of $635, and a transcript of the same was duly filed in the County of Anderson on the same day. This does not seem to be one of the claims proved against Dacus & Jordan, under the call for creditors, as it does not correspond in amount with either of the claims so proved; and hence we suppose that it was a claim held by Rogers against N. C. Dacus individually, and not a claim against the partnership; though, under the view which we take, it is a matter of no consequence whether our supposition be well or ill founded.

It further appeared that on the —— day of December, 1891,

the appellants, Hurst, Purnell & Co., filed their bill in the Circuit Court of the United States to set aside the assignment, and for the appointment of a receiver, but that, after the appointment of a temporary receiver, that cause was discontinued, and, by consent of the parties, an order was passed directing the temporary receiver to turn over the assets in his hands to the assignee and agent, and making certain provisions for the payment of the costs of the case and the compensation allowed the receiver, the particulars of which need not be stated further than to say that $200 of the compensation allowed the receiver should be paid out of the *pro rata* share of Hurst, Purnell & Co. in the assets of the assigned estate.

The master found, amongst other things, as matter of law, that the parties named above, having accepted and executed releases within the time prescribed, were entitled to be first paid (after expenses, &c.), and that Hurst, Purnell & Co. and the other creditors named in the notice above set out, not having executed releases within the prescribed time, could not be placed in that class. To this report several of the parties filed exceptions, and the case was heard by his honor, Judge Fraser, upon the report and exceptions, who rendered his decree, sustaining some and overruling others of the exceptions, as may be seen by reference to the exceptions and decree thereon set out in the "Case." The decree concluded in these words: "It is, therefore, ordered and adjudged, that in all respects, except as indicated above, the report be confirmed, and that parties have leave to apply for proper orders to carry out the same. Questions not herein passed upon reserved. It is further ordered, that the time for creditors to come in and establish their claims, under the previous order of the court, be extended to the first day of October next."

To this decree the following notice of exceptions was given in due time, to wit: "For the purposes of appeal to the Supreme Court from the final decree in this cause, the defendants, Hurst, Purnell & Co., in behalf of themselves and all others of the creditors of Dacus & Jordan who occupy the same position, except" to the decree of Judge Fraser, upon two grounds, which are set out in the record, but need not be

copied here, as they raise substantially but two questions: 1st. Whether there was error in holding that the notice given on the 26th of January, 1892, above set out, was not a sufficient compliance with the terms of the assignment to place appellants in the class of accepting creditors. 2d. If not, whether there was error in holding that the execution of the releases ten days after the prescribed time had expired, taken in connection with the said notice, was insufficient. Smith & Stoughton, who, though not parties to the original record, had become so, by coming in under the call for creditors and establishing their demands, in part at least, also filed the following exceptions to Judge Fraser's decree, "for the purposes of appeal to the Supreme Court from the final decree in this cause, to wit: For that his honor holds that there is no good reason why the assignment should be set aside, whereas he should have held that, taking into consideration the conduct of N. C. Dacus and J. C. Rogers (before and after the date of the assignment), the form of the assignment, and the confession of judgment by N. C. Dacus to the said J. C. Rogers, it was evidently the purpose of the said N. C. Dacus to give a preference to the said J. C. Rogers over other creditors, and the said assignment and confession of judgment are, therefore, void."

It seems that Judge Fraser in his decree recommitted the report to the master for two purposes only, so far as we can discover: first, to ascertain the correct amount due Smith & Stoughton; second, to extend the time allowed creditors to come in and prove their claims. In accordance with this portion of the decree, the master made a second report, ascertaining the correct amount due Smith & Stoughton, and reporting other claims established. This report came before his honor, Judge Aldrich, with exceptions thereto, as we presume, though none are set out in the "Case," and Judge Aldrich rendered his decree, confirming this second report of the master, and directing, amongst other things, that the assignee and agent of the creditors do pay out the assets to the several creditors in accordance with their rights as ascertained by the decree of Judge Fraser. Notice of appeal from this decree was given by Messrs. Perry & Heyward, as attorneys for the defendants; but the only

exceptions we find in the record are those of Hurst, Purnell & Co. and others (who the "others" are is not stated), and of Smith & Stoughton, those of the former making the same points substantially as were made in their exceptions to Judge Fraser's decree, and those of the latter making the same points as was made in their exceptions to Judge Fraser's decree, and in addition thereto the further point that the assignment "being a partial assignment requiring releases, it is void upon its face."

Before going into a consideration of the questions raised by these exceptions, it is necessary to notice certain preliminary objections to the hearing of these appeals, raised by counsel for respondents in their argument here, based upon the ground that Judge Fraser's decree was a final decree, at least so far as the rights of Hurst, Purnell & Co. and others standing in their position are concerned, and there being no notice of appeal from that decree, these appellants have no standing in this court, and that Smith & Stoughton's appeal cannot be considered for the same reason, as well for the further reason that these last named appellants have no such connection with the record as would entitle them to appeal. But, under the view which we take of this case, we do not deem it necessary to consider these objections, of a somewhat technical character, especially as they were not taken by any formal notice of a motion to dismiss the appeals, and we shall, therefore, pass them by without expressing or even intimating any opinion as to whether such objections are well or ill founded.

Coming, then, to a consideration of the questions presented by the exceptions, we propose to take them up in what seems to be their logical order, without regard to the order in which they are presented in the record. First, whether there was any error on the part of Judge Fraser in holding that there was no good reason why the assignment should be set aside. This involves two inquiries: first, whether it was void as a partial assignment requiring releases; second, whether it was rendered void on account of the conduct of the parties, N. O. Dacus and J. C. Rogers, evincing an intention to give J. C. Rogers an unlawful preference, by the terms of the assignment and the confession of judgment.

The first inquiry is conclusively answered by the recent decision of this court, in the recent case of *Trumbo* v. *Hamel*, 29 S. C., 520, where it was held that an assignment by a copartnership of all its partnership property for the benefit of its partnership creditors, and containing provisions for releases, was not void, as a partial assignment, though it did not embrace the individual property of one of the partners. As was well said by Mr. Justice McGowan, in that case: "A copartnership is a distinct entirety, entirely separate from that of any of its members, and we know of no reason why it may not assign its property for the payment of its debts without including the individual property of the different partners." Here, as in that case, the assignment embraced all of the partnership property, as found by the master, to which finding there was no exception, and there is no reason why the fact that it did not also embrace individual property of one of the copartners, N. C. Dacus, should render it invalid. There was no finding of fact, and no testimony upon which such a finding of fact could have been based, either that there was any fraud intended, or that the fact that one of the copartners had individual property was concealed from the creditors.

2d. As to the second inquiry, there was a like absence of any evidence tending to show any fraud in the conduct of the parties, and surely the confession of judgment to Rogers by one of the partners, made several months after the execution of the assignment, and after an effort had been made and abandoned to set aside the assignment, could not possibly have the effect of bringing this case within the rule laid down in the cases from *Wilks* v. *Walker*, 22 S. C., 108, down to *Putney* v. *Friesleben*, 32 S. C., 492. The act of making the assignment, and the act of confessing the judgment several months afterwards, were the acts of two different and distinct persons in the eye of the law—the copartnership and one of its individual members—and it would require much more evidence than we have been able to find in this record to bring these two acts together as parts of the same transaction. Besides, it is more than questionable whether the issues sought to be raised by the exceptions of Smith & Stough-

ton are not so wholly beyond the scope of the pleadings in this case as to preclude the court from considering them. The action was brought for the purpose, as we learn from the "Case," of construing the assignment and ascertaining the rights of the parties under it. This necessarily assumes the validity of the assignment; and to allow one who is not a party to the original record, and only became so by coming in under the call for creditors, to attack the assignment, would, to use no harsher term, certainly be anomalous. These exceptions of Smith & Stoughton must, therefore, be overruled.

It only remains to consider the questions raised by the exceptions of Hurst, Purnell & Co. and others. Here, too, we think that the first question presented by these exceptions is conclusively determined by the recent decision of this court, in the case of *Jaffray* v. *Steedman*, 35 S. C., 33, adversely to the appellants. That case decides distinctly that there must be not only an acceptance of the terms of the assignment, but also a release. Here the paper relied upon, a copy of which is set out above, is simply a notice, signed by the attorneys of said creditors, that such creditors "hereby accept the terms of the assignment * * * and offer releases of their said claims, respectively, as required by said assignment," but no releases were executed, either by the creditors or their attorneys, within the prescribed time. The fact that the paper contained not only an acceptance of the terms of the assignment, but an *offer* to release, cannot avail these appellants, for, as is said in Bur. on Assign., § 485, "where a release is required by the assignment, it must be actually executed by the creditor; a mere *offer* to execute is not sufficient;" and the author cites, in support of this proposition, the case of *Pearpoint* v. *Graham*, 4 Wash. C. C., 232, which was a much stronger case than this; for there the trustee, or assignee as he is called here, under the assignment, gave public notice that a release would be prepared by him for the signature of the creditors, and one of the creditors called upon the trustee, before the expiration of the sixty days, and offered to execute the release, but was informed by him that the instrument had not been prepared; and yet it was held that the

42—39

offer was not tantamount to a release, and that the creditor was, nevertheless, bound to execute a release in due form within the prescribed period. The reason of this ruling, doubtless, was that the object being to fix the rights of the parties at the time specified, a mere offer, which might be withdrawn before it was accepted and acted upon, would not be sufficient. But, in addition to this, it appears that this paper was signed by the attorneys of the creditors—attorneys at law, *not* attorneys in fact—and it is settled that an attorney at law has no power to execute a release of his client's claims. *Gilliland* v. *Gasque,* 6 S. C., 406; *Kirk's Appeal,* 87 Penn., 243; rsported, also, in 30 Am. Rep., 357.

The only remaining inquiry is whether the execution by the creditors themselves of formal releases, ten days after the expiration of the time limited, would not have the effect of ratifying and confirming the previous action of their attorneys, so as to give such action effect from the day when it was taken. It seems to us very obvious that such cannot be the effect of the subsequent so-called ratification. The object being, as we have said, to fix a specified time when the rights of the parties shall become vested by a compliance with the prescribed conditions, it is very clear that when the rights of some of the creditors have thus become vested, no subsequent act of other creditors can be permitted to divest or disturb such vested rights. If the attorneys had the right to execute releases, then no subsequent ratification would be necessary; but if they did not have such right, then their action could not bind their clients until ratification was made. But this becomes unimportant under the view which we have taken that, even if the attorneys had the power to execute releases, they did not in fact exercise such supposed power; and hence in no view of the case could these appellants come within the class of creditors who had accepted and released within the prescribed time.

The judgment of this court is, that the judgments both of Judge Fraser and Judge Aldrich be affirmed.

### JENKINS v. RICHMOND &c. RAILROAD COMPANY.

1. RAILROADS—FELLOW-SERVANTS.—It is an established rule that a railroad company is not liable to one of their agents for an injury arising from the negligence of another competent agent.

2. IBID.—IBID.—The conductor of a preceding freight train and the assistant fireman of a following freight train are fellow-servants, to the extent that the fireman on train No. 2 cannot recover from the master for damages received by him in jumping from his engine to avoid a collision with cars on the track, detached from train No. 1, of whose presence proper signals by torpedoes or otherwise had not been given. Whether persons in the same employment are fellow-servants does not depend upon the respective rank, grade, or authority of the servants.

3. IBID.—SAFE TRACK.—It is the duty of the railroad company as master to furnish a safe track and competent servants, but this duty is not violated where the track, safe in itself, is rendered dangerous for the time by the omission of one of its servants to give the necessary notice of the obstruction thereon to a fellow-servant on an approaching train.

Before WALLACE, J., Richland, October, 1892.

This was an action by John H. Jenkins against the Richmond and Danville Railroad Company, commenced February 23, 1891.

*Messrs. Andrew Crawford* and *Alston & Patton*, for appellant.

*Mr. B. L. Abney*, contra.

November 3, 1893. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. This action was brought by the plaintiff, an employee of the defendant, for the recovery of damages sustained by him through the negligence of the defendant company. The case came on for trial before his honor, Judge Wallace, and the defendant company interposed an oral demurrer, that the complaint did not state facts sufficient to constitute a cause of action against the defendant. The judge, without stating his reasons, sustained the demurrer and dismissed the complaint. From this order the plaintiff appeals to this court upon one general ground, that the judge erred in sustaining the demurrer.

Upon this state of the pleadings, the facts well alleged must be assumed to be true; and, therefore, it is necessary to set out the important allegations made.    He complains, substantially, as follows: "That the plaintiff, John H. Jenkins, on March 3, 1890, at the time of committing the grievances hereinafter complained of, was in the employment of the defendant as an assistant fireman upon a locomotive engine, No. 135, the property of the said defendant, driven by steam upon its road; and it was the duty of the defendant to provide an unobstructed track for said engine running upon its track, and to give warning of any obstruction thereon by placing torpedoes on the track, and signaling said engine at a distance therefrom remote enough to enable the engineer to avoid a collision therewith, by the employment of the appliances used in stopping engines, trains, &c.    That on the said March 3, 1890, while the plaintiff, in the performance of his duty as aforesaid, on the locomotive engine No. 135, was going north from Columbia over the defendant's road, and at a point thereon about 2½ miles from said city, there were standing on defendant's track, on the line of the Columbia and Greenville Railroad, several cars in charge of the conductor of the train from which they had broken loose, and which had preceded by fifteen or twenty minutes said engine No. 135 in its progress up the road as aforesaid.

"That the defendant, its agents and servants in charge of the loose cars as aforesaid, not regarding their duty, conducted themselves so carelessly, negligently, and unskillfully, that they failed to make said obstruction known to those in charge of the approaching engine No. 135 in time to stop the same, either by placing torpedoes on the track or by signaling the engineer running said engine, at a point sufficiently removed from said obstruction wherein it was possible to stop said engine, as is required by the rules and regulations governing the running of engines on the road of the above named defendant. That for the want of due care and attention to the duty devolving upon the said defendant, its agents and servants as aforesaid, at the time and place aforesaid, and while the said loose cars were in the use and service of said defendant, and in charge of one of its conductors as aforesaid, on the track of the said rail-

road, and while the plaintiff was in the performance of his duty in the capacity as aforesaid, in the service of said defendant, by reason of the carelessness, negligence, and recklessness of the said defendant, its agents and servants, in failing to give proper signals, which would have stopped the approaching engine in time to avoid all possibility of a collision, this plaintiff, to save his life, was forced to leap from said engine while it was running rapidly over said track, just before it reached said obstruction, whereby his arm was broken at the wrist, causing a permanent injury; and he was for days and weeks unable to work at all, and can never perform a man's full share of manual labor, owing to said permanent injury, and his sufferings, both mental and physical, were intense and continued until his wound healed; all to his damage $1,950."

The principles upon which a railroad company is responsible to a stranger or to passengers transported for a consideration, are reasonably well defined and understood by the profession. But a corporation must of necessity act through agents, and the relations between the ideal existence known as the corporation, and its own employees for hire, are not at all so clear or well defined. On the contrary, there is some confusion and much difference of opinion on the subject; so much so, that the doctrines as to "fellow-servants" and responsibility for their acts, have been characterized by a learned judge "as a perplexing and tangled subject." Since the case of *Murray* v. *South Carolina R. R. Company*, 1 McMull., 385, decided by our then Court of Errors in 1841—the first of our cases on the subject, if not the first on the American Continent— the general rule has been considered as established on principle and policy, "that a railroad company is not liable to one of their agents for an injury arising from the negligence of another competent agent." And in one of the latest and fullest publications which treats of the subject, the principle is stated thus: "The general rule resulting from considerations of justice as of policy, is, that he who engages in the employment of another for the performance of specified duties and services for compensation, takes upon himself the natural and ordinary risks and perils incident to the performance of such services.

The perils arising from the carelessness and negligence of those who are in the same employment are no exceptions to this rule; and where a master uses due diligence in the selection of competent and trusty servants, and furnishes them with suitable means to perform the services in which he employs them, he is not answerable to one of them for an injury received by him in consequence of the carelessness of another, while both are engaged in the same service * * * The rule thus established was almost universally followed, and the labor of the courts since has been in properly applying it, and determining its principal limitations,'' &c.   See 7 Am. & Eng. Enc. Law, 823, and numerous cases cited.

The plaintiff here was an assistant fireman on train No. 2, injured, as alleged, by the negligence of "the agents and servants" (without indicating which) of the defendant company on another train, No. 1, in not giving timely notice of certain "loose cars" being on the track of the company; and he, the plaintiff, claims that the judge committed error in holding that the conductor on train No. 1, and the assistant fireman on train No. 2, were fellow-servants in the sense of the rule.   The employees of a railroad are generally numerous, and necessarily divided into classes, according to the work assigned them.   But all of the persons thus employed, under one principal, in the conduct of one enterprise, such as operating a railroad, are, according to the ordinary meaning of the word, *servants or employees of one principal,* and, as it would seem, *"fellow-servants"* of each other.

But it is said that, by successive decisions of the courts, the rule has been modified, and, according to the limitations imposed, the parties here were not technically "fellow-servants." After some conflict, we suppose it may be regarded as settled, that, whether parties are "fellow-servants" in the sense of the rule, does not depend upon the grade, rank, or authority of the two servants.   A fireman and engineer or conductor are "fellow-servants."   Judge Cooley states that persons are "fellow-servants, when they engage in the same common pursuit, under the same general control."   Cooley on Torts, 541.   Judge Thomson, in his work on Negligence, announces as a general

rule, that all who serve the same master work under the same control, derive authority and compensation from the same common source, are engaged in the same general business, though it may be in different grades or departments of it, are fellow-servants, who take the risk of each other's negligence." Or, in the forcible view of Judge Brewer, lately appointed associate justice of the Supreme Court of the United States, in the case of *Howard* v. *Denver &c. R. R. Co.,* 24 Am. & Eng. R. R. Cas., 448 (1886); "Neither can it be said that Ryan and decedent were engaged in a different class of work. True, they were on different trains, and at the time of the accident had no opportunity of noticing the conduct of each other until too late to prevent the collision. But being engaged in the same kind of service, they must naturally have been often thrown into contact, and had ample opportunities for mutual supervision. * * * He who engages in train service knows that other trains besides his will be running, and may fairly be considered as contracting to take the risk of the negligence of the employees managing such trains. He must expect to be employed now on one train and now on another, to be thus thrown into contact with the other employees in that service, to know himself what is proper care in such work, and be able to detect any evidence of carelessness on the part of those in like service." See *Howard* v. *Denver &c. R. R. Co.,* 24 Am. & Eng. R. R. Cas., 448; *New Port News R. R. Co.* v. *Howe,* 52 Fed. Rep., 362; *Norfolk & W. R. R. Co.* v. *Donnelly's Adm'r,* 14 S. E. Rep., 692 (1892), 88 Va., 853.

But it is said that there is one limitation to the general rule which has been well established, and it is this: that while the question as to whether parties are fellow-servants is not to be determined by the rank or grade of the offending or injured servant, "it is to be determined by the character of the act being performed by the offending servant. If it is an act that the law implies a contract duty on the part of the employer to perform, then the offending employee is not a servant, but an agent; but as to all other acts they are fellow-servants." As we understand it, this is the rule which has been adopted in this State. See *Gunter* v. *Graniteville Company,* 18 S.

C., 270, and *Calvo* v. *R. R. Company*, 23 *Id.*, 529. In these cases, the Chief Justice announced the doctrine as follows: "The true question is, whether the person in question is employed to do any of the duties of the master. If so, then he cannot be regarded as the fellow-servant or co-laborer of the operatives, but is the representative of the master, and any negligence on his part in the performance of the duty of the master thus delegated to him must be regarded as the negligence of the master." This we have held to be the true test; and the only question now is, whether it is applicable to and must rule this case.

Let us see what is the proper construction of this limitation. As we have seen, the employees of a railroad company are necessarily divided into classes, to each of which, in the division of labor, certain specified ordinary duties are assigned, as to which each servant, within the compass of his employment, in one sense, is the representative of the company. Is it the intention that "the duties of the master" referred to, as changing the character of an employee into that of master, should include those matters of ordinary regulation and management, or only those original and essential duties implied by the contract of service; such, for instance, as the duty of keeping a safe and sound track, furnishing all proper appliances, competent servants, &c.? But be this as it may, competent authority has indicated the following as "the duties of the master" referred to, viz: to furnish suitable machinery and appliances, and keep them in repair; the selection and retention of sufficient and competent servants, and the establishment of proper rules and regulations, &c. Under the head of "appliances" is understood to be included a proper roadway, or, as it has come to be phrased, "a safe track and a safe place to work."

Did the company directly or indirectly violate any of these fundamental contract duties in this case? It will be observed that there is no allegation in the complaint that the cars were "loose" on the track from any fault or negligence on the part of the servants on train No. 1, nor any distinct allegation as to the time *when* they were detached, or, indeed, in what manner

the accident occurred; .nor is there any allegation that the track was not safe or sufficient, or that there was wanting suitable appliances or competent servants. As we read it, the only allegation of fact made by the complaint was one not of commission, but of omission—that the servants on train No. 1 did not give proper signals, which would have stopped the train approaching in time to avoid the collision. This is entirely a different case from that of Calvo, *supra*, where one Wooten, a section master and supervisor of the track-laying force, disregarding the signal carried by a preceding train, which indicated that it was to be followed by another, did *not* wait for that other train, but at once took up the track, making a gap in the road, which derailed the engine and inflicted the injury complained of. It thus appears that there was not only a failure to furnish a safe track, but really the destruction of it. The facts of this case are essentially different; and we may adopt.as applicable to this, the statement of a learned judge, lately made in one of the numerous cases on the subject: "So far as the place and machinery, both were safe. There is no pretense that the track was not in good order, or that the engines and other implements for the movement or control of the train, were not sufficient. It will not do to say that because Ryan's engine was in the way and collided with decedent's train, the track was not clear, and, therefore, the master had failed in his duty of providing a 'safe place' for the employees to work in and upon. The negligent use by one employee of perfectly safe machinery, will seldom be adjudged a breach of the master's duty of providing a safe place for the employees. Such a construction would make any negligent misplacement of a switch, any collision of trains, even any negligent dropping of tools about a factory, a breach of the duty of providing a 'safe place.' The true idea is, that the place and the instruments must in themselves be safe, for this is what the master's duty fairly compels, and not that the master must see that negligent handling by an employee of the machinery shall not create danger," &c. ·

We can not doubt that the employees of train No. 1, and the plaintiff on No. 2, were fellow-servants, when the plaintiff

jumped and broke his arm, without such fault or negligence on the part of the company as to make them liable for damages; and, therefore, we think the Circuit Judge committed no error of law, in dismissing the complaint.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

---

## KINARD v. COLUMBIA &c. R. R. COMPANY.

1. CONTRIBUTORY NEGLIGENCE—NON-SUIT.—In action to recover damages from a railroad company for injuries received by plaintiff in being thrown from his buggy at the time of the rapid passage of defendant's train, the question, whether the injury was not caused by plaintiff's contributory negligence in his own handling of the mule that drew the buggy, is a question of fact, which cannot be determined on motion for non-suit.

2. RAILROADS—INJURIES AT CROSSINGS—COLLISION.—The statute of this State gives a right of action for injuries to a person "by collision with the engine or cars of a railroad corporation at a crossing," and makes the company liable only for damages "caused by the collision," where the prescribed statutory signals were not given. *Held*, that a railroad company was not liable under this statute, where the signals were not given, but the injury resulted from the person, who was not then intending immediately to cross, being thrown from his buggy while endeavoring to drive his frightened animal away from the train.

3. IBID.—IBID.—NONSUIT.—But as plaintiff is entitled to sue at common law where a less degree of negligence may defeat a recovery than is required under this statute, this court will not direct a non-suit; but only order a new trial.

Before IZLAR, J., Newberry, November, 1892.

Action by Samuel J. Kinard against the Columbia, Newberry and Laurens Railroad Company, commenced October 4, 1892, to recover damages for injuries received on May 23, 1892.

*Messrs. Lyles & Muller*, for appellant.

*Messrs. Johnstone & Cromer*, contra.

November 3, 1893. The opinion of the court was delivered by

MR. CHIEF JUSTICE MCIVER.    This was an action to recover

damages for injuries sustained by reason of the alleged negli-
gence of the defendant company. The allegations contained in
the complaint are substantially as follows: that on the day the
disaster occurred, plaintiff was traveling in a buggy along the
public highway, which crosses the railroad a short distance
below the town of Prosperity, and was on the roadbed, ready
to cross the railroad, when a locomotive with a train of cars
approached, which the officers and agents of defendant company
negligently caused to approach the said crossing at great speed,
and negligently and carelessly omitted, while approaching the
said crossing, to give any signal by ringing the bell or sounding
the whistle, by reason whereof the plaintiff was unaware of
their approach, and that in consequence thereof the plaintiff,
while attempting to avoid a collision, and to control the mule
by which his buggy was drawn, was thrown from his buggy to
the ground with such force as to break his collar-bone. At the
close of plaintiff's testimony, defendant moved for a non-suit
upon two grounds: 1st. That there was no testimony tending
to show "that this accident came under the provisions of the
act relating to that matter * * * that the act was not intended
to meet cases of simply frightening animals." 2d. That "the
testimony shows that the accident was caused by Mr. Kinard's
own handling of the mule, rather than as resulting from the
approach of the train." The motion was refused by the Cir-
cuit Judge, upon the ground that the plaintiff "was there in-
tending to cross," and after hearing the testimony of defendant
and that of the plaintiff in reply, the case was submitted to
the jury, who found a verdict in favor of the plaintiff, and
judgment having been entered thereon, the defendant appeals,
alleging error in the refusal of the motion for a non-suit.

The plaintiff's testimony tended to show that he was travel-
ing along the public highway, intending to cross the railroad
track, at the crossing near which the disaster occurred, in a
buggy drawn by a mule; but before he reached the crossing,
and before he had got upon defendant's roadbed, he stopped,
to speak to a friend, at a point some fifteen or twenty feet from
the railroad track, and while there, seeing the train approach-
ing, at a distance of some fifty yards or more, he attempted to

turn his buggy, when the single-tree or the traces broke (the plaintiff saying the former, while his witness in the buggy with him said the latter), whereby the mule was released and the shafts of the buggy were run into a bank, and the plaintiff was thrown from the buggy and received the injury complained of. There was also testimony tending to show that the signals required by section 1483—ringing the bell or blowing the whistle—were not given by the approaching train; that it was not a regular but an extra train, and that plaintiff had no knowledge of its approach until it reached a point some fifty yards distant from the crossing—too late, considering the speed at which it was running, for the plaintiff to venture to cross in front of it. There was also testimony tending to show that plaintiff's mule was frightened by the approaching train, and this was probably the reason why plaintiff attempted to turn his buggy, in order to get further from the railroad track.

From this outline of the leading facts of the case, gathered from the testimony, all of which may be found in the "Case," the sole question for us to determine is whether there was error in refusing the motion for a non-suit. It is quite clear that the second ground upon which the motion for a non-suit was based cannot be sustained, as that would involve a determination of a question of fact—whether the plaintiff was guilty of contributory negligence; and it is too well settled by numerous cases that such a question cannot be considered on a motion for a non-suit, to need any citation of the cases.

The question is, therefore, narrowed down to the inquiry, whether there was error in refusing to sustain the first ground of the motion, to wit: that there was no testimony tending to show that the action could be sustained under the provisions of section 1529 of the General Statutes; for the language used by the Circuit Judge in refusing the motion shows very clearly that he considered the question in that aspect solely. In speaking of the plaintiff, he said: "If he had crossed over and been on the other side, I am satisfied that the statute would not cover his case, but he was there intending to cross." From this it is apparent that his honor construed the

section as giving a right of action to a person who was injured at a railroad crossing, if he was there intending to cross. We cannot concur in this construction; for the statute, in express terms, only gives the right of action therein provided for, to a person injured, either in person or property, *"by collision with the engine or cars of a railroad corporation at a crossing,"* and makes such corporation liable only for damages *"caused by the collision."* When, therefore, as in this case, there was not the slightest evidence of any collision at all, either with the engine or cars of the defendant company, it is very clear that the plaintiff had no cause of action *under the statute*, and that the Circuit Judge erred in ruling otherwise. Regarding, therefore, the action as an action under the statute, as it was manifestly considered by the Circuit Judge, the judgment below must be reversed for error in his ruling upon that subject.

But as it may be possible that the plaintiff will be able to maintain his action, without reference to the statute, as an action for injuries sustained by reason of defendant's negligence, at common law, a non-suit will not now be granted, but the case will be remanded for a new trial, when the question, which has not yet been considered by the Circuit Court, and cannot, therefore, be now considered by us, to wit: whether the plaintiff can maintain his action at common law, may be made. It will be observed that there is a great difference in the defence to an action under the statute, and to an action at common law. In the former, in order to sustain the defence of contributory negligence, it would be necessary to show either *gross* negligence on the part of the plaintiff, or that he was acting in violation of law, while in the latter such a degree of negligence would not be required to be shown. It would, therefore, be manifestly unjust to allow a judgment recovered in an action, erroneously treated as an action under the statute, to stand, notwithstanding such erroneous ruling. It may be in this very case (though, of course, we intimate no opinion upon the subject) that while the defendant would not be able to show such gross negligence on the part of the plaintiff as would protect it, in an action under the statute, yet a

lesser degree of negligence, sufficient to protect it in an action at common law, might be shown.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and that the case be remanded to that court for a new trial.

---

## *EX PARTE* LEONARD.

### *IN RE* ESTATE OF BOWEN.

1. WILL SIGNED BY DIRECTION—WITNESSES.—A person who signs the name of testatrix to her will by her express direction, is a competent witness to its execution, and may sign his name thereto as one of the three subscribing witnesses.

2. IBID.—EXPRESS DIRECTIONS.—Under the statute of this State regulating the execution of wills, it must be signed by the devisor, "or by some other person in his presence, and by his express directions." *Held*, that if the whole conversation between the testatrix and the person who signed her name to the will (as it occurred at the time the instructions as to the will were given, and a few hours afterwards at the time of execution) amounted to an express declaration, it should be construed as an express direction by testatrix to such person to sign her name to the paper.

3. IBID.—SIGNATURE.—Where S. S. K., the person who prepared the will, signed testatrix's name in her absence, and then in her presence and in the presence of the witnesses added to testatrix's name the words, "by S. S. K., by request," the will was sufficiently signed for testatrix, and was valid.

Before NORTON, J., Laurens, February, 1893.

The opinion states the case.

*Mr. W. H. Martin*, for appellant.

*Mr. H. J. Haynsworth*, contra.

November 3, 1893. The opinion of the court was delivered by

MR. JUSTICE MCGOWAN. On August 16, 1890, Emeline Bowen, widow, departed this life. On September 6 thereafter, a paper writing, purporting to be her last will and testament, was filed in the office of the probate judge of Laurens County,

who admitted the same to probate in common form; and on October 20, 1891, Albert Dial and others, the heirs and distributees of deceased, if she died intestate, filed their petition that Benjamin E. Leonard, the party producing said paper, be required to prove the same in due form of law on or before November 15 thereafter.   On November 11, 1891, said Leonard filed his petition accordingly, and on June 23, 1892, the matter came on for a hearing in the Probate Court, and after hearing the testimony of the subscribing witnesses and others both for and against the said will, the probate judge filed his decree, admitting the same to probate in due form of law.  Whereupon Albert Dial, Elizabeth Teague, and others appealed to the Court of Common Pleas of the said county.

At the February term of the court thereafter, the proceedings on appeal came on for a hearing before his honor, Judge Norton, who submitted two questions to the jury : (1) Was the paper duly executed as a will?   (2)  Was Mrs. Emeline Bowen at the time of executing the will competent to make a will? On these issues of will or no will there was much testimony, covering nearly 100 pages of printed matter, reported by the stenographer as it fell from the witnesses, and, of course, it cannot be restated here.   But in order to make the points intelligible, it will be necessary to make a short and condensed statement of facts as developed.

It appeared that Mrs. Bowen, the testatrix, was very sick, with what was called typhoid fever, and that about noon of August 16, 1890, she asked her attending physician, Dr. S. S. Knight, to prepare her will for her, and gave him minute instructions as to how she wished it drawn, of which the doctor took rough notes.  Among other things, she asked him if it would not do for him to sign her will for her, as she was so nervous; to which he replied that he thought so.   Later the doctor drafted the will; and as he testifies, he first prepared it to be signed by "a mark," by leaving a blank space and writing "her mark" above and below respectively; it is not very clear whether he then wrote the name of "Emeline Bowen" in preparing for the mark, but we think it probable that he did. After having done this, the doctor says he concluded that it

would be best not to sign with "a mark," and so erased the words "her mark." About twilight he procured two other witnesses, and went to Mrs. Bowen's room, which was lighted by a lamp. He then produced the paper, and told Mrs. Bowen that it was her will, and was ready to be executed. He recalled to her attention what she had said about signing the will, by asking her, "Shall I sign the will for you?" to which she answered, "Yes," and he signed the will for her. It is not quite clear, whether he did this by writing then all the words, "Emeline Bowen by S. S. Knight by request," or whether the name, "Emeline Bowen," having been previously written in preparing the will for "a mark," and not having been erased, the signing was merely by writing under the name, "Emeline Bowen," the other words—"by S. S. Knight by request." Then each of the witnesses in turn signed the paper, including Dr. Knight, who signed the paper for the deceased. All this was done in the presence of the testatrix, who was lying in bed, with her face towards the little table in the room on which the paper rested, in full view of all who chose to use their senses. Mrs. Bowen died on the next day night, within thirty hours after the signing of the paper, &c.

After a full and careful charge, the jury found both issues of fact referred to them in the affirmative—that Mrs. Bowen was competent to make a will; and that the will was executed according to law. The contestants did not except to the finding on the second issue—that Mrs. Bowen was competent to make a will; and, therefore, that issue goes out of the contest. But they did except to the finding on the first issue, as to the manner of the alleged execution of the paper propounded as a will, and moved for a new trial, which was refused. And then the whole issues involved came on to be heard by the presiding judge, who, after argument, held and decreed as follows: "The parties seeking to set aside the probate of the will raise and urge the following propositions before me now: First. That the witness, S. S. Knight, is not a competent witness, as he signed the name of the testatrix to the paper propounded as a will. Second. That the will was not signed by S. S. Knight in the presence of testatrix. Third. That the will was not

signed by her express direction. Fourth. The signature of testatrix not having been made in her presence, was the signing of S. S. Knight's signature under hers a sufficient ratification of any previous instructions to sign for her? I am of opinion that the three first propositions are not well taken, and are overruled. As to the fourth and last proposition, I am in doubt, rather inclining to sustain the position; but as the effect would be to grant a new trial, I prefer that the Supreme Court pass upon this question, as, in that event, the case would be ended one way or the other; and, therefore, the motion to set aside the probate of the will is refused and the appeal dismissed."

From this judgment, the contestants appeal to this court, upon numerous exceptions, fourteen in number, which are all printed in the Brief. But following the good example of the appellants' attorney, we think that they all may be considered under four general propositions urged in the argument below, to set aside the verdict of the jury and refuse probate of the will, which have already been stated in the judgment of the court.

The power to direct during life how one's property shall go after death is certainly a great privilege. As was said by the court in *Means* v. *Means*, 5 Strob., 190: "The right to make a will is especially valuable to the old and infirm. Their thoughts dwell most upon posthumous arrangements, and in this right they have the means, not only of gratifying their feelings, but of securing substantial advantages while they live," &c. In order to protect this valued right against fraud and imposition, the law has prescribed for the execution of wills peculiar formalities, which must be observed. Section 1854 of the General Statutes declares that "All wills and testaments of real and personal property shall be in writing, and signed by the party so devising the same, or by some other person in his presence and by his express directions, and shall be attested and subscribed in the presence of the said devisor and of each other by *three* or more credible witnesses, or else they shall be utterly void and of no effect." The words of this law, which are in point here, are identical with those in the old English statute

43—39

522                     *Ex parte* LEONARD.

_____
                Opinion of the Court.            [39 S. C.
_____

of frauds, and have often received construction, which may throw light on the inquiry here. Mrs. Bowen, the testatrix, did not sign the paper propounded as her will, but the law allowed her to execute a will, "signed by another person in her presence and by her express directions, *attested* and *signed* by three or more subscribing witnesses, in the presence of the devisor and of each other," &c.

(1.) The first objection to the execution is, that "as Knight signed the name of the testatrix to the paper propounded as her will, he was not a competent witness to attest her will as one of the subscribing witnesses required by law." At first some of us thought it rather an anomalous proceeding for a witness to attest a signing by himself, but Mr. Jarman explains that such a witness does not attest the signing merely, but also the directions given to sign. But, at all events, the authorities concur, that, under the circumstances stated, the signer of the will is competent as one of the three subscribing witnesses required by law. See 1 Jarman, 204; Schouler on Wills, 338; Redfield on the Law of Wills, 209. Mr. Redfield says: "Both the earlier and present English statute, and most of those in force in this country, allow the testator's signature to be made by some other person, if made in the presence of the testator and by his express direction. Under this clause of the statute, it has been held that this act may be done by one of the witnesses. Indeed, it is the law in some of the States, that one who has signed for the testator at his request, *must write his name* as witness to the will." We think there was no error here.

(2.) The second proposition is, that Mrs. Bowen did not give Doctor Knight "express directions" to sign her will for her. The judge charged that it was a question of fact to be decided by the jury, saying that the "plaintiffs' attorney contended that Mrs. Bowen need not have said in articulate words, 'Doctor Knight, you must sign that paper for me,' and that is the right contention. It is sufficient if the whole conversations that occurred between the testatrix and Dr. Knight amounted to an express declaration: it should be construed into 'an express direction' to sign the paper." As we

understand it, a simple question and answer may amount to a declaration. We cannot suppose that the word *express* was intended to be limited necessarily to an expression in words. We take it that one perfectly dumb and unable to speak a word may in some way indicate his desire, so as to come within the provision of the law, as to giving direction—as some one has tersely put it, *a direction in fact, but not in words.* But taking both conversations of the parties together—that of the afternoon, when Dr. Knight was requested to write the will, and that at night, when they were about to execute it—we think that the judge committed no error on this point. There is no evidence that Dr. Knight was a volunteer in the matter.

(3.) The next proposition is, that "the will was not signed in the presence of Mrs. Bowen, the testatrix; and the signing of S. S. Knight's name under hers was not a sufficient ratification of any previous instructions to sign for her."

The judge charged: "If you find that S. S. Knight did not write or sign Mrs. Bowen's name to the paper propounded as her will in *her presence*, then it was not duly executed under the law; unless he then and there adopted it by signing his name as agent in the presence of the other witnesses." Under the charge, the jury must have found that Knight wrote the words, "by S. S. Knight, by request," under the name of "Emeline Bowen," already in the will, thereby adopting the name previously written by himself; and that this was done at the time the will was executed, in the presence of the testatrix and the witnesses. Assuming, then, that the name of the testatrix was written on the will in the afternoon, and not rewritten at the time of execution, it is very clear that her written name, no matter when or where made, was not an accomplished act, but only preparatory to something else to give it vitality. At first the appending of "her mark" by Mrs. Bowen was intended, which would certainly have adopted it, no matter when written; but afterwards changed to "another person signing for her by request." Standing alone, it was a perfect nullity, and might have been stricken out as a word incorrectly used. As it seems to us, it is not a question of ratification by Mrs. Bowen, for she did not know that in preparing

her will her name had been written in it; but rather a question of adoption by Knight, as a part of his signing by request. Neither the law nor the testatrix directed Knight how he was to sign; and we cannot see why he might not adopt her name previously written by himself, as he could then have run his pen through the name and have rewritten it then and there.

But if in this we are in error—if, from the nature of the subject, Knight *could not* adopt the name of Mrs. Bowen standing on the draft of the will, so as to be a compliance with the law, which requires that the signing by "another person" *must be in the presence* of the testator, &c.—was it indispensable to the execution, that the "other person" deputed to sign for Mrs. Bowen should, in doing so, set out her name? It will be observed that the law does not so require, and, as it seems, the signing by "another person" is not confined only to the name of the testatrix. All the authorities agree that a will may be executed without the name of the devisor appearing on its face. It has often been decided that a mark, without the name itself, is sufficient, and, of course, the initials of testator's name would also suffice. See *Ray* v. *Hill*, 3 Strob., 303, and *Adams* v. *Chaplin*, 1 Hill Ch., 265. And the will may be signed by another person for the testator. That "other person," as it seems, may be one of the witnesses, and it is immaterial that he signed his own name instead of the name of the testator. And when the testator directed a person to sign the will for him, which that person did by writing at the foot, "This will was read and approved by C. F. B. by C. C. in the presence of," &c., and then followed the signature of the witnesses, the will was held good, &c. The following form of subscription is sufficient: "E. N. for R. D. at her request." "So, also, where the testator's name was subscribed at his request by one of the subscribing witnesses." See 1 Jarman on Wills, page 79, and Redfield on the Law of Wills, 205, and numerous cases in the notes; and, also, 1 Williams on Executors, page 83.

But be this as it may, we can not say it was error to hold that, under the authority given him by the testatrix to sign for her, S. S. Knight sufficiently signed for her on Sunday night,

at the time the will was executed, in the presence of the testatrix and of the subscribing witnesses.

The judgment of this court is, that the judgment of the Circuit Court be affirmed, and the case be remanded to the Probate Court of Laurens County for such further proceedings as may be deemed proper and necessary to carry out the conclusions herein announced.

---

## MARTIN v. SUBER.

1. ADMISSION BY ANSWER—OPENING AND REPLY.—Where the answer to a complaint on a promissory note admits the execution of the note sued on—as the statements of this answer were construed to have done—and pleads affirmative defences, the defendant assumes the burden of proof, and is entitled to open and reply, as, without any evidence, the plaintiff would be entitled to a recovery.

2. HUSBAND AND WIFE—AGENCY—PROOF.—A husband may act as agent of his wife, but she will not be bound by any contract of his making until it has been shown that he was authorized to make such contract for her.

3. IBID.—IBID.—IBID.—It having been suggested to the trial judge that he should charge, "that the actions and conduct of the husband of defendant may go towards establishing the agency" for her, the judge said: "I have told them they must take all the testimony they have heard bearing upon the subject of agency and determine that question. The husband's mere declarations do not establish agency." *Held*, that error could not be imputed to this charge, because (1) the charge was sufficiently responsive to the request; (2) there being no testimony printed in the record, it cannot be known whether there was any evidence on this point; and (3) the charge as asked for would have bound the wife by acts of her husband, whether she acquiesced in them or not.

4. IBID.—IBID.—EVIDENCE.—The agency of a husband for his wife cannot be established by his declarations, which would be mere hearsay evidence.

5. MARRIED WOMEN—INTENTION TO CHARGE—NOTES.—The act of 1887 (19 Stat., 819), which declares that "all conveyances, mortgages, and like formal instruments, affecting her separate estate, executed by a married woman, shall be effectual to convey or charge her separate estate, whenever the intention so to convey or charge such separate estate is declared in such conveyances, mortgages, or other instruments of writing," does not include in its terms promissory notes with no such intention specifi-

cally declared therein, for they do not seem to be "like formal instruments," which "charge" an estate, nor instruments "affecting her separate estate," and they certainly cannot be so included where no such intention is in words declared.

6. CASE CRITICISED.—The decision of this court in Reid v. Stevens, 38 S. C., 519, stated.

Before IZLAR, J., Newberry, November, 1892:

Action by James N. Martin against Texanna Suber. The judge charged the jury as follows:

You are to deal with, and are the sole judges of, the facts. I cannot even intimate an opinion as to them. I can only give you the law applicable to the case, as I understand it, and leave you to find the facts and apply the law to the facts as you may find them from the evidence.

In this case the execution of the note sued on is admitted. On this point, therefore, you will have no difficulty.

There is, however, some difficulty as to the law of the case, and I confess that I have some doubts as to the principles of the law by which you should be governed in deciding the issues raised. But, be that as it may, you are to take the law from the court, and if I should err, there is a tribunal specially provided to correct my errors. Under the pleadings in this case, it seems to me that you must necessarily go back in your deliberations to the contract which is claimed to be the consideration of the note set out in the complaint. If the supplies furnished by the plaintiff in 1886 were furnished to the defendant for the benefit of her separate estate, and were used and expended by her in making the crops upon her plantation during the year 1886, I am of opinion that she cóuld, even in 1888, have given a promissory note in settlement of the account for supplies, which would be binding upon her. This being the case, certain important questions are presented for your consideration. Were the supplies advanced to the defendant by the plaintiff, and for the benefit of her separate estate? Or were they advanced to her husband, on his own credit, and for his own benefit, and used by him in making his own separate crops, in which his wife had no interest, and from which her

separate estate derived no benefit? Or were the advances made
to the defendant, and for the benefit of her separate estate,
through her husband as her agent?

A husband may act as the agent of his wife in obtaining
supplies for carrying on her farming operations on her separate
estate. But the authority must be shown. Does the evidence
satisfy you that in obtaining the supplies in 1886 the husband
of Mrs. Suber was acting as her agent and with her authority?
The mere declarations of the husband will not be enough to
establish such agency. You must take all the testimony bear-
ing upon this issue and answer the question. The burden of
proof is upon the plaintiff on this issue, and he must prove
the agency to your satisfaction. Now, if the testimony satis-
fies you that the supplies were advanced to Mrs. Suber directly,
or through her husband as her authorized agent, and that these
supplies were for the benefit of her separate estate, then the
plaintiff would be entitled to recover the amount due on the
note, with interest from its date. If, on the other hand, you
are satisfied from the evidence that the supplies were advanced
to the husband, to be used in making his own crops planted
that year, in which his wife had no interest, and from which
she was to derive no benefit, then the plaintiff would not be
entitled to recover.

Again, if the supplies were advanced to the husband, and
in 1888 Mrs. Suber gave her note to the plaintiff to secure the
debt of her husband, her liability on the note would depend
upon the construction of the act of 1887. Now, this act reads
as follows: "All conveyances, mortgages, and like formal in-
struments of writing, affecting her separate estate, executed
by a married woman, shall be effectual to convey or charge
her separate estate whenever the intention so to convey or
charge such separate estate is declared in such conveyances,
mortgages, or other instruments of writing." Now, what in-
struments of writing affecting a married woman's separate
estate shall be effectual to charge the same? The act says:
"All mortgages and like formal instruments of writing."
When shall such instruments of writing be effectual to charge
the separate estate of a married woman? The act says:

"Whenever the intention so to charge her separate estate is declared in the mortgage or other instrument of writing."

Is a promissory note a like formal instrument of writing with a mortgage? There are certain formalities attending the execution of mortgages, such as signing, witnessing, and delivery, and in cases of mortgages of real estate, sealing. The act says "all mortgages;" this includes chattel mortgages. The same formalities attend the execution of a promissory note as attend the execution of a chattel mortgage. Both require to be signed and delivered. It is true, that a chattel mortgage should be witnessed, if it is to be recorded. Yet witnessing is not essential to its due execution. It may, therefore, be concluded that a promissory note is a like formal instrument of writing with a chattel mortgage. But it is not every like formal instrument in writing that will be effectual to charge the separate estate of a married woman under the act. It is only those like formal instruments which affect her separate estate—that is, those instruments which act upon her separate estate; that is, create a lien or charge upon it which encumber it. Now, a promissory note is not such instrument of writing.

But, if we admit that a promissory note is one of the like formal instruments in writing included in the act, this cannot help the plaintiff, because the act says, in plain terms, such instrument in writing shall be effectual to charge her separate estate whenever the intention so to charge such separate estate is declared in the instrument in writing. This being the case, a mortgage—one of the instruments named in the act—would not be effectual to charge the separate estate of a married woman if the intention so to charge is not declared in the mortgage. It will not do to say that the fact that a married woman executes a mortgage of her separate estate is a sufficient declaration of her intention to create a charge upon it. In interpreting statutes, the rule is that they must be so construed as that every word and clause shall have effect. If the mere execution of the mortgage was a sufficient declaration of the intention of a married woman to create a charge upon her separate estate, then these words of the act would be meaningless and

nugatory. There would be no necessity for them. And it will be borne in mind that the act says, "whenever," that is, at whatever time, the intention to charge is declared *in*, and not *by*, the mortgage or like formal instrument of writing. The provision was in the nature of a condition. It was intended to put the woman on her guard, to call specially to her attention the nature of the act she was about to perform, and to impress her with its solemnity. It was for her protection. In order to create a charge upon her separate estate, the act must be strictly followed. The power to charge her separate estate can only be exercised by complying strictly with the provisions of the statute. If this is done, a married woman, under the act of 1887, may charge her separate estate for the payment, not only of her own debt, but for the debt of her husband.

So, then, the first question for your consideration is to ascertain, as I have previously said, whether or not these supplies were advanced directly to Mrs. Suber, and for the benefit of her separate estate; and if you come to the conclusion that they were, then, as I have already said, the plaintiff would be entitled to recover. If you come to the conclusion, however, that they were not so advanced, but that they were advanced to the husband for his benefit and to carry on his farming operations, and were expended in the cultivation of his crops, and his wife had no interest in them, and derived no benefit from them, the plaintiff could not recover; and even in the event that they were advanced to the husband, and the defendant afterwards gave her note for it, I charge you that under this note the plaintiff could not recover, because the interpretation which I have given you of the statute of 1887, as I understand it, requires that it must be such an instrument as would affect the separate estate of a married woman, and I have already charged you that a promissory note is not such an instrument; and even were it such an instrument, this note could not create a charge upon her separate estate, because the declaration required by the act is not contained in the note. I have further charged you with reference to the agency, and you will remember the law which I have given you in regard to the husband's acting as the agent of his wife.

There was something said in this case by one of the witnesses, Mrs. Suber herself, that there were thirty or forty dollars of this note that was for supplies that were advanced to her, and for the benefit of her estate, and which she got the benefit of, and which her counsel said she was willing to pay. It is for you to ascertain from the testimony, if you can arrive at it, what was the amount of this sum; and if you come to the conclusion that it went to her benefit, and the testimony is satisfactory to you on this point, you would be warranted in finding that much of the note for the plaintiff; but I leave that entirely with you; you must ascertain that fact from the testimony which you have heard.

Is there anything further that you would have charged, gentlemen? (To counsel.)

*Mr. Carlisle:* Nothing, except that the actions and conduct of the husband may go towards establishing the agency.

*The Court:* I have told them they must take all the testimony they have heard bearing upon the subject of agency, and determine that question. The husband's mere declarations do not establish agency.

*Mr. M. A. Carlisle,* for appellant.

*Messrs. Johnstone & Cromer,* contra.

November 3, 1893, the opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER. This was an action to recover a specific sum of money, which the defendant had promised to pay to the plaintiff by her promissory note. The first allegation in the complaint, and the only one which it is deemed necessary to notice, is in the following words: "That the defendant is indebted to plaintiff in the sum of six hundred and sixty-five dollars and ninety-two cents, with interest from the 27th day of January, A. D. 1888, at the rate of seven per cent. per annum, which said sum of money the defendant, by her promissory note, bearing date the 27th day of January, A. D. 1888, undertook and promised to pay to plaintiff, a copy of which note is as follows, to wit:

"665.92.                                    January 27, 1888.

"One day after date, I promise to pay to the order of J. N. Martin six hundred and sixty-five 92–100, for value received, with interest from date.    (Signed)            Texanna Suber."

The defendant answered, saying: "1. That she emphatically denies that she is, or was, indebted to the plaintiff in the sum of six hundred and sixty-five dollars and ninety-two cents, with interest from the 27th day of January, 1888, as stated in the complaint, or in any sum whatever.   2. That she admits that she did sign a note similar to the one mentioned in the complaint, and that she supposes that said note is correctly exhibited in the complaint, but she denies that said note represents any debt of hers, or that it is in any sense binding upon her. 3. That she alleges that the plaintiff herein had a claim or account against Mr. J. Benson Suber, of the county and State aforesaid, and urged her to give her note for, or assume the payment of, the said claim or account, at the same time, and as an inducement to her to accede to his request, promising her that she should pay the same when it suited her convenience, and at no other time, and distinctly promising her that she should not be pressed in the payment thereof; that under these promises she signed a note for said indebtedness of the said J. Benson Suber, the same being the note herein sued on; that if said note is to be held binding upon her, she demands that it be reformed by this court so as to conform to the real contract by her, if any legal contract she made with the plaintiff." In the fourth paragraph of the answer the defendant alleges: "That at the time of the signing of said note, and at the present time, she was, and is, a married woman," and had no legal capacity to make any contract such as that evidenced by said note.   In the fifth paragraph she alleges that she has been damaged to an amount stated, by the conduct of the plaintiff in inveighing her into the signing of the said note, and by failing to incorporate therein the terms and conditions upon which she so signed, and by his failing to observe said terms, for which amount she demands judgment against the plaintiff.

The plaintiff replied, denying the material allegations contained in defendant's answer, upon which she rests her defence.

At the trial, defendant's counsel stated "that the execution of the note being admitted," the defendant had the right to open and reply, and the court so ruled, to which exception was duly taken by plaintiff's counsel. The trial proceeded accordingly, and after a charge by the Circuit Judge, a copy of which should be inserted in the report of this case, the jury found a verdict for defendant, and the plaintiff appeals from the judgment entered thereon upon the following grounds, alleging error on the part of the Circuit Judge in his ruling and in his charge in the following particulars: 1. In that he held that the defendant had the right to open and reply in this action, and that the burden of proof was upon the defendant. 2. In that he charged the jury, that the mere declarations of the husband were not enough to establish agency for the wife in this action, and that the burden of proof was upon the plaintiff on this issue, and that plaintiff must establish the agency to the satisfaction of the jury. 3. In that he charged the jury, that even in the event that the supplies were advanced to the husband, and the defendant afterwards gave her note for them, the plaintiff could not recover on this note, as the statute of 1887 requires that it must be such an instrument as would affect the separate estate of a married woman, and a promissory note is not such an instrument; and even if it were, this note could not create a charge upon her separate estate, because the declarations required by the act is not contained in the note. 4. In that he refused or neglected to charge the request of the plaintiff, that the actions and conduct of the plaintiff (?) may go towards establishing the agency."

As to the first ground of appeal, it is clear that there is no ground for the alleged error there complained of. Since the case of *Addison* v. *Duncan*, 35 S. C., 165, where the previous cases were collected and reviewed, it must be regarded that the rule is well settled, that where the plaintiff's whole cause of action is admitted by the pleadings, and the defendant relies solely upon an affirmative defence, which, of course, he is bound to establish, the burden of proof is upon the defendant, and he is entitled to open and reply. As is there said: "The true test is, who would be entitled to the ver-

dict if the case is submitted to the jury simply upon the pleadings, without evidence being adduced by either side? If the plaintiff, then unquestionably the defendant, being the actor, would be entitled to open and reply." Applying this test to the case under consideration, it is clear that there was no error in the ruling complained of. The plaintiff here sought to recover damages for the breach of the contract evidenced by the note set out in the complaint, and all that it was necessary for him to show to entitle him to recovery, was the execution of said note by the defendant. But when the execution of the note was admitted in defendant's answer, there was nothing left for the plaintiff to prove, and hence if the case had been submitted to the jury upon the pleadings simply, without any evidence being adduced on either side, there can be no doubt that the plaintiff would have been entitled to the verdict; as the only fact, which it would otherwise have been necessary for him to prove, having been admitted by the pleadings, there was nothing left for him to prove, and under such admission he would unquestionably have been entitled to recover.

It is urged in the argument on behalf of the appellant, that the execution of the note was not, in fact, admitted by the answer; and to meet this view, we have been particular to set out the pleadings more fully than otherwise would have been deemed necessary. It seems to us impossible to read the answer without perceiving that the execution of the note was distinctly admitted more than once. In the second paragraph of the answer the language is: "That she admits that she did sign a note similar to the one mentioned in the complaint, and that she supposes that said note is correctly exhibited in the complaint." In the third paragraph the language is: "That under these promises she signed a note for said indebtedness of the said J. Benson Suber, *the same being the note herein sued on*" (italics ours). And in the fourth paragraph of the answer defendant says: "That at the time of the signing of said note," referring plainly to the note set out in the complaint, she was a married woman, &c. In the face of these repeated admissions contained in the answer, we are at a loss to conceive how it is possible to deny that the execution of the note was ad-

mitted in the pleadings. This case differs materially from the case of *McConnell* v. *Kitchens*, 20 S. C., 430, for there the action was based upon a written contract containing certain terms and stipulations, while the defendant in his answer, in effect, denied that the contract was properly described in the complaint, and, on the contrary, alleged that the contract really contained other terms and stipulations, as appeared by a copy thereof set out in the answer. Hence, it was very properly held, that the defendant, not having admitted in his answer plaintiff's cause of action, as set out in the complaint, was not entitled to open and reply. Here, however, the defendant in her answer did distinctly admit the execution of the note set out in the complaint, and hence she was entitled to open and reply.

The second and fourth grounds of appeal, both relating to alleged errors in the charge in respect to agency, may be considered together. It seems to us that when the Circuit Judge instructed the jury that it was competent for a husband to act as agent for his wife, and that it was for them to determine whether the evidence was sufficient to show that, in this case, the husband was acting as the agent of his wife in purchasing the supplies for which the note was given, the jury were properly instructed as to the law applicable to that view of the case; for it certainly needs neither argument nor authority to show that before one person can be made liable for a contract made by another, there must be satisfactory evidence that the person making the contract had the authority of the person sought to be charged to make such contract. In other words, there must be satisfactory evidence of agency. This evidence may be direct or circumstantial, and when the jury were told that they "must take all the testimony bearing upon this issue and answer the question," we do not see what more could be required.

As to the alleged refusal of the implied request to charge "that the actions and conduct of the husband may go towards establishing the agency," we think it is answered by several considerations. In the first place, the judge did not refuse to so charge the jury; on the contrary, his

reply was: "I have told them they must take all the testimony they have heard bearing upon the subject of agency and determine that question." In the second place, the testimony not being either set out or stated in the "Case," we have no means of ascertaining whether there was any testimony upon which such a request could have been based. But, in the third place, we do not think that such a request could properly have been granted in its unqualified form, and, therefore, under the well-settled rule that when requests are submitted, unless they are correct as submitted, they may be refused, there is no error in refusing such requests. *Gunter* v. *Graniteville Company*, 15 S. C., 443; *Columbian Insurance Company* v. *Lawrence*, 2 Peters, 25; *Indianapolis R. R. Co.* v. *Horst*, 93 U. S., 291. Now, if, as we shall presently see, mere declarations of the alleged agent are not competent to establish the agency, upon the same principle mere actions and conduct of the alleged agent would not be competent to establish agency. Hence, even if the Circuit Judge had flatly refused to charge in accordance with this implied request, which, however, we do not think he did, there would have been no error; for the mere actions and conduct of the husband, unless shown to have been known to and acquiesced in by the wife, would not be competent evidence of the agency. That "the mere declarations of the husband will not be enough to establish such agency," seems to us too plain for argument. It would be a very dangerous doctrine to establish, that one person could be made liable for a debt contracted by another, simply by the declarations of the person contracting the debt that he was acting as agent of the person sought to be charged. Indeed, we think that until there is some other evidence of the agency, such declarations are mere hearsay, and as such incompetent. See 1 Greenl. Evid., p. 158, note (b), and cases there cited. *Renneker* v. *Warren*, 17 S. C., 139.

It only remains to consider the third ground of appeal, which, as it seems to us, was taken under a misconception of the judge's charge. In the first part of the charge the jury were fully and properly instructed as to the law applicable to the case outside of the act of 1887, in terms to which no exception was or could be taken. But as the note sued on was

executed after the passage of that act, it became necessary to construe that act in order to ascertain whether the defendant would be liable, even though the jury should come to the conclusion that the supplies, which constituted the consideration of the note, were furnished to the husband and not to the wife. It is very manifest that the jury must have reached the conclusion that the supplies were furnished to the husband and not to the wife, for otherwise their verdict, under the first part of the charge, would necessarily have been in favor of the plaintiff. So that this ground of appeal raises only the question whether the Circuit Judge put the proper construction upon the act of 1887. The first section of that act (the only one pertinent to this controversy) reads as follows: "All conveyances. mortgages, and like formal instruments of writing, affecting her separate estate, executed by a married woman, shall be effectual to convey or charge her separate estate whenever the intention so to convey or charge such separate estate is declared in such conveyances, mortgages, or other instruments of writing." As was held in *Scottish &c. Company* v. *Mixson*, 38 S. C., 432, the manifest object of that act was to effect a radical change in the previous law, not only by substituting a question of intention for a question of power, but declaring how such intention should be manifested. Hence, whenever a question as to the liability of a married woman on any of the classes of written instruments referred to in the act is presented, the question is no longer a question whether the married woman had the power to make such instrument, but the sole inquiry is whether she has declared her intention, in the instrument, to charge her separate estate.

It will be observed that the act does not cover *all* instruments in writing, but only "conveyances, mortgages, and like formal instruments of writing" affecting the separate estate of the married woman. Hence, unless the instrument in writing in a given case falls within one or the other of the classes mentioned, the act will not apply. So that the first inquiry here is whether a mere promissory note falls within either of the classes mentioned. We agree with the Circuit Judge that it does not, for the reason that it is not a "like formal instrument

in writing" to either of the classes specifically mentioned—conveyances or mortgages—which necessarily imply a transfer of, or a charge upon, the separate estate of the married woman. This is not only implied from the essential nature of the instruments specified, but also from the subsequent words in the statute, "shall be effectual to convey *or charge her separate estate.*" Now it is very clear that a simple promissory note has none of the elements of a conveyance, and it seems to us equally clear that a note cannot properly be said to be *a charge* upon any estate. But even if we are in error in this latter respect, a note is certainly not an instrument affecting the separate estate of the married woman.

But without resting our decision upon this point, it is sufficient for us to say that the absence of any declaration of intention on the part of the maker of the note, in the note upon which the action was based, was abundantly sufficient to take the case out of the operation of the statute. For this court has held, in the case of *Reid* v. *Stevens*, 38 S. C., 519, that even in the case of a formal mortgage of real estate, which does not contain the declaration of intention provided for by the act of 1887, the married woman will not be bound unless it appears that the contract which the mortgage was given to secure, was a contract as to her separate estate.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

----

TOMPKINS v. TOMPKINS.

1. TRIAL—ABSENCE OF COUNSEL.—On call of a cause on docket, the presiding judge refused to confirm a report on sales, set aside the sale, and ordered a resale and distribution in accordance with the terms of the prior decree for sale. *Held*, that there was no error in so ordering without notice to the party who had given notice of his opposition to the approval of the sale.[1]

2. ADMINISTRATIVE ORDERS—RECORD.—A party at whose instance a sale was set aside, and a resale directed by order passed in open court, cannot ob-

----

[1] See Nobles *v.* Hogg, (6), 36 S. C., 329.

44—39

ject because that others in interest were not represented, or the necessity for a sale shown, especially where the "Case" fails to disclose any facts which would support these objections.

3. JUDICIAL SALE—TIME OF SALE—RESALE.—The rule that charges a purchaser at a judicial sale with the duty of ascertaining that the court which orders the sale has jurisdiction, imposes upon the purchaser the duty of seeing that the officer sells under the authority of such order. Where a master, being authorized to sell only on a day named, advertised for sale on such day, and then withdrew the land from sale and readvertised and sold on a subsequent salesday, without order of the court or consent of all parties in interest, there was no error in setting the sale aside and directing a resale.[1]

4. IBID.—PURCHASER—SUBROGATION.—But the money paid at such unauthorized sale having been in large part appropriated to the payment of charges resting on such land, the purchaser should be protected at the resale. And this court ordered that such resale should not be had unless a greater bid was made, and if sold, that the first purchaser should be repaid what he had paid in, and that his deed, bond, and mortgage be cancelled.

Before IZLAR, J., Edgefield, March, 1892.

The appeal in this case was from the following decretal order:

This is a motion, upon due notice by the defendants, to set aside a sale of certain real estate made by the master, under an order passed in the same cause on the 11th day of March, 1891, upon the following grounds: 1. That the order obtained at the March term, 1891, was passed without notice to the plaintiffs or defendants, or any of them. 2. That all the parties interested in said land were not parties to this suit in March, 1891, and are not now parties herein. 3. That the order passed at March term, 1891, was in all respects regular and properly passed. It authorized the master to sell only "on salesday in November, 1891," and on no other day, or at any other time, and the sale reported as having been made on the 3d day of January, 1892, was a surprise to, and a fraud upon, the parties in interest, without authority, and void. The motion was heard by me at the March, 1892, term of the Court of Common Pleas for said county.

The facts necessary to a full understanding of this question raised and to be determined are briefly as follows: * * *

---

[1] See note j in 21 L. R. A., p. 44.

In the view I take of the case presented, I do not think it necessary to discuss fully the first and second grounds set forth in the motion papers. It may be proper to say, however, that I do not think these grounds can avail the moving parties. The order of the 11th day of March, 1891, was made in open court; and ordinarily all parties interested would be charged with notice thereof, and if certain necessary parties were not before the court at that time, their rights are not affected thereby. The third ground, however, presents a serious question. It is clearly competent for the court, in the absence of any statutory regulation, to prescribe the mode and terms of sale, fix the time of sale, and these requirements must be conformed to by the master or other persons conducting the sale; the conduct of the person conducting the sale is subject to the scrutiny of the court. Confirmation is the judicial sanction of the court, and in all cases of this nature, the court being the vendor, it may in its discretion give or withhold its consent. Any mistake or misunderstanding between persons conducting the sale and intended bidders, or parties in interest, any accident, fraud, or other circumstances by which interests are prejudiced, without fault of the injured party or parties, or by reason whereof property is sold at an under price considerably disproportioned to the real value, will be deemed sufficient cause for refusing confirmation and for ordering a resale, and so generally whatsoever, and even less, that is sufficient to set a sale aside after its confirmation, will, of course, upon the same principle, if known, cause a confirmation to be denied. Rorer on Judicial Sales, sec. 129.

The powers of the master are precisely what the decretal order of the court confers. *Young* v. *Teague,* Bail. Eq., 22. The terms of the decretal order become the law of the case, the condition on which the authority is to be exercised. *Baily* v. *Baily,* 9 Rich. Eq., 395. If the official fails to comply with the terms of the order in making the sale, such sale is without authority, and, therefore, void. *Baily* v. *Baily, supra; Ex parte Alexander,* 35 S. C., 409. Now, in *Baily* v. *Baily, supra,* it is held that where a commissioner sells land without having advertised the sale for the time prescribed in the order of sale,

the sale is invalid, and will be set aside. At this time there is no statute regulating the time for the advertisement of sales made under the order of the court. Therefore, the rule may be different now as to the length of time lands shall be advertised before sales, by reason that we have no statutes regulating the time when, or the month in which, sales of land ordered by the court shall be made.

Such being the case, I take it that the court may fix the time in the decretal order of sale; and when this is done, it becomes one of the conditions on which the authority of the master, or the person making the sale, is to be exercised; and if such officer fails to comply in this respect with the terms of the order in making the sale, such sale is without authority, and, therefore, void. It often becomes a serious question at what time a sale of land should be made; and frequently the court is called upon to exercise a sound judicial discretion in fixing the time of sale so as to prevent a sacrifice of the property and an impairment of the rights and interest of the parties. If the time fixed by the decretal order for sale can be disregarded by the master, then the object which the court had in view may be wholly defeated. To allow the master to modify the terms of the decretal order of sale in this particular at his discretion, would be dangerous to the rights and interests of the parties interested in such sales. If the master can, in his discretion, when the time of sale is fixed to take place on salesday in a certain month, disregard this specific condition, and sell upon some subsequent salesday thereafter, what is then to prevent him selling on some salesday previous to that named in the order?

In my opinion, the master has no such discretion. If the decretal order specifies that the sale is to be made on a certain salesday, this becomes one of the conditions on which the authority of the master is to be exercised, and if he fails to sell on that day, his authority is at an end, and his power to make the sale is gone; he must await the further order and discretion of the court. If, in the exercise of his discretion, he proceeds to sell upon some salesday previous or subsequent to that named in the order, such sale will be invalid for want of authority to make it. Here the decretal order fixed the time for

the sale on the salesday in November, 1891. No authority is given the master to sell at any other time. Without any further order or direction from the court, he sold on the salesday in January, 1892. This was certainly a surprise to the parties here complaining, even if bound by and charged with notice of the order of March 11th, 1891.

Immediately upon receiving information that the sale had been made, the master was notified not to consummate the sale, as its confirmation would be resisted. Notwithstanding this notice, the master, after having led the parties to believe that he would not complete the sale, but would report the facts and circumstances to the court and ask its direction, proceeded to complete the sale by receiving the cash portion of the purchase money, taking the bond and mortgage of the purchaser for the credit portion, and executing and delivering titles to the purchaser. This conduct on the part of the master, under the circumstances, is, to say the least, not commendable; he should have submitted the matter for the judgment of the court. I am not prepared to say that the premises would not have brought a larger price than the bid by W. R. Parks; I am rather inclined, however, to think that they would, as doubtless there would have been more and greater competition. This was, in a measure at least, prevented by the master's selling at an unauthorized time.

It is, therefore, ordered, that the motion to confirm the master's report of sales, bearing date the 4th day of March, 1892, be, and the same is hereby, refused ; that the sale of the "homestead tract," made by the master on the salesday in January, 1892, be set aside, and that the master of Edgefield County do resell the said "homestead tract," at Edgefield C. H., at public auction, on the salesday in November next, or some convenient salesday thereafter, after due and legal advertisement, upon the same terms as to cash, credit, and security, as directed in the previous order for sale thereof. Further ordered, that said master do pay out the proceeds arising from such sale as directed in the previous order for sale of the homestead tract, and retain the surplus until further order of the court.

*Mr. S. S. Tompkins,* for himself.

*Messrs. Sheppard Bros.,* contra.

November 4, 1893.   The opinion of the court was delivered by

MR. JUSTICE POPE.   It seems that in 1877 the plaintiffs, J. G. Tompkins and others, exhibited their complaint on the equity side of the Court of Common Pleas for Edgefield County against S. S. Tompkins and J. W. Tompkins, as executors of the last will of James Tompkins, deceased, and J. L. Tompkins and F. A. Tompkins, as defendants, wherein in general terms it may be stated that the object was to withdraw from said executors the further control of the estate of their testator, that their accounts as such executors might be stated, &c. Creditors of the testator were called in.   Decree was made and carried on appeal to the Supreme Court.   A portion of the real estate of testator was sold under the order of the court, but a tract of over 1,000 acres, known as the "homestead tract," was reserved from sale.   The cause remained on the calendar of the Court of Common Pleas for Edgefield County down to the present time.   At the March term, 1891, of said court, Judge Hudson passed an order directing the sale by the master of this "homestead tract" of land on the first Monday in November, 1891.   No appeal was taken from this order.

The master advertised the sale to take place on first Monday in November, 1891, but at the suggestion of one of the counsel interested in the cause, such master, without any direction from the court, withdrew the land from sale, but readvertised the land for sale on the first Monday of January, 1892, again acting without any authority from the court.   He sold the land to W. R. Parks at the price of $3,250, said purchaser complying with his bid by paying one-half of the purchase money in cash, but before deed was executed by the master or a bond and mortgage by the purchaser, notice from S. S. Tompkins was given to such master and the purchaser Parks that he objected to such sale.   Nevertheless, after such notice, the master executed a deed to the purchaser, and the purchaser gave his bond, secured by mortgage.   Thereafter a motion was

made at the March term, 1892, before his honor, Judge Izlar, to refuse to confirm the sale. This motion was made on numerous affidavits. Judge Izlar made an order setting aside the sale, and directing the master to resell the said premises on the first Monday of November, 1893, in accordance with the terms of Judge Hudson's decretal order of March 7th, 1891, and pay out the proceeds of such sale as directed in Judge Hudson's order.

From this order of Judge Izlar two separate appeals are taken, one on behalf of S. S. Tompkins, and one by W. R. Parks for himself. The grounds of Mr. Tompkins' appeal are: 1. That said order was made without any motion therefor, and without notice to this defendant, or opportunity of arguing the same.[1] 2. That said order was made without having the necessary parties before the court, the legal representatives of appellant's deceased co-defendants, J. W. Tompkins, James L. Tompkins, and F. A. Tompkins, who represent in the aggregate one half interest in said land, they never having been made parties to this suit. 3. That his honor erred in ordering any further sale of testator's land until the proceeds of former sales had been accounted for and applied, and the exact amount of each subsisting claim ascertained, and the parties in interest given the opportunity of settling the same without selling the ashes of their ancestors. 4. That his honor erred in ordering any part of the proceeds of sale to be paid to Messrs. Gary & Evans, their said claim being an individual liability of appellant's co-defendant, J. W. Tompkins, if it was ever a claim against the estate, being barred by the terms of the order of this court calling in the creditors of said estate, as directed by the Supreme Court.

W. R. Parks presented the following grounds of appeal: 1. Because, as matter of law, his honor erred in refusing to confirm the master's report of sale herein. 2. Because his honor erred in setting aside the sale of the "homestead tract," made by the master on salesday in January, 1892. 3. Because, if

[1] This ground was probably intended to be aimed at Judge Hudson's decree. (See grounds of motion as stated in Judge Izlar's decree.) But it is alleged as a ground of appeal from Judge Izlar's decretal order, and this court so considered it.—REPORTER.

his honor did not err in ordering the "homestead tract" to be resold, he erred in refusing to provide for the return by the master to W. R. Parks of the amount paid by him to the master for the purchase money of said tract.

We will first consider and dispose of the appeal of Mr. Tompkins. We cannot see any virtue in his first ground. Judge Izlar was asked at the regular term of court in March, 1892, at Edgefield, by this appellant to protect him against what he conceived was an invasion of his rights by the master, by a disregard of the terms of the decretal order of Judge Hudson, wherein a tract of land known as the "homestead tract" was required to be sold. When Judge Izlar viewed the terms of such order, and compared the terms of sale adopted by the master, he saw there was, what he conceived to be, a fatal variance. To provide a relief to the plaintiff, he tried by his order to place all the parties as they were under the order of Judge Hudson. It would be difficult to conceive what other course the Circuit Judge could have adopted during term time.

The reformation or change in the administrative part of Judge Hudson's decretal order was all that was done by Judge Izlar, independent of setting the sale aside. This act of Judge Izlar forms no part of an order on the merits. We fail to perceive any injury to this appellant. Besides, there is nothing in the case which informs this court that a decree was not made in this cause when all the parties were alive and allowed to speak for themselves. The previous sale of two thousand acres of land furnishes strong evidence of this. The third ground of appeal seems fanciful. There is nothing to show us that all due regard had not been paid to the rights of all the parties to this controversy in the action of the court below. It certainly had remained on the calendar of the court in Edgefield sufficiently long to enable any amount of scrutiny into the claims of creditors. Besides, this court cannot be called upon to assume the existence of errors in the court below. They must be made to appear by the "Case," and here there is a woful silence in every important particular. The fourth ground of appeal is disposed of by the views we have expressed

in disposing of the first ground of appeal. These four grounds of appeal must be dismissed.

It remains now to consider the complaint of W. R. Parks. 1. Was it error in the Circuit Judge to refuse to confirm the sale made by the master to Parks? Let us consider this matter seriously, for it involves the decision of a question of practice that is of moment to purchasers at judicial sales. We should be slow in adopting any views that would create doubt in the minds of would-be purchasers at such sales. It is of the utmost importance that such sales should be regulated by such wholesome rules, the effect of which will cause the property thus exposed to sale to command its full value, by obtaining bidders to agree to purchase at such figures as represent that full value; and technical difficulties, growing out of such a sale, ought not only to be discouraged, but when made, speedily disapproved of. The court of last resort in this State has repeated the rule to be, that purchasers are only to be concerned with the facts, that the court that orders the sale has jurisdiction, and that all the parties essential to the cause have been made parties. This rule seems to us to include the idea of an order for sale, and imports that purchasers should be bound to observe the terms of the order for the sale. The courts of this State are interdicted from "opening the bids," as it is called. But it has been held that where a sale has been made under a decree of the Court of Equity in this State, and there has been a failure by the master to observe the terms of such decree, the court will refuse to confirm such sale. *Baily* v. *Baily*, 9 Rich. Eq., 392. Chancellor Dargan, as the organ of the court in that case, said: "But where the court has made an order of sale, of which a notice is to be given by advertisement for a given time, such direction, *as well as the other terms* [italics ours], become the law of the case. It becomes the condition on which the authority is to be exercised, the non-performance of which will destroy the power." Again he says: "The decree investing the commissioner with power to sell is held sufficient, *if he conforms to the conditions of his authority.*"

The Circuit Judge elaborates this view in his decretal order

that will accompany the report of this case.    We concur in the views expressed by him.    We suppose it is scarcely necessary that we should say, in announcing this conclusion, that no reflection is intended to be made upon the worthy gentleman who was master and made this sale.    His motives were praiseworthy, but he was guilty of an error.    It may be stated, in passing, that great caution should be observed by officers charged with the duty of making sales under decrees of courts.    We will not say that they are never justified in failing to sell on the day named in a decree, without the authority of an order of court for that purpose.    It is decidedly the safest and best course, however, to obtain such order.    But for an officer, who has failed to get such an order, of his own motion to fix a new day for such sale, cannot be sanctioned.    It is true, if all parties in interest had consented to this course, and the court had thereafter sanctioned it by the passage of an order, the error would have been cured.    This ground of appeal is overruled.    And for the same reason the second ground of appeal is dismissed.

The third ground of appeal seems to us to be meritorious. In this case everybody concerned acquiesces in the sale except S. S. Tompkins.    The purchaser has paid into court $1,625 of his money, a large part of which has been appropriated to the purposes of the action under the decree of court.    Now, if there is one thing over others in our system of jurisprudence that merits the commendation of all, it must be the flexibility of the principles adopted by Courts of Equity, by which they are made to subserve the needs of each particular case.    Ought not those principles to be applied here?    It seems so to us.    Under our law, William R. Parks, by being a successful bidder at the sale provided for by a decree in this cause, has, to a certain extent, become a party to this action.    His money has been paid into court and used for the purpose of the action, under an honest mistake, it is true. Only one party to the action seeks any relief against him.    The Circuit Judge orders a new sale, without any provision being made for his (Parks) protection.    This is error, and must be rectified.

After much reflection, we have concluded that a decretal

order should be made on Circuit, whereby the master should be directed to sell the "homestead tract" of land, here in dispute, after twenty-one days public advertisement, for one-half of the purchase money to be paid in cash and the balance on a credit of twelve months, the credit portion to be secured by bond of the purchaser and a mortgage of the lands by the purchaser, but that such sale shall, in the advertisement and in its conduct, provide that no bid will be received of less than $3,250; and that if no more than $3,250 is bid at such sale, then the purchase by Parks shall be confirmed; but if more than $3,250 is bid, that then the sale to Parks shall be annulled, his deed from the master for the premises shall be cancelled and delivered up by him, and that he shall be paid the sum of $1,625 in cash, and have his bond and mortgage cancelled by the master and delivered to him (Parks).

It is the judgment of this court, that the judgment of the Circuit Court be modified as herein required, and that the cause be remanded to the Circuit Court, without any delay of the *remittitur* going down, for the purpose of having the Circuit Court prepare the decree in accordance with the directions of this court.

# NOTES OF CAUSES

### Decided During the Period comprised in This Volume and not Reported in Full.

No. 3173. BUERHAUS *v.* DESAUSSURE, April Term, 1893. The appellants in this case gave their notice of appeal on December 23, 1892, and served their exceptions on January 21, 1893. Meantime the following agreement was signed by all the attorneys in the cause: "Charleston, S. C., January 9, 1893. We, the undersigned, the counsel in the above cause, in consequence of the voluminous papers necessary to prepare the appeal to the Supreme Court in this case, hereby agree to have the time for preparation and serving of such appeal extended until February 12, 1893." By written agreement, the time was still further extended until March 10, 1893. On April 7, 1893, the printed case was served on the attorneys for respondents, and a certified copy thereof sent to the clerk of the Supreme Court, with a request to docket. On this same day (April 7), the respondents, conceiving that the agreement made did not dispense with the necessity of filing a return within forty days after the service of the exceptions, made affidavits of the dates of the service of notice of appeal and exceptions; and it appearing to the clerk that more than forty days had since expired and that no return had been filed, he dismissed the appeals, under Rules 1 and 2 of this court. The certified case sent up from Charleston on April 7, was not received by the clerk until April 12.

The two motions stated in the order of this court were afterwards noticed and made; and after argument by *H. A. DeSaussure* and *Mitchell & Smith*, for appellants, and by *John F. Ficken, J. E. Burke,* and *R. G. O'Neale,* for defendants, the following order was passed April 28, 1893,

PER CURIAM. In this case it appears that three appeals were taken, one by the said Martha G. DeSaussure, one by Julia

Jugnot, and the third by G. M. Trenholm, as administrator *de bonis non, cum testamento annexo,* of Elodie C. Downey, and that all of these appeals have been dismissed by the clerk of this court for default in filing the "return," as required by Rules 1 and 2 of this court.   The motions now made are to reinstate the said appeals, upon the ground, that under the construction given by appellants' counsel to a written agreement entered into by all the counsel in the cause, the appellants were entitled to a longer time than that required by the Rules within which to file their return, and that the "Case," which they regarded as an "Agreed Case," was forwarded by express to the clerk of this court within the time prescribed, but owing to the default of the carrier in delivering the package, it was not received by the clerk until after he had granted the orders dismissing the appeals.   The appellants, also, ask that if the court shall hold that they have erred in their construction of the written agreement above referred to, and are in default in failing to file the return within the prescribed time, they may be relieved from the consequences of such default under the provisions of section 349 of the Code, upon the ground that their default (if there was any) was due to their mistake and inadvertence.

Without going into any detailed consideration of the voluminous papers which have been submitted to us, it does seem to us that the phraseology of the written agreement between the counsel might have led appellants' counsel into the belief that the agreement was not merely for an extension of time *to prepare and serve the Case,* but also comprehended an extension of time for taking any of the steps necessary to the preparation of the appeal, for the language of the first and second agreement is, "to extend the time *for preparation* and service of such appeal," and as the filing of the return was one of the necessary steps to be taken in *the preparation* of the appeal, we can well understand how counsel might have supposed that the time for filing the return was extended, as well as the time for preparing and serving the "Case."   But without resting our conclusion exclusively upon that view, we are entirely satisfied, from a careful examination of all the papers, that even if there was default in filing the return within the prescribed time, such

default was due solely to the mistake or inadvertence of counsel, and not to any inexcusable neglect, or for the purpose of delay, on the part of counsel. This, therefore, is just such a case as entitles the appellants to relief under section 349 of the Code, which provides, that: "When any party shall omit, through mistake or inadvertence, to do any act or acts necessary to perfect an appeal, * * * the Supreme Court may, in their discretion, permit such act or acts to be done at any time to perfect the appeal," &c. While, therefore, we think that the clerk was right in dismissing these appeals, upon the showing made before him, yet, under the showing now made, we think that appellants are entitled to have their appeals reinstated.

An alternative motion has been submitted by respondents, in the event the motion to reinstate the appeals is granted, to recommit the "Case" to the Circuit Court for the purpose of adding to or taking from the "Case" such parts of the record as counsel may agree upon, or as may be ordered by the Circuit Judge, who tried the cause within forty days from the order of recommital, upon motion of any party to the cause upon four days notice to all of the other parties or their counsel. This motion having been assented to by the counsel, and a stipulation in writing to that effect having been filed with the record here, the motion will, of course, be granted.

It is, therefore, ordered, that the several appeals above referred to be reinstated, and the cause be docketed for hearing at the next term of this court. It is further ordered, that the "Case" be recommitted for resettlement in accordance with the stipulation of counsel as above stated.

No. 3174. GEDDES v. HUTCHINSON, April Term, 1893. The several motions made in this case are stated in the order of this court. W. St. J. Jervey, for appellants, T. M. Mordecai and A. M. Lee, for respondents, cited Sullivan v. Thomas, 3 S. C., 548; Pregnall v. Miller, 26 S. C., 612; Gardner v. Mays, Ibid., 613; Dial v. Dial, 33 S. C., 607; Lombard v. Brown, Ibid., 598; Donaghue v. Enterprise R. R. Co., Ibid., 608; Bomar v. Means, 35 S. C., 591; Chisolm v. Providence Company, Ibid., 599.

April 29, 1893. The following order was passed

PER CURIAM.  This is a motion to reinstate an appeal which has been dismissed by the clerk of this court for failure to file the return as required by Rules 1 and 2 of this court.   After a very careful consideration of the various and voluminous papers which were presented at the hearing of this motion, we have reached the conclution to grant the motion, for the reasons which will be very briefly stated, as we do not think it would serve any useful purpose to enter upon any detailed consideration of the various facts appearing in the voluminous record presented, or to undertake to settle disputed questions of fact between counsel, about which honest differences of opinion might well have arisen.

We do not think the "Case" as printed, incorporating the amendments proposed by respondents, can in any proper sense be regarded as an "Agreed Case," and is not, therefore, a substitute for the return ; for the very fact that the amendments proposed were served on appellants' counsel in due time after the service of the proposed "Case," and afterwards a notice served of an application to the Circuit Judge to settle the "Case," shows that the parties had not then agreed upon the "Case ;" and the fact that afterwards the appellants accepted the proposed amendments, manifestly not for the reason that they agreed to such amendments but for other reasons, which it is needless to state here, could not convert the proposed "Case" into an "Agreed Case," which would serve as a substitute for the return.   Hence we do not think that there was any error on the part of the clerk in dismissing the appeal, upon the showing made before him.   But we are satisfied from a review of the whole proceedings that the appellants' counsel were misled (unintentionally, of course,) by the correspondence between counsel into the belief that time would not be insisted on in taking any of the steps necessary to the perfection of the appeal.   This, therefore, is a very proper case for this court, under the provisions of section 349 of the Code, to extend relief to the appellants.   It will be observed that this case differs from the authorities cited by respondents' counsel to show that relief under that section of the Code should be applied for before the motion to dismiss the appeal had been

granted, for those cases apply to motions to dismiss appeals granted *by this court*, and cannot apply where the motion to dismiss the appeal has been granted *by the clerk*, who has no jurisdiction to grant relief under section 349 of the Code. In this case the motion for relief under that section was made to this court at the earliest time practicable.

An alternative motion has been submitted by respondents, that in the event the motion just considered should be granted, then that the appeal be dismissed, or rather declared abandoned, for failure to comply with Rule 49 of the Circuit Court, requiring a copy of the "Case" to be filed in the office of the clerk of the Circuit Court within ten days after the same has been settled. This motion, as it seems to us, must be refused, upon the same ground that the motion first considered is granted. For, as we have said above, we think that the showing made is sufficient to entitle the appellants to relief from this default as well as the other, under the provisions of section 349 of the Code.

It is, therefore, ordered, that the motion to reinstate the appeal be granted, and that the case be docketed for hearing at the next term of this court; provided, the appellants will file the return required by Rules 1 and 2 of this court within forty days from the date of this order.

An informal application has been made by appellants' counsel for leave to withdraw the points and authorities heretofore filed by them. We do not see that any sufficient reason has been shown for granting such application, and it must, therefore, be refused. Of course, this will not preclude any of the counsel engaged in the cause from filing any additional argument or points and authorities, if they so desire, within the time prescribed by the rules of this court.

No. 3175. UNION MORTGAGE &C. COMPANY *v.* BROWN, April Term, 1893. On the call of this cause for a hearing, it was brought to the attention of the court that appellant's Points and Authorities had not been on file with the clerk of this court for the three preceding days, as required by Rule 8; and on this ground a motion was made, under Rule 11, to dismiss the appeal. Motion granted PER CURIAM, May 3, 1893. *J. J. Brown*

and *L. T. Izlar*, for appellant. *John T. Sloan, jr.*, and *A. J. Green*, for respondents.

No. 3176. STATE *v.* SALTERS, April Term, 1893. On the call of this cause for a hearing, no one appeared for the defendant, appellant. Whereupon, on motion of Mr. Solicitor Wilson, for the State, the appeal was declared abandoned for want of prosecution. Order PER CURIAM, May 4, 1893.

No. 3177. STATE *v.* KEELS, April Term, 1893. On May 4, 1893, Mr. Solicitor Wilson made affidavit that notice of appeal was served upon him on October 8, 1892, that the Case for Appeal was agreed upon on January 10, 1893, and that no return had yet been filed, attaching to his affidavit a certificate from the clerk of this court that no return had been filed. An order was thereupon obtained from the Chief Justice, dismissing the appeal for want of prosecution. And thereafter the *remittitur* was sent down.

No. 3205. SAME *v.* SAME, April Term, 1893. This was a motion by defendant to recall the *remittitur* and reinstate the appeal. On behalf of appellant, it was shown that counsel for appellant left the further preparation of the appeal record to the defendant himself (who was an attorney at law), and that the delay had resulted from defendant's sickness. But affidavits contra fully fixed the date of this sickness as subsequent to defendant's return from Florida after the middle of April. *J. D. Kennedy*, for the motion. *Wilson*, solicitor, contra.

June 30, 1893. The following order was passed

PER CURIAM. This is a motion to recall the *remittitur* heretofore sent down from this court to the Circuit Court, whereby the judgment of this court, dismissing the appeal in this case, was remitted to the Circuit Court. The ground upon which this motion is based is excusable delay in perfecting this appeal. In order to justify this court in exercising the unusual power of recalling the *remittitur* after it has been sent down, a very strong showing would be required that the *remittitur* was sent down through some mistake or inadvertence on the part of this

45—39

court or its officer, and there is no pretense of any such showing in this case. It is not enough to show that the default of the appellant in perfecting his appeal was due to some excusable neglect; for the proper time to make such a showing would be when the motion to dismiss the appeal was made, or at least before the *remittitur* was sent down. We may add, however, that after a careful examination of the affidavits and counter-affidavits submitted at the hearing of this motion, we do not think that the showing would have been sufficient to justify this court in reinstating the appeal, even if the motion had been made at the proper time. Besides, it is more than questionable whether this court has the power to recall the *remittitur* after it has been sent down to the Circuit Court, *and acted upon by that court*, which, as we are informed on the argument here, was the fact in this case. But as that point does not necessarily arise in this case, we are not to be regarded as definitely decid· ing it now. The motion to recall the *remittitur* and to reinstate the appeal is, therefore, refused.

No. 3186. Ex Parte Thomas, April Term, 1893. This was an order, in *habeas corpus* proceedings, admitting Capers Thomas, charged with murder, to bail in the sum of $1,000, with not less than two nor more than five sureties, the recognizance to be approved by the clerk of the Court of General Sessions for Edgefield County. Dated May 19, 1893.

No. 3191. State *v.* Wilson, April Term, 1893. This was a consent order dismissing an appeal, and directing the *remittitur* to issue forthwith. Dated May 23, 1893.

No. 3192. Trimmier *v.* Thomson, April Term, 1893. The appellant filed his Points and Authorities on May 22, 1893, and on the next day, May 23, the cause was called on the docket for a hearing. Thereupon, on motion of *R. K. Carson*, attorney for respondent (*W. W. Thomson*, attorney for appellant), an order was passed PER CURIAM dismissing the appeal.

No. 3206. Same *v.* Same, April Term, 1893. A motion having been made in this case to reinstate this appeal dismissed, as above, June 30, 1893, the following order was passed

PER CURIAM. This is a motion to reinstate an appeal heretofore dismissed by this court for failure to comply with Rule 8. The ground upon which the motion is based is excusable neglect. We do not think that the affidavits submitted are sufficient to show that the default upon the part of the appellant to comply with the Rules of this court was excusable.

Rules of court are designed to secure the orderly and *prompt* dispatch of business, and it is very important that these Rules should be observed. At all events, when parties invoke the protection of these Rules, in order to prevent delays in the adjudication of their rights, this court is bound to accord them that protection.

The motion to reinstate the appeal, must, therefore, be refused.

No. 3210. HENDERSON *v.* WENDLER, April Term, 1893. Plaintiff sued defendants, man and wife, for trespass in entering upon land of Mrs. Wendler, which had been leased for the year to plaintiff, and in plowing up this land after it had been planted by plaintiff. It appeared from the testimony, that Wendler plowed up the land, while his wife walked behind him with a gun in her hand. The trial justice gave judgment against both defendants for $25, holding that Mrs. Wendler "acted with her own free will, and not under compulsion of her husband." On appeal to the Circuit Court, JUDGE ALDRICH sustained the trial justice, and defendants appealed to this court.

*R. K. Carson,* for appellant. *Stanyarne Wilson,* contra.

July 19, 1893. The opinion of the court was delivered by MR. JUSTICE McGOWAN, who, after a statement of the case, ruled as follows:

This was an action at law for damages, and, therefore, the judgment of the trial justice without a jury must stand as a special verdict upon the facts of the case, which this court has no right to review or reverse. See *Nichols* v. *Railroad Co.*, 23 S. C., 604.

Exception 1 charges error on the part of the Circuit Judge, in not holding that the trial justice erred in refusing to allow Adam Wendler to testify as to the contents of a letter he

2 (Wendler) sent to Henderson. It seems that during the controversy about the field which the plaintiff was to cultivate, Wendler wrote a letter to Henderson, and sent it by his little daughter. The family of Henderson would not receive the letter, and it was destroyed. There was proof that Henderson never saw the letter, or knew its contents. We are not aware of any principle which required the trial justice to allow Wendler to prove the contents of a letter written by himself to Henderson, but which was never delivered to him, or its contents known to him.

Exception 2 complains of error in not holding that the trial justice erred in allowing William Henderson to testify as to conduct, conversation, and demand made by Mrs. 3 Wendler for the house after suit was brought. The right of Henderson to occupy "the house" was a part of the original contract; and we think that evidence as to the conduct and conversation of Mrs. Wendler, when she demanded possession of the house, after action brought, was admissible. "Whenever the injury is in its nature continuous, and continued after action brought, there can be no question that the party injured is entitled to recover for all damages up to trial." See *Puckett* v. *Smith*, 5 Strob., 26, and authorities there cited.

Exceptions 3, 4, 5, and 6 make the point that a married woman cannot be made liable for a tort committed in the presence of her husband, without proof showing that she 4 acted voluntarily and wilfully. The doctrine upon the subject of the liability of the husband for the tort of the wife committed in his presence is truly stated in the case of *State* v. *Houston*, 29 S. C., 112, as follows: "In the case of *State* v. *Parkerson*, 1 Strob., 170, Judge Withers, in delivering the opinion of the court, said : 'It is a mistake to affirm that a wife may not be indicted, convicted, and punished in conjunction with her husband. While it is true that if she committed a bare theft, or even a burglary, by the coercion of her husband, she will not suffer punishment; and while it is also laid down that coercion is to be presumed from his presence, still it is quite clear that this is only one of those presumptions or inferences classed as *prima facie* that may be rebutted by tes-

timony, and hence presents a question for the jury,' etc. From this it appears that in this State the question of coercion is an open one," etc.

The doctrine has been laid down more fully in volume 9, p. 824, Amer. & Eng. Enc. Law, as follows: "(1) If the tort is committed in the presence of the husband, and nothing more appears, it is his sole tort, as the wife is considered to have acted under his coercion; (2) If the tort is committed in his presence, but she appears to have acted deliberately and freely, it is their joint tort; (3) If the tort is committed in his presence and against his will, it is her tort, and he is liable with her; (4) If the tort is committed out of his presence, but by his direction, she is jointly liable with him; (5) If the tort is committed out of his presence, and without his knowledge or consent, he is liable with her."

In this case the trial justice found as a fact that Mrs. Wendler "acted with her own free will and accord," and not under compulsion of her husband. That places the case in the second category above stated, when the tort is committed in the presence of her husband, but the wife appears to have acted "deliberately and freely." The land belonged to her; she was active in the business; and we concur with the trial justice and Circuit Judge, that she did not act under the compulsion of her husband, but "deliberately and freely."

Judgment affirmed.

